# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ACK FOR WHALES, INC., a Massachusetts non-profit corporation, P.O. Box 3057, Nantucket, MA 02584; VALLORIE OLIVER, a resident of Massachusetts, 3B Newtown Road, Nantucket, MA 02554; AMY DISIBIO, a resident of Massachusetts, 4 Masaquet Avenue, Nantucket, MA 02554; VERONICA BONNET, a resident of Massachusetts, 15 Shimmo Pond Road, Nantucket, MA 02554; DOUGLAS LINDLEY, a resident of Massachusetts, P.O. Box 2394, Nantucket, MA 02584; STEVEN KOHLER AND SHARYL KOHLER, residents of Massachusetts, PO Box 2754, Nantucket, MA 02584; DANNY PRONK, a resident of Massachusetts, 40 Vesper Lane, Nantucket, MA 02554; WILLIAM VANDERHOOP, a resident of Massachusetts, P.O. Box 83, 12 Old South Road, Aquinnah, MA 02535; GREEN OCEANS, a Rhode Island non-profit corporation, P.O. Box 976, Little Compton, RI 02837; RHODE ISLAND PARTY AND CHARTER BOAT ASSOCIATION, a Rhode Island not-for-profit corporation, P.O. Box 171, Wakefield, RI 02880; CAPE COD CHARTER BOAT ASSOCIATION, INC., a Massachusetts non-profit corporation, P.O. Box 195, S. Dennis, MA 02660; CONNECTICUT CHARTER AND PARTY BOAT ASSOCIATION, INC., a Connecticut non-stock corporation, 20 1st St., Waterford CT 06385; MONTAUK BOATMEN AND CAPTAINS ASSOCIATION, INC., a New York not-for-profit corporation, P.O. Box 1908, East Hampton, NY 11937; WAMPANOAG TRIBE OF GAY HEAD AQUINNAH, a federally recognized Indian Tribe, 20 Black Brook Rd, Aquinnah, MA 02535, | Case No. 1:25-cv-01678 Honorable |

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF COMMERCE, 1401 Constitution Avenue, NW, Washington, DC 20230; HOWARD LUTNICK, in his official capacity as the Secretary of Commerce, 1401 Constitution Avenue, NW, Washington, DC 20230; NATIONAL MARINE FISHERIES SERVICE, 1315 East-West Highway, Silver Spring, MD 20910; and EUGENIO PIÑEIRO SOLER, in his official capacity as the Assistant Administrator, National Marine Fisheries Service, 1315 East-West

Highway, Silver Spring, MD 20910; BUREAU OF
OCEAN ENERGY MANAGEMENT, 1849 C Street NW,
Washington, DC 20240; WALTER CRUICKSHANK in
his official capacity as the Director of the Bureau of
Ocean Energy Management, 1849 C Street NW,
Washington, DC 20240; UNITED STATES
DEPARTMENT OF INTERIOR, 1849 C Street NW,
Washington, DC 20240; DOUG BURGUM, in his official
capacity as the Secretary of the Interior, 1849 C Street
NW, Washington, DC 20240,

*Defendants.*

**Complaint For Declaratory and Injunctive Relief To Set Aside Final Agency Action**

Plaintiffs ACK FOR WHALES, INC., VALLORIE OLIVER, AMY DISIBIO,
VERONICA BONNET, STEVEN KOHLER AND SHARYL KOHLER, DOUGLAS LINDLEY,
DANNY PRONK, WILLIAM VANDERHOOP, GREEN OCEANS, RHODE ISLAND PARTY
AND CHARTER BOAT ASSOCIATION, CAPE COD CHARTER BOAT ASSOCIATION,
CONNECTICUT CHARTER AND PARTY BOAT ASSOCIATION, MONTAUK BOATMEN
AND CAPTAINS ASSOCIATION; and, WAMPANOAG TRIBE OF GAY HEAD AQUINNAH
("Plaintiffs") by its attorneys file this Complaint against Defendants United States Department of
Commerce; United States Secretary of Commerce HOWARD LUTNICK; National Marine
Fisheries Service; Director of the National Marine Fisheries Service, EUGENIO PIÑEIRO
SOLER; Bureau of Ocean Energy Management; Director of the Bureau of Ocean Energy
Management, WALTER CRUICKSHANK; U.S. Department of Interior; and, DOUG BURGUM,
Secretary of the Interior, and allege the following.

**Nature of the Action**

1.    This is an action for declaratory and injunctive relief, challenging the failure of the
Bureau of Ocean Energy Management's ("BOEM") and National Marine Fisheries Service

("NMFS") to comply with numerous statutes and their implementing regulations, including: the Marine Mammal Protection Act ("MMPA"), the Endangered Species Act ("ESA"), the Outer Continental Shelf Lands Act ("OCSLA"), the National Historical Preservation Act ("NHPA") and the Administrative Procedures Act ("APA"). Plaintiffs seek orders vacating and setting aside as unlawful the recent project Record of Decision ("ROD") issued by BOEM approving New England Wind 1 and 2 (hereinafter, "New England Wind"), the Biological Opinion, and Letter of Authorization issued by NMFS for New England Wind.

2.      NMFS' issuance of the Biological Opinion ("BiOp"), and BOEM's award of the lease to the project area and issuance of the ROD, now constitute final agency actions pursuant to the APA.

3.      NMFS' Biological Opinion is violative of the ESA. NMFS' BiOp is flawed and unlawful, BOEM's reliance on the BiOp in approving New England Wind was arbitrary and capricious.

4.      NMFS' approval of the MMPA Letter of Authorization was arbitrary and capricious.

5.      In this suit, Plaintiffs ask this Court to invalidate the putative approvals of the New England Wind Project until and unless the Federal Government complies with the relevant statutes and regulations. Each federal statute delineated infra provides independent grounds on which the approval of New England Wind should be vacated.

6.      In all of the allegations, *infra*, Plaintiffs incorporate by reference all contents of their Notice of Intent to Sue under the ESA of January 13, 2025.

**Jurisdiction and Venue**

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331 (federal questions), 28 U.S.C. § 1346 (United States as defendant), 16 U.S.C § 1361 et seq. (MMPA), 28 U.S.C. § 2201 (declaratory judgment),  28 U.S.C. § 2202 (injunctive relief) 16 U.S.C. 1531 et seq. (ESA), 43 U.S.C. § 1331 et seq. (OCSLA), 54 U.S.C. § 300101 (NHPA) and 5 U.S.C. § 701 through 706 (APA).

8.      Final agency decisions are subject to judicial review. Plaintiffs have met all applicable statute of limitations, namely, the six-year statute of limitations, pursuant to 28 U.S.C. § 2401, and the two-year statute of limitations for FAST-41 Act, set forth at 42 U.S.C. § 4370m-6(a)(1)(A).

9.      For all claims brought under the APA, Plaintiffs have exhausted all administrative remedies available to them.

10.      Pursuant to 16 U.S.C. § 1540(g), on January 13, 2025, Plaintiffs sent a 60-day notice of intent ("NOI") to sue to NMFS and BOEM over their respective failures to comply with the ESA when reviewing and approving the New England Wind project, including the issuance of the Project's BiOp.

11.      Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e)  because all of the Federal Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**Parties**

12.      Plaintiff ACK FOR WHALES is a 501(c)(3) non-profit corporation established to protect the natural and human resources that are threatened by BOEM's massive offshore wind energy program and its component elements, including the New England Wind Project. The members of ACK for Whales will be able to view the Project from various vantage points (public and private) on Nantucket. Plaintiffs Vallorie Oliver, Amy DiSibio and Veronica Bonnet own

properties on Nantucket. Moreover, they frequently travel on, through, and over coastal waters that will be affected by the New England Wind project, including waters wherein marine mammals (some of which listed as threatened or endangered) frequent. ACK For Whales and its constituent members have ardent interests in protecting these marine mammals, including the North Atlantic Right Whale, as well as the cultural and historical heritage of Nantucket from the inimical effects of New England Wind. National Marine Fisheries Service and Bureau of Ocean Energy Management both abdicated their duties to comply with various environmental statutes and regulations by approving New England Wind. For example, Plaintiff Vallorie Oliver of ACK for Whales, will suffer harm under the ESA, MMPA, and OCSLA (*see* allegations *infra* under Plaintiff Vallorie Oliver establishing individual standing). As such, ACK for Whales and its members are and have been harmed by the federal agencies' failure to comply with the statutes and regulations designed to protect marine mammals, including the ESA, MMPA, and OCSLA (and their harms fall squarely within the zone of interests of those statutes). As a direct result of the federal agencies' approvals of New England Wind, ACK for Whales and its constituent members will suffer harm under the ESA, MMPA, and OCLSA, traceable to the agencies' sanctioned activities of New England Wind, and redressable by this Court.

13.    Plaintiff VALLORIE OLIVER – a founding member of ACK for Whales - is an individual who resides in Nantucket and has done so her entire life. She travels on and through and utilizes the waters around Nantucket. She considers it her responsibility to guard those waters and all the plant and animal life within it. She has personally observed whales and dolphins, likely including migrating Humpbacks and North Atlantic Right Whales, from the shore of Nantucket, and on occasion, while out boating on the waters surrounding Nantucket. She has concrete plans for future observances of whales and dolphins in this area near and adjacent to Nantucket. Thus,

she is a person for whom the aesthetic and recreational values of the area is and will be lessened due to BOEM's approval of New England Wind, and particularly, by New England Wind's pile driving/construction and later operations, which will negatively impact and impair Plaintiff Oliver's ability to personally observe the whales and dolphins. Additionally,  she customarily frequents the beaches along Nantucket's shores. Her formerly unencumbered views of the ocean and marine life will be marred further by the New England Wind Project, as the Project's wind turbines will be clearly visible from the Nantucket shoreline, like the now Vineyard Wind 1 turbines which are not as tall as the proposed New England Wind turbines. The proposed New England Wind project threatens the resources that make Nantucket the idyllic place that Vallorie Oliver has chosen to call her lifelong home. Ms. Oliver is also deeply invested in the historical heritage of Nantucket, and sits as a Commissioner on the Nantucket Historic District Commission trying to protect the Island's National Historic Landmark Status, which the New England Wind project will invariably further damage. As a direct result of the federal agencies' approvals of New England Wind, Plaintiff Oliver will suffer harm under the ESA, MMPA, and OCLSA (and her harms fall squarely within the zone of interests of those statutes), traceable to the agencies' sanctioned activities of New England Wind, and redressable by this Court.

