IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ACK FOR WHALES, INC, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, <br><br> *Defendants,* <br><br> and <br><br> AVANGRID POWER, LLC, <br> PARK CITY WIND LLC, and <br> COMMONWEALTH WIND, LLC <br><br> *Proposed Defendant-Intervenors* | Case No.: 1:25-cv-01678-AHA <br><br> Hon. Amir H. Ali |

**DECLARATION OF KEN KIMMELL IN SUPPORT OF
AVANGRID POWER, LLC; PARK CITY WIND LLC; AND COMMONWEALTH
WIND, LLC'S MOTION TO INTERVENE AS A DEFENDANTS**

Pursuant to 28 U.S.C. § 1746(2), I, Ken Kimmell, hereby declare:

1. I am employed by Avangrid Power, LLC ("Avangrid") as Chief Development Officer for Offshore Wind, where I have been involved in the permitting and development for the commercial-scale New England Wind Project. The New England Wind Project is being developed in two phases—New England Wind 1 and New England Wind 2 (both phases are collectively referred to as the "Project"). The Project will be located in federal waters approximately 14 miles south of Martha's Vineyard, Massachusetts, and approximately 14 miles southwest of Nantucket, Massachusetts. At Avangrid, I lead a team that develops new offshore wind business opportunities, obtains federal, state, and local approvals for Avangrid's offshore wind projects,

1

secures infrastructure and economic development partnerships, and ensures implementation of workforce and other commitments made by the projects.

2. Before this position, I served as President of the Union of Concerned Scientists, Commissioner of the Massachusetts Department of Environmental Protection, and as General Counsel at the Executive Office of Energy and Environmental Affairs in Massachusetts. I have also practiced law for 17 years as the director and senior attorney at a Boston-based law firm specializing in environmental, energy, and land-use issues. I earned a bachelor's degree at Wesleyan University and a law degree at the University of California, Los Angeles.

3. New England Wind 1 is owned and developed by Park City Wind LLC, and New England Wind 2 is owned and developed by Commonwealth Wind, LLC. Park City Wind LLC and Commonwealth Wind, LLC are both wholly owned by Avangrid Power, LLC (which was formerly known as Avangrid Renewables, LLC) (hereinafter "Avangrid"). Avangrid Power, LLC, Park City Wind LLC and Commonwealth Wind, LLC are collectively referred to herein as the "Proposed Defendant-Intervenors."

4. Once complete, the Project will include up to 130 total positions for wind turbine generators ("WTGs") and Electrical Service Platforms ("ESPs"), generating up to 2,600 MW of electricity to meet existing and potential future offtake demands and power more than 900,000 homes and businesses each year. For context, according to the Department of Energy, "[a] typical nuclear reactor produces 1 gigawatt [1,000 MW] of power per plant on average."[1] Phase 1 of the Project (New England Wind 1) includes installation of up to sixty-two (62) WTGs and up to two (2) ESPs that will generate 791 MW of electricity.

5. As Chief Development Officer for Offshore Wind at Avangrid, I have been

---

[1] Office of Nuclear Energy, https://www.energy.gov/ne/articles/infographic-how-much-power-does-nuclear-reactor-produce.

2

responsible for securing all federal, state, regional and local permits for the Project, negotiating and concluding numerous commercial and real estate agreements needed for the Project, managing community benefits and stakeholder relationships, and conferring with numerous public authorities who have jurisdiction over the Project. I am therefore personally familiar with the Project's environmental permitting and development history. I execute this Declaration in support of intervention in the case based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto.

