*Exhibit E to Declaration of Matthew Giacona*
*Ack for Whales, Inc. et al. v US Dept. of Commerce*
*1:25-cv-1678*



**United States Department of the Interior**
OFFICE OF THE SOLICITOR
Washington, D.C. 20240

April 9, 2021

M-37067

Memorandum

To: Secretary

From: Principal Deputy Solicitor

Subject: Secretary's Duties under Subsection 8(p)(4) of the Outer Continental Shelf Lands Act When Authorizing Activities on the Outer Continental Shelf

## I.   Introduction

On December 14, 2020, former Solicitor Daniel H. Jorjani issued M-Opinion 37059.[1] That Opinion interpreted subsection 8(p)(4)(I) of the Outer Continental Shelf Lands Act ("OCSLA"), which requires the Secretary of the Interior to "ensure that any activity under this subsection is carried out in a manner that provides for the prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas[.]" 43 U.S.C. § 1337(p)(4)(I). The focus of the opinion was on the relationship between offshore wind power generation and commercial fishing on the outer Continental Shelf.

M-37059 concluded that subsection 8(p)(4)(I) of OCSLA "requires the Secretary . . . to prevent interference with reasonable uses in a way that errs on the side of less interference rather than more interference," including by "preventing *all* interference, if the proposed activity would lead to unreasonable interference." M-37059 at 2 (emphasis added). In so concluding, the Opinion interpreted the statutory phrase "prevention of interference" in isolation, and did not acknowledge the prefatory language of subsection 8(p)(4), i.e., the command that the Secretary "carr[y] out" action in a general "manner that provides for" twelve enumerated goals. Nor did the Opinion acknowledge that "prevention of interference with reasonable uses (as determined by the Secretary)" is only one of the objectives the Secretary must consider when implementing subsection 8(p)(4) of OCSLA. In addition, the Opinion failed to note that the parenthetical modifies the entire preceding clause, such that the Secretary has discretion to determine what constitutes "interference with reasonable uses."

A well-established body of law recognizes that this type of statute—a general requirement that an agency accomplish one or more broadly defined goals—does not provide the narrow directive

---

[1] M-Opinion 37059 is entitled, "Secretary's Duty to Prevent Interference with Reasonable Uses of the Exclusive Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer Continental Shelf Lands Act Subsection 8(p), *Alternate Energy-related Uses on the Outer Continental Shelf*."

that M-37059 identified in subsection 8(p)(4)(I). Instead, subsection 8(p)(4) of OCSLA and similar statutes require only that the Secretary strike a rational balance between Congress's enumerated goals, i.e., a variety of uses. In making this determination, the Secretary retains wide discretion to weigh those goals as an application of her technical expertise and policy judgment.

Because M-37059 did not acknowledge this body of law nor read OCSLA subsection 8(p)(4) as a whole, its conclusions are in error. Pursuant to delegated authority, I hereby withdraw the Opinion and advise the Secretary that, for purposes of subsection 8(p)(4) of OCSLA, her actions must strike a rational balance between the subsection's enumerated goals.

## II.     Statutory Background

The Outer Continental Shelf Lands Act defines the Outer Continental Shelf ("OCS") as all submerged lands lying seaward of state coastal waters (*i.e.*, generally 3 miles offshore) that are under United States jurisdiction. 43 U.S.C. § 1331(a). Subsection 8(p) of OCSLA authorizes the Secretary to "grant a lease, easement, or right-of-way on the [OCS]" for certain activities, including those to "produce or support production, transportation, or transmission of energy from sources other than oil and gas." 43 U.S.C. § 1337(p)(1)(C).

