**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ACK FOR WHALES, INC, *et al.*, | |
| *Plaintiffs,* | Case No.: 1:25-cv-01678-AHA |
| v. | Hon. Amir H. Ali |
| UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, | <u>Hearing Requested</u> |
| *Defendants,* | |
| and | |
| AVANGRID POWER, LLC, PARK CITY WIND LLC, and COMMONWEALTH WIND, LLC, | |
| *Defendant-Intervenors.* | |

**DEFENDANT-INTERVENORS AVANGRID POWER, LLC; PARK CITY WIND LLC;
AND COMMONWEALTH WIND, LLC'S OPPOSITION TO FEDERAL DEFENDANTS'
MOTION FOR VOLUNTARY REMAND AND STAY**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................1

II.    BACKGROUND .............................................................3

    A.    OCSLA .................................................................3

    B.    Factual Background ..........................................6

        1.    The Project ...............................................6

    C.    The Change in Administrations .....................9

    D.    Procedural History ..........................................13

III.    STANDARD ..................................................................13

IV.    ARGUMENT ................................................................14

    A.    Voluntary Remand is Unwarranted ...............14

        1.    Federal Defendants Have Not Shown a "Substantial and Legitimate" Basis for Remand ...............14

            a.    BOEM Already Considered the Proper Interpretation of OCSLA Section 1337(p)(4). .....................15

            b.    There is No Substantial or Legitimate Reason to Remand the COP Because it Complies with Section 1337(p)(4) as the Administrative Record will Demonstrate .................20

            c.    BOEM Has no Authority to Rescind the COP here.......................24

        2.    Remand Would Unduly Prejudice New England Wind ..........................27

        3.    Remand Would Not Promote Judicial Economy .......................................39

    B.    The Court Should Decline to Issue a Stay .............................41

V.    CONCLUSION..............................................................43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Am. Waterways Operators v. Wheeler,*
    427 F. Supp. 3d 95 (D.D.C. 2019) .................................................................14, 16, 30, 31, 38

*Am. Waterways Operators v. Wheeler,*
    507 F. Supp. 3d 47 (D.D.C. 2020) .........................................................................................40

*Arkema Inc. v. EPA,*
    618 F.3d 1 (D.C. Cir. 2010) ....................................................................................................26

*Asylumworks v. Mayorkas,*
    No. 20-CV-3815 (BAH), 2021 WL 2227335 (D.D.C. June 1, 2021) .....................................42

*Barton v. D.C.,*
    209 F.R.D. 274 (D.D.C. 2002) ...............................................................................................42

*Belize Soc. Dev. Ltd. v. Gov't of Belize,*
    668 F.3d 724 (D.C. Cir. 2012) .........................................................................................41, 42

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) ...............................................................................................................26

*Cadillac of Naperville, Inc. v. Nat'l Lab. Rels. Bd.,*
    14 F.4th 703 (D.C. Cir. 2021) ................................................................................................14

*Canvs Corp. v. Flir Sys., Inc.,*
    No. 14-cv-180, 2014 WL 12616944 (M.D. Fla. June 10, 2014) ............................................43

*Carpenters Indus. Council v. Salazar,*
    734 F. Supp. 2d 126 (D.D.C. 2010) .......................................................................................40

*Clinton v. Jones,*
    520 U.S. 681 (1997).................................................................................................................41

*Code v. McHugh,*
    139 F. Supp. 3d 465 (D.D.C. 2015) ..................................................................................14, 27

*ConverDyn v. Moniz,*
    68 F. Supp. 3d 34 (D.D.C. 2014) ...........................................................................................37

*Ctr. for Biological Diversity v. Ross,*
    419 F. Supp. 3d 16 (D.D.C. 2019) ....................................................................................41, 42

*DACA's NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.D.C. 2018) ...................................................................27

*Dellinger v. Mitchell*,
   442 F.2d 782 (D.C. Cir. 1971) .........................................................................41

*DSMC, Inc. v. Convera Corp.*,
   273 F.Supp.2d 14 (D.D.C.2002) .......................................................................43

*E. Tenn. Nat. Gas Co. v. Sage*,
   361 F.3d 808 (4th Cir. 2004) ...........................................................................37

*Empire Leaseholder LLC v. Burgum*,
   No. 1:26-cv-00004-CJN (D.D.C. Jan. 15, 2026), Dkt 63 .......................................12

*Empire Leaseholder LLC v. Burgum*,
   No. 1:26-cv-00004-CJN, Dkt. 8-2 .....................................................................11

*Ethyl Corp. v. Browner*,
   989 F.2d 522 (D.C.Cir.1993) ...........................................................................39

*FBME Bank Ltd. v. Lew*,
   142 F. Supp. 3d 70 (D.D.C. 2015) ................................................................27, 39

*FDA v. Wages & White Lion Invs.*,
   LLC, 145 S. Ct. 898 (2025) .............................................................................17

*Fox Television Stations, Inc. v. F.C.C.*,
   280 F.3d 1027 (D.C. Cir.), *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir.
   2002) ......................................................................................................19

*Frizelle v. Slater*,
   111 F.3d 172 (D.C. Cir. 1997) .........................................................................24

*Garcia v. Credit One Bank, N.A.*,
   No. 218CV191JCMGWF, 2018 WL 11304605 (D. Nev. Oct. 3, 2018) ......................41

*Hearth, Patio & Barbecue Ass'n v. EPA*,
   11 F.4th 791 (D.C. Cir. 2021) ..........................................................................19

*Ivy Sports Med., LLC v. Burwell*,
   767 F.3d 81 (D.C. Cir. 2014) ...........................................................................25

*Keltner v. United States*,
   148 Fed. Cl. 552 (2020) .................................................................................28

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) ......................................................................................26

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936)..................................................................................41

*Larkin v. United States*,
  177 Fed. Cl. 17 (2025) ...........................................................................14

*Limnia, Inc. v. Dep't of Energy*,
  857 F.3d 379 (D.C. Cir. 2017)..................................................14, 28, 38

*\*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024).............................................................................2, 18

*\*Lutheran Church–Missouri Synod v. FCC*,
  141 F.3d 344 (D.C.Cir.1998)...............................................................26, 28

*Maine Lobstermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*,
  No. CV 21-2509 (JEB), 2023 WL 7128474 (D.D.C. Oct. 30, 2023) ...................................42

*Marbury v. Madison*,
  5 U.S. 137 (1803).........................................................................................18

*Mayor and City Council of Ocean City, Maryland et al v. United States Department of the Interior et al*,
  No. 1:24-cv-03111-SAG (D. Md. filed Sept. 12, 2025) ...................................................10, 21

*Mazaleski v. Truesdell*,
  562 F.2d 701 (D.C. Cir. 1977)..............................................................16, 25

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
  915 F.3d 197 (4th Cir. 2019) ...............................................................37

*Nat. Res. Def. Council v. Regan*,
  67 F.4th 397 (D.C. Cir. 2023)................................................................24

*Nat'l Airmotive v. Gov't & State of Iran*,
  491 F. Supp. 555 (D.D.C. 1980)............................................................41

*NetCentrics Corp. v. United States*,
  169 Fed. Cl. 453 (2024) .......................................................................17

*NLRB v. Wyman-Gordon Co.*,
  394 U.S. 759 (1969)..............................................................................20

*Philipp v. Fed. Republic of Germany*,
  253 F. Supp. 3d 84 (D.D.C. 2017).........................................................41

*Pub. Emps. for Env't Resp. v. U.S. Dep't of the Interior,*
    832 F. Supp. 2d 5 (D.D.C. 2011) ................................................................16, 40

*Revolution Wind, LLC v. Burgum,*
    No. 1:25-CV-02999-RCL (D.D.C. Jan. 12, 2026) ........................................12

*Revolution Wind, LLC v. Burgum,*
    No. 1:25-CV-02999-RCL, Dkt. 36 (D.D.C. issued Sept. 22, 2025) ..............11

*Revolution Wind, LLC v. Burgum,*
    No. 1:25-CV-02999-RCL, Dkt. 39 ...............................................................11

*Revolution Wind, LLC v. Burgum,*
    No. 1:25-CV-02999-RCL, Dkt. 48-2 .............................................................11

*Revolution Wind, LLC v. Burgum,*
    No. 1:25-CV-02999-RCL, Dkt. 63 (D.D.C. Jan. 12, 2026) ..........................12

*Salem v. Pompeo,*
    No. 19CV363LDHCLP, 2024 WL 1364320 (E.D.N.Y. Mar. 31, 2024) ................40

*Save Long Beach Island, Inc. v. U.S. Dep't of Com.,*
    No. 1:25-CV-02211-JMC (D.D.C. filed Sept. 26, 2025) ...............................10

*Schneider v. Dumbarton Devs., Inc.,*
    767 F.2d 1007 (D.C. Cir. 1985) ...................................................................41

*Scotts Valley Band of Pomo Indians v. Burgum,*
    1:25-cv-00958, 2025 WL 3034885 ...............................................................25

*\*Seafreeze Shoreside, Inc. v. United States Dep't of the Interior,*
    123 F.4th 1 (1st Cir. 2024) ...............................................................5, 18, 19, 21

*\*Seafreeze Shoreside, Inc. v. United States Dep't of the Interior,*
    No. 1:22-CV-11091-IT, 2023 WL 6691015 (D. Mass. Oct. 12, 2023) ...................5

*Shaffer v. Defense Intelligence Agency,*
    601 F.Supp.2d 16 (D.D.C. 2009) .................................................................20

*Shalala v. Guernsey Mem'l Hosp.,*
    514 U.S. 87 (1995) ........................................................................................24

*Springs v. Del Toro,*
    No. 20-3244, 2023 WL 8190859 (D.D.C. Nov. 27, 2023) .............................14

*Talamantes-Enriquez v. U.S. Att'y Gen.,*
    12 F.4th 1340 (11th Cir. 2021) ................................................................20, 40

*Town & Cnty. of Nantucket, Massachusetts v. Burgum,*
No. 1:25-cv-00906-TSC (D.D.C. filed Sept. 18, 2025)........................................................10

*U.S. Telecom Ass'n v. F.C.C.,*
400 F.3d 29 (D.C. Cir. 2005).........................................................................................24

*Utah ex. rel. Cox v. EPA,*
No. 23-1157, 2025 WL 1354371 (D.C. Cir. May 2, 2025) ................................................39

*Util. Solid Waste Activities Grp. v. EPA,*
901 F.3d 414 (D.C. Cir. 2018).......................................................13, 14, 27, 28, 38

*Virginia Electric and Power Company v. U.S. Dep't of the Interior*,
No: 2:25-cv-00830-JKW-LRL (E.D. Va. Jan. 16, 2026), Dkt. 78..........................12

*Wisconsin Gas Co. v. FERC,*
758 F.2d 669 (D.C. Cir. 1985).......................................................................................38

## STATUTES

42 U.S.C.
§§ 4370m – m-10 ...............................................................................................29
§ 4370m-2(c)(2)(D)(iii)(II) .................................................................................30

43 U.S.C.
§ 1332(3)................................................................................................................3
§ 1334(a)(2)(A), (B)........................................................................................25
§ 1337(p)(1)(C).................................................................................................3
§ 1337(p)(4) .......................................2, 4, 5, 6, 8, 15, 17, 18, 19, 20, 21, 23, 25, 26, 30, 40, 43
§ 1337(p)(4)—a ...................................................................................................1

## RULES

Fed. R. Civ. P.
12(a)(4) ................................................................................................................43
24(a) ....................................................................................................................28

## REGULATIONS

30 C.F.R.
§ 285.700-702
§ 704-708 .............................................................................................................34
§ 585 ....................................................................................................................21
§ 585.102.........................................................................................................6, 25
§ 585.102(a) ....................................................................................................5, 24
§§ 585.600, 585.620(c) ........................................................................................32

89 Fed. Reg.
    42,602, 42,722 (May 15, 2024) ................................................................................5
    42602, 42644 (May 15, 2024) ...............................................................................16

90 Fed. Reg. 8363 (Jan. 20, 2025) ................................................................................10

## I.    INTRODUCTION

After a decade of careful review of the New England Wind 1 and New England Wind 2 projects (together, the "Project"), the numerous Federal Defendants approved the Project's Construction and Operations Plan ("COP") and provided all other key permits needed for development.    Federal Defendants specifically analyzed the Project under 43 U.S.C. § 1337(p)(4)—a provision of the Outer Continental Shelf Act ("OCSLA") that requires the Secretary of the U.S. Department of the Interior ("Interior") to ensure that offshore wind projects provide for various factors, including "safety," "protection of the environment," "prevention of interference with reasonable uses," and "conservation of the natural resources of the outer Continental Shelf"—and determined that the Project would be carried out in a manner that provides for these factors.    In reliance on these approvals, Defendant-Intervenors have invested hundreds of millions of dollars and entered into numerous contracts to develop the Project.    But eighteen months after approving the COP, based on a new legal theory that is inconsistent with court precedent and governing regulations, Federal Defendants have switched course and assert that they "believe that the decision to approve the COP did not fully comply with section 8(p)(4) of OCSLA" and ask for voluntary remand.