14.     Plaintiff AMY DISIBIO, a member of ACK for Whales, also owns property on Nantucket, and travels on and through and utilizes the waters around Nantucket. She considers it her responsibility to guard those waters and all the plant and animal life within it. She has personally observed whales and dolphins, likely including migrating Humpbacks and North Atlantic Right Whales, from the shore of Nantucket and on boating trips adjacent to Nantucket. She has concrete plans for future observances of whales and dolphins in this area near and adjacent to Nantucket. Thus, she is a person for whom the aesthetic and recreational values of the area is

and will be lessened due to BOEM's approval of New England Wind, and particularly, by New England Wind's pile driving/construction and later operations, which will negatively impact and impair Plaintiff DiSibio's ability to personally observe the whales and dolphins. Additionally, she customarily frequents the beaches along Nantucket's shores. Her views of the ocean and marine life will be marred further by the New England Wind Project, as the Project's wind turbines will be clearly visible from the Nantucket shoreline, negatively impacting the pristine natural setting of thousands of acres of preserved shorelines and unobstructed views of the horizon. Ms. DiSibio has been visiting Nantucket for multiple decades. Ms. DiSibio is also deeply invested in the historical heritage of Nantucket, which the New England Wind project will invariably damage. As a direct result of the federal agencies' approvals of New England Wind, Plaintiff DiSibio will suffer harm under the ESA, MMPA, and OCLSA (and her harms fall squarely within the zone of interests of those statutes), traceable to the agencies' sanctioned activities of New England Wind, and redressable by this Court.

15.    Plaintiff VERONICA BONNET, a member of ACK for Whales, also owns property on Nantucket, and travels on and through and utilizes the waters around Nantucket. She considers it her responsibility to guard those waters and all the plant and animal life within it. She has personally observed whales and dolphins, likely including migrating Humpbacks and North Atlantic Right Whales, from the shore of Nantucket. Ms. Bonnet regularly observes whales and dolphins from her boat in the area near and around Nantucket. She has concrete plans for future observances of whales and dolphins in this area near and adjacent to Nantucket. Thus, she is a person for whom the aesthetic and recreational values of the area is and will be lessened due to BOEM's approval of New England Wind, and particularly, by New England Wind's pile driving/construction and later operations, which will negatively impact and impair Plaintiff

Bonnet's ability to personally observe the whales and dolphins. Additionally, she customarily frequents the beaches along Nantucket's shores. Her views of the ocean and marine life will be marred further by the New England Wind Project, as the Project's wind turbines will be clearly visible from the Nantucket shoreline, negatively impacting the pristine natural setting of thousands of acres of preserved shorelines and unobstructed views of the horizon. Ms. Bonnet has been visiting Nantucket for over 20 years and has owned a home on Nantucket for 8 years now. Ms. Bonnet is also deeply invested in the historical heritage of Nantucket, which the New England Wind project will invariably damage. A favorable Court decision will redress the harm caused by New England Wind. As a direct result of the federal agencies' approvals of New England Wind, Plaintiff Bonnet will suffer harm under the ESA, MMPA, and OCLSA (and her harms fall squarely within the zone of interests of those statutes), traceable to the agencies' sanctioned activities of New England Wind, and redressable by this Court.

16.     Plaintiffs STEVEN KOHLER AND SHARYL KOHLER are both residents on the southern shore of Nantucket, Massachusetts. They have a beautiful view from their home on the South Shore with visibility through the area within which New England Wind will be constructed. They can already see Vineyard Wind 1 both day and night. Plaintiffs have inhabited their home on Nantucket for over 25 years and visit the beach, almost daily. They regularly look for and observe whales from in front of their house and enjoy the pristine view. They have seen several dead whales on their beach over the past three years. As such, given Plaintiffs enjoyment and observations of whales in the waters affected by New England Wind render them persons for whom the aesthetic and recreational values of the area is and will be lessened due to BOEM's approval of New England Wind, and particularly, by New England Wind's pile driving/construction and later operations, which will negatively impact and impair Plaintiffs' ability to personally observe the

whales. Plaintiffs also have concrete plans to observe whales in the future from their beach. A favorable Court decision will redress this harm caused by New England Wind. As such, this harm confers standing for the ESA, MMPA, and OCSLA, and NHPA (as their residence is in Historic Nantucket within the Area of Potential of Effects of New England Wind, and will experience adverse visual impacts in addition to a concomitant decrease in cultural and historic value of their property). As a direct result of the federal agencies' approvals of New England Wind, Plaintiffs STEVEN KOHLER AND SHARYL KOHLER will suffer harm under the ESA, MMPA, NHPA, and OCLSA (and their harms fall squarely within the zone of interests of those statutes), traceable to the agencies' sanctioned activities of New England Wind, and redressable by this Court.

17.    Plaintiff DOUGLAS LINDLEY also resides on Nantucket. He is a pilot and classified as a "fish spotter." He spots for fishermen and whale watchers. As such, Plaintiff LINDLEY regularly observes fish and whales from the air, over the region within which New England Wind will be located. As such, given Plaintiff's enjoyment and observations of whales in the waters affected by New England Wind, he is a person for whom the aesthetic and recreational values of the area is and will be lessened due to BOEM's approval of New England Wind, and particularly, by New England Wind's pile driving/construction and later operations, which will negatively impact and impair his ability to personally observe the whales. Plaintiff LINDLEY also has concrete plans to observe whales and fish in the future from the air. A favorable Court decision will redress this harm caused by New England Wind. As such, this harm confers standing for the ESA, MMPA, and OCSLA. As a direct result of the federal agencies' approvals of New England Wind, Plaintiff DOUGLAS LINDLEY will suffer harm under the ESA, MMPA, and OCLSA (and his harms fall squarely within the zone of interests of those statutes), traceable to the agencies' sanctioned activities of New England Wind, and redressable by this Court.

18.    Plaintiff DANNY PRONK resides on Nantucket, and is a lobsterman by trade. He has been lobstering in the area around Nantucket for 40 years, and is being pushed out of the grounds within which he has lobstered due to the construction of turbines. The noise from all aspects of turbine preparatory work through operation have caused the animals to move, and the wind projects are impelling him and other lobstermen into areas that are scheduled to also be converted into offshore wind power plants. As such, Plaintiff PRONK is and will continue to be economically harmed by way of New England Wind. A favorable Court decision will redress this harm caused by New England Wind. As such, this harm confers standing for OCSLA, principally through Plaintiff PRONK's economic harm. The physical obstruction of the agency sanctioned New England Wind project will destructively interfere and impair Plaintiff PRONK's ability to adequately obtain lobster. As a direct result of the federal agencies' approvals of New England Wind, Plaintiff PRONK will suffer harm under the OCLSA (and his harms fall squarely within the zone of interests of that statutes), traceable to the agencies' sanctioned activities of New England Wind, and redressable by this Court.

19.    Plaintiff WILLIAM VANDERHOOP is the owner of the business Tomahawk Charters. For 38 years, he has run his charter fishing and whale watching business in the area where Vineyard Wind 1 currently is located and New England Wind will be constructed. Prior to owning his business, he was a swordfish fisherman for 20 years. He is also a member of the Wampanoag Tribe of Gay Head Aquinnah. His business has already been harmed by Vineyard Wind 1 and the pre-construction surveying (inter alia) activities of New England Wind, which are substantially decreasing the available fish in the area. Plaintiff VANDERHOOP has not seen anything like it (the decreased fish population) in his time there. Accordingly, he is and will continue to be economically harmed by New England Wind, conferring standing under OCSLA.

His use of the area and the fact that he relies upon this critical area for the economic success of his business renders him an archetypal OCSLA plaintiff. As a direct result of the federal agencies' approvals of New England Wind, Plaintiff VANDERHOOP will suffer harm under the OCLSA (and his harms fall squarely within the zone of interests of that statutes), traceable to the agencies' sanctioned activities of New England Wind, and redressable by this Court.

20.    Plaintiff GREEN OCEANS, is a Rhode Island-based nonpartisan non-profit, federally recognized 501(c)(3) corporation (https://green-oceans.org/) comprising citizens dedicated to combating climate change but not at the expense of the ocean's biodiversity and health. The president is Elizabeth Knight, MD PHD. Green Oceans' mission: "We strive to protect the ocean against industrialization. A healthy ocean is one of our best defenses against climate change. By protecting the ocean and marine biodiversity, we can help safeguard the planet for future generations."[1] The organization includes artists, scientists, doctors, educators, local business leaders, ex-military personnel, and homeowners who exhibit a strong personal connection to the ocean. Green Oceans seeks to obviate irretrievable damage to the oceanic ecosystem and coastal communities. Green Oceans engages in public education efforts about risks to the ocean and advocates for heightened transparency from the government and developers about both the indeterminate risks and unproven benefits of industrializing the ocean. Green Oceans submitted comments to NOAA and BOEM on the Draft Strategy for the North Atlantic Right Whale and to NOAA on the Incidental Take Authorization/Letter of Authorization for New England Wind (germane here for administrative remedy exhaustion under the Marine Mammal Protection Act cause of action for all other Plaintiffs in this action).