6. The Project is expected to contribute significantly to Massachusetts' renewable energy and carbon reduction goals.[2] Specifically, the Project will "result in a net avoidance of 3.93 million tons of carbon dioxide emissions annually, which is equivalent to taking 775,000 cars off the road each year."[3]

7. In addition to supplying renewable energy to the region, Proposed Defendant-Intervenors estimate that the Project will generate thousands of jobs in Massachusetts during pre-construction, construction, installation and operation and maintenance. The number of indirectly supported jobs would be even greater. Avangrid has a Project Labor Agreement ("PLA") with the Massachusetts Building Trades Council for onshore construction work and is negotiating a PLA with the National Building Trades Union for offshore construction. In total, the Project is expected to deliver $9.7 billion in direct and indirect investment across the region, including $130 million in upfront and lease payments to spur the development of an offshore wind marshalling port and operations and maintenance hub.

---

[2] Bureau of Ocean Energy Management ("BOEM"), Record of Decision for New England Wind Farm and New England Wind Project Construction and Operations Plan ("ROD") (April 1, 2024) at 9, 58, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record%20of%20Decision_New%20England%20Wind_OCS-A%200534.pdf.
[3] ROD at 58.

8. So far, Proposed Defendant-Intervenors have incurred or otherwise committed substantial financial obligations developing, permitting, engineering, procuring, fabricating, preparing for Project construction, including to enter into contracts to manufacture and transport Project components and to lease vessels, as well as other steps taken in reliance on the approvals challenged in this case. A large wind project like the Project here requires specialized equipment, workers, and tools—some of them with long lead times. Proposed Defendant-Intervenors have invested hundreds of millions of dollars developing the Project, including in reliance on the permits and approvals challenged by Plaintiffs in this lawsuit.

9. The Proposed Defendant-Intervenors seek to intervene in this action to protect their significant protectable interests in the Project.

***The Project's development process has spanned over ten years.***

10. The Proposed Defendant-Intervenors have spent a significant amount of time, effort, and money in the extensive, multi-year planning and development process for the Project. This includes working with technical experts and the permitting team to develop voluminous technical and scientific submissions for federal, state, and local agencies and participating in public consultation and review processes. In total, the Project has obtained over twenty-five federal, regional, state and local permits and authorizations for construction and operation of the Project's facilities. In this declaration, I provide a summary of this over-ten-year process, with a focus on the particular permits and approvals that Plaintiffs challenge in this lawsuit and the extensive level of effort expended by Proposed Defendant-Intervenors to obtain these approvals.

11. On January 29, 2015, BOEM conducted a competitive lease sale for commercial leasing for wind power on the Massachusetts Outer Continental Shelf ("OCS") after conducting a

thorough environmental review and issuing an environmental assessment.[4] The lease areas offered in this competitive sale process were the result of an extended public planning process, including consultation under National Historic Preservation Act ("NHPA") Section 106 regarding the issuance of the commercial lease and approval of site assessment activities. On April 4, 2015, Vineyard Wind LLC[5] won lease OCS-A 0501 pursuant to this sale.[6]

12.    After the award of the lease, BOEM approved an application to assign a portion of the lease to Park City Wind LLC, which resulted in the segregation of OCS-A 0501 and the creation of a new lease number, OCS-A 0534, for the segregated portion.[7]

13.    On March 19, 2024, Park City Wind LLC submitted an application for a partial assignment of lease OCS-A 0534 to Commonwealth Wind, LLC.[8] BOEM approved the assignment, and, on May 15, 2024, the Project was segregated into two leases, New England Wind 1 (OCS-A 0534) and New England Wind 2 (OCS-A 0561). The northern portion of the original lease was retained by Park City Wind LLC and retains the original lease number given by BOEM (New England Wind 1), while the southern portion of the original lease was assigned to Commonwealth Wind, LLC (New England Wind 2).[9]

14.    On May 10, 2018, BOEM issued its final approval for a Site Assessment Plan ("SAP") submitted by the Project's predecessor in interest, as then-required by BOEM regulations, to conduct site assessment activities in the existing lease area and the SAP.[10] This involved the