The Secretary of the Interior must consider certain factors before acting under subsection 8(p). Specifically:

> [t]he Secretary shall ensure that any activity under [subsection 8(p)] is carried out in a manner that provides for—
>
> (A) safety;
>
> (B) protection of the environment;
>
> (C) prevention of waste;
>
> (D) conservation of the natural resources of the outer Continental Shelf;
>
> (E) coordination with relevant Federal agencies;
>
> (F) protection of national security interests of the United States;
>
> (G) protection of correlative rights in the outer Continental Shelf;
>
> (H) a fair return to the United States for any lease, easement, or right-of-way under this subsection;
>
> (I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas;
>
> (J) consideration of—
>
>> (i) the location of, and any schedule relating to, a lease, easement, or right-of-way for an area of the outer Continental Shelf; and

>>(ii) any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation;
>
>(K) public notice and comment on any proposal submitted for a lease, easement, or right-of-way under this subsection; and
>
>(L) oversight, inspection, research, monitoring, and enforcement relating to a lease, easement, or right-of-way under this subsection.

43 U.S.C. § 1337(p)(4).

## III.     Analysis

Subsection 8(p)(4) requires the Secretary to "carr[y] out" action in a "manner" that "provides for" twelve different goals. *Id*. This type of command—an instruction that the agency act in pursuit of certain goals or in a specific "manner"—is "mandatory as to the object to be achieved, but . . . leaves [the agency] a great deal of discretion in deciding how to achieve it." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004) ("*SUWA*"). In *SUWA*, for example, the Supreme Court interpreted 43 U.S.C. § 1782(c), which requires the Bureau of Land Management to manage certain land "in a manner so as not to impair the suitability of such areas for preservation as wilderness." The Court explained that this "broad statutory mandate" imposes no discrete duties on the Secretary, and instead reserves for her a series of "day-to-day" decisions, in which she may exercise her "discretion" to resolve "policy disagreements." *Id.* at 65-66. The Court observed that 43 U.S.C. § 1782 is not unique, identifying several statutes that require action in certain "manners" or for certain "benefits," and that therefore do not impose discrete obligations on the Secretary. *Id.* at 66 (citing 16 U.S.C. §§ 1333(a), 410bbb-2(a)(1), 460nnn-12(b)).

Congress also provides agencies with discretion when it commands them to act for the benefit of several goals (rather than only one goal, as in *SUWA* itself). Indeed, these statutes "*require*[] balancing by the agency and the exercise of discretion and judgment" because various congressional goals "can be in tension with one another." *Lovgren v. Locke*, 701 F.3d 5, 32 (1st Cir. 2012) (addressing standard of review for agency compliance with ten "National Standards" in the Magnuson-Stevens Act). In *Watt v. Energy Action Education Foundation*, for example, the Supreme Court considered a challenge to the Secretary's alleged failure to implement new bidding regimes for oil and gas leasing under OCSLA. 454 U.S. 151 (1981). Plaintiffs alleged that the reforms were necessary under section 18 of OCSLA, which requires the Secretary to maintain an oil as gas leasing program "in a manner consistent with" several principles, including the "receipt of fair market value for the lands leased and the rights conveyed by the Federal Government." 43 U.S.C. § 1344(a)(4). The Court rejected the argument that any particular method must be adopted by the Secretary because the "[t]he receipt of fair market value . . . is only one of many general considerations commended to the Secretary's attention," and therefore did not, by itself, impose an "express statutory check" on the Secretary. *Watt*, 454 U.S. at 164. To the contrary, the Court explained that OCSLA "requires experimentation with at least some . . . new bidding systems, but leaves the details to the Secretary's discretion." *Id. See also Commonwealth of Mass. v. Andrus*, 594 F.2d 872, 889 (1st Cir. 1979) (reading list of general policy priorities in former section 3 of OCSLA to mean that "where . . . sets of interests conflict . . . , the Secretary must determine which interests must give way, and to what degree, in

3

order to achieve a proper balance," a task that "rules out a policy based on sacrificing one interest to the other").