Courts may grant motions for voluntary remand where federal defendants raise a "substantial and legitimate" issue with the initial approval, and the other parties will not be prejudiced.    Neither element is met here.    Rather, Federal Defendants' Motion for Voluntary Remand and Stay ("Motion") is both weak and pretextual and significantly prejudices Defendant-Intervenors.    In a detailed 36-page analysis attached to the Record of Decision ("ROD") and supported by an extensive administrative record, Federal Defendants already found that the

requirements of OCSLA Section 1337(p)(4) were met.[1]  The Motion is not predicated on a mistake of law; rather, it is an improper attempt to create project delay and potentially cancellation.

Further, Defendant-Intervenors have significant reliance interests here, including over $725 million spent or committed to develop the Project.  Given that, the Government's attempt to revisit the COP 18 months after the fact is not remotely timely.

To protect these interests, Defendant-Intervenors have filed a Crossclaim seeking confirmation that the COP was properly issued.  Whether the Project's COP approval is based on the correct interpretation of OCSLA Section 1337(p)(4) is squarely before the Court now and is purely a legal issue for this Court to decide under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 399 (2024).  Remand would greatly prejudice Defendant-Intervenors and prevent them from having their own Crossclaim heard.

The delay caused by remand could also effectively kill the Project.  Permitting and constructing a utility-scale wind project in the North Atlantic is a difficult proposition in the best of circumstances, requiring years-long coordination of key suppliers, contractors, permit conditions, and financing.  Defendant-Intervenors won the bid under a Massachusetts power purchase solicitation to provide much needed energy to the Commonwealth, but the deadline to enter into the Power Purchase Agreement ("PPA") is June 30, 2026.  The PPA has not been signed due to the dark cloud that this administration and the Motion have placed on Defendant-Intervenors' ability to perform under the PPA.  In addition, a key approval for installing turbine foundations, the Letter of Authorization ("LOA"), will expire if work cannot begin soon, subjecting the Project to a whole new round of data collection, a new application, and what is often

---

[1]      The  Project's  ROD  is  available  at  https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record%20of%20Decision_New%20England%20Wind_OCS-A%200534.pdf.

protracted negotiation with federal agencies.  Unless remand is denied and Defendant-Intervenors'
Crossclaim is heard promptly, it will be impossible to finalize the PPA before the June 30, 2026
deadline or complete turbine installation before the LOA expires.  And should the LOA expire,
reaching a commercial operating date of 2033 (which is necessary to receive billions of dollars in
investment tax credits), would be nearly impossible.  Federal Defendants are using the pretext of
an open-ended voluntary remand and "re-evaluation" process to delay the Project and kill it
through delay.  *See infra* Section II.C.

For these reasons, Defendant-Intervenors ask the Court to deny Federal Defendants'
request for voluntary remand and a stay and instead order expedited briefing on cross motions for
summary judgment to adjudicate the merits of the parties' respective claims.

## II.    BACKGROUND

### A.    OCSLA

OCSLA provides that "the outer Continental Shelf is a vital national resource reserve held
by the Federal Government for the public, which should be made available for expeditious and
orderly development, subject to environmental safeguards."  43 U.S.C. § 1332(3).  Congress
amended OCSLA in 2005, authorizing Interior to grant leases for, among other things, offshore
wind.  43 U.S.C. § 1337(p)(1)(C); Pub. L. No. 109-58, 119 Stat. 594, 746.  By providing for
domestic offshore wind development, Congress sought to "enhance the energy security of the
United States," to "decrease dependence on foreign sources of fuel," S. Rept. No. 109-78, at 1
(2005), and to "ensure jobs for our future with secure, affordable, and reliable energy," H.R. Rept.
No. 109-90, at 1 (2005).

Development under OCSLA can occur only after a carefully phased review by the Federal
Government, including planning and analysis to select areas suitable for wind energy development,

leasing, site assessment to characterize the lease area, and finally approval of the COP.[2]   That

process here took approximately 10 years.

Before authorizing wind energy development activity on the Outer Continental Shelf and

approving a COP, OCSLA requires the Secretary of the Interior to "ensure that any activity under

this subsection is carried out in a manner that provides for" a series of twelve enumerated factors,

including "safety," "protection of the environment," "conservation of the natural resources of the

outer Continental Shelf," and "prevention of interference with reasonable uses" offshore.   43

U.S.C. § 1337(p)(4).

OCSLA Section 1337(p)(4) has been subject to different interpretations by Interior over

the years.   On December 14, 2020, then-Solicitor of Interior Daniel H. Jorjani issued a

memorandum (the "Jorjani Opinion") providing his view of Section 1337(p)(4).[3]   The Jorjani

Opinion adopted a narrow reading of Section 1337(p)(4) finding the provision relating to

"prevention of interference with reasonable uses" categorically prohibits "all interference, if the

proposed activity would lead to unreasonable interference" which he defined as any interference

that was more than "*de minimis* or reasonable interference."   Jorjani Opinion at 15 (emphasis in

original).

---

[2]   *See* BOEM, *Wind Energy Commercial Leasing Process* (May 2021), https://www.boem.gov/sites/default/files/documents/about-boem/Wind-Energy-Comm-Leasing-Process-FS-01242017Text-052121Branding.pdf.

[3] S*ecretary's Duty to Prevent Interference with Reasonable Uses of the Exclusive Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer Continental Shelf Lands Act Subsection 8(p), Alternate Energy-related Uses on the Outer Continental Shelf*, M-37059 (Dec. 14, 2020), https://www.doi.gov/sites/default/files/m-37059.pdf.

In April 2021, then-Principal Deputy Solicitor of Interior, Robert T. Anderson, issued a memorandum (the "Anderson Opinion") withdrawing the Jorjani Opinion as incorrect.[4]  The Anderson Opinion emphasized that "'prevention of interference with reasonable uses (as determined by the Secretary)' is only one of the objectives the Secretary must consider when implementing subsection 8(p)(4) of OCSLA."   Anderson Opinion at 1 (quoting 43 U.S.C. § 1337(p)(4)).  The Anderson Opinion opined that Section 1337(p)(4) "and similar statutes require only that the Secretary strike a rational balance between Congress's enumerated goals, i.e., a variety of uses.  In making this determination, the Secretary retains wide discretion to weigh those goals as an application of her technical expertise and policy judgment."  *Id*. at 2.  Notably, this issue of how best to interpret OCSLA was raised in litigation challenging the Vineyard Wind 1 offshore wind project, and both the District Court and the First Circuit Court of Appeals held that interpretation in the Anderson Opinion was a reasonable reading of the statute.  *Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*, 123 F.4th 1, 25-26 (1st Cir. 2024); *Seafreeze Shoreside, Inc. v. United States Dep't of the Interior*, No. 1:22-CV-11091-IT, 2023 WL 6691015, at * 22 (D. Mass. Oct. 12, 2023).

The New England Wind ROD was issued on April 1, 2024, when BOEM's regulations in 585.102 provided:  "(a) BOEM will ensure that any activities authorized in this part are carried out in a manner that provides for:  [OCSLA Section 1337(p)(4)'s goals]."  Declaration of Janice Schneider ("Schneider Decl."), Ex. E, ROD (Apr. 1, 2024 issuance date).  Interior subsequently conducted a notice-and-comment rulemaking and in May 2024 codified the Anderson Opinion in the Interior's regulations.  89 Fed. Reg. 42,602, 42,722 (May 15, 2024).  Under 30 C.F.R.

---

[4] *Secretary's Duties under Subsection 8(p)(4) of the Outer Continental Shelf Lands Act When Authorizing Activities on the Outer Continental Shelf*, M-37067 (Apr. 9, 2021), https://www.doi.gov/sites/default/files/m-37067.pdf.

§ 585.102(a), which remains in effect today, BOEM must "ensure that any activities . . . are carried out in a manner that provides for and reaches a rational balance among [Section 1337(p)(4)'s] goals to the extent they conflict or are otherwise in tension, none of which inherently outweighs or supplants any other[.]"

In May 2025, Interior's then-Acting Solicitor Gregory Zerzan issued a memorandum (the "Zerzan Opinion") that concluded the Anderson Opinion did not reflect a permissible interpretation of Section 1337(p)(4).[5]  The Zerzan Opinion withdrew the Anderson Opinion and reinstated the Jorjani Opinion.  Zerzan Opinion at 3.  The Zerzan Opinion did not (and could not) rescind the governing regulation contained in 30 C.F.R. § 585.102.  As of today, Federal Defendants have not proposed any revisions to 30 C.F.R. § 585.102.  According to the Federal Defendants' declarant, "BOEM is currently beginning preparations for a rulemaking that will amend" the governing regulation, Dkt. 18-1 ¶12 ("Giacona Decl."), but "[t]he projected timeline . . . is currently uncertain," *id*. ¶ 18.

## B.    Factual Background

### 1.    The Project

The New England Wind Project consists of two phases—New England Wind 1 and New England Wind 2 (together, the Project).  Second Declaration of Ken Kimmel ("Second Kimmell Decl.") ¶ 1.[6]  These two phases were approved as set forth above simultaneously by the Federal

---

[5] *Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059, Secretary's Duty to Prevent Interference with Reasonable Uses of Exclusive Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer Continental Shelf Lands Act Subsection 8(p), Alternate Energy-related Uses on the Outer Continental Shelf 2*, M-37086 (May 1, 2025), https://www.doi.gov/sites/default/files/documents/2025-05/m-37086.pdf.

[6] New England Wind 1 is owned and developed by Park City Wind LLC, and New England Wind 2 is owned and developed by Commonwealth Wind, LLC.  Second Kimmell Decl. ¶ 3.  Park City Wind LLC and Commonwealth Wind, LLC are both wholly owned by Avangrid Power, LLC, which was formerly known as Avangrid Renewables, LLC.  *Id*.

Defendants.  *Id*. ¶ 14.  New England Wind 1 is a more advanced project with all the requisite permits and a winning bid award from the Commonwealth of Massachusetts.  *Id*. ¶¶ 9, 30.