21.    Plaintiff RHODE ISLAND PARTY AND CHARTER BOAT ASSOCIATION is

---

[1] Green Oceans, *Our Story*, https://www.green-oceans.org/our-story (last visited May 23, 2025).

a registered not for profit organization in the State of Rhode Island. Their mission is to promote the charter fishing industry and advocate for sustainable fishing practices that provide value for our clients. As an affected stakeholder, they have engaged in the permitting process for several projects over several years, including South Fork, Revolution, Vineyard, and Sunrise Wind. Captain Richard Bellavance is the president of Rhode Island Party And Charter Boat Association. His business will incur economic harm as a result of New England Wind. Fisheries that are impacted in the NE Wind area are predominately offshore fisheries such as Tuna and Shark. The organization has concerns that the habitat of a primary forage fish called Sand Lance could be altered, which would drive their game fish farther away and possibly out of range, eliminating those fisheries in their portfolio.  They have concerns about cumulative impacts of all the projects during many years of back-to-back construction and operation that will last for many generations of some important species like squid.  Further concerns include displaced efforts in the New England Wind area to areas closer to them, creating more demand on more local aggregations of some fish. The construction and operation activities are also proximate to spawning and larval distributions of valuable species like Atlantic Cod, which are in rebuilding stages and do not need further disruptions. As fishermen, they have been asked to stop fishing for these fish to aid in rebuilding the population, yet offshore wind and its recognized impacts to spawning go on without change. Projects that include massive cooling designs that will pull several million gallons of sea water each day through distribution plants in some farms, then discard it as super-heated water back into the environment also concern them. They feel larval staged animals like cod and lobster will be inhaled and destroyed. Sand lance spend time on or near the surface and will be impacted by these activities as well. As such, Captain Richard and his organization will suffer economic harm, traceable to New England Wind, and redressable by this Court. The sanctioned offshore

wind activities of New England Wind will disturb the aforesaid ecosystems on which they derive income. As a direct result of the federal agencies' approvals of New England Wind, Plaintiff RHODE ISLAND PARTY AND CHARTER BOAT ASSOCIATION will suffer harm under the OCLSA (and their harms fall squarely within the zone of interests of that statutes), traceable to the agencies' sanctioned activities of New England Wind, and redressable by this Court.

22.    Plaintiff CAPE COD CHARTER BOAT ASSOCIATION is a distinguished organization that actively commits to advancing safety, sustainability, and recreation in the world of charter boat operations and sport fishing. At CCCBA, their mission is clear – to promote and encourage safety in the use and operation of boats, foster sportfishing in the waters surrounding or near Cape Cod, and support the business of carrying passengers for hire, specifically for sportfishing. They work tirelessly to ensure fair and equitable legislation, collaborating with like-minded organizations to champion the interests of our members. William Hatch is the president of the organization.

23.    Plaintiff CONNECTICUT CHARTER AND PARTY BOAT ASSOCIATION is an organization that provides a safe, relaxing and memorable day on the water for its clients. Capt. Marc Berger is the President of the Connecticut Charter and Party Boat Association. His business, relies upon the recreational, aesthetic experience of the customers.

24.    Plaintiff MONTAUK BOATMEN AND CAPTAINS ASSOCIATION was originally established in 1965 by a group of local captains for the purpose of ensuring their voices were heard by lobbying politicians at the state and federal levels. Their mission was to preserve the tradition of the sportfishing culture in Montauk and ensure long-term and equal access to our local fisheries. Today, the MBCA is more than 80 members strong, and includes party and charter

boat captains, commercial fishermen, recreational anglers, marinas, and other supporting organizations interested in helping us. Their mission remains to protect our fisheries by promoting sustainable fishing practices, helping ensure fair regulations, and preserving Montauk's rich maritime heritage. They are committed to sustaining our strong fishing community by providing resources, education and advocacy to support the livelihood of those who depend on our waters. Through collaboration and proactive engagement, they strive to safeguard the future of Montauk's fishing industry for generations to come.

25.    Plaintiff WAMPANOAG TRIBE OF GAY HEAD is a federally recognized Indian Tribe, with its headquarters located at Aquinnah, MA on the island of Martha's Vineyard. The Chairwoman of the Aquinnah Wampanoag Tribe is Cheryl Andrews-Maltais. The Wampanoag Tribe of Gay Head (Aquinnah) (Aquinnah Tribe) are part of the Great Wampanoag Nation and are known as The People of the First Light. The aboriginal Wampanoag Territory homelands spans from north of current day Boston, Massachusetts, westward and south to Mount Hope Bay in eastern Rhode Island, and then eastward to include southeastern Massachusetts, Cape Cod, the Elizabeth Islands, Noepe (aka Martha's Vineyard) and Nantucket, as well as the now submerged lands all the way out to the outer -continental shelf break. As the original stewards of this region; the Tribe has inhabited the lands and utilized the waters and their resources since time immemorial. They lived upon the land, practiced their traditions and culture, held ceremony and interred their People on the land that is currently dry, and the lands that are currently submerged. Within this area are an untold number of submerged archeological resources including the likelihood of ancient burials. Additionally, the unobstructed and majestic views from the south side of the island from Chappaquiddick to Aquinnah and the Aquinnah (Gay Head) Cliffs, which overlook the waters where the project is being constructed, are areas of unparallel cultural significance to the

Aquinnah Wampanoag Tribe. The unobstructed eastern view is inextricably intwined with who they are as a People and their cosmology, essential to their spiritual beliefs and practices. And, the Sacred Aquinnah Cliffs is the only location on the island where you can view both the sunrise and sunset. In 2010, the Department of the Interior National Park Service's Keeper of the National Register designated all of Nantucket Sound and an undefined boundary as a Traditional Cultural Property, eligible for listing on the National Register of Historic Places under all four (4) Criteria. The Aquinnah (Gay Head) Cliffs are sacred to the Tribe and are also inextricably intwined with the history traditions and cosmology of their People. The Aquinnah (Gay Head) Cliffs have been listed on the National Park Service National Register of Historic Places as a Natural National Landmark since 1966. Further, the North Atlantic Right Whale plays a critical role in the Tribe's cosmology. Specifically, in the Aquinnah Wampanoag Tribe oral history regarding the creation of Noepe, the North Atlantic Right Whale fed Moshup and the Wampanoag people on the Island. In fact, according to Wampanoag history, the unique colors of the Cliffs is a direct result of Moshup's use of the whale as his favorite food source. The North Atlantic Right Whale is prominently depicted in the Tribe's logo, demonstrating its continued significance to the Tribe to this day. This is a region that is thus replete with cultural and historical tradition to this day. The potential adverse effects of New England Wind on the unobstructed, ethereal views of the ocean, the Traditional Cultural Places, their beliefs, and natural and cultural resources, will be substantial. The Tribe was identified as a consulting party by BOEM[2] but the adverse visual effects of the Project will result in an irretrievable, irrecoverable aesthetic, cultural, and historical diminution of value for the Tribe.

---

[2] Bureau of Ocean Energy Management, *New England Wind Project Final Environmental Impact Statement Appendix A* (Mar. 1, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/New_England_Wind_App_A_EnviroPermits_Consult.pdf.

Accordingly, Plaintiff AQUINNAH WAMPANOAG TRIBE will suffer harm as a result of the Project, attributable to New England Wind's actions, and redressable by this Court. The New England Wind project will cause substantial adverse effects on the Tribe's cultural landscape, including irretrievable harm to sacred viewsheds, disruption of marine areas containing submerged cultural resources, and aesthetic degradation of Traditional Cultural Properties. As a result, the Aquinnah Wampanoag Tribe will suffer concrete harm traceable to the federal agencies' approval of New England Wind and are redressable by this Court. The Tribe's interests fall squarely within the zone of interests protected by the NHPA and this harm is sufficient to confer standing.

26.     Defendant National Marine Fisheries Service is an agency of the federal government, within the United States Department of Commerce's National Oceanic and Atmospheric Administration. "NOAA Fisheries, also known as the National Marine Fisheries Service, is responsible for the management, conservation, and protection of living marine resources within about 200 miles of the U.S. coast."[3]

27.     Defendant EUGENIO PIÑEIRO SOLER is the director of the NMFS.[4]

28.     Defendant HOWARD LUTNICK is the Secretary of the United States Department of Commerce.

29.     Defendant BOEM is a federal agency within the U.S. Department of Interior, tasked with managing the "development of U.S. Outer Continental Shelf (OCS) energy, mineral, and

---

[3] *NOAA Fisheries,* USA.GOV, https://www.usa.gov/agencies/noaa-fisheries#:~:text=NOAA%20Fisheries%2C%20also%20known%20as,miles%20of%20the%20U.S.%20coast (last visited May 23, 2025).
[4] NOAA Fisheries, *Eugenio Piñeiro Soler Appointed to Lead NOAA Fisheries* (Apr. 14, 2025), https://www.fisheries.noaa.gov/feature-story/eugenio-pineiro-soler-appointed-lead-noaa-fisheries.

geological resources in an environmentally and economically responsible way."[5]

30.    Defendant U.S. Department of Interior is an executive department of the U.S. federal government responsible for the management and conservation of most federal lands and natural resources.

31.    Defendant DOUG BURGUM is the Secretary of the Department of Interior.

32.    Defendant WALTER CRUICKSHANK is the Director of BOEM.

## FIRST CAUSE OF ACTION
### [Violations Of The Marine Mammal Protection Act and the Administrative Procedures Act]

33.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

34.    This cause of action challenges significant legal deficiencies, in the BiOp and Incidental Take Authorization.

35.    Pursuant to 16 U.S.C. 1373(a), the MMPA stipulates that, "the Secretary, on the basis of the best scientific evidence available and in consultation with the Marine Mammal Commission, shall prescribe such regulations with respect to the taking and importing of animals from each species of marine mammal . . . ." The best scientific evidence available was not utilized in the agencies' analysis in the BiOp, Incidental Take Statement or MMPA.