---

[4] ROD at Appendix B at. 2-4.
[5] At that time Avangrid was a joint venture partner in Vineyard Wind LLC.
[6] ROD at 3.
[7] ROD at 9.
[8] BOEM, New England Wind Leasing History, available at https://www.boem.gov/renewable-energy/state-activities/new-england-wind-1-and-2.
[9] *Id.*
[10] ROD at 2; Site Assessment Plan (Nov. 22, 2017) at section 2.0 (describing results of geotechnical, geological, archeological, and biological surveys) and section 3.0 (site characterization and impact analysis for resources including coastal habitats, water quality, benthic resources, fisheries and essential fish habitat, marine mammals and sea turtles, coastal and marine birds and bats, archeological resources, social and economic resources, coastal and marine uses, and air quality), available at https://www.boem.gov/sites/default/files/renewable-energy-program/State-

5

installation of buoys to collect metocean data (both meteorological and oceanic) and conditions.[11] The Project also conducted extensive surveys, including to characterize biological, water quality, geologic, geotechnical, geophysical, archaeological and benthic conditions in the lease area to support development of the Construction and Operations Plan ("COP").[12]

15.    In July 2020, the Project's predecessor in interest submitted a detailed COP to BOEM, describing the planned facilities and construction and operation activities for a phased Project, which was renamed in favor of the Project after the lease segregation and assignment in 2021 to Park City Wind. On August 9, 2023, Park City Wind LLC submitted an updated COP to include updated technical information. The final version of the COP, which provided minor administrative updates, was submitted in February 2024 and is thousands of pages long, including appendices.[13]

16.    On June 30, 2021, BOEM issued a Notice of Intent ("Notice") to prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA") for its review of the Project COP. That Notice began a more than two-and-a-half-year period of environmental review by the federal government and a public process involving Park City Wind LLC, nine federal agencies, nine state and local cooperating agencies, and an extensive array of other stakeholders—ranging from the fishing industry, to local communities, to American Indian tribes and historic preservation organizations.[14] The draft EIS ("DEIS") was published on December 23, 2022, and, after accepting and responding to public comments, BOEM published

---

Activities/MA/VW-Site-Assessment-Plan.pdf.
[11] ROD at 5.
[12] BOEM, New England Wind 1 and 2 Construction and Operations Plan at 1-7 to 1-15 (listing detailed requirements required under regulations for COP and cross-referencing COP sections and appendices where information is provided), available at https://www.boem.gov/renewable-energy/state-activities/new-england-wind-ocs-0534-construction-and-operations-plan.
[13] Id.
[14] FEIS at Appendix A, A-4-7.

6

the final EIS ("FEIS") on February 26, 2024.[15]

17. BOEM's NEPA process included three public scoping meetings where interested parties were invited to offer feedback and identify issues and potential alternatives for BOEM to consider in the EIS. BOEM held an additional three public meetings on the DEIS. Park City Wind LLC attended all of the meetings and responded to many agency requests for information and questions throughout the COP review process.

18. On April 1, 2024, BOEM issued a Record of Decision ("ROD") documenting the Department of the Interior's decision to approve the COP, with some modifications.[16] On July 1, 2024, BOEM issued the COP approvals and Conditions for the COP approvals for both phases of the Project.[17]

19. Proposed Defendant-Intervenors expended extensive additional time, effort, and financial resources to secure other required permits and approvals for the Project. My declaration focuses on the key approvals Plaintiffs are challenging in this lawsuit, but Avangrid was required to obtain over twenty-five federal, regional, state, and local approvals—many of which involved significant public process that Avangrid engaged in.[18]

20. BOEM and other cooperating agencies conducted Endangered Species Act ("ESA") Section 7 consultation. To support the consultation with the U.S. Fish and Wildlife Service ("FWS"), BOEM reviewed and approved the Project's avian survey plan in 2018 and the Project conducted primary surveys in the lease area over the course of a year. The Project also

---

[15] The DEIS and FEIS are available under the "Environmental Review" tab at https://www.boem.gov/renewable-energy/state-activities/new-england-wind-1-and-2.
[16] Both the ROD and COP approvals are available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record%20of%20Decision_New%20England%20Wind_OCS-A%200534.pdf.
[17] COP Approval Letters and Conditions of COP Approval for both New England I and 2 are available at https://www.boem.gov/renewable-energy/state-activities/new-england-wind-1-and-2.
[18] FEIS at Appendix A (describing "Required Environmental Permits and Consultations").