As in *Watt*, subsection 8(p)(4) of OCSLA commands the Secretary to act in a "manner that provides for" many separate—and potentially competing—considerations. Thus, the Secretary's obligations to provide for the "protection of the environment," the "prevention of waste," the "protection of national security interests of the United States," and the "fair return to the United States" may weigh in favor of Secretarial actions to maximize low-emission and renewable electrical generation from offshore wind facilities, but, in some circumstances, the siting and operation of those facilities may not optimally provide for other "reasonable uses" of the exclusive economic zone. 43 U.S.C. § 1337(p)(4)(B), (C), (F), (H), (I). *Accord Watt*, 454 U.S. at 164 & n.16 (recognizing that Secretary must weigh "the receipt of fair market value" against, e.g., any competing interests in the "economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS]"); *Andrus*, 594 F.2d at 889 (same, for "policies that will result in the extraction of oil and gas" on one hand, and, on the other, "unreasonable risks and damage to renewable resources"). OCSLA subsection 8(p)(4) therefore requires discretionary balancing among its several factors, and the subsection's text plainly leaves "striking the proper balance . . . up to the Secretary of the Interior," *Watt*, 454 U.S. at 164 n.16, so long as that balance is rational. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Andrus*, 594 F.2d at 889. Conversely, subsection 8(p)(4) does not provide any "discrete" commands to the Secretary, *SUWA*, 542 U.S. at 65-66, or "express statutory check[s]" on her discretion, *Watt*, 454 U.S. at 164, since those provisions would foreclose the very balancing on which the statute depends.[2]

In reaching a contrary conclusion, M-Opinion 37059 did not read OCSLA subsection 8(p)(4) as a whole, but instead applied tools of statutory construction to "interpret" the phrase "prevention of interference with reasonable uses" in subsection 8(p)(4)(I).[3] Because the Opinion did not acknowledge the subsection's remaining text—requiring the Secretary to act "in a manner providing for" several goals—the Opinion failed to situate subsection 8(p)(4) within a familiar category of statutes imposing only general obligations on federal agencies. The Opinion's analysis was therefore superfluous: because subsection 8(p)(4) commands only that the Secretary rationally balance the subsection's various goals, the subsection may not be read to impose

---

[2] By regulation, the Secretary may establish uniform processes for balancing the subsection 8(p)(4) factors or define ambiguous language in those factors. In their current form, the implementing regulations largely reiterate the requirements of subsection 8(p) itself, and therefore do not add to the analysis of what the subsection does and does not require of the Secretary. *Compare, e.g.*, 30 C.F.R. § 585.621(c) (requiring proponents of a Construction and Operations Plan for offshore projects under OCSLA to demonstrate that the Plan "[d]oes not unreasonably interfere with other uses of the OCS") *with* 30 C.F.R. § 585.638(f) (providing that the Secretary, in her discretion, "*may* approve, disapprove, or approve with modifications [the Plan]") (emphasis added).

[3] Among these tools was a lengthy examination of OCSLA's legislative history, including a comparison of that history to the text of disparate and largely unrelated statutes such as the Deep Seabed Hard Mineral Resources Act and 46 U.S.C. § 3715, which governs aspects of lightering (the practice of transferring oil or similarly hazardous material from one ship to another). M-37059 at 6-10. In the words of M-Opinion 37059, "[t]he legislative history for the amendment of OCSLA that added subsection 8(p) is very limited and does not appear to shed light on the meaning of the terms used in [that] subsection[] . . . in any detail." *Id.* at 2. For this reason—and because the plain text of OCSLA section 8(p)(4) itself governs the issues described herein—we do not rely on OCSLA's legislative history to construe the Secretary's obligations.

4

additional requirements in its individual paragraphs, such as the requirement that the Secretary "prevent[] all interference, if the proposed activity would lead to unreasonable interference." M-Opinion 37059 at 2. The Opinion, including its extra-statutory policy advice, is therefore in error.

## IV. Conclusion

As set forth above, I conclude that subsection 8(p)(4) of OCSLA imposes a general duty on the Secretary to act in a manner providing for the subsection's enumerated goals. The subsection does not require the Secretary to ensure that the goals are achieved to a particular degree, and she retains wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension.

This opinion supersedes and replaces M-37059, which will have no further force or effect.

                                Robert T Anderson *(Digitally signed by Robert T Anderson, Date: 2021.04.09 09:52:56 -04'00')*
                                Robert T. Anderson