The Project will be located in federal waters approximately 14 miles south of Martha's Vineyard, Massachusetts, and approximately 14 miles southwest of Nantucket, Massachusetts.  *Id*. ¶ 1.  Once complete, the Project will include up to 130 total wind turbine generators and Electrical Service Platforms ("ESPs"), generating up to 2,600 megawatts ("MW") of electricity to power more than 900,000 homes and businesses each year.  *Id*. ¶ 4.  The Project will help Massachusetts meet its renewable energy and carbon reduction goals by avoiding 3.93 net million tons of carbon dioxide emissions annually (the equivalent to taking 775,000 cars per year off the road).  *Id*. ¶ 64. It will also improve grid reliability, lower costs (especially in the winter), and add billions of dollars to the local economy over its lifetime.  *Id*. ¶¶ 61-63, 65-66.  The Project will generate thousands of jobs in Massachusetts and New England during preconstruction, construction, installation and operation and maintenance, and will indirectly support even more jobs.  *Id*. ¶ 63. As part of the bidding process for the Project, Defendant-Intervenors have committed to spend up to $74.5 million in directly funded initiatives, including investment in the workforce and supply chain, environmental conservation and monitoring initiatives, a tribal nation support fund, fisheries sustainability programs, and improvements to the local community microgrid.  *Id*. ¶ 60.

In July 2020, a detailed COP for the Project was submitted to BOEM, describing the planned facilities and construction and operation activities for the phased Project.  *Id*. ¶ 11.  After an iterative process with BOEM, including amendments, the final version of the COP, which is thousands of pages long, including appendices and which provides minor administrative updates, was submitted to BOEM in February 2024.  *Id*.

On June 30, 2021, BOEM issued a Notice of Intent ("Notice") to prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA") for its review of the Project's COP. *Id.* ¶ 12.  The Notice began a more than two-and-a-half-year period of environmental review by the Federal Government and a public process involving the Project, nine federal agencies, nine state and local cooperating agencies, and an extensive array of other stakeholders—ranging from the fishing industry to local communities, to Native American tribes and historic preservation organizations. *Id.*  The Project's draft EIS was published on December 23, 2022, and after BOEM accepted and responded to public comments, the Project's final EIS was issued on February 26, 2024. *Id.*  During the public comment period, BOEM specifically considered and rejected comments advocating the same interpretation of OCSLA Section 1337(p)(4) that the Agency now insists requires BOEM to reconsider the COP approval.[7]

On April 1, 2024, BOEM issued a ROD documenting Interior's decision to approve the COP, with some modifications. *Id.* ¶ 14.  BOEM specifically "determined that the Project will comply with the Bureau's regulations and that the proposed activities will be carried out in a manner that provides for safety, protection of the environment, prevention of waste, and the other factors listed in subsection 8(p)(4) of OCSLA."  Schneider Decl., Ex. F, ROD Appendix B at 1. In support of this determination, BOEM issued a 36-page memorandum documenting that the COP adequately considers the 12 factors enumerated in Section 1337(p)(4), including the protection of the national security interests of the United States and preventing interference with other reasonable uses of the Outer Continental Shelf. *Id.* at 15-34.

---

[7] Responses to Comments on the Draft Environmental Impact Statement for the New England Wind Project at O-173, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/New_England_Wind_App_O_RTC_Draft_EIS.pdf.

On July 1, 2024, BOEM issued the Condition of COP Approval Letters and Conditions of COP Approvals ("COP Conditions") for both phases of the Project consistent with the decision made in the ROD.[8]  Second Kimmell Decl. ¶ 14.  The COP Conditions each span over 80 pages with over 140 major compliance requirements and many more sub-requirements, including extensive mitigation requirements such as requirements related to navigational and aviation safety, national security, protected species and habitat, and commercial, for-hire, and recreational fishing. *Id.*; COP Conditions at 2-82.  Overall, Interior concluded that the decision to approve the Project's COP was "consistent with the duties required under subsection 8(p)(4) of OCSLA, which requires the Secretary to ensure that approved activity is carried out in a manner that provides for Congress's enumerated goals."  ROD at 25.

Defendant-Intervenors have made significant investments to obtain the COP and in reliance on its approved COP, which now has been in place for nearly 1.5 years.  Second Kimmell Decl. ¶¶ 6-8, 34-36, 46.  For example, Defendant-Intervenors have spent considerable time and expense in entering into leases and contracts necessary for construction and operation of the Project; securing and purchasing critical components for the Project, such as wind turbines, vessels for installation of critical infrastructure, export cables, and more; and securing federal, state, regional and local permits for the Project.  *Id.*

C.    **The Change in Administrations**

After spending a decade working with Defendant-Intervenors to permit the Project, Federal Defendants changed their stance on offshore wind and the Project with the new administration.  In

---

[8] A true and correct copy of the Conditions of COP Approval Letters for the Project are attached as Exhibits G and H of the Schneider Decl.  The COP Conditions for the Project are also referenced in the Schneider Decl. and available at https://www.boem.gov/renewable-energy/state-activities/new-england-wind-1-and-2.

early 2025, President Trump issued a Presidential Memorandum, which imposed a moratorium on the issuance of permits and other approvals for offshore wind projects.[9]  On July 15, 2025, Interior Secretary Burgum issued a directive establishing a new permitting review procedure for wind and solar projects that effectively prevented approvals for renewable energy projects from being made. Under this directive, "all decisions, actions, consultations, and other undertakings . . . related to wind and solar energy facilities shall require submission to the Office of the Executive Secretariat and Regulatory Affairs, subsequent review by the Office of the Deputy Secretary, and final review by the Office of the Secretary."[10]

In addition to this case, the Government has sought remand of the COPs in three other cases involving offshore wind projects,[11] and also issued illegal "stop work orders" against two offshore wind projects in the spring and fall of 2025, one of which was lifted after incurring approximately $200 million in losses[12] and the other which was enjoined as the "height of arbitrary

---

[9] "Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects," 90 Fed. Reg. 8363 (Jan. 20, 2025).  On December 8, 2025, the District Court of Massachusetts invalidated the permit moratorium in the Presidential Memorandum. *Trump*, No. 25-CV-11221-PBS, 2025 WL 3514301, at *1 (D. Mass. Dec. 8, 2025).

[10] U.S. Dep't of the Interior, *Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities* at 1, (July 15, 2025), https://www.doi.gov/media/document/departmental-review-procedures-decisions-actions-consultations-and-other.  This action is currently being challenged in the District of Massachusetts along with numerous others designed to slow or prevent development of renewable energy projects. *Renew Northeast et al. v. U.S. Department of the Interior et al.*, 1:25-cv-13961-DJC.

[11] Motion to Remand with Vacatur and to Dismiss, *Mayor and City Council of Ocean City, Maryland et al v. United States Department of the Interior et al*, No. 1:24-cv-03111-SAG (D. Md. filed Sept. 12, 2025); Motion to Remand, *Town & Cnty. of Nantucket, Massachusetts v. Burgum*, No. 1:25-cv-00906-TSC (D.D.C. filed Sept. 18, 2025); Motion to Remand to United States Bureau of Ocean Energy Management, *Save Long Beach Island, Inc. v. U.S. Dep't of Com.*, No. 1:25-CV-02211-JMC (D.D.C. filed Sept. 26, 2025).

[12] BOEM issued a stop work order to Empire Wind on April 16, 2025.  That order was amended on May 19, 2025 "to lift the halt on activities during the ongoing review."  Both the April 16, 2025

and capricious action" after incurring approximately $105 million in costs from the stop work order.[13]   Recently, a news organization reported that based on documents released in response to a Freedom of Information Act request, Secretary Burgum personally ordered the halt of the offshore wind project in August 2025 without agency involvement—a highly unusual level of involvement from a senior political appointee.[14]

On December 22, 2025, the Department of the Interior announced that it was pausing all activities (with limited exceptions to protect health, safety and the environment) for all five large-scale offshore wind projects under construction in the United States.[15]   At the time, Secretary Burgum stated that "[Interior] is PAUSING leases for 5 expensive, unreliable, heavily subsidized offshore wind farms! ONE natural gas pipeline supplies as much energy as these 5 projects

---

and May 19, 2025 orders are available at https://www.boem.gov/renewable-energy/state-activities/empire-wind.  *See* Declaration of Theodore Mulhfelder, *Empire Leaseholder LLC v. Burgum*, No. 1:26-cv-00004-CJN, Dkt. 8-2 ¶ 38 (D.D.C. filed Jan. 6, 2026) ("$200 million in delay costs incurred by Empire Wind during the pendency of the April 2025 Stop Work Order").

[13] Third Declaration of Paul Murphy in Support of Plaintiff's Motion for a Preliminary Injunction and Stay Pending Review, *Revolution Wind, LLC v. Burgum*, No. 1:25-CV-02999-RCL, Dkt. 48-2 ¶ 29 (D.D.C. filed Jan. 2, 2026) ("After the First Stop Work Order was enjoined and construction resumed, Revolution Wind determined that actual losses were $105 million (i.e., approximately $3.2 million per day)."); Order Granting Preliminary Injuction, *Revolution Wind, LLC v. Burgum*, No. 1:25-CV-02999-RCL, Dkt. 36 (D.D.C. issued Sept. 22, 2025); 9-26-25 Preliminary Injunction Tr. at 41:13-19, *Revolution Wind, LLC v. Burgum*, No. 1:25-CV-02999-RCL, Dkt. 39 ("Mandating an immediate pause to construction of a project whose approval the bureau continues to defend in those other cases is the height of arbitrary and capricious action.").

[14] Energy Wire, *Burgum ordered Revolution Wind's August halt, documents show* (Jan. 14, 2026), https://www.eenews.net/articles/burgum-ordered-revolution-winds-august-halt-documents-show/.

[15] U.S. Dep't of the Interior, *The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases*, (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.

COMBINED. [President Trump] is bringing common sense back to energy policy & putting security FIRST!"[16]  Three of these federal actions have already been enjoined by federal courts.[17]

On January 9, 2026, President Trump held a meeting with oil and gas executives where he reiterated that "[m]y goal is to not let any windmill be built."[18]  Addressing Secretary Burgum, the President stated, "I can proudly say, Doug, that we have not approved one windmill since I've been in office and we're going to keep it that way."  *Id.*  Although the President acknowledged that "[m]aybe we get forced to do something because some stupid person in the Biden administration agreed to do something years ago," he ended his discussion by reaffirming that "[w]e will not approve any windmills in this country."  *Id.*

---

[16]  Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 8:35 a.m.), https://x.com/SecretaryBurgum/status/2003094666040787213.

[17]  Order Granting Preliminary Injunction, *Revolution Wind, LLC v. Burgum*, No. 1:25-CV-02999-RCL, Dkt. 63 (D.D.C. Jan. 12, 2026); 1-12-26 Tr. of Preliminary Injunction Hearing at 43:23 – 44:10, *Revolution Wind, LLC v. Burgum*, No. 1:25-CV-02999-RCL (D.D.C. Jan. 12, 2026) (finding BOEM's order is likely arbitrary and capricious and that the "stated national security reason may have been pretextual.").  An excerpt of this transcript is attached as Exhibit A to the Schneider Declaration.

*See also* Minute Order Granting Preliminary Injunction, *Empire Leaseholder LLC v. Burgum*, No. 1:26-cv-00004-CJN (D.D.C. Jan. 15, 2026), Dkt 63.  An excerpt of the transcript for this preliminary injunction hearing is also attached as Exhibit B to the Schneider Declaration.  *See* 1-15-26 Tr. of Preliminary Injunction Hearing at 9:16 – 10:4, 16:1-25, 19:1-10, *Empire Leaseholder LLC v. Burgum*, No. 1:26-cv-00004-CJN (D.D.C. Jan. 15, 2026) (rejecting government's argument that potential harms from stop work order were "hedged in permissive language" because "Damocles's sword does not have to actually fall on the movant before the court will issue an injunction.") (citation omitted).