36.    The primary purpose of the MMPA was to "establish a national policy to prevent marine mammal species and population stocks from declining beyond the point where they ceased to be significant functioning elements of the ecosystems of which they are a part."[6]

---

[5] Bureau of Ocean Energy Management, *About BOEM,* https://www.boem.gov/about-boem (last visited May 23, 2025).
[6] NOAA Fisheries, *Marine Mammal Protection Act Policies, Guidance, and Regulations*, https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-protection-act-policies-guidance-and-regulations (last visited May 23, 2025).

37.    The MMPA at 16 U.S.C. 1371(a) provides, "There shall be a moratorium on the taking and importation of marine mammals and marine mammal products, commencing on the effective date of this chapter, during which time no permit may be issued for the taking of any marine mammal and no marine mammal or marine mammal product may be imported into the United States except in the following cases . . ."

38.    The MMPA permits an exception to this general proscription, "upon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region, the Secretary shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of small numbers of marine mammals of a species or population if the Secretary finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock." 16 U.S.C. 1371(a)(5)(A).

39.    As such, even within the exception, the MMPA countenances only the taking of 'small numbers' of marine mammals. "Take" within the meaning of the MMPA can mean Level A or Level B takes.

40.    Level A harassment is defined as, "has the potential to injure a marine mammal or marine mammal stock in the wild." 16 U.S.C. § 1362(18)(A)(i), 50 CFR 216.3.

41.    Level B harassment is defined as, "has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." 16 U.S.C. § 1362(18)(A)(ii), 50 CFR 216.3.

42.    The MMPA language does not address potential outcomes of harm and fatality resulting indirectly from animal disturbance as the ESA does (*see supra*). Additionally, as stated

17

in *NRDC, Inc. v. Pritzker*, 828 F.3d 1125, Level A harassment involves activities that directly injure or are likely to injure marine mammals. By contrast, Level B harassment involves activities that interfere with normal behavioral patterns of the marine mammals, with the risk of indirect harm that creates. To satisfy the requirements of both Acts, and for both Acts to be consistent, the Level B take analyses supporting the BiOp, the LOA's and the final EIS should have included a detailed assessment of the potential for animal harm and fatality resulting indirectly from level B disturbances.

43.    New England Wind 1 and 2[7] authorizes Level B takes for the North Atlantic Right Whale of 60 (annually) and 126 for the total 5-year period. That constitutes 17.8% of the NARW stock annually[8] and 37.3% of the stock over the 5-year period. This violates the MMPA small numbers and negligible impact provisions.

44.    For the Humpback whale, the LOA authorizes the annual take of 152 whales (18 Level A and 134 Level B), and a 5-year total take of 301 whales (31 Level A and 270 Level B). The annual take of 152 constitutes 10.9% of the Humpback population and 5-year take constitutes 21.6% of the population. This violates the MMPA small numbers and negligible impact provisions.

45.    For the common dolphin, the LOA authorizes the annual take of 26,573 dolphin (1 Level A and 26,572 Level B), and a 5-year total take of 46,761 (2 Level A and 46,759 Level B). The annual take of 26,573 constitutes 28.5% of the common dolphin population and 5-year take

---

[7] National Marine Fisheries Service, *Letter of Authorization for the New England Wind Project* (July 22, 2024), https://www.fisheries.noaa.gov/s3/2024-07/MAAvangrid-2024LOA-LOA-OPR1.pdf.

[8] NOAA Fisheries, *North Atlantic Right Whale* (May 2023), https://www.fisheries.noaa.gov/s3/2023-08/North-Atlantic-Right-Whale-Western-Atlantic-2022.pdf (The North Atlantic Right Whale population is estimated at "338 individuals.").

constitutes 50.2% of the population.[9] This egregiously violates the MMPA small numbers and negligible impact provisions.

46.    For the Gray Seal, the LOA authorizes the annual take of 1,546 gray seals (9 Level A and 1,537 Level B), and a 5-year total take of 3,305 (15 Level A and 3,290 Level B). The 5-year take constitutes 12.1% of the population. This violates the MMPA small numbers and negligible impact provisions.

47.    Jurisprudence has elucidated that "small numbers" cannot possibly constitute a proportion greater than 10.6% and certainly not as much as 12%.

48.    The NFMS is not entitled to deference regarding their small numbers interpretation, in view of the overturning of Chevron. As such, the Court must employ an independent assessment, which objectively, should yield a small numbers interpretation as described herein.

49.    There is no cogent evidence that the marine site characterization surveys, pile driving, or operational turbine noise will have a "negligible impact" on marine mammals pursuant to the stipulation of the MMPA. In view of the observed marine mammal mortalities derived from the marine site characterization surveys, underestimated impacts from same, underestimated impacts from pile driving, operational noise, and the reality of likely obstruction to the NARWs' migration corridor via operational noise, inter alia.

50.    The best scientific evidence available was thus not utilized in the LOA's determination of requested takes, or its conclusion that such takes would have a negligible impact on marine mammals.

51.    Under the MMPA, a taking has a "negligible impact" if it "cannot be reasonably

---

[9] Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the New England Wind Project, Offshore Massachusetts, 89 Fed. Reg. 52222.

expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103. The NMFS is not entitled to deference on their interpretation of negligible impact, in view of Chevron's eradication, and an independent assessment of the meaning yields a clear violation of this standard here.

52.    Furthermore, the best scientific evidence available was not employed in actually determining the requested takes of marine mammals, as such calculation significantly underestimates the magnitude of takes – both Level B and Level A.

53.    As explicated supra, the agencies underestimate the injurious effects of marine site characterization surveys, pile driving, and operational noise on marine mammals. They fail to employ the best science available on all of these issues in developing their take estimates. The agencies fail to conduct a cumulative analysis of marine site characterization surveys, pile driving, and operational noise on the takes of marine mammals. As a result, Level B and Level A takes are significantly underestimated and render the agencies determinations arbitrary and capricious.

54.    The above MMPA allegations have been broached to the agency in the administrative record. For example, see public comment from Green Oceans submitted and received on July 10, 2023.[10] The public comment raises the issue of unjustified number of takes, including the North Atlantic Right Whale, common dolphins, etc., and thus, the agency was on notice of this issue prior to this legal action (as evidenced by the public comment in the administrative record of New England Wind cited in the footnote).

55.    Further despite the Aquinnah Wampanoag Tribe's unique relationship with the North Atlantic Right Whale, the Tribe was not consulted as required by Executive Order 13175,

---

[10] NOAA Fisheries, *Comment from Green Oceans on Proposed Incidental Take Regulations for the New England Wind Project, NOAA-NMFS-2023-0080-0045* (July 11, 2023), https://www.regulations.gov/comment/NOAA-NMFS-2023-0080-0045.

Consultation and Coordination with Indian Tribal Governments.

56.     As such, the determinations of NMFS with its MMPA final rule, BiOp and ITS violate the MMPA and APA for the aforesaid reasons. And as such, Plaintiffs ACK FOR WHALES, VALLORIE OLIVER, VERONICA BONNET, AMY DISIBIO, DOUGLAS LINDLEY, and STEVEN AND SHARYL KOHLER, have been harmed through violation of MMPA.

**SECOND CAUSE OF ACTION**
**[Violations Of The Endangered Species Act and the Administrative Procedures Act]**

57.     Plaintiffs reallege and incorporate by reference all of their previous allegations (and all contents of their Notice of Intents to Sue under the ESA, submitted January 13, 2025), and further allege as follows:

58.     The ESA's guiding purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species . . ." 16 U.S.C. § 1531(b).

59.     It is further stipulated under the ESA that "federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." 16 U.S.C. § 1531(c)(1).

60.     It is ostensible that Congress's intent in passing the ESA is to "halt and reverse the trend toward species extinction -- whatever the cost." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1978). "This is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Id.*[11]

_____

[11] "One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies 'to ensure that actions authorized,  funded, or carried out by them do not jeopardize the continued existence' of an endangered species or 'result in the destruction or modification of

61.     Agency determinations under the ESA are reviewed pursuant to the APA, which requires that an agency action be "upheld unless it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* at 1247 (citing *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001). However, as enunciated in *Conservation Cong. v. United States Forest Serv.*, 720 F.3d 1048 (9th Cir. 2013), an agency action is arbitrary and capricious if it, "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise (emphasis added)." *Id.* at 1054.

62.     Section 7(a)(2) (16 U.S.C. § 1536(a)(2)) of the ESA provides that the "Federal agency shall, in consultation with and with the assistance of the Secretary, ensure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . ."

63.     Pursuant to the ESA's stipulations in 16 U.S.C. § 1536(a)(2), agencies must utilize the "best scientific and commercial data available" in determining that an agency action will not jeopardize the continued existence of any endangered species or threatened species. This "best data available" stipulation obviates an agency from "disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006).

---

habitat of such species . . . .' 16 U.S.C. § 1536. This language admits of no exception." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (quoting 16 U.S.C. § 1536 (1976)).

64.     The agency must "not ignore available biological information." *Id.* at 1080-81 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988); accord *San Luis & Delta-Mendota Water Authority v. Badgley*, 136 F. Supp. 2d 1136, 2000 WL 33174414, 10-11 (E.D. Cal. 2000); *Pacific Coast Federation of Fishermen's Ass'n v. National Marine Fisheries Service*, 71 F. Supp. 2d 1063, 1073 (W.D. Wash. 1999).