7

responded to numerous requests for information from BOEM and cooperating agencies during the ESA process. BOEM submitted a draft Biological Assessment to FWS on December 23, 2022 and continued to coordinate with FWS during the course of the consultation.[19] The Project received the draft BiOp in 2023 and provided feedback in advance of issuance. On September 28, 2023, FWS issued a Biological Opinion ("BiOp") that concluded that the Project is not likely to jeopardize listed species or destroy or adversely modify critical habitat under FWS jurisdiction and included an Incidental Take Statement.[20]

21. The Project also provided technical information to support the ESA consultation with the National Marine Fisheries Service ("NMFS"). This included meetings and responding to multiple requests for information from NMFS, as well as modeling to support take estimates. BOEM submitted a draft Biological Assessment to NMFS on September 7, 2022 and continued to coordinate with NMFS throughout the consultation. On February 16, 2024, NMFS issued a BiOp that assessed the potential effects of construction, operation, maintenance, and decommissioning of the Project on ESA-listed whales, sea turtles, fish, corals, and designated critical habitat in the Project area.[21] The BiOp concluded that the Project is not likely to jeopardize the continued existence of any ESA-listed species under its jurisdiction.[22] More specifically, the BiOp concluded that the Project is likely to adversely affect but is not likely to jeopardize the continued existence of blue, fin, sei, sperm, or North Atlantic right whales or the Northwest Atlantic distinct population segment ("DPS") of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley, leatherback sea turtles, shortnose sturgeon, or any of the five distinct population segments of

---

[19] FEIS at Appendix A, A-8-9.
[20] FWS, Biological Opinion for New England Wind (September 28, 2023) ("FWS BiOp"), at 40, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/20230928%20BOEM_New%20England%20Wind%20BO_Final%20alm%20signed.pdf.
[21] NMFS, Biological Opinion for New England Wind (Feb. 16, 2024) ("NMFS BiOp"), available at https://repository.library.noaa.gov/view/noaa/60610.
[22] *Id.*

Atlantic sturgeon.[23]  The BiOp also concluded that the Project is not likely to adversely affect giant manta rays, hawksbill sea turtles, oceanic whitetip sharks, or critical habitat designated for the New York Bight DPS of Atlantic sturgeon and that the Project will have no effect on the Gulf of Maine population segment of Atlantic salmon or critical habitat designated for the North Atlantic right whale[24], and "[t]here are no [Endangered Species Act] listed [distinct population segments] of humpback whales that occur in the action area."[25]  The BiOp included an Incidental Take Statement pursuant to ESA Section 7(b)(4), 16 U.S.C. § 1536(b)(4), and identified the permitted take incidental to the Project and extensive enforceable mitigation measures and requirements to avoid and minimize impacts to listed species.[26]

22.     Pursuant to Sections 101(a)(5)(A) and (D) of the Marine Mammal Protection Act ("MMPA"), on December 1, 2021, Park City Wind LLC submitted a request for the promulgation of regulations, known as Incidental Take Regulations ("ITR"), and issuance of a letter of authorization ("LOA") for the taking of marine mammals, by harassment, incidental to construction activities associated with the Project.[27]  NMFS deemed the application complete in July 2022, and routine meetings were held with NMFS over a 14 month period to discuss the LOA, revised modeling, and revisions to the application.[28]  The application is hundreds of pages long and includes extensive data collection and analysis, including modeling, of the proposed activities, as well the numbers, status, and distribution of the species and stocks of marine mammals that could be affected, as well as proposed mitigation, monitoring and reporting requirements.