*See also Virginia Electric and Power Company v. U.S. Dep't of the Interior*, No: 2:25-cv-00830-JKW-LRL (E.D. Va. Jan. 16, 2026), Dkt. 78.

[18]  The video of the meeting is available on YouTube at https://www.youtube.com/watch?v=LpdPuJoBmts.  *See also* Dinah Voyles Pulver, Trump assails 'windmills' and wind energy as junk: 'They're losers,' USA Today (Jan. 9, 2026); available at https://www.usatoday.com/story/news/nation/2026/01/09/trump-assails-windmills-and-wind-energy-as-junk-theyre-losers/88108694007/.

### D.    Procedural History

On May 27, 2025, Plaintiffs filed their Complaint alleging the Project's challenged federal approvals violate the Administrative Procedure Act ("APA"), the Marine Mammal Protection Act ("MMPA"), the Endangered Species Act ("ESA"), the National Historic Preservation Act ("NHPA"), and OCSLA.  Dkt. 1 ¶¶ 1-6.  On December 2, 2025, Federal Defendants filed their Motion.  Dkt. 18.  In support of the Motion, the Acting Director of BOEM submitted a declaration stating that "I believe that the decision to approve the COP did not fully comply with section 8(p)(4) of OCSLA."  Giacona Decl. ¶ 13.

In support of its Motion, Federal Defendants argue that "BOEM's reconsideration of its COP approval may result in it withdrawing or modifying the approval, which would moot Plaintiffs' OCSLA claim as well as directly impact—if not outright moot—Plaintiffs' NEPA, ESA, MMPA, and NHPA claims."  Mot. at 13.  But Defendant-Intervenors do not agree that a remand of the COP Approvals would moot the remaining claims in this case given that each permit maintains its validity independent of the COP Approvals.  To protect its interests, on January 16, 2026, Defendant-Intervenors filed their Answer and Crossclaim seeking declaratory relief, including a declaration that the approvals under OCLSA, ESA, MMPA, and NHPA are valid.

## III.    STANDARD

Courts "have broad discretion to grant or deny an agency's motion to remand."  *Util. Solid Waste Activities Grp. v. EPA ("USWAG")*, 901 F.3d 414, 436 (D.C. Cir. 2018).  But "government motions for a voluntary remand to an agency for additional consideration should not simply be granted in a perfunctory manner.  Instead, such motions should be treated as with any other motion affecting the substantial rights of the plaintiff, by subjecting the government's position to careful

analysis." *Larkin v. United States*, 177 Fed. Cl. 17, 23 (2025) (internal citation and quotations omitted).

"[V]oluntary remand is typically appropriate only when the agency intends to revisit the challenged agency decision on review." *Limnia, Inc. v. Dep't of Energy*, 857 F.3d 379, 381 (D.C. Cir. 2017). Courts grant motions for voluntary remand made in response to "intervening events" outside an agency's control that may affect the validity of the agency action, such as a new legal court decision or the passage of new legislation. *Am. Waterways Operators v. Wheeler*, 427 F. Supp. 3d 95, 97 (D.D.C. 2019). Voluntary remand can be appropriate where "the agency expresses a 'substantial and legitimate' concern about the agency's earlier decision." *Code v. McHugh*, 139 F. Supp. 3d 465, 468 (D.D.C. 2015) (internal citation omitted). But remand is inappropriate when the motion is "frivolous or made in bad faith" or when granting the motion "would unduly prejudice the non-moving party." *USWAG*, 901 F.3d at 436. Voluntary remand is also inappropriate "when the agency fails to 'provide[] a reasoned explanation for a remand.'" *Springs v. Del Toro*, No. 20-3244, 2023 WL 8190859, at * 1 (D.D.C. Nov. 27, 2023) (quoting *Cadillac of Naperville, Inc. v. Nat'l Lab. Rels. Bd.*, 14 F.4th 703, 719 (D.C. Cir. 2021)).

IV.    **ARGUMENT**

    A.    **Voluntary Remand is Unwarranted**

        1.    **Federal Defendants Have Not Shown a "Substantial and Legitimate" Basis for Remand**

BOEM's alleged reasons for seeking remand are pretextual, and the Court should deny remand. The only specific "concern" Federal Defendants identify is BOEM's "reliance" on the now-rescinded Anderson Opinion, which, according to Federal Defendants, "does not . . . reflect a permissible interpretation of OCSLA section 8(p)(4)." *See* Giacona Decl. at ¶¶ 12-13 ("Based in part on the ROD's express reliance on the now withdrawn [Anderson Opinion], I believe that

14

the decision to approve the COP did not fully comply with section 8(p)(4) of OCSLA."); Mot. at 9 (BOEM has been directed to "re-evaluate agency decisions—such as the COP approval here—that relied on the Anderson Opinion and its interpretation of OCSLA subsection 8(p)(4).").

BOEM's professed reason for seeking remand is not "substantial and legitimate," rather, it is pretextual for the following reasons:  (1) BOEM already examined the scope of OCSLA Section 1337(p)(4) in the administrative proceedings on the Project and in regulations that remain in effect; (2) the scope of OCSLA Section 1337(p)(4) is a purely legal issue that must be decided by this Court under the Supreme Court's case in *Loper Bright*—remand will do nothing to advance the case or save judicial resources; (3) the COP complies with OCSLA Section 1337(p)(4) as the administrative record will demonstrate and as further demonstrated by court opinions in the Vineyard Wind litigation; (4) BOEM has no authority to rescind the COP.

> a. BOEM Already Considered the Proper Interpretation of OCSLA Section 1337(p)(4).

In extensive administrative proceedings, BOEM already considered the precise issue that it now claims requires remand for further consideration.  Review and permitting of the Project occurred over a period of more than 10 years.  Second Kimmell Decl. ¶¶ 6-29.  During the public comment period on the Project, which ended on February 21, 2023, one of the public comments specifically argued for the same interpretation of OCSLA Section 1337(p)(4) that BOEM says now requires remand and agency reconsideration.:

> BOEM states that it will make its determination on the proposed Project "after weighing the factors in subsection 8(p)(4) of OSCLA that are applicable to plan decisions and in consideration of the above goals". OSCLA says nothing about weighing. It says "shall ensure" the factors listed, not in consideration of the developers or state's goals or contractual "obligations," but in the absolute.[19]

---

[19]  Responses to Comments on the Draft Environmental Impact Statement for the New England Wind Project at O-173, available at

BOEM offers no explanation as to why it needs remand to consider something it has already considered and courts have denied remand in similar circumstances. *Am. Waterways Operators*, 427 F. Supp. 3d at 96 (rejecting voluntary remand on EPA approval of decision to approve a no discharge-zone in the Puget Sound where "this [was] not a case where the agency merely overlooked an issue" but agency had already held a public process where "commenters . . . articulated concerns" on the same cost issues EPA sought remand to address).

BOEM also conducted a rulemaking with public notice and comment from January 30, 2023, to May 15, 2024, in which it addressed this exact issue. 89 Fed. Reg. 42602, 42644 (May 15, 2024) ("BOEM is amending these regulations to clarify that none of the enumerated requirements is intended to outweigh or supplant any other. The purpose of this change is to clarify that BOEM takes all of these relevant factors into consideration in planning and administering its renewable energy program and that no one factor or consideration, by itself, should outweigh the other relevant considerations."). BOEM offers no explanation as to why three years later it needs to reconsider an issue it has already considered in depth. Courts find in such circumstances that there is no substantial and legitimate interest allowing remand. *Am. Waterways Operators*, 427 F. Supp. 3d at 96; *see also Mazaleski v. Truesdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) (describing a "reasonable" period for reconsideration as something "measured in weeks, not years"); *Pub. Emps. for Env't Resp. v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 32 (D.D.C. 2011) ("[F]or this Court to reverse and remand defendants' decision would conflict with the governing 'reasonableness standard,' because it would require the agency to conduct an identical analysis on this question

---

https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/New_England_Wind_App_O_RTC_Draft_EIS.pdf.

when it is clear that it has already looked closely at the environmental consequences of this decision.") (cleaned up).

Indeed, apart from reliance on the Anderson Opinion, the Motion and Giacona Declaration identify no specific concerns with BOEM's approval of the COP and allege only that BOEM "*may* have failed to account for all the impacts that New England Wind Projects 1 and 2 *may* cause" and "[o]ther record documents, such as the Environmental Impact Statement, *may* have also understated impacts that were then improperly weighed in making the determinations in the OCSLA Memo."  Giacona Decl. ¶ 14 (emphasis added).  Federal Defendants do not even attempt to describe the impacts BOEM "may" have failed to account for or identify which impacts "may" have been understated in the Project's environmental documents.  These vague allusions to potential and unspecified defects to conduct more study do not support a claim that BOEM has "substantial and legitimate concerns" with its prior approval to warrant remand.  *See NetCentrics Corp. v. United States*, 169 Fed. Cl. 453, 456 (2024) (rejecting the government's motion for voluntary remand as "unacceptably vague.").

BOEM's failure to explain the change in its position—especially when it has already considered and rejected the interpretation of OCSLA Section 1337(p)(4) it advances now—also conflicts with the "change-in-position doctrine," which provides that agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests."  *FDA v. Wages & White Lion Invs.*, LLC, 145 S. Ct. 898, 917 (2025).  BOEM has failed to meet any of those requirements.  And as discussed in Section IV.A.2 below, remand would fail to account for Defendant-Intervenors' reliance interests, including the over $725 million Defendant-Intervenors have spent

17

or committed to the Project, a substantial portion of which Defendant-Intervenors could lose if the case is remanded.

In *Loper Bright Enters. v. Raimondo*, the Supreme Court explained that "legal interpretation" "has been, 'emphatically' 'the province and duty of the judicial department' for at least 221 years." 603 U.S. at 399 (citing *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). "It therefore makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best." *Id.* at 400. Therefore, even if BOEM's ROD and COP approval were based on a mistaken interpretation of Section 1337(p)(4) (they were not), it is the Court—not BOEM—that must determine the "single, best meaning" of the statute, a judicial effort that has already begun with the Vineyard Wind cases. *Id.* The Jorjani Opinion is simply the agency's legal opinion—not a judicial determination of the "single, best meaning" of the statute. Unlike the Anderson Opinion, the Jorjani Opinion has not been adopted by any court as an appropriate reading of OCSLA Section 1337(p)(4) or codified into Interior's regulations.[20] Remanding the case to BOEM would only delay resolution of a matter that the *Court* must ultimately determine, at great detriment to the Project.

The Zerzan Opinion actually acknowledges that, under *Loper Bright*, a "'permissible' agency interpretation of a statute will not suffice to shield the agency from reproach if its reading is not the best, most faithful reading of the statute in question." Zerzan Opinion at 3.[21] The Zerzan

---

[20] *Seafreeze Shoreside*, 123 F.4th at 25-27.

[21] *See also* Secretary's Order No. 3437 entitled "Ending Preferential Treatment for Unreliable, Foreign-Controlled Energy Sources in Department Decision Making" at 2 (July 29, 2025) (admitting that the question of how to interpret OCSLA 1337(p)(4) is for the courts to determine under *Loper Bright*), available at https://www.doi.gov/document-library/secretary-order/so-3437-ending-preferential-treatment-unreliable-foreign. The Order claims that "the prior Department's leadership operated under the erroneous assumption that it could meet some criteria while ignoring or minimizing others." *Id* at 3. This is not correct, as a review of the administrative record will demonstrate.