65.     If those challenging the agencies can identify relevant data not considered, then the presumption that agencies have employed the best available is repudiated. *Kandra v. United States*, 145 F. Supp. 2d 1192, 1208 (D. Or. 2001)  (citing *Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 985 (9th Cir. 1985). Moreover, a BiOp is arbitrary and capricious in contravention of the ESA if it "fails to consider the relevant factors and articulate a rational connection between the facts found and the choice made." *Ctr. for Biological Diversity v. United States BLM*, 698 F.3d 1101, 1121 (9th Cir. 2012) (citing *Pac. Coast Fed'n of Fishermen's Ass'ns*, 265 F.3d at 1034 (9th Cir. 2001) (quoting *Natural Res. Def. Council v. U.S. Dep't of the Interior,* 113 F.3d 1121, 1124 (9th Cir. 1997))).

66.     The ESA says that take is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct," with harm defined by regulation (50 C.F.R. §222.102) as "an act which actually kills or injures fish or wildlife. Such an act may include significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding, or sheltering." *See also*, 50 CFR 17.3.

67.     The NMFS' determination that the New England Wind 1 and 2 Project does not jeopardize the North Atlantic right whale is not based on the best available science and is  arbitrary, capricious, and otherwise contrary to law.

68.     NMFS' determination that the project would not induce any Level A takes (harm/injury) of NARW is arbitrary, capricious, and otherwise contrary to law.

69.     Both BOEM and NMFS failed to ensure that New England Wind would not jeopardize the survival of federally-listed species, such as the NARW, and failing to avoid jeopardizing the continued existence of the NARW.

70.     The BiOp NMFS prepared for the New England Wind 1 and 2 project is analytically deficient and not supported by the best available scientific data. By approving the New England Wind 1 and 2 project, BOEM violated the procedural and substantive requirements of the ESA. By issuing a defective BiOp, NMFS violated the procedural and substantive requirements of the ESA. And by relying upon the defective BiOp, BOEM violated the ESA. "Arbitrarily and capriciously relying on a faulty Biological Opinion violates this duty." *Defenders of Wildlife v. United States EPA*, 420 F.3d 946, 976 (9th Cir. 2005).

71.     The BiOp entirely ignores and fails to analyze the statistically anomalous increase in whale strandings in the NJ/NY Bight from late 2022-through 2023. Such strandings initiated in earnest in 2016-17 in the offshore waters of New England coterminous with the construction of Block Island Wind Project surveying (5 strandings of North Atlantic Right Whale around Martha's Vineyard from August 2017-18). Indeed, offshore wind surveying activity increased in earnest during the 2015-17 period, coterminous with the uptick in marine mammal mortalities.

72.     The BiOp fails to analyze an important, and perhaps the most important, aspect of the underwater noise problem.  It does not include a cumulative wind project assessment from the NJ/NY Bight area to New England's offshore waters of the significantly increased operational turbine noise impacts from these large gearbox turbines, which will likely block the migration of the NARW, as well as fin and humpback whales that frequent the lease area. The BiOp also fails

to analyze the cumulative impact/effect of HRG surveys and pile driving on NARW and other marine mammals as a result of all of the proposed/active offshore wind projects (in various stages of permitting) from Virginia to New England.

73.    The agencies' failure (particularly NMFS) to cumulatively assess the effect of takes at all other project sites that were in the approval process at the time of reviewing New England Wind's application is arbitrary and capricious.

74.    The BiOp does not include a numerical Level A assessment of the serious harm and fatality that can occur to the whale from Level B disturbances of its behavior, which are expected to significantly impair its navigation and communication capabilities.

75.    ACK FOR WHALES contends all aspects of the BiOp's putative mitigation protocols exhibit deficiencies, including vessel speed itself, vessel speed restrictions, exemptions, soft-starts, protected species observers, passive acoustic monitoring, and seasonality restrictions.

76.    In 77 FR 50290, cited by *NRDC v. Pritzker*, 62 F. Supp. 3d 969 (N.D. Cal. 2014), the cited efficacies for passive acoustic monitoring ("PAM") and protected species observers ("PSO") are 25% and 9% respectively.

77.    As to PAM, in *Native Village of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031 (D. Alaska 2013), the Court discussed defendant Apache Alaska Corporation's acknowledgement regarding the material limitations of acoustic monitoring: "Apache's application acoustic monitoring has limitations for detecting marine mammals because 'it requires that the animals produce sounds . . . [and] it requires those sounds to be of sufficient amplitude to be detected at the monitoring location.' The 'received levels of the biological sounds [also must] exceed background noise and other measurement noise. . .'" *Id*. at 1043-44.

78.    PSOs are riddled with numerous limitations, including observer independence,

bias, elevation of observation platform, weather conditions and visibility, opacity of the water, among other variables. These observers cannot effectively see beneath the surface of the water, and in terms of distance, the absolute "best" case scenario is observability out to 1-1.5km. Note that NARW spend significant time just below the surface.

79.     The BiOp attempts to discredit the work of Stober and Thompson in predicting noise levels for the larger turbines by stating that the authors did not do any in field measurements to validate their predictions (Yet, inconsistently, the BiOp readily accepts modelling data in various other contexts such as right whale distribution/density and acoustic modelling/pile driving noise), but fails to point out that such measurements are impossible to do because none of the larger turbines are installed yet. It points to the uncertainty in the predictions which of course exist, but those uncertainties are not sufficient to discredit the reliability of using their data to predict the source level of larger turbines.

80.     Therefore, the BiOp incorrectly determined that Stober and Thomsen (2021)[12] is not considered the best available scientific information on underwater noise likely to result from operation of 10 MW or larger turbines. The turbines here, for the Project, will exhibit capacities up to 15 MW.[13]

81.     The BiOp incorrectly concludes that Elliot et al. 2019 represents the best available data on operational noise that can be expected from the operation of The Project's turbines. That cannot be the case because that study dealt with 6-megawatt turbines, whose noise source intensity levels are thousands of times less than the 15-megawatt turbines to be used here.

---

[12] Uwe Stober and Frank Thomsen, *How could operational underwater sound from future offshore wind turbines impact marine life?,* J Acoust Soc Am. (Mar. 2021), doi: 10.1121/10.0003760. PMID: 33765823.
[13] NMFS, *New England Wind Offshore Energy Project Biological Opinion* (Feb. 16, 2024) at 197, https://repository.library.noaa.gov/view/noaa/60610.

82.    The BiOp does not provide the number of estimated vessel miles traveled. It only provides vessel trips, which does not disclose the length of those trips. The length of the trips more accurately serves to assess the risk posed to whales and other marine mammals. As such, a complete analysis on vessel strike risk to NARWs and other listed species cannot be conducted.

83.    The BiOp's proposed mitigation measures, including: "The proposed mitigation measures include restrictions on pile driving, establishment of clearance zones for all activities, shutdown measures, soft start of pile driving, ramp up of HRG sources, noise mitigation for impact pile driving, and vessel strike avoidance measures" all exhibit varying degrees of insufficiency and ineffectiveness. Taken together, they will not prevent the Project from jeopardizing the NARW.

84.    The BiOp fails to cite, analyze or otherwise use or consider (pursuant to ESA regulations) the salient data related to the NARWs' birth rates, death rates, and calving rates. It fails to cite or discuss the 7.6-year calving rate.[14] Further, detected NARW mortalities outnumber births 3:2. *Id.*

85.    Likewise, the BiOp contains no analysis of the fact that the population dynamics of the NARW have altered significantly, and that the potential biological removal threshold for NARW has dropped to 0.7.[15] This implies that less than one NARW can be killed through anthropogenic activities and still maintain / recover to its optimal sustainable population size.

86.    The BiOp contains no analysis of the fact that approximately 48 NARW have died in entanglements 2010-18, and that deaths recorded are only 36% of actual deaths, per a study

---

[14] Pettis, H. M., et al., *North Atlantic Right Whale Consortium 2020 Annual Report Card* (2021), https://www.narwc.org/uploads/1/1/6/6/116623219/2020narwcreport_cardfinal.pdf
[15] Taking of Marine Mammals Incidental to Commercial Fishing Operations; Atlantic Large Whale Take Reduction Plan Regulations, 88 Fed. Reg. 7362.

commissioned by the NMFS.[16] The entanglement risk is higher than postulated by NMFS, and there is little evidence for the conclusion, "We have concluded that capture or entanglement of a right whale and any associated injury or mortality is not an expected outcome..." BiOp, p. 457. Note that vertical buoy lines, which are utilized in the region within which the project is proposed, can significantly enhance the risk of entanglements. These risks were insufficiently analyzed.

87.    Pile driving disruption to foraging behavior caused by the noise can lead to increased time at surface. NARW are one of the species most frequently impacted by collisions, and ship strikes are a leading cause of mortality in NARW. This increased time at surface could increase their probability of being struck, especially since NARW do not appear to present evasive behaviors in the presence of approaching ships / ship noise.

88.    The assumption of a bubble curtain attenuation of 10db is significantly overestimated, especially for the low frequency and noise emitted by these larger turbines.

89.    Operational noise may have longer term impacts on the overall health of whales by increasing their stress with the increased noise. Baleen whales have many behavioral responses to impulsive noises well below the current 160 dB threshold. Wood et al., (2012) predict a 50% probability of disturbance of migrating baleen whales at 140 dB. Avoidance behaviors due to the noise may increase the risk of ship strike and/or increase energetic demand of NARW.

90.    The Project's NARW take estimates for HRG surveys, pile driving, and every phase of the project, are grossly underestimated.

91.    The BiOp fails to utilize the best available scientific evidence on operational noise,

---

[16] Richard M. Pace, et al., *Cryptic Mortality of North Atlantic Right Whales*, 3 Conservation Sci. and Practice 1 (2021) at 6, https://repository.library.noaa.gov/view/noaa/31474 ("We used an abundance estimation model to derive estimates of cryptic mortality for North Atlantic right whales and found that observed carcasses accounted for only 36% of all estimated death during 1990–2017.").

pile driving, entanglements, population baseline, recovery, and survival, and otherwise, all aspects of this Project.