23.     On August 22, 2022, NMFS published in the Federal Register a notice of receipt

---

[23] NMFS BiOp at 483.
[24] *Id*.
[25] *Id.* at 55.
[26] *Id.* at Section 11: Incidental Take Statement.
[27] ROD at 26.
[28] Application for MMPA Rulemaking and Letter of Authorization (July 2022), available at https://media.fisheries.noaa.gov/2022-08/NewEnglandWind_2023LOA_App_OPR1_508.pdf.

of Park City Wind LLC's application and held a 30-day public comment period.[29]  NMFS published a proposed rule on June 8, 2023, and held another public comment period.[30]  Additional revisions and refinements were made to the application, all resulting in a reduction in expected and requested take.[31]  On June 21, 2024, NMFS published its final Incidental Take Regulations ("ITR") authorizing incidental take of small numbers of marine mammals by Level A and B harassment for the Project.  No take from mortality or serious injury to any marine mammals is anticipated or authorized.[32]  To protect North Atlantic right whales, the final rule includes months-long seasonal pile driving moratoriums on impact pile driving, drilling, vibratory pile driving and detonations, with limited exceptions requiring NMFS approval.[33]

24. In accordance with the final rule, NMFS issued a Letter of Authorization ("LOA") authorizing the incidental take, by unintentional harassment, of marine mammals incidental to construction-related activities within the Project area for a period of five years from March 27, 2025, through March 26, 2030.[34]  The LOA is issued to Avangrid, which will oversee the construction of both phases of the Project by its two subsidiaries.[35]  In issuing the LOA, NMFS determined that the authorized take will have a negligible impact on marine mammal stocks, will

---

[29] Taking and Importing Marine Mammals; Taking Marine Mammals Incidental to Construction of the New England Wind Offshore Wind Farm, Offshore Massachusetts, 87 Fed. Reg. 51345 (August, 22, 2022), available at https://www.federalregister.gov/documents/2022/08/22/2022-18057/taking-and-importing-marine-mammals-taking-marine-mammals-incidental-to-construction-of-the-new
[30] Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the New England Wind Project Offshore Massachusetts, Proposed Rule, 88 Fed. Reg. 37606 (June 8, 2023), available at https://www.federalregister.gov/documents/2023/06/08/2023-11814/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the.
[31] Updates to the Application for MMPA Rulemaking and Letter of Authorization (January 2024), available at: https://www.fisheries.noaa.gov/s3/2024-06/MAAvangridNEWind-2024FR-January-2024-Application-Update-OPR1.pdf.
[32] Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the New England Wind Project, Offshore Massachusetts, ("Final Rule"), 89 Fed. Reg. 52222 (June 21, 2024), available at https://www.federalregister.gov/documents/2024/06/21/2024-12085/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the.
[33] *Id.*
[34] NMFS, New England Wind LOA (July 22, 2022), available at https://www.fisheries.noaa.gov/s3/2024-07/MAAvangrid-2024LOA-LOA-OPR1.pdf.
[35] Final Rule, 89 Fed. Reg. 52222.

10

not have an unmitigable adverse impact on the availability of the affected marine mammal stock for subsistence uses, and the mitigation measures required will provide a means of affecting the least practicable adverse impact on the affected stocks and their habitat.[36] NMFS's LOA includes over 40 pages of mitigation requirements and monitoring and reporting requirements.[37] In addition, the LOA is based on conservative assumptions (i.e., assumptions that tend to overstate the Project's impacts to marine mammals), including conservative assumptions about the duration of construction activities, the propagation of noise from pile driving, the number of strikes to drive each pile, that drilling would occur 24 hours every day, modeling the presence of species based on the month with the highest density among areas of interest for that species, and applying an exposure model that does not account for most project noise mitigation.