Opinion then claims that the Anderson Opinion's interpretation of Section 1337(p)(4) to allow rational balancing is inconsistent with the First Circuit decision in *Seafreeze Shoreside v. United States Department of the Interior*, 123 F.4th at 25-27, which the Zerzan Opinion provides held that each criteria is "mandatory" and cannot be "to the determinant of another criteria." *Id*.

The Zerzan Opinion turns *Seafreeze Shoreside* upside down. There, the First Circuit Court of Appeals *affirmed* the district court's holding that "BOEM must have 'discretion' in considering whether each statutory criterion is satisfied, and must 'balance' the statutory mandate to develop energy projects on the Outer Continental Shelf with the twelve statutory criteria for which it must provide." *Seafreeze Shoreside, Inc.*, 123 F.4th at 25-26. In doing so, the First Circuit rejected an "absolutist" approach to the Section 1337(p)(4) factors, explaining that "[a] statute encouraging the development of offshore wind projects but obligating the BOEM to ensure that such projects be carried out in a manner that provides for safety, for example, cannot be read to prohibit project approval simply because one could imagine the project being involved in an accident." *Id.* at 30. Here, BOEM's approval of the COP was consistent with the First Circuit's interpretation of Section 1337(p)(4).

Moreover, interpretation and balance of the Section 1337(p)(4) factors is ripe and presumptively reviewable by the Court. *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791 (D.C. Cir. 2021) (a "purely legal claim . . . is presumptively reviewable"). Claims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues that are fit for review. *Fox Television Stations, Inc. v. F.C.C.*, 280 F.3d 1027, 1039 (D.C. Cir.), *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002) ("the issues in this case are fit for judicial review because the questions presented are purely legal ones: whether the Commission's determination was arbitrary and capricious or contrary to law"). Further, Defendant-Intervenors will suffer

considerable hardship as they will be forced to "undertake costly changes in response" to remand. *Shaffer v. Defense Intelligence Agency*, 601 F.Supp.2d 16, 23 (D.D.C. 2009); *see also infra* Section IV.A.2.

Since interpretation of the Section 1337(p)(4) factors is ripe for judicial review, review by this Court now of the parties' respective claims is also far more efficient than remanding this purely legal issue to BOEM only for this dispute to return to the Court at a later time. *Talamantes-Enriquez v. U.S. Att'y Gen.*, 12 F.4th 1340, 1349 (11th Cir. 2021) ("Remanding pure law issues to an administrative agency risks an 'idle and useless formality' of a proceeding. After all, administrative law 'does not require that we convert judicial review of agency action into a ping-pong game.'") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)).

Remanding to BOEM to interpret a purely legal issue that this Court must decide would be particularly wasteful and unnecessarily dilatory given that BOEM has *already* made its position known. In this lawsuit, BOEM's Acting Director has already opined: "I believe that the decision to approve the COP did not fully comply with section 8(p)(4) of OCSLA." Dkt. 18-1 ¶ 13. And Federal Defendants have consistently implemented the President's directive to "to not let any windmill be built." *See supra* Section II.C. Federal Defendants' basis for its Motion is pretextual and granting the Motion would do nothing to advance resolution of this case; rather it would allow Federal Defendants to use delay to try to kill the Project.

<blockquote>

b.    There is No Substantial or Legitimate Reason to Remand the COP Because it Complies with Section 1337(p)(4) as the Administrative Record will Demonstrate

</blockquote>

There is no "substantial and legitimate" concern justifying voluntary remand. Rather, the record will demonstrate that BOEM carefully scrutinized the Project against OCSLA Section 1337(p)(4). When BOEM approved the Project's COP, it carefully considered each of Section 1337(p)(4)'s factors and found "that the proposed activities will be carried out in a manner that

provides for safety, protection of the environment, prevention of waste, and the other factors listed in subsection 8(p)(4) of OCSLA." Schneider Decl. at Ex. F, ROD Appendix B at 24. BOEM analyzed and summarized the Project's provision for every one of the enumerated factors in Section 1337(p)(4) in a memorandum attached to its ROD approving the Project's COP. *See id*. at 15-34. BOEM concluded that "[t]he numerous consultations performed under various federal statutes, and the analysis in the Final EIS, indicate that approval of the Preferred Alternative would not result in undue harm to environmental resources or in unreasonable interference with other OCS uses." *Id*. at 36; *see also id* at 24-25. Accordingly, BOEM concluded that "[a]pproval of the COP—as modified by the Preferred Alternative and the proposed Terms and Conditions included with the ROD—would be in accordance with the regulations at 30 C.F.R. part 585 and would 'ensure' that all Project activities on the OCS are carried out in a manner that provides for the factors in Subsection 8(p)(4) of OCSLA." *Id*.

BOEM's analysis was consistent with the language of Section 1337(p)(4) and cases interpreting it. *Seafreeze Shoreside*, 123 F.4th 1, 25-26 ("BOEM must have 'discretion' in considering whether each statutory criterion is satisfied, and . . . BOEM must 'balance' the statutory mandate to develop energy projects on the Outer Continental Shelf with the twelve statutory criteria for which it must provide."). Importantly, the administrative record will demonstrate that BOEM's OCSLA compliance review properly evaluated whether there was unreasonable interference with other reasonable uses of the OCS. Accordingly, this Court should order briefing on cross motions for summary judgment before considering remand in this case, consistent with the approach taken by the District of Maryland in *Mayor & City Council of Ocean*

*City*, No. 1:24-cv-3111 which is requiring the Federal Defendants to produce the administrative record and the parties to brief cross-motions for summary judgment before it rules on remand.[22]

BOEM considered navigation and vessel traffic, aviation and air traffic, commercial fisheries and for-hire recreational fishing, scenic and visual interference, National Oceanic and Atmospheric Administration scientific research and surveys, and national security and defense as part of this review, before concluding the Project would not unreasonably interfere with these uses. Schneider Decl. at Ex. F, ROD Appendix B at 25-31.

With respect to interference with fishing—an area of concern identified by the Plaintiffs and Federal Defendants, *see* Mot. at 7, BOEM's review also comported with more specific guidance in the Jorjani Opinion regarding what may be considered "unreasonable interference." There, the Jorjani Opinion noted that if a wind project "would bar access to, or greatly impact fishing activity, then this degree of interference would rise to the level of unreasonableness" and that the Secretary should also consider cumulative interference, including "other pre-existing wind energy activities." Jorjani Opinion at 11-12. Indeed, BOEM explained that the Project "would result in moderate adverse impact to commercial fisheries and for-hiring fishing, depending on the fishery or fishing operation" and that "minor beneficial impacts from the presence of structures for commercial and for-hire recreational fishing operations could also occur." ROD Appendix B at 27. With respect to cumulative impacts, BOEM noted that "future planned actions, including future offshore wind approvals, could result in moderate impacts to commercial fisheries and for-hire recreational fishing, depending on the fishery or fishing operation." *id*. at 27-28. These

---

[22] *See* 9-18-25 Status Conference Tr. at 15:1 - 21:5, *Mayor & City Council of Ocean City*, No. 1:24-cv-3111, Dkt. 84; 10-7-25 Status Conference Tr. at 13:8-9, *Mayor & City Council of Ocean City*, No. 1:24-cv-3111, Dkt. 91. Schneider Decl. at Exs. C, D.

"moderate" impacts are by definition not the type of impacts that would "greatly impact" fishing activity as expressed in the Jorjani Opinion and in any event are also required to be mitigated. BOEM noted that, while fishing and transit may need to avoid *temporary* safety zones during Project construction, "[d]uring the operational period, fishing and transit would be permitted." *Id*. at 28.  To the extent larger vessels or vessels towing certain fishing gear "*choose* to avoid the Project Area due to operational concerns," BOEM "anticipate[s] that vessel operators that *choose* to avoid the area will fish or transit in other locations." *Id*. (emphasis added).  In addition, the Project has committed over $12 million to mitigate for any impacts to fishing activities, including millions of dollars in direct financial compensation for commercial and for-hire recreational fishers.  Second Kimmell Decl. ¶ 21.  Accordingly, there is nothing inconsistent with BOEM's consideration of fishing as another "reasonable use" of the Outer Continental Shelf and the Jorjani Opinion's guidance on what constitutes "unreasonable interference" and, therefore, no legitimate and substantial grounds for remand on that account.

There is no substantial and legitimate reason for remanding based on the Zerzan Opinion. The Federal Defendants do not claim—nor will the record show—that BOEM actually favored one Section 1337(p)(4) criteria over another when reviewing the Project.  To the contrary, BOEM reviewed each factor individually before confirming that "all Project activities on the OCS are carried out in a manner that provides for the factors in Subsection 8(p)(4) of OCSLA."  Schneider Decl., Ex. F at 36.

F, ROD Appendix B at 36.  Regardless, there is no legitimate basis to remand on these grounds because the regulations, which Federal Defendants acknowledge remain in effect, *see* Giacona Decl. ¶ 12, still authorize BOEM to "rational[y] balance" the Section 1337(p)(4) factors,

none of which "inherently outweighs or supplants any other." 30 C.F.R. § 585.102(a);[23] *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997) ("agencies in general, [are] bound to follow [their] own regulations"); *U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29, 35 (D.C. Cir. 2005) ("The Supreme Court has said that if an agency adopts 'a new position inconsistent with' an existing regulation, or effects 'a substantive change in the regulation,' notice and comment are required") (citing *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995)); *see also Refugee & Immigrant Ctr. for Ed. & Legal Servs.*, 793 F. Supp. 3d 19, 96 (D.D.C. 2025).

        c.        BOEM Has no Authority to Rescind the COP here.

Contrary to Federal Defendants' suggestion otherwise, Mot. at 7, they have no inherent authority to reconsider, revise, or replace New England Wind's COP approval as their request is untimely. As an initial matter, the D.C. Circuit has recognized that the concept of "inherent authority" "rests on a faulty premise." *Nat. Res. Def. Council v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023). "It is axiomatic that administrative agencies may act only pursuant to authority delegated to them by Congress." *Id.* (internal quotations omitted). Federal Defendants, then, "ha[ve] no inherent authority. [They] ha[ve] only the authority given to them by" Congress in OCSLA, the statute under which the COP was issued. *See id.* Here, OCSLA specifically describes when and how BOEM can cancel an already issued permit like the COP here. "[S]uch cancellation shall not occur unless . . . operations under such . . . permit shall have been under suspension . . . continuously for a period of five years," and then only when the Secretary of the Interior holds a hearing, makes specific findings about the project's impacts, and pays compensation to the project.

---

[23] Federal Defendants explicitly recognize that the current regulations at 30 C.F.R. § 585.102(a) were revised in 2024 "to be consistent with the now-withdrawn [Anderson Opinion]." *See* Giacona Decl. ¶ 12. While Federal Defendants claim that "BOEM is currently beginning preparations for a rulemaking that will amend that provision of the regulations, consistent with M-37086," *see id.*, the regulations remain in force and must be followed.

43 U.S.C. § 1334(a)(2)(A), (B).  Indeed, the D.C. Circuit has made clear that when Congress "provides statutory authority" to undo an agency determination, it "displace[s]" any "inherent authority" that the agency might otherwise have had to reconsider.  *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014).  Federal Defendants' claim of inherent authority here to re-evaluate the COP and potentially disapprove it would obviate the important limits on that authority in Section 1334(a)(2).