92.    The BiOp provides, "[a]t least four PSOs must be actively observing marine mammals before, during, and after installation of foundation piles (*i.e.*, monopiles and pin piles). At least two PSOs must be stationed and observing on the pile driving vessel and at least two PSOs must be stationed on a secondary, PSO-dedicated vessel. Concurrently, at least one PAM operator must be actively monitoring for marine mammals with PAM before, during, and after impact pile driving." Both the number of PSOs and PAM operators are significantly insufficient.

93.    The BiOp does not adequately address the project's construction and operational impacts on NARW navigation, communication, migration, and behavior.

94.    The BiOp does not adequately address the project's impacts, at any phase, on the behavior of NARWs and other marine mammals, and the resultant potential strandings, vessel strikes, entanglements, or other injuries and deaths that can eventuate from the project's noise or activities.

95.    The BiOp states, "North Atlantic right whales' resilience to future perturbations affecting health, reproduction, and survival is expected to be very low," (page 69), but yet does not analyze this fact in its jeopardy assessment.

96.    The BiOp admits: "Large whales also do not have to be at the water's surface to be struck." Page 306. Yet, the PSOs have little to no efficacy in detecting sub-surface whales.

97.    The BiOp arbitrarily utilizes the proxy of Block Island Wind Farm (5 6MW wind turbines) for the Project's operational noise impacts.

98.    The BiOp arbitrarily assumes that soft-starts will cause NARWs to leave the area temporarily (and potentially into adjacent shipping lanes).

99.     The BiOp does not account for the potential of subsurface vessel strikes on marine mammals or NARWs in the take or jeopardy analysis.

100.    The BiOp's reasonable and prudent measures feature very little analysis on prevention of vessel strikes.

101.    The BiOp does not discuss or cite the 7.6-year calving interval for the NARW.

102.    The BiOp does not discuss or cite the fact that NARW mortalities outnumber births 3:2.

103.    The BiOp fails to examine whether any phase of the project will increase water turbidity, and such concomitant effect on the NARW. This is important particularly in view of the NARW's strong reliance on eyesight.

104.    The BiOp ephemerally references auditory masking in the context of vessel noise and cable installation:

> "Marine mammals may experience masking due to vessel noises. For example, right whales were observed to shift the frequency content of their calls upward while reducing the rate of calling in areas of increased anthropogenic noise (Parks et al. 2007a) as well as increasing the amplitude (intensity) of their calls (Parks et al. 2011a; Parks et al. 2009). Right whales also had their communication space reduced by up to 84 percent in the presence of vessels (Clark et al. 2009a). Although humpback whales did not change the frequency or duration of their vocalizations in the presence of ship noise, their source levels were lower than expected, potentially indicating some signal masking (Dunlop 2016)." P 247, BiOp.

105.    However, no analysis is provided on the implications of this 84% reduction in NARW communication space in the presence of vessels. This is a significant datapoint that warrants more much considered analysis. The auditory masking effect on the NARW could lead to a variety of negative consequences, potentially even leading to loss of navigational capacity, orientation, or injury and death via other, secondary causes.

106.    The BiOp does not actually "use" or "consider" much of the data it presents,

pursuant to the ESA regulations (use best available data). The dictionary definition of "use" and "consider" is to avail oneself of, and think about carefully. The BiOp, on numerous occasions, fails to sedulously examine the datapoints and discuss them in a synergistic manner.

107.    The BiOp does not analyze the cumulative, synergistic effects of vessel noise and pile driving noise, especially in view of the fact that vessels will often be traversing the area contemporaneous with pile driving activities.

108.    The BiOp fails to analyze or discuss the noise interference that can occur with PAM – background, measurement, anthropogenic, or otherwise. There are a variety of disparate sources of noise that can contaminate a whale's vocalization signal, and prevent same from being received at the monitoring location. These variables are undiscussed.

109.    While the BiOp avers that no Level A NARW takes will occur, it predicts that other whales will suffer Level A harassment. This is an inconsistency that cannot be reconciled in the BiOp. Furthermore, the total Level B takes of 126 and maximum annual takes of 60 violate the ESA and MMPA.[17]

110.    In order for soft-starts to work, the undergirding assumption is that the mammals' avoidance response will initiate, causing it to deter / evacuate the region. A study conducted by Compton, et al. (2008) demonstrated that some mammals may, paradoxically, be attracted – not repelled – by weaker sounds, thus exposed to potentially harmful sounds as the noise level increases.[18]

---

[17] National Marine Fisheries Service, *Letter of Authorization for the New England Wind Project* (July 22, 2024), https://www.fisheries.noaa.gov/s3/2024-07/MAAvangrid-2024LOA-LOA-OPR1.pdf.

[18] Ross Compton, et al., *A critical examination of worldwide guidelines for minimising the disturbance to marine mammals during seismic surveys* (2008), https://www.sciencedirect.com/science/article/abs/pii/S0308597X07000607.

111.    A study examining short-finned whales in the context of soft-starts found that the whales, initially moved away, but then remained within 900 meters of the vessel as it passed by.[19]

112.    Another soft-start study on humpback whales found that the whales slowed their speed toward the vessels, but importantly, did not alter their course.[20]

113.    Moreover, soft start procedures can actually increase the total amount of acoustic energy emanated into the ocean environment, thereby worsening impacts to marine mammals and whales.

114.    A study explained that, "Single transits of a management zone by visual surveys were only able to reliably (>0.5 probability) detect right whales when more than 20 whales were present. Twenty or more transits were required to reliably detect a single right whale."[21] This exemplifies the absence of efficacy associated with PSOs. Visual detection of NARWs is extremely difficult when NARWs are not grouped together in larger numbers.

115.    The BiOp does not analyze any of this information or consider it. Soft-starts, PSOs, and PAM have low-efficacy.

116.    The BiOp contains insufficient and inadequate analysis on the impact of the project's activities on the NARW's foraging, critical habitat, and migration.

---

[19] Caroline R. Weir, *Short-finned pilot whales (Globicephala macrorhynchus) respond to an airgun ramp-up procedure off Gabon* (Sept. 2008), Aquatic Mammals, 34, 349-354, https://www.researchgate.net/publication/228404124_Short-Finned_Pilot_Whales_Globicephala_macrorhynchus_Respond_to_an_Airgun_Ramp-up_Procedure_off_Gabon.
[20] Rebecca Dunlop, et al., *Response of humpback whales (Megaptera novaeangliae) to ramp-up of a small experimental air gun arra,* Marine Pollution Bulletin, 103, 72-83 (2016), https://pubmed.ncbi.nlm.nih.gov/26781958/.
[21] Valentina Ceballos, *Comparison of visual and acoustic surveys for the detection and dynamic management of North Atlantic right whales (Eubalaena glacialis) in Canada* (Dec. 27, 2022), https://conbio.onlinelibrary.wiley.com/doi/full/10.1111/csp2.12866#:~:text=Acoustic%20surveys%20by%20Slocum%20gliders,detection%20range%20of%20acoustic%20platforms.

117.    The BiOp contains no significant analysis of the impact of the project's various stages on the NARW's stress response (or the stress response of other marine mammals).

118.    The potential for pile driving noise to compel NARW into entanglements and buoy lines nearby is undiscussed.

119.    The potential for operational noise to compel the NARW into vessels or entanglements nearby is undiscussed.

120.    The following piece of information disclosed by the BiOp seriously undercuts the efficacy and reliance on PSOs, as whales can be struck by vessels sub-surface. Given PSOs efficacy is constrained to the surface, PSOs will entirely fail to detect sub-surface strikes/potential strikes.

> Large whales also do not have to be at the water's surface to be struck. In a study that used scale models of a container ship and a right whale in experimental flow tanks designed to characterize the hydrodynamic effects near a moving hull that may cause a whale to be drawn to or repelled from the hull, Silber et al. (2010) found when a whale is below the surface (about one to two times the vessel draft), there is likely to be a pronounced propeller suction effect. This modeling suggests that in certain circumstances, particularly with large, fast-moving ships and whales submerged near the ship, this suction effect may draw the whale closer to the propeller, increasing the probability of propeller strikes. P. 306.

121.    The BiOp does not discuss the ramifications of the Quintana-Rizzo 2021 ("QR") study, namely that the recent shifts in right whale distribution and foraging behavior, namely that NARWs are becoming more reliant on the southern New England region for survival, and that the "enormous development [offshore wind energy leases] could have a local impact on right whales at a critical time when they are becoming more reliant on the region."[22]

122.    In the above and numerous other respects, the BiOp fails to utilize the best science

---

[22] E. Quintana-Rizzo, et al., *Residency, demographics, and movement patterns of North Atlantic right whales Eubalaena glacialis in an offshore wind energy development area in southern New England, USA* (July 29, 2021), https://www.int-res.com/abstracts/esr/v45/p251-268/.

available, fails to consider critical data, and draws conclusions antithetical to the evidence before them. And as such, Plaintiffs ACK FOR WHALES, VALLORIE OLIVER, VERONICA BONNET, AMY DISIBIO, DOUGLAS LINDLEY, and STEVEN AND SHARYL KOHLER have been harmed through the NMFS' and BOEM's violation of ESA.

### THIRD CAUSE OF ACTION
**[Violations Of The Outer Continental Shelf Lands Act (OCSLA)—43 U.S.C. §§ 1331, Et Seq. and Administrative Procedures Act]**

123.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

124.    Plaintiffs' OCSLA-based claim is pursued exclusively through the APA, not OCSLA's citizen suit provision, and it challenges BOEM's unlawful agency action.

125.    By approving the Project, BOEM violated Section 1337(p)(4)(A), (B), (D)[23] in multifarious ways.

126.    BOEM's approval failed to ensure protection of the environment and conservation of the natural resources of the outer Continental Shelf.

127.    BOEM abdicated its statutory and regulatory duty to properly, sufficiently examine the impacts of the Project on the North Atlantic Right Whale and other marine mammals. These impacts include but are not limited to the NARW's migration, feeding, habitat, and other life cycle behaviors. The inimical impacts of the Project include high resolution geophysical surveys, pile driving, and operational phase.