25. In 2022, Park City Wind LLC submitted consistency certifications to the Rhode Island Coastal Resources Management Council ("Rhode Island CRMC") and the Massachusetts Office of Coastal Zone Management ("Massachusetts CZM") for review for consistency, to the maximum extent practicable, with each state's approved coastal management program pursuant to the Coastal Zone Management Act, 16 U.S.C. § 1451.1.[38] On October 19, 2023, the Rhode Island CRMC issued a concurrence with the federal consistency certification for the Project, finding it is consistent and complies with the enforceable policies of Rhode Island's approved coastal management program, subject to certain mutually agreed conditions.[39] Some of those conditions were compensatory mitigation for impacts to fishing, including "a total of $4,873,638 (net present

---

[36] Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the New England Wind Project, Offshore Massachusetts, Notice of LOA, 89 Fed. Reg. 60356 (July 25, 2024), available at https://www.federalregister.gov/documents/2024/07/25/2024-16411/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the.
[37] NMFS LOA for the Project, https://www.fisheries.noaa.gov/s3/2024-07/MAAvangrid-2024LOA-LOA-OPR1.pdf.
[38] FEIS Appendix A, A-8.
[39] State of Rhode Island Coastal Resources Management Council. CRMC Federal Consistency Review (Oct. 19, 2023), available at https://www.crmc.ri.gov/windenergy/newengland/NEWind_FedConDecision_101923.pdf.

value) consisting of $3,972,908 in direct financial compensation for commercial fishers, $400,731 for Rhode Island-based for-hire recreational fishers, and an additional $500,000 to support commercial and for-hire recreational fishing operations."[40] The Massachusetts CZM also issued a conditional concurrence with the federal consistency certification for the Project in November 2023.[41] The concurrence relied on the fact that the Project has committed to mitigation for impacts to fishing "totaling $7,359,471 for impacts over the life of the project."[42]

26.     Park City Wind LLC retained Epsilon Associates, Inc., an environmental consulting firm, to conduct required assessments and to perform additional surveys and analyses, including reports to assess archaeological, cultural and visual impacts associated with the Project, including: (a) Marine Archaeological Assessment Report for the New England Wind Offshore Wind Farm for OCS-A 0534 Construction and Operations Plan Terrestrial Archaeological Resources Assessment (2022); (b) Terrestrial Archaeology Report–Phase 1 Report: Intensive Archaeological Survey New England Wind Phase 1 (Park City Wind)/New England Wind 1 Connector Onshore Project Components "Intensive Archeological Surveys for New England Wind Phase 1 and 2 Facilities" (2022); (c) Technical Memorandum, New England Phase 2 Potential Onshore Substation Sites, Cultural Resources Archaeological Due Diligence Study (2022); (d) New England Wind Visual Impact Assessment (2022); and (e) New England Wind Historic Properties Visual Impact Assessment (2022).[43] In addition, BOEM retained ERM Environmental Consultants to prepare a "Cumulative Historic Resources Visual Effects Assessment for the New England Wind Project under Section 106 of the National Historic Preservation Act," which was

---

[40] *Id.* at 5.
[41] The Commonwealth of Massachusetts, CZM Federal Consistency Review of Park City Wind LLC (Nov. 9, 2023), available at https://www.mass.gov/doc/offshore-wind-park-city-wind-fcr-decision-11-9-23-revised-and-signed-with-attachments/download.
[42] *Id.* at 2.
[43] FEIS, Appendix J, J-20-23.

completed on December 23, 2022.[44]

27.     On June 14, 2021, BOEM initiated the NHPA Section 106 consultation on the proposed Project with eight federally recognized tribes to identify historic properties that may be adversely affected by the Project and measures to resolve those adverse effects. On June 30, 2021, BOEM informed the federally recognized tribes of its intent to use the NEPA process to fulfill its review obligations for the proposed Project under NHPA Section 106 in lieu of the procedures set forth in 36 CFR §§ 800.3. Additional consulting parties were invited through the consultation process as they were identified.[45]

28.     BOEM convened five consulting party meetings on March 3, 2022; February 8, 2023; June 15, 2023; September 14, 2023; and December 13, 2023.[46] Park City Wind LLC participated in each of these consultation meetings, presenting information and answering questions about the Project as requested. In addition to the formal consultation meetings, the Project met with individual tribes numerous times and consulting parties to provide project overviews, project updates, pre-survey consultations, and reviews of draft reports on marine archaeological assessments and historic property treatment plans.