Furthermore, even if BOEM has some degree of inherent authority to reconsider BOEM's prior COP approval, BOEM (or any of the other Federal Defendants) may only exercise that authority "in a timely fashion."  *Ivy Sports Med., LLC*, 767 F.3d at 86; *see also Scotts Valley Band of Pomo Indians v. Burgum*, 1:25-cv-00958, 2025 WL 3034885 at *7 (noting that any inherent authority agencies have to revisit their prior decisions has two limits: (1) "[a]gencies cannot revisit past decisions when a statute forbids it or sets out another correction process" and (2) "[a]gencies may deploy their inherent reconsideration power only if they do so in a timely fashion.") (internal citation and quotation omitted).  The D.C. Circuit has described a "reasonable" period for reconsideration as something "measured in weeks, not years."  *Mazaleski*, 562 F.2d at 720.  Here, the Project's ROD was issued on April 1, 2024, BOEM approved the COP on July 1, 2024, and Federal Defendants' Motion was filed in December 2025.  Mot. at 4.  BOEM's reconsideration comes almost two years too late, after Defendant-Intervenors have invested hundreds of millions of dollars in reliance on the COP approval.  There is nothing "reasonable" or "timely" about Federal Defendants' approach to "re-evaluate" the COP approval here.

Moreover, the existing regulations are inconsistent with the interpretation of OCSLA Section 1337(p)(4) that BOEM seeks to apply on remand.  *See* 30 C.F.R. § 585.102 ("BOEM will ensure that any activities authorized in this part are carried out in a manner that provides for and

reaches a rational balance among the following goals . . . [listing OCSLA Section 1337(p)(4) factors].").  Federal Defendants concede this inconsistency when they state they are "considering" changing those regulations, *see* Giacona Decl. ¶ 18, but they have not even started a rulemaking, consistent with their pattern of delay.  BOEM's new legal interpretation of OCSLA Section 1337(p)(4) cannot amend the existing regulation or apply to New England Wind under "the APA's rulemaking requirements, which require regulations to go through notice and comment before they can bind third parties."  *Kisor v. Wilkie*, 588 U.S. 558, 561 (2019); *see also Refugee & Immigrant Ctr. for Ed. & Legal Servs.*, 793 F.Supp. 3d at 96 (recognizing that agencies "may not adopt guidance or other procedures that conflict with or disregard duly promulgated regulations" and holding that agency guidance inconsistent with its own regulations was arbitrary and capricious).

Furthermore, any new regulations would not apply retroactively to approvals that have been issued, such as New England Wind's COP approval.  *See Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010) ("Generally, an agency may not promulgate retroactive rules without express congressional authorization."); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law.  Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.").  Federal Defendants' proposal to remand to evaluate the Project under a yet-to-be-adopted rule is not a valid reason for remand and should be rejected by this Court.  For example, in *Lutheran Church–Missouri Synod v. FCC*, 141 F.3d 344, 348-49 (D.C.Cir.1998), the court denied an agency's request for voluntary remand after it claimed that it would apply a "new 'policy statement' retroactively and vacate" portions of agency action challenged in the litigation.  The

court denied the motion, recognizing it as a "legal tactic" to "avoid judicial review"—precisely what Federal Defendants are doing here. *See id.* at 349.[24]

### 2.      Remand Would Unduly Prejudice New England Wind

Granting BOEM's Motion would prejudice New England Wind in at least four ways, any one of which is sufficient grounds on its own for the Court to deny BOEM's Motion.

First, concurrently with filing their opposition to Federal Defendants' Motion, Defendant-Intervenors filed a Crossclaim against the Federal Defendants seeking declaratory relief that the federal approvals for the Project comply with OCSLA and other applicable federal law. Defendant-Intervenors are entitled to have their Crossclaim timely heard by the Court, but granting Federal Defendants' Motion would prevent that.  Standing alone, this is sufficient prejudice to Defendant-Intervenors to support the Court denying remand.  For example, in *USWAG*, environmental petitioners and industry petitioners challenged a 2015 rule by the Environmental Protection Agency governing coal residuals from powerplants.  901 F.3d at 419-20.  The industry petitioners challenged the EPA's authority to regulate inactive impoundments, and the environmental petitioners claimed that EPA's regulation of legacy ponds (a subset of inactive impoundments) was inadequate.  *Id.* at 432, 435.  The EPA sought a voluntary remand "to the agency's authority to regulate inactive impoundments so that it [could] reconsider its interpretation of the statute."  *Id.* at 436.  But the Court denied voluntary remand on that issue because "the

---

[24] The cases cited by Federal Defendants are either irrelevant or demonstrate why Federal Defendants have not shown a "substantial and legitimate" issue supporting remand here.  Motion at 9-11.  *Code v. McHugh*, 139 F. Supp. 3d 465, 468 (D.D.C. 2015) (remand would potentially resolve litigation; no intervenor or cross-claim in the case or legal interpretation of statute for court to decide under *Loper Bright*); *FBME Bank Ltd. v. Lew*, 142 F. Supp. 3d 70, 74 (D.D.C. 2015) (similar); *DACA's NAACP v. Trump*, 298 F. Supp. 3d 209, 243 (D.D.C. 2018) (case did not involve voluntary remand at all, but rather remand after the Court "concluded that [Deferred Action for Childhood Arrivals] rescission violated the APA"); *USWAG*, 901 F.3d at 436 (court denied remand in circumstances analogous to those here).

EPA's statutory authority over inactive sites necessarily implicates the Environmental Petitioners' claim regarding legacy ponds. So, even if Industry Petitioners are willing to go along with a remand, Environmental Petitioners are not and remand would prejudice the vindication of their own claim." *Id.* Precisely the same reasoning applies here; granting the Motion would prejudice Defendant-Intervenors' vindication of their own claims. *See Limnia, Inc.*, 857 F.3d at 381 (reversing district court's granting of motion for voluntary remand where "decision to grant the voluntary remand request functioned as a dismissal" of plaintiffs' claims).

Even if Defendant-Intervenors had no Crossclaim, a remand order would essentially be a ruling in favor of Plaintiffs and would prejudice Defendant-Intervenors' ability to protect their interests. None of the parties challenged Defendant-Intervenors' intervention, and Defendant-Intervenors unquestionably "claim[] an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede [Defendant-Intervenors'] ability to protect [their] interest." Fed. R. Civ. P. 24(a). Remand would prejudice Defendant-Intervenors since it would have essentially the same effect as if Defendant-Intervenors lost on the merits of the case and on their Crossclaim, but without any opportunity to actually adjudicate those claims. *See Limnia, Inc.*, 857 F.3d at 388 (finding that a "voluntary remand order was a 'remand' in name only" and the claimant's "position was the same as if its case had been dismissed on the merits" where a claimant would be unable to "vindicate its statutory rights under the APA"); *see also Keltner v. United States*, 148 Fed. Cl. 552, 568 (2020) (denying the government's motion for voluntary remand and finding that the plaintiff was "at least entitled to have his claims heard on the merits by th[e] [c]ourt without the government's interposing any further delay."); *Lutheran Church–Missouri Synod*, 141 at 348-49 (rejecting

voluntary remand to consider new "policy statement" retroactively as "unusual legal tactic[] . . . to avoid judicial review").

Second, Defendant-Intervenors would be prejudiced if the Federal Defendants are allowed to circumvent the strict deadlines for approving the Project under Title 41 of the Fixing America's Surface Transportation ("FAST") (referred to herein as "FAST-41") by seeking remand and re-opening their decision on the COP or other approvals.  FAST-41 was enacted by Congress to streamline permitting and judicial review for certain projects.  42 U.S.C. §§ 4370m – m-10. Through FAST-41, Congress adopted various measures to expedite permitting for covered projects, including a Federal Permitting Improvement Steering Council.  *Id*. § 4370m-1.  FAST-41 requires the Council to establish a permitting timetable.  *Id*. § 4370m-2(c)(2).  "Each Federal agency shall conform to the intermediate and final completion dates set forth in the permitting timetable . . . ."  *Id*. § 4370m-2(c)(2)(F)(i).  Once a permit schedule is approved, the final completion date can be extended "to a date more than 30 days after the final completion date originally established . . ." only after the agency in consultation with the Council consults "with the project sponsor" and makes "a determination on the record" after consideration of factors enumerated by statute.  *Id*. § 4370m-2(c)(2)(D)(i)(IV).  In extending the permit schedule, the agency and the Council can consider the "size and complexity of the covered project" and similar factors.  *Id*. § 4370m-2(c)(2)(B).  Extensions of a schedule by more than 50% from the "establishment of the permitting timetable" to the "to the last final completion date" in the original schedule are prohibited unless approved by "[t]he Director of the Office of Management and Budget, after consultation with the project sponsor," and then "the Director of the Office of Management and Budget shall transmit, not later than 5 days after making a determination to permit an authorization of extension under this subclause, a report to Congress explaining why

such modification is required. Such report shall explain to Congress with specificity why the original permitting timetable and the modifications authorized by the Executive Director failed to be adequate." *Id*. § 4370m-2(c)(2)(D)(iii)(II).

Here, the Project is a covered project under FAST-41.[25]  Federal Defendants have not consulted with Defendant-Intervenors or completed any of the other required steps Congress mandated under FAST-41 to extend the permitting timetable.  The FAST-41 process was initiated on March 15, 2021 and the initial completion date was September 30, 2023—for an initial schedule length of 30 and a half months (929 days).[26]  So any extension past January 7, 2025 (465 days past the "last final completion date" in the original permitting timetable) requires consultation with Defendant-Intervenors, approval by the Director of the Office of Management and Budget, and a detailed report to Congress.  42 U.S.C. § 4370m-2(c)(2)(D)(iii)(II).  That has not been done here. By seeking remand and further consideration of their OCSLA decision and the COP, Federal Defendants are impermissibly extending the permitting timetable under FAST-41, but without taking any of the required steps the Congress mandated under FAST-41.  Especially given that Federal Defendants already considered the proper interpretation of OCSLA Section 1337(p)(4) during the Project permitting, this attempt by Federal Defendants to "circumvent the statutory requirement" of FAST-41 is highly prejudicial to Defendant-Intervenors.  *Am. Waterways Operators v. Wheeler*, 427 F. Supp. 3d 95, 96 (D.D.C. 2019) (rejecting motion for voluntary remand where "[g]ranting EPA's remand request to elicit more comments on costs after it considered and rejected the cost information it had the first time around would effectively allow

---

[25]    *See* Fed. Permitting Improvement Steering Council, https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/new-england-wind (last visited January 15, 2026).

[26] *Id.*

EPA to circumvent the statutory requirement to receive comments and issue a determination" within a statutory deadline).

Third, Defendant-Intervenors will face the prospect of crushing delay if the Court grants voluntary remand. The Acting Director of BOEM stated in his declaration that "I believe that the decision to approve the COP did not fully comply with section 8(p)(4) of OCSLA." In light of the administration's stated goals to not allow any wind projects to be built and the adverse actions to date against the industry, *see supra* Section II.C, the Court should grant BOEM no presumption of regularity.

Further, remand will do nothing to advance the asserted basis for remand, which is ultimately a legal issue the Court must adjudicate. *See supra* Section IV.A.1.a. And because the Defendants seek a remand untethered to any timeline for resolution, a remand places the Project in limbo, as Defendant-Intervenors are unable to advance the Project for an unknown period of time. Second Kimmell Decl. ¶¶ 40-59. Instead, the Court should deny the Motion and promptly hear Defendant-Intervenors' Crossclaim. In *American Waterways Operators v. Wheeler*, the Court denied EPA's motion for voluntary remand its decision in part because of the uncertainty it would create, providing:

> A remand also will leave regulated parties uncertain as to their compliance obligations. For instance, certain vessels, including tug boats, commercial fishing vessels, and small commercial passenger vessels, do not need to come into compliance until 2023. . . . If the court remands EPA's decision on the agency's proposed timetable, these boat owners will experience substantial uncertainty as to whether to begin the process of coming into compliance with the no-discharge zone or wait to see if EPA reverses course.