128.    During the construction phase of the Project (i.e., pile driving), high intensity noise emanating from the pile driving sites will induce disruptions to the NARW and other marine mammals' navigational capacity, spatial orientation, potentially splitting mothers and calves, and

---

[23] *See* 43 U.S.C. § 1337(p)(4).

otherwise catalyzing behavioral disruptions that can and do eventuate in injuries and deaths.

129.    The Project is proposed within a critical region of feeding grounds for the NARW, including but not limited to the area south of New England (i.e., south of Nantucket and Martha's Vineyard).

130.    The Project intends to construct up to 130 wind turbine generators with power capacities of up to 15 MW.

131.    The operational phase of the Project will continue to induce perpetual impacts to marine mammals and the NARW which heavily utilizes the region within which the Project is proposed. This operational noise will catalyze numerous Level B and Level A takes. The operational component's impact on the health of marine mammals and NARW specifically is completely unaccounted for in the BiOp, Letter of Authorization and Incidental Take Statement.

132.    BOEM has violated OCSLA by abdicating its duty to ensure the prevention of pollution, discharges, or otherwise, which can degrade the marine environment.

133.    Pursuant to OCSLA regulations, at 30 CFR 585.105, it provides: "(a) Design your projects and conduct all activities in a manner that ensures safety and will not cause undue harm or damage to natural resources, including their physical, atmospheric, and biological components to the extent practicable; and take measures to prevent unauthorized discharge of pollutants including marine trash and debris into the offshore environment."

134.    There is no evidence in the BiOp, EIS documents, LOA, or elsewhere that the Secretary has directed the applicant or otherwise taken such steps necessary to obviate the above from eventuating, for example, the recent blade failure event(s) attendant Vineyard Wind 1, and the multiplicity of examples globally of recurring blade failure events. In fact, there does not appear to be a blade failure event plan even contained in the Construction and Operations Plan.

135.     Recently, the acting Solicitor withdrew[24] Solicitor's Opinion M-37067 and reinstated M-Opinion 37059, which ensures that the Secretary err on the side of ensuring less interference with reasonable uses.[25] These reasonable uses include that which Plaintiffs engage in, including but not limited to commercial fishing, sportfishing, recreational activities, boating/shipping, etc. As such, Plaintiffs have been harmed.

136.     As explained by the Acting Solicitor, "The Anderson Opinion's assertion that 'subsection 8(p)(4) commands only that the Secretary rationally balance the subsection's various goals" both diminishes the importance of each subparagraph (contrast "mandatory" with "goals"), while also opening the door to the possibility that any one criteria may be favored over another. This no longer reflects the best, or even a permissible, agency interpretation. It must therefore be withdrawn.'" However, the New England Wind Project was sanctioned under the erroneous interpretation of  subsection 8(p)(4), a construction that simply cannot be reconciled with the best, proper interpretation of that provision, namely one that gives meaning and value to each individual criterion.[26] Thus, New England Wind's approvals should be forthwith rescinded and reexamined

---

[24] *See* Off. of the Solicitor, U.S. Dep't of the Interior, *Memorandum Opinion on the Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059* (May 1, 2025), https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf.

[25] *See* 43 U.S.C. § 1337(p)(4) ("(4) Requirements. The Secretary [of the Interior] shall ensure that any activity under this subsection is carried out in a manner that provides for— . . . (I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas[.]").

[26] *See* Bureau of Ocean Energy Management, *New England Wind Project Record of Decision* (Apr. 1, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record%20of%20Decision_New%20England%20Wind_OCS-A%200534.pdf ("The Secretary's authorization must comply with OCSLA subsection 8(p)(4) (43 U.S.C. § 1337(p)(4)), which 'imposes a general duty on the Secretary to act in a manner providing for the subsection's [various policy] goals.' According to M-Opinion 37067, "[t]he subsection does not require the Secretary to ensure that the goals are achieved to a particular degree, and she retains wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension." **But this Opinion, M-37067, was abrogated, rendering its**

under the proper subsection 8(p)(4) framework. BOEM's disregard of the requirements of OCSLA for offshore wind approval is arbitrary, capricious, and otherwise not in accordance with law.

137.    Moreover, BOEM erred in affording New England Wind a 15-year deferral in financial assurance of decommissioning.[27] As explicitly provided in 43 U.S.C. § 1337(p)(6), the Secretary shall require the lease-holder to furnish a surety bond or other form of security and provide for the "restoration of the lease, easement, or right-of-way." 43 U.S.C. § 1337(p)(6)(c).

138.    And in 30 CFR 585.516, the implementing regulations ostensibly stipulate financial assurances as a prerequisite to installation of facilities. "Before BOEM will . . . (3) Allow you to install facilities approved in your COP . . . you must provide . . . A supplemental bond or other authorized financial assurance in an amount determined by BOEM **based on anticipated decommissioning costs** of the proposed facilities [emphasis added]."

139.    The Secretary was without legal authority in approving the Project. The available evidence evinces that the Project will not provide for the protection of the environment, the conservation of the natural resources of the Outer Continental Shelf, safety; and moreover, the Secretary has not taken steps to effectuate the Project's compliance with 30 CFR 585.105. Accordingly, OCSLA has been violated, and the Project's approvals must be rescinded prior to the

**operational force null and void. Thus, New England Wind's approval was predicated upon an erroneous interpretation of OCSLA.).**

[27] *See* Bureau of Ocean Energy Management, *New England Wind 1 COP Approval Letter* (July 1, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/New%20England%20Wind%201%20OCS-A%200534%20COP%20Approval%20Letter%20signed.pdf; *see also* Bureau of Ocean Energy Management, *New England Wind 2 COP Approval Letter* (July 1, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/New%20England%20Wind%202%20OCS-A%200561%20COP%20Approval%20Letter%20signed.pdf; *see also* Bureau of Ocean Energy Management, *Vineyard Wind 1 COP Approval Letter* (June 15, 2021), https://www.boem.gov/sites/default/files/documents/renewable-energy/3779-FINAL-Approval-Letter.pdf.

construction of the Project.

140.    And as such, Plaintiffs ACK FOR WHALES, VALLORIE OLIVER, VERONICA BONNET, AMY DISIBIO, DOUGLAS LINDLEY, and STEVEN AND SHARYL KOHLER, DANNY PRONK, WILLIAM VANDERHOOP, AND RHODE ISLAND PARTY AND CHARTER BOAT ASSOCIATION, have all been harmed through violation of OCSLA.

**FOURTH CAUSE OF ACTION**
**[Violations Of The National Historic Preservation Act**
**and the Administrative Procedures Act]**

141.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

142.    Plaintiffs WAMPANOAG TRIBE OF GAY HEAD, AQUINNAH and STEVEN KOHLER AND SHARYL KOHLER own historic properties within BOEM's identified Areas of Potential Effects and will be harmed under the NHPA.

143.    First, it is indisputable that all of Nantucket is designated as a historic landmark as evidenced by its status on the National Register of Historic Places: https://npgallery.nps.gov/NRHP/SearchResults?view=list. Further, "Nantucket was designated a local historic district in 1955 under early historic preservation legislation established by the Commonwealth of Massachusetts. It was listed as an NHL in 1967, just 1 year after the passage of the National Historic Preservation Act."[28]

144.    The lands of the WAMPANOAG TRIBE OF GAY HEAD (Aquinnah) held by the United States in trust for the benefit of the Wampanoag Aquinnah Tribe are on the island of Martha's Vineyard. All other aforesaid Plaintiffs own properties on the island of Nantucket.

---

[28] Bureau of Ocean Energy Management, *Cumulative Historic Resources Visual Effects Assessment* (Dec. 23, 2022), https://www.boem.gov/sites/default/files/documents/renewable-energy/New_England_Wind_Cumulative_HRVEA_compliant.pdf.

145.    As such, these Plaintiffs' properties are deemed "historic" due to their location on the historically designated island of Nantucket, and the historical designation for the WAMPANOAG TRIBE OF GAY HEAD, AQUINNAH. This confers standing to Plaintiffs regarding their National Historic Preservation Act claims.

146.    Section 106 of the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 306108, demands that "the head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property."

147.    BOEM determined that New England Wind 1 and 2 is an "undertaking" within the meaning of 54 U.S.C. § 306108, and thus subject to Section 106 review.[29]

148.    The regulations implementing Section 106 at 36 CFR 800.2 et seq., provide that Section 106 consultation involves a) initiation of consultation (undertaking determined), b) identification of historic properties in the Area of Potential Effects, c) assessment of whether the action would engender adverse effects to historic properties, and d) resolution of adverse effects.

149.    Part and parcel of this consultation is sufficient involvement of the public, *see* 36 CFR 800.2(d)(1)-(3), "The agency official shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties, confidentiality

---

[29] Bureau of Ocean Energy Management, *New England Wind Project Final Environmental Impact Statement Appendix A* (Mar. 1, 2024) at A-10, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/New_England_Wind_App_A_EnviroPermits_Consult.pdf.

concerns of private individuals and businesses, and the relationship of the Federal involvement to the undertaking." 36 CFR 800.2 (d)(1).

150.     "The agency official must, except where appropriate to protect confidentiality concerns of affected parties, provide the public with information about an undertaking and its effects on historic properties and seek public comment and input. Members of the public may also provide views on their own initiative for the agency official to consider in decisionmaking." 36 CFR 800.2 (d)(2).