29.     BOEM circulated documents and analyses to consulting parties and consulted on the Area of Potential Effects ("APE") for the Project and identification of historic properties in 2022.[47] BOEM circulated a draft Finding of Adverse Effect ("FoAE") in December 2022 and an edited FoAE on May 26, 2023, with the final FoAE appearing in the FEIS.[48] The FoAE described

---

[44] https://www.boem.gov/sites/default/files/documents/renewable-energy/New_England_Wind_Cumulative_HRVEA_compliant.pdf.
[45] FEIS, Appendix A, p. A-11.
[46] Memorandum of Agreement Regarding the New England Wind Offshore Wind Energy Project ("MOA"), at 6, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/New_England_Wind_App_J1_MOA_Compiled_With%20Sig%20Pages_Redacted%201.pdf.
[47] FEIS, Appendix J, J-25.
[48] *Id.*

the process to identify historic properties that could be affected by the Project, including properties in the "viewshed" from which renewable energy structures might potentially be visible (the "visual APE"). BOEM determined that the Project would have a direct adverse visual effect on one National Historic Landmark ("NHL"): the Nantucket Historic District.[49] BOEM determined that the Project would have direct adverse visual effects on five other historic properties: the Gay Head Lighthouse, Edwin Vanderhoop Homestead (Aquinnah Cultural Center), the Gay Head–Aquinnah Shops Area, the Chappaquiddick Island traditional cultural property ("TCP"), and the Nantucket Sound TCP.[50] BOEM determined that due to the distance and open viewshed, the integrity of the properties would not be so diminished as to disqualify any of them for NRHP eligibility.[51] The Massachusetts State Historic Preservation Officer ("SHPO") concurred with BOEM's FoAE on April 25, 2023.[52]

30. In December 2022, BOEM circulated a draft Memorandum of Agreement ("MOA") to consulting parties, including New England Wind, and requested recommendations. BOEM consulted with the consulting parties on drafts of the MOA and made the draft MOA available for public review and comment.[53]

31. The Section 106 review concluded with the execution of the MOA, which resolved adverse effects and was signed by BOEM, Massachusetts SHPO, the Advisory Council on Historic Preservation, and Park City Wind LLC as required signatories, and became effective in March 2024.[54] The U.S. Army Corps of Engineers, the Bureau of Safety and Environmental Enforcement, the Town of Aquinnah, and the Gay Head Lighthouse Advisory Board also signed the MOA as

---

[49] FEIS, Appendix J, J-31.
[50] FEIS, Appendix J, J-37.
[51] FEIS, Appendix J, J-37.
[52] MOA at 5.
[53] ROD, Appendix B, at 11-12, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record%20of%20Decision_New%20England%20Wind_OCS-A%200534.pdf.
[54] *Id*; ROD at 22.

invited signatories. After lease segregation, the MOA was amended to add Commonwealth Wind, LLC as an invited signatory.