427 F. Supp. 3d at 100. A voluntary remand here would similarly create uncertainty, preventing Defendant-Intervenors from being able to rely on their approved COP—this highly prejudicial impact is much greater than that in *Wheeler* and justifies denying remand. Second Kimmell Decl. ¶¶ 40-59.

Fourth, remand would prejudice Defendant-Intervenors by harming their reliance interests and threatening the Project with extinction.  The prejudice is most acute for the first phase of the Project, New England Wind 1, as it has won a bid award from the Commonwealth of Massachusetts, has secured all necessary permits, and but for the administration's actions would have been ready for construction in 2025.  Granting the Motion and voluntary remand would be an existential threat for New England Wind 1.  Thus, the argument below focuses primarily on the prejudice to New England Wind 1 and the term "the Project" in this section of the brief means New England Wind 1.

Defendant-Intervenors have invested over 10 years and committed hundreds of millions of dollars to date to plan, permit, and develop this Project.  Second Kimmell Decl. ¶¶ 34-35.  They have entered into over 15 major contracts to manufacture, transport, and install Project components, and to lease vessels.  *Id*. ¶ 36.  Defendant-Intervenors cannot conduct any construction activities on the leases without a duly issued COP and the cloud a remand creates in light of the Acting Director's declaration effectively prevents any development.  *See, e.g.,* 30 C.F.R. §§ 585.600, 585.620(c).

Remanding the COP approval to allow BOEM's reconsideration would unduly prejudice New England Wind 1 by threatening those investments as well as New England Wind's very existence and future.  Second Kimmell Decl. ¶¶ 40-59.  There is a serious risk that New England Wind 1 will not survive the opaque and indeterminate remand that Federal Defendants request.  Park City Wind LLC's sole purpose is to develop an offshore wind farm.  *Id*. ¶ 3.  The administration's attacks on the wind energy industry—including the Project—has forced Defendant-Intervenors to pay additional costs to resolicit, renegotiate, or extend required contracts and revise the Project's construction schedule.  *Id*. ¶¶ 44, 46.  A decision rejecting Plaintiffs' claims

on the merits and upholding Defendant-Intervenors' Crossclaim would provide necessary certainty to Defendant-Intervenors, the Project, and other key stakeholders, including investors and vendors on whom Defendant-Intervenors must rely to complete Project construction.

Federal Defendants also erroneously assert, Mot. at 12, that New England Wind 1 "would not be prejudiced because project construction has not yet commenced and is not imminent." Not so. Illegal delays by the Federal Defendants, such as the permit moratorium directed by the President's Memorandum on the first day of the administration, have already caused Defendant-Intervenors to pause key milestone dates, and further delays will have a cascading effect and may ultimately kill the project. *Id.* ¶¶ 37-39. Defendant-Intervenors have already renegotiated its Transmission Support Agreement with Eversource to support a revised construction schedule and commercial operations in 2029, increasing the costs of the Agreement by more than $45 million. *Id.* ¶ 55. Such delays have already forced the Project to attempt to reschedule specialized vessels to install turbine foundations. *Id.* ¶¶ 43, 54.

Any further delay will threaten the existence of New England Wind 1 by threatening its ability to complete the PPA and renegotiate key contracts such as vessel installation contracts, thereby threatening the expiration of the LOA before the Project can be completed, and threatening the ultimate commercial operation date, which could result in the forfeiture of billions of dollars in investment tax credits. *Id.* ¶ 54. As the sponsor, Defendant-Intervenors must take many significant preparatory steps before construction may begin, including acquiring necessary materials and entering into contracts, securing investments, and stakeholder and public engagement. *Id.* ¶¶ 36, 45, 54, 58-60. The Project's construction schedule had also been carefully sequenced into a series of steps, each of which must be thoroughly and carefully complete before progressing to the next step. *Id.* ¶ 40.

For example, under the LOA, New England Wind 1's construction schedule must comply with seasonal weather variations and seasonal environmental mitigation measures that restrict the periods during which various construction activities are permitted to protect various species. *Id*. ¶¶ 19, 42-44. Thus, pile driving is not allowed during a four month period, onshore construction is limited to certain times of the day and is also prohibited for four months a year, export cable installation and related activities at the landfall site are prohibited during a five month period, and there are multi-year pre-construction environmental survey requirements that must be conducted during certain seasons (not just calendar years). *Id*. To complicate matters further, the LOA is set to expire on March 26, 2030, and cannot be renewed without undergoing a new, lengthy, "start from scratch" permitting process. *Id*. ¶¶ 20, 44-45. And because wind turbine foundation installation is prohibited from January to April, installation actually needs to be completed by end of 2029. *Id*. ¶¶ 44-45. In order to meet LOA requirements before the deadline, PPAs must be negotiated and signed, installation vessels must be secured, two years of pre-construction surveys must be completed, pre-construction geophysical surveys mitigating boulder risk and unexploded ordnance ("UXO") risk must be completed, construction plans must be prepared, submitted and approved by the National Marine Fisheries Service,[27] a Facility Design Report and Fabrication and Installation Report must be submitted to the Bureau of Safety and Environmental Enforcement for review, and verified by the Certified Verification Agent, and the foundations must be manufactured and installed. *Id*. ¶ 44. Therefore, even a slight delay in the schedule can have a significant domino effect of repercussions that can lead to the costly expiration of the LOA. *Id*. ¶ 45. A remand would all but ensure that the schedule would not be met and the LOA would

---

[27] See 30 C.F.R. 285.700-702, 704-708.

expire prior to completing necessary work, increasing costs and further delay, and affecting the very viability of the Project as a whole.  *Id.* ¶¶ 40-45.

Should the LOA expire, reaching commercial operation by a key outside date of 2033 becomes extremely difficult, if not impossible.  *Id.* ¶ 45.  That date is critical because in order to utilize the tax credits provided for under the Inflation Reduction Act, New England Wind 1 must reach commercial operation by the latest 2033.  *Id.*  Critically, offshore wind projects take 4-5 years to construct, and if it is required to secure a new LOA for the Project after 2029, there is a significant risk that New England Wind 1 will not reach that milestone and would lose vital renewable energy tax credits worth billions of dollars.  *Id.*  Without the tax credits, it would be impossible for Defendant-Intervenors to proceed under the current fixed price bid award terms included in the form Power Purchase Agreement, dooming the Project.  *Id.*

Defendant-Intervenors' inability to negotiate and enter into a PPA for New England Wind 1 with the Commonwealth's electric distribution companies, Eversource, National Grid, and Unitil, is yet another example of significant prejudice that has already been caused by the Federal Defendant's Motion.  *Id.* ¶¶ 47-51.

In 2022, Massachusetts enacted An Act Driving Clean Energy and Offshore Wind.  St. 2022, c. 179.  The Act aims to move Massachusetts toward net-zero greenhouse gas emissions by 2050 through the promotion and development of offshore wind, including by requiring procurement of 5,600 megawatts of offshore wind by June 30, 2027.  *Id.* § 61(b).  Once agreement is reached, the Massachusetts Department of Public Utilities must review and approve the PPAs, which could take up to nine months.  Second Kimmell Decl. ¶ 47.

As of September 2024, Defendant-Intervenors had won a bid award for energy from New England Wind 1 following a competitive solicitation, and was in the process of completing long-

term PPAs with the electric distribution companies. *Id.* ¶¶ 30, 47-48. However, due to changing federal policy commencing in 2025, including the administration's moratorium on the issuance of permits and other approvals for offshore wind projects, Defendant-Intervenors have been forced to hold off on executing PPAs for the New England Wind 1 Project, because they cannot bind themselves to build and operate a wind farm that lacks the necessary federal permits. *Id.* ¶¶ 48, 50. The Federal Defendants' Motion has now completely paused any possibility of signing a PPA, as signing a long term 20-year contract without having the permits in hand would expose New England Wind 1 to enormous financial risk. *Id.* ¶¶ 49-51. Indeed, if Defendant-Intervenors were to execute PPAs but failed to bring New England Wind 1 online within the timeframes required due to a remand they could be subject to liquidated damages in excess of $150 million owed to the utility companies. *Id.* ¶ 48. The current deadline to execute a PPA is June 30, 2026, and meeting this date is not possible if a remand were granted. *Id.* ¶ 49.

New England Wind 1's construction schedule also requires the availability of specialized vessels that are required for construction—these vessels are in limited supply globally and tightly scheduled often years in advance. *Id.* ¶¶ 43-44, 53. New England Wind 1 has already faced challenges with scheduling the necessary vessels for installation of the offshore foundations and substation due to uncertainty surrounding the Project. *Id.* ¶¶ 52-54. New England Wind 1 requires at least 12 months to work to install foundations and there are very few vessels world-wide capable of handling the weight required to install foundations, and scheduling these vessels must be done years in advance. *Id.* ¶¶ 44, 53. Due to the administration's policies on offshore wind projects, including Federal Defendants' Motion, Defendant-Intervenors have been unable to procure a vessel for foundation installations at New England Wind 1. *Id.* ¶¶ 39, 43. New England Wind 1 has also been attempting to reschedule the Vessel Reservation Agreement secured for the

installation of the offshore substation. *Id*. ¶¶ 54. While vessels were previously scheduled for a 2029 commercial operation date, that date is no longer feasible due to the unlawful actions of the Federal Government. *Id*. And it is now facing challenges to reschedule the offshore substation vessel reservation as the current environment has made vessel operators hesitant to provide a new schedule for vessels that will meet the Project's goals. *Id*. Unless the work on New England Wind 1 can be completed before the LOA expires, the Project will need to restart a lengthy and expensive permit process, risking the vital tax credits needed for the Project. *Id*. ¶¶ 45, 54. The current situation, which will be immensely exacerbated by a remand of indeterminate length, will make it virtually impossible to reschedule vessels in the timeframe needed and threaten New England Wind 1's viability. *Id*. ¶ 54.

Simply stated, *any* further delay to the start of the Project's start of construction due to a remand (including delay stemming from BOEM's proposed indefinite reconsideration of the Project's COP Approval) will cause cascading effects on the rest of New England Wind 1's construction schedule, which could cause its LOA to expire before work is complete as well as causing the Project to miss the outside completion date of 2033 to utilize billions of dollars of grandfathered tax credits. Second Kimmell Decl. ¶¶ 45, 54. Allowing this litigation to tarry while BOEM indefinitely reconsiders the Project's otherwise final COP could effectively shut down the Project and bankrupt Park City Wind LLC. *See, e.g.*, *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004) (granting a preliminary injunction to keep a pipeline project on schedule to avoid incurring substantial costs and missing contractual deadlines); *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 218-19 (4th Cir. 2019) (finding that monetary harm from construction delays constitutes irreparable injury for purposes of preliminary injunction); *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 (D.D.C. 2014)

(same, where harm threatens the very existence of the movant's business); *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (same).