151.     Secondarily, Nantucket is a historic landmark within the Area of Potential Effects, therefore, BOEM was required to assess whether the undertaking would engender adverse effects to this historic island. As BOEM conceded, the impact to Nantucket is significant, "BOEM's (2022) Finding of Adverse Effect found that the proposed Project's adverse effect on the district is . . . based on the maritime orientation of the island and its inhabitants, as the undeveloped ocean view is integral to the character, setting, feeling, and association of the historic property."[30]

152.     BOEM found that Nantucket would indeed be "adversely affected" by the proposed project: "BOEM determined that, in addition to the five resources listed above, the proposed Project would also adversely affect the Nantucket Sound TCP on Martha's Vineyard, as well as the Nantucket Historic District National Historic Landmark (NHL). These properties all fall within the area of "intervisibility," defined as the geographic intersection of the viewshed from which structures from the proposed Project and other offshore wind projects in the RI/MA Lease Areas would be theoretically visible." *Id*. at 4.

---

[30] Bureau of Ocean Energy Management, *Cumulative Historic Resources Visual Effects Assessment* (Dec. 23, 2022) at 28,
https://www.boem.gov/sites/default/files/documents/renewable-
energy/New_England_Wind_Cumulative_HRVEA_compliant.pdf.

153.    "Overall, the undertaking would contribute less than other projects to the cumulative visual effects of offshore wind on Nantucket District NHL. Also, WTGs would not be visible from approximately 80 percent of the Nantucket District NHL, which means only about 20 percent of the island would experience adverse visual effects on their southern viewshed (COP Appendix III-H.b; Epsilon 2023)."[31]

154.    "BOEM has concluded that the undertaking would adversely affect the Nantucket District NHL through the introduction of new ocean-founded visual elements that are out of character with the historic setting, feeling, and association of the resource, thereby diminishing its integrity. While the proposed undertaking is only partially visible from the Nantucket District NHL, and meteorological conditions would often obscure the view of the proposed Project, making it visible primarily during ideal weather conditions, the existence of the undertaking's visual elements ultimately are out of character and thus adversely affect the NHL."[32]

155.    Moreover, BOEM engages in specious logic to conclude that the proposed New England Project is acceptable due to the fact that it will not (purportedly) result in a loss of the Aquinnah area's historical designation. See below verbiage extracted from BOEM's Section 106 Visual Effects Assessment.

"Undeveloped ocean views are a qualifying characteristic of historic setting of the Gay Head Lighthouse, Aquinnah Cultural Center, and Aquinnah Shops Area. In particular, the ocean views relate directly to the function of the lighthouse and its value. Nonetheless, the degree to which the characteristic of undeveloped ocean views is diminished by the visibility of WTGs offshore is small relative to the other aspects of integrity that remain intact for all three resources. BOEM (2022) determined that the direct adverse visual effect of the proposed Project on the three

---

[31] Bureau of Ocean Energy Management, *New England Wind Project Final Environmental Impact Statement Appendix J* (Mar. 1, 2024) at J-32, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/New_England_Wind_App_J_FOE.pdf.
[32] *Id.* at J-31.

Aquinnah area resources would not diminish the integrity of the properties to the extent that it would disqualify them for NRHP eligibility. Although the **cumulative effect of the other offshore wind projects would further adversely affect the setting of the Aquinnah area resources**, this effect would not increase proportionately with the number of theoretically visible WTGs installed and would be moderated by the similar characteristics of the WTGs, the distance from the properties, and environmental and meteorological conditions that limit visibility. While the proposed Project and other offshore wind projects **would have long-term and cumulative adverse effects on the overall historic setting and other aspects of the integrity of the Aquinnah area resources**, these projects would not diminish the integrity of these resources to the extent that it would disqualify the Gay Head Lighthouse, Aquinnah Cultural Center, or Aquinnah Area Shops from NRHP eligibility [emphasis added]."

156.    BOEM acknowledges the adverse effect of the New England project to Aquinnah area resources, BOEM appears to rely on factitious mitigations such as "meteorological conditions" that reduce visibility, "similar characteristics" of the turbines and the Project's comparatively lesser effect in isolation versus other projects. But this does not eliminate or alleviate the fact that a significant adverse harm will be incurred  by the Aquinnah area resources, thus harming the WAMPANOAG TRIBE OF GAY HEAD, AQUINNAH.

157.    Pursuant to 36 CFR 800.6, BOEM is required to consult with various parties and "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties."

158.    However, BOEM was derelict in its duty to require legally adequate mitigation of the adverse visual effects of New England Wind 1 and 2 on the historic, archeological, and cultural areas.

159.    The essence of the visual adverse effect mitigations can be effectively condensed into two putative mitigations: first, that the color of the turbines be painted "no lighter than RAL 9010 Pure White and no darker than RAL 7035 Light Grey."[33] However, this is standard Federal

---

[33] *Id.* at J-38.

Aviation Administration compliance, and is not tantamount to a meaningful mitigation. The WTGs will still be fully visible with this color scheme, and no cogent evidence was posited that same reduces WTG visibility in a way that attenuates the adverse effect on Nantucket.

160.    Secondarily, BOEM required "Aircraft Detection Lighting System" (ADLS), which simply indicates that the warning lights would activate only when an aircraft is in the vicinity. But this entirely fails to mitigate the visual intrusion during daylight hours, which is the principal time frame during which the adverse visual effect occurs.

161.    Note that, "An essential component of a reasonably complete mitigation discussion is an assessment of whether the proposed mitigation measures can be effective . . . The Supreme Court has required a mitigation discussion precisely for the purpose of evaluating whether anticipated environmental impacts can be avoided . . . A mitigation discussion without at least *some* evaluation of effectiveness is useless in making that determination." *South Fork Band Council of Western Shoshone of Nevada v. U.S. Department of the Interior*, 588 F.3d 718 (9th Cir. 2009).

162.    As such, the agency cannot simply delineate various mitigations with no substantive analysis of whether these mitigations will actually impart the intended effect of mitigating the visual impact.

163.    The mitigations required for visual adverse effect do not, in fact, materially alter the visual appearance of the turbines.

164.    There is no cogent evidence that such mitigations diminish the intensity of the adverse visual effect on Nantucket or Martha's Vineyard.

165.    Therefore, Plaintiffs will suffer harm due to the adverse visual effect of New England Wind 1 and 2 on their properties located on historic Nantucket and Martha's Vineyard.

166.    As such, BOEM arbitrarily and capricious concluded that it "resolved" the adverse effects of New England Wind 1 and 2, in violation of 36 CFR § 800.6 and NHPA Section 106. Authorizing the New England Wind 1 and 2 Project without Section 106 compliance was arbitrary, capricious, and contrary to law.

167.    Furthermore, Section 110(f) demands a heightened degree of scrutiny with respect to minimizing harm to National Historic Landmarks. 54 U.S.C. § 306107.

168.    "Section 110(f) of the act requires that the agency official, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to any National Historic Landmark that may be directly and adversely affected by an undertaking. When commenting on such undertakings, the Council shall use the process set forth in §§ 800.6 through 800.7 and give special consideration to protecting National Historic Landmarks as specified in this section." 36 CFR 800.10(a).

169.    "Resolution of adverse effects. The agency official shall request the Council to participate in any consultation to resolve adverse effects on National Historic Landmarks conducted under § 800.6." 36 CFR 800.10(b).

170.    BOEM failed to comply with the heightened standards of scrutiny stipulated under these statutory and regulatory provisions. It failed to undertake adequate planning and actions necessary to minimize harm to Nantucket and Martha's Vineyard. It failed to conduct adequate visual simulations, and assess and resolve adverse effects to Nantucket and Martha's Vineyard.

171.    The mitigation measures are legally inadequate and do not satisfy the criteria set forth by Section 110(f).

172.    Therefore, without employing all possible planning to reduce harm to Nantucket and Martha's Vineyard, BOEM violates Section 110(f) through authorization of the project. This

approval was arbitrary, capricious and contrary to law. Plaintiffs STEVEN AND SHARYL KOHLER and WAMPANOAG TRIBE OF GAY HEAD, AQUINNAH have been and are harmed as a result of the aforesaid.

**Prayer for Relief**

173.     Plaintiffs ask the Court for the following relief:

174.     An order holding unlawful, vacating, and setting aside Defendants' February 2024, decision approving the Construction and Operations Plan for the New England Wind Project, as arbitrary, capricious, and otherwise not in accordance with law;

175.     An order holding unlawful, vacating, and setting aside Defendants' April 1, 2024, decision approving the New England Wind Record of Decision as arbitrary, capricious, and otherwise not in accordance with the law;

176.     An order holding unlawful, vacating and setting aside Defendants' MMPA Letter of Authorization;

177.     Adjudge and declare that Defendant NMFS' February 16, 2024 BiOp, was arbitrary, capricious, and unlawful;

178.     Adjudge and declare that Defendant NMFS' February 16, 2024 BiOp for the New England Wind 1 and 2 project violates Section 7(a)(2) of the ESA because it concludes, with insufficient evidence, that BOEM's action (i.e., approval of the New England Wind 1 and 2 Project) will not jeopardize the North Atlantic Right Whale or any other federally-listed species;

179.     Adjudge and declare that Defendant BOEM's approval of the New England Wind 1 and 2 Project violates Section 7(a)(2) of the ESA because BOEM failed to ensure that its actions do not jeopardize the North Atlantic Right Whale and all other federally-listed species potentially affected by the Project;

180.     Reasonable attorneys' fees and costs for bringing this suit; and,

181.    Such other and further relief as the Court deems appropriate.

Respectfully submitted,

s/Nancie G. Marzulla
Nancie G. Marzulla, Bar No. 400985
(Local Counsel)
Marzulla Law, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, D.C. 20036
(202) 822-6760
nancie@marzulla.com

Thomas Stavola Jr. Esq.
*Pro Hac Vice Pending*
NJ Bar ID number: 380012022
Law Office of Thomas Stavola Jr. LLC
209 County Road 537
Colts Neck, NJ 07722
tstavolajr@stavolalaw.com
732-539-7244

Dated: May 27, 2025                        Counsel for Plaintiffs