32. The final MOA memorialized agreements by the signatories to adopt specific avoidance, minimization, and mitigation measures, including measures relating to the affected NHL and historic properties, in order to take into account the effects of the undertaking on historic properties, to undertake such planning and actions as may be necessary to minimize harm to any NHL, and meet the requirements of both Section 106 and Section 110(f) of the NHPA.[55] Specifically, to minimize adverse impacts to historic properties, including the NHL, the MOA required mitigation measures as conditions of approval for the Project COP, including: (1) uniform WTG design, speed, height, and rotor diameter to reduce visual contrast and clutter; (2) uniform WTG spacing to decrease visual clutter; (3) requirements that Park City Wind LLC color the WTGs pure white/light gray before operation to reduce daytime visibility on the horizon; and (4) the use of an aircraft detection lighting system to limit the time during which WTG lights are on and visible from affected properties, which Park City Wind LLC estimates will only be active for approximately 13 minutes over the course of a year.[56]

33. Further, included as attachments to the MOA are Historic Property Treatment Plans ("HPTPs") that Park City Wind LLC is required to implement to mitigate visual adverse effects to each of the historic properties.[57] The proposed mitigation measures in the HPTPs serve to support other means of conveying the significance of the historic properties and to minimize the harm to NHLs, including documentation, interpretation, and dissemination of information and property preservation planning and activities (including repair and stabilization).[58] Under the

---

[55] MOA at 1-6 (Recital).
[56] MOA, Stipulations III.A.i-iv., at 8-9.
[57] MOA at 9-14, 39.
[58] *Id*. (identifying HPTPs attached to MOA).

15

terms of the MOA, Park City Wind LLC is required to provide up to $2.9 million to support avoidance, minimization, and mitigation of all adverse effects to historic properties from the Project.[59] In executing the MOA, the full suite of mitigation measures was agreed to by the parties, including BOEM, the Massachusetts SHPO, and the Advisory Council on Historic Preservation as sufficient to resolve adverse effects.

***Impairment of Proposed Defendant-Intervenors' significant interests in the Project approvals if intervention if not granted.***

34.  Proposed Defendant-Intervenors have committed hundreds of millions of dollars to date to plan, permit, and develop this Project, including certain funds already paid for direct community investment commitments.  This substantial investment would be adversely impacted if the Project approvals were vacated or otherwise set aside by this lawsuit.

35.  In September 2024, following a competitive solicitation process, Massachusetts selected the first phase of the Project (New England Wind 1) to provide 791 MW of power to the electric distribution companies in the State to help meet its clean energy requirements.  That power purchase agreement is in the process of being negotiated.

36.  The first phase of the Project (New England Wind 1) has entered into many contracts to manufacture and transport Project components, and has leased vessels for Project construction.  This includes contracts to supply and install duct banks and transition joint bays for the export cable onshore and upgrade the electrical substation, as well as to design, procure and install offshore facilities such as the WTG, offshore substation equipment, subsea transmission and interarray cables, as well as to contract with five installation vessels to support construction and to lease port space for construction purposes.  There are a limited number of installation vessels

---

[59] FEIS, Appendix J, at 377, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/New_England_Wind_App_J_FOE.pdf.

available world-wide and they have to be secured years in advance of construction. If the project is delayed because of this lawsuit, those vessels can be lost with significant financial consequences. Additionally, key transmission components are already in the process of being manufactured.

37. As the Project developer, OCS lessee, holder of the state and federal permits for the Project, and owner of real estate rights from governmental and private entities, Proposed-Defendant Intervenors seek to protect their significant financial investments in the Project, as well as the significant investment of time in the administrative processes supporting the challenged approvals and the maintenance of their existing contracts entered into in reliance on the Project's permits and approvals. Proposed Defendant-Intervenors could lose billions of dollars in future project revenues if Plaintiffs succeed in blocking the Project, as well as funds already committed. An order enjoining or setting aside the challenged approvals would cause significant delays in the Project's construction and operation, increase Project costs, disqualify the Project's winning bid for New England Wind 1, and threaten Proposed Defendant-Intervenors' extensive investment in the Project.

38. As a result of the substantial investments in the Project and related governmental approvals, Proposed Defendant-Intervenors have a significant legally protectable interest in preserving and defending the numerous approvals that Plaintiffs have challenged in this case, which would be impaired if it were not permitted to intervene.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 1, 2025.

*Ken Kimmell*
Ken Kimmell