Federal Defendants rely on *Town & County Of Nantucket, Massachusetts v. Burgum* but that case is clearly distinguishable. No. 25-cv-906, 2025 WL 3120419 (D.D.C. Nov. 4, 2025). First, Defendant-Intervenors have demonstrated that they would suffer significant and immediate hardship from remand—effectively killing New England Wind 1 by making it impossible to sign a PPA, install foundations before the LOA expires, and schedule installation vessels in a timely manner—in sharp contrast the Court's finding in *Town & Cnty. Of Nantucket* that there was a "lack of [such] evidence." *Id*. at *1; *see also* Second Kimmell Decl. ¶¶ 40-59. Second, unlike the project in *Town & Cnty. Of Nantucket*, New England Wind 1 here is fully permitted with all of the necessary major approvals for construction. Second Kimmell Decl. ¶ 9.[28] Third, here, unlike with the project in *Town & Cnty. Of Nantucket*, Defendant-Intervenors have filed a Crossclaim that would be indefinitely delayed if the Motion is granted—standing alone that is ample prejudice to deny the Motion and a significant distinguishing factor from *Town & County Of Nantucket*. *USWAG*, 901 F.3d at 419-20; *Limnia, Inc.*, 857 F.3d at 381. Fourth, in the *Town & Cnty. Of Nantucket* case the project's COP was issued only 8 months before the government sought remand, while here New England Wind's COP has been in place for nearly 18 months, and during that period, Defendant-Intervenors have made significant investments and decisions in reliance on its duly issued COP. *American Waterway Operators v. Wheeler*, 427 F. Supp. 3d 95, 99 (D.D.C. 2019) (denying remand where it would "unduly prejudice" Intervenors that took action in reliance

---

[28] *See also* FAST-41 permitting dashboard showing status of all permits as "Complete," available at: https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/new-england-wind. https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/southcoast-wind-energy-llc-southcoast-wind.

on a prior EPA determination that would be placed "in limbo" during remand); *see also Dkt.* 1 at 45-46 (Plaintiffs' eight prayers for relief of which only one invokes the Project's COP).  And finally, in *Town & County Of Nantucket* the Court reasoned that "an agency does not need a remand to reconsider a challenged rule—it can do so at any time, including while challenges are pending before this court." 2005 WL 3120419 at *2 (citing *Utah ex. rel. Cox v. EPA*, No. 23-1157, 2025 WL 1354371, at *5 (D.C. Cir. May 2, 2025)).  Federal Defendants are not proposing remand to reconsider a rule of general applicability, but a duly issued COP that was approved more than a year and half before the Motion resulting in significant reliance interests that are wholly ignored by the Federal Defendants.  And as shown above, Federal Defendants cannot reconsider or rescind the COP in these circumstances.  *Supra* Section IV.A.1.c.

*Friends of Animals v. Williams*, cited by Federal Defendants, highlights why this case is not appropriate for remand.  Unlike that case in which there was a "possibility of FWS providing Friends of Animals all of the relief it seeks without the need for further litigation," 628 F. Supp. 3d 71, 78 (D.D.C. 2022), here BOEM's reconsideration may only address one of Plaintiffs' four claims—indeed, any modifications to BOEM's COP approval under OCSLA will not address Plaintiffs' allegations raised under the MMPA, ESA, or NHPA.

### 3.    Remand Would Not Promote Judicial Economy

Contrary to Federal Defendants claim, remand would not promote judicial economy but would only needlessly prolong litigation.  Mot. at 11-12.  The rationale underlying Federal Defendants' cited cases is that when all sides of a dispute acknowledge error, remand offers the possibility of resolving concerns in the underlying litigation.  *See Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C.Cir.1993) (recognizing preference "to allow agencies to cure their own mistakes rather than wast[e] the courts' and the parties' resources reviewing a record that **both sides** acknowledge to be incorrect or incomplete.") (Emphasis added.); *FBME Bank Ltd. v. Lew*,

142 F. Supp. 3d 70, 74 (D.D.C. 2015) ("All that FinCEN seeks is a temporary stay to allow it to pursue further administrative action to remedy the likely procedural defects that this Court identified in FinCEN's prior rulemaking."); *Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 134 (D.D.C. 2010) ("Voluntary remand will also preserve this Court's scarce judicial resources by providing the federal defendants' the opportunity to 'cure their own mistakes.'").  In contrast, here Defendant-Intervenors have filed their own Crossclaim and intend to challenge any future decision by Federal Defendants to revoke its approval of the Project.  Accordingly, there is no possibility that remand will resolve both Defendant-Intervenors' and Plaintiffs' claims regarding the sufficiency of BOEM's review and approval.  In fact, this Court will ultimately need to resolve the legal issue regardless of what BOEM does on remand.  Where remand would not resolve all the underlying claims and could instead potentially result "in piecemeal litigation over [the agency's] determination for years to come," judicial economy is not preserved.   *See Am. Waterways Operators v. Wheeler*, 507 F. Supp. 3d 47, 57-58 (D.D.C. 2020) (recognizing that "[n]o one benefits from" remand where "the parties potentially could be mired in piecemeal litigation over [the agency's] determination for years to come").   The fact that Federal Defendants' justification for remand hinges exclusively on the correct interpretation of Section 1337(p)(4), which is ultimately a determination for the Court, is further evidence that remand would not promote judicial economy but only delay resolution of this case.  *Pub. Emps. for Env't Resp.*, 832 F. Supp. 2d at 32; *Talamantes-Enriquez*, 12 F.4th at 1349; *Salem v. Pompeo*, No. 19CV363LDHCLP, 2024 WL 1364320, at *4 (E.D.N.Y. Mar. 31, 2024) (finding that remand would not promote efficiency where "Plaintiffs complain of constitutional violations that are best resolved by the court, rather than the agency.").

### B.    The Court Should Decline to Issue a Stay

As "[t]he proponent[s] of the stay," Federal Defendants "bear[] the burden of establishing its need," *see Clinton v. Jones*, 520 U.S. 681, 708 (1997), and "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else[,]" *see Philipp v. Fed. Republic of Germany*, 253 F. Supp. 3d 84, 88 (D.D.C. 2017) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936)). To determine whether to issue a stay, this Court must consider: "(1) harm to the nonmoving party if a stay does issue; (2) the moving party's need for a stay—that is, the harm to the moving party if a stay does not issue; and (3) whether a stay would promote efficient use of the court's resources." *Ctr. for Biological Diversity v. Ross*, 419 F. Supp. 3d 16, 20 (D.D.C. 2019).  Here, the "district court's issuance of an indefinite stay order must be supported by 'a balanced finding that such need overrides the injury to the party being stayed.'"  *See Belize Soc. Dev. Ltd. v. Gov't of Belize,* 668 F.3d 724, 732 (D.C. Cir. 2012) (quoting *Dellinger v. Mitchell*, 442 F.2d 782, 787 (D.C. Cir. 1971).  Federal Defendants have not met their burden here.

As an initial matter, issuing an indefinite stay pending resolution of BOEM's reconsideration of the Project's COP will harm Defendant-Intervenors, particularly in light of the Crossclaim filed by Defendant-Intervenors in this case for declaratory relief.  *Supra* Section IV.A.2; *Schneider v. Dumbarton Devs., Inc.*, 767 F.2d 1007, 1017 (D.C. Cir. 1985) (intervenor "becomes a full participant in the lawsuit and is treated just as if it were an original party").  Here, "[a]n indefinite stay would severely prejudice [Defendant-Intervenors who are] wholly blameless with respect to the present difficulty." *Nat'l Airmotive v. Gov't & State of Iran*, 491 F. Supp. 555, 556 (D.D.C. 1980).  The prejudice is particularly manifest given Federal Defendants' open-ended request. *Garcia v. Credit One Bank, N.A.*, No. 218CV191JCMGWF, 2018 WL 11304605, at *2

41

(D. Nev. Oct. 3, 2018) ("immeasurable delay [is] prejudicial"); *Barton v. D.C.*, 209 F.R.D. 274, 278 (D.D.C. 2002).

A stay would clearly harm Defendant-Intervenors, but Federal Defendants fail to meet their burden of showing they would be harmed without a stay. *See Ctr. for Biological Diversity*, 419 F. Supp. 3d at 20. Here, Defendant-Intervenors have lodged a Crossclaim thus Federal Defendants "bear the burden of making out a clear case of hardship or inequity in being required to go forward, given the fair possibility that the proposed stay will damage [Defendant-Intervenors] at a minimum, by delaying any resolution of their claims." *See Asylumworks v. Mayorkas*, No. 20-CV-3815 (BAH), 2021 WL 2227335, at *6 (D.D.C. June 1, 2021) (internal citation and quotations omitted) (cleaned up). Furthermore, where, as here, "the moving party seeks a stay 'of indefinite duration'—*i.e.*, when 'the record fails to show either what a 'resolution' of [the] case would entail or when such a resolution is likely to be reached'—that party must show not just a need for a stay under the second factor, but 'a pressing need.'" *Maine Lobstermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, No. CV 21-2509 (JEB), 2023 WL 7128474, at *2 (D.D.C. Oct. 30, 2023) (quoting *Belize Soc. Dev. Ltd.*, 668 F.3d at 733). Federal Defendants fail to establish any need, let alone a pressing one.

Federal Defendants argue that a stay pending BOEM's indeterminate review "would avoid significant prejudice to Federal Defendants" by allowing them and the Department of Justice to avoid expending limited agency resources to litigate the merits of this agency decision. Mot. at 15. But "being required to defend a suit, without more, does not constitute a clear case of hardship or inequity. This is particularly true of counsel for the United States, the richest, most powerful, and best represented litigant to appear before the Court." *Ctr. for Biological Diversity v. Ross*, 419 F. Supp. 3d 16, 21 (D.D.C. 2019) (cleaned up).

Furthermore, contrary to Federal Defendants' claims, a stay would not "promote judicial economy." Mot. at 14-15. Federal Defendants cite cases where staying proceedings is appropriate due to "legitimate developments that could obviate the need for judicial review," *see e.g.*, Mot. at 14, and claim that "the interests of judicial economy favor a stay of litigation because the outcome of BOEM's reconsideration on remand may moot or narrow Plaintiffs' claims," Mot. at 15. Not so. Even if BOEM's reconsideration on remand has the potential to narrow or moot *Plaintiffs' claims* (a position which Defendant-Intervenors do not concede as discussed *supra* Section II.D), it will do nothing to address Defendant-Intervenors' Crossclaim and only delay the Court's inevitable consideration of BOEM's review of the Project at considerable (indeed existential) harm to New England Wind. Here, the only specific issue that BOEM has alleged with respect to its approval of the Project concerns the agency's interpretation of Section 1337(p)(4). Because it is the Court that must ultimately answer this question of statutory interpretation, "a stay will not streamline issues at trial or reduce the burden of litigation for the Parties or the Court" and it should be denied. *See Canvs Corp. v. Flir Sys., Inc.*, No. 14-cv-180, 2014 WL 12616944, at *2 (M.D. Fla. June 10, 2014). Indeed, "[p]ostponing the resolution of the issues raised in this case for some indefinite time does not comport with the efficient and timely judicial resolution of matters before the federal courts." *See DSMC, Inc. v. Convera Corp.*, 273 F.Supp.2d 14, 31 (D.D.C.2002).

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Federal Defendants' Motion, direct Federal Defendants to answer the complaint and Defendant-Intervenors' Crossclaim within 14 days of this Court's order pursuant to Federal Rule of Civil Procedure 12(a)(4), and proceed with the filing of the administrative record and merits briefing on both Plaintiffs' claims and Defendant-Intervenors' Crossclaim.

Dated: January 16, 2026

Respectfully submitted,

/s/ Janice M. Schneider
Janice M. Schneider (D.C. Bar No. 472037)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: janice.schneider@lw.com

Daniel P. Brunton (*Pro Hac Vice*)
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA
Telephone: (858) 523-5400
Facsimile: (858) 523-5450
Email: daniel.brunton@lw.com

*Attorneys for Defendant-Intervenors*
*Avangrid Power, LLC, Park City Wind LLC,*
*and Commonwealth Wind, LLC*