# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ACK FOR WHALES, INC., *et al.*,

       *Plaintiffs,*

   v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

       *Defendants,*

  and

AVANGRID POWER, LLC,
PARK CITY WIND LLC, and
COMMONWEALTH WIND, LLC,

       *Defendant-Intervenors.*

Case No.: 1:25-cv-01678-AHA

Hon. Amir H. Ali

<u>Hearing Requested</u>

**SECOND DECLARATION OF KEN KIMMELL IN SUPPORT OF
DEFENDANT-INTERVENORS AVANGRID POWER, LLC; PARK CITY WIND LLC;
AND COMMONWEALTH WIND, LLC'S OPPOSITION TO FEDERAL DEFENDANTS'
MOTION FOR VOLUNTARY REMAND AND STAY**

Pursuant to 28 U.S.C. § 1746(2), I, Ken Kimmell, hereby declare:

    1.     I am employed by Avangrid Power, LLC ("Avangrid") as Chief Development

Officer for Offshore Wind, where I have been involved in the permitting and development for the

commercial-scale New England Wind Project.  The New England Wind Project is being developed

in two phases—New England Wind 1 and New England Wind 2 (both phases are collectively

referred to as the "Project").  The Project will be located in federal waters approximately 14 miles

south of Martha's Vineyard, Massachusetts, and approximately 14 miles southwest of Nantucket,

Massachusetts.   At Avangrid, I lead a team that develops new offshore wind business

opportunities, obtains federal, state, and local approvals for Avangrid's offshore wind Projects,

secures infrastructure and economic development partnerships, and ensures implementation of workforce and other commitments made by the Projects.

2.      Before this position, I served as President of the Union of Concerned Scientists, Commissioner of the Massachusetts Department of Environmental Protection, and as General Counsel at the Executive Office of Energy and Environmental Affairs in Massachusetts.  I have also practiced law for 17 years as the director and senior attorney at a Boston-based law firm specializing in environmental, energy, and land-use issues.  I earned a bachelor's degree at Wesleyan University and a law degree at the University of California, Los Angeles.

3.      New England Wind 1 is owned and developed by Park City Wind LLC, and New England Wind 2 is owned and developed by Commonwealth Wind, LLC.  Park City Wind LLC's sole purpose is to develop New England Wind 1, and Commonwealth Wind, LLC's sole purpose is to develop New England Wind 2.  Park City Wind LLC and Commonwealth Wind, LLC are both wholly owned by Avangrid Power, LLC (which was formerly known as Avangrid Renewables, LLC).  Avangrid Power, LLC, Park City Wind LLC and Commonwealth Wind, LLC are collectively referred to herein as "Defendant-Intervenors."

4.      Once complete, the Project will include up to 130 total positions for wind turbine generators ("WTGs") and Electrical Service Platforms ("ESPs"), generating up to 2,600 MW of electricity to meet existing and potential future offtake demands and power more than 900,000 homes and businesses each year.  For context, according to the Department of Energy, "[a] typical nuclear reactor produces 1 gigawatt [1,000 MW] of power per plant on average."[1]  Phase 1 of the Project (New England Wind 1) includes installation of up to sixty-two (62) WTGs and up to two (2) ESPs that will generate 791 MW of electricity.

---

[1] Office of Nuclear Energy, https://www.energy.gov/ne/articles/infographic-how-much-power-does-nuclear-reactor-produce.

5.      As Chief Development Officer for Offshore Wind at Avangrid, I have been responsible for securing all federal, state, regional and local permits for the Project, negotiating and concluding numerous commercial and real estate agreements needed for the Project, managing community benefits and stakeholder relationships, liaising with the teams that procure goods and services for offshore wind construction, and conferring with numerous public authorities who have jurisdiction over the Project.  I am, therefore, personally familiar with the Project's environmental permitting and development history.  I execute this Declaration in support of Defendant-Intervenors' Opposition to Federal Defendants' Motion for Voluntary Remand and Stay ("Motion") based on my personal knowledge of the matters referred to herein and, if called upon to do so, could and would testify truthfully thereto.

### *Defendant-Intervenors have Spent Millions Obtaining and Retaining the Project Leases.*

6.      On January 29, 2015, BOEM conducted a competitive lease sale for commercial leasing for wind power on the Massachusetts Outer Continental Shelf ("OCS") after conducting a thorough environmental review and issuing an environmental assessment.[2]  The lease areas offered in this competitive sale process were the result of an extended public planning process, including National Environmental Policy Act ("NEPA") review and consultation under National Historic Preservation Act ("NHPA") Section 106 regarding the issuance of the commercial lease and approval of site assessment activities.  On April 4, 2015, Vineyard Wind LLC[3] won lease OCS-A 0501 pursuant to this sale.[4]

7.      After the award of the lease, on June 28, 2021 BOEM approved an application to assign a portion of the lease to Park City Wind LLC, which resulted in the segregation of OCS-A

---

[2] ROD at Appendix B at. 2-4.
[3] At that time Avangrid was a joint venture partner in Vineyard Wind LLC.
[4] ROD at 3.

0501 and the creation of a new lease number, OCS-A 0534, for the segregated portion.[5]

8.      On March 19, 2024,  Park City Wind LLC submitted an application for a partial assignment of lease OCS-A 0534 to Commonwealth Wind, LLC.6  BOEM approved the assignment, and, on May 15, 2024, the Project was segregated into two leases, New England Wind 1 (OCS-A 0534) and New England Wind 2 (OCS-A 0561).  The northern portion of the original lease was retained by Park City Wind LLC and retains the original lease number given by BOEM (New England Wind 1), while the southern portion of the original lease was assigned to Commonwealth Wind, LLC (New England Wind 2).7  The OCS-A 0534 and OCS-A 0561 leases required that rent be paid annually.  To date, Defendant-Intervenors have paid over $3.3 million total in rent on the OCS-A 0534 and OCS-A 0561 leases and the associated easements.

### *The Project Underwent a Robust Permitting and Environmental Review Process.*

9.      Defendant-Intervenors spent a significant amount of time, effort, and money in the robust, extensive, multi-year planning and development process for the Project.  This includes working with technical and permitting experts to develop voluminous technical and scientific submissions for federal, state, and local agencies and participating in public consultation and review processes.  In total, following extensive agency engagement and review, the Project has obtained over thirty federal, regional, state and local permits and authorizations for construction and operation of the Project's facilities.  The first phase of the Project–New England Wind 1, is now fully permitted, with post-permit "sign offs" remaining such as review of the final installation plans.[8]  New England Wind 2 is at the same stage as New England Wind 1 at the federal level,

---

[5] ROD at 9.

[6] BOEM, New England Wind Leasing History, available at https://www.boem.gov/renewable-energy/state-activities/new-england-wind-1-and-2.

[7] *Id.*

[8] The Permitting Dashboard on the United States' Federal Infrastructure Project website indicates that all

except that it does not have a US Army Corps of Engineers permit, and is still pursuing certain state, regional and local permits.

10.     On May 10, 2018, BOEM issued its final approval for a Site Assessment Plan ("SAP") submitted by the Project's predecessor in interest, as then-required by BOEM regulations, to conduct site assessment activities in the existing lease area and the SAP.[9]  This involved the installation of buoys to collect metocean data (both meteorological and oceanic) and conditions.[10]  The Project also conducted extensive surveys to support development of the Construction and Operations Plan ("COP"), characterizing biological, water quality, geologic, geotechnical, geophysical, archaeological and benthic conditions in the lease area.[11]

11.     In July 2020, the Project's predecessor in interest submitted a detailed COP to BOEM, describing the planned facilities and construction and operation activities for a phased Project, which was renamed New England Wind after the lease segregation and assignment in 2021 to Park City Wind LLC.  On August 9, 2023, Park City Wind LLC submitted an updated COP to include updated technical information.  The final version of the COP, which provided minor administrative updates, was submitted in February 2024 and is thousands of pages long,

---

"environmental review and permitting" are "complete."  New England Wind Permitting Dashboard, available at https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/new-england-wind.

[9] ROD at 2; Site Assessment Plan (Nov. 22, 2017) at section 2.0 (describing results of geotechnical, geological, archeological, and biological surveys) and section 3.0 (site characterization and impact analysis for resources including coastal habitats, water quality, benthic resources, fisheries and essential fish habitat, marine mammals and sea turtles, coastal and marine birds and bats, archeological resources, social and economic resources, coastal and marine uses, and air quality), available at https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/MA/VW-Site-Assessment-Plan.pdf.

[10] ROD at 5.

[11] BOEM, New England Wind 1 and 2 Construction and Operations Plan at 1-7 to 1-15 (listing detailed requirements required under regulations for COP and cross-referencing COP sections and appendices where information is provided), available at https://www.boem.gov/renewable-energy/state-activities/new-england-wind-ocs-0534-construction-and-operations-plan.

including appendices.[12]

12.    On June 30, 2021, BOEM issued a Notice of Intent ("Notice") to prepare an Environmental Impact Statement ("EIS") under NEPA for its review of the Project COP.  That Notice began a more than two-and-a-half-year period of environmental review by the Federal Government and a public process involving Park City Wind LLC, nine federal agencies, nine state and local cooperating agencies, and an extensive array of other stakeholders—ranging from the fishing industry, to local communities, to American Indian tribes and historic preservation organizations.[13]   The draft EIS ("DEIS") was published on December 23, 2022, and, after accepting and responding to public comments, BOEM published the final EIS ("FEIS") on February 26, 2024.[14]

13.    BOEM's NEPA process included three public scoping meetings where interested parties were invited to offer feedback and identify issues and potential alternatives for BOEM to consider in the EIS.  BOEM held an additional three public meetings on the DEIS.  Park City Wind LLC attended all of the meetings and responded to many agency requests for information and questions throughout the COP review process.

14.    On April 1, 2024, BOEM issued a Record of Decision ("ROD") documenting the Department of the Interior's decision to approve the COP, with some modifications.[15]   On July 1, 2024, BOEM issued the COP approvals and Conditions for the COP approvals for both phases of

---

[12] *Id.*

[13] FEIS at Appendix A, A-4-7.

[14] The DEIS and FEIS are available under the "Environmental Review" tab at https://www.boem.gov/renewable-energy/state-activities/new-england-wind-1-and-2.

[15] Both the ROD and COP approvals are available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record%20of%20Decision_New%20England%20Wind_OCS-A%200534.pdf.

the Project.[16]  The COP approval conditions are extensive, each running over 80 pages with over

140 major compliance requirements and many more sub-requirements.

15.    BOEM and other cooperating agencies conducted the Endangered Species Act

("ESA") Section 7 consultation.  To support the consultation with the U.S. Fish and Wildlife

Service ("FWS"), BOEM reviewed and approved the Project's avian survey plan in 2018 and the

Project conducted primary surveys in the lease area over the course of a year.  The Project also

presented proposed avian and bat post construction monitoring measures to BOEM and FWS on

November 18, 2022, and, based on agency feedback, submitted the New England Wind Avian and

Bat Post-Construction Monitoring Framework on June 17, 2023.  The Project also responded to

numerous requests for information from BOEM and cooperating agencies during the ESA process,

including providing inputs for avian collision risk modelling.  BOEM submitted a draft Biological

Assessment to FWS on December 23, 2022 and continued to coordinate with FWS during the

course of the consultation.[17]  The Project received the draft Biological Opinion ("BiOp") in 2023

and provided feedback in advance of issuance.  On September 28, 2023, FWS issued a BiOp that

concluded that the Project is not likely to jeopardize listed species or destroy or adversely modify

critical habitat under FWS jurisdiction and included an Incidental Take Statement.[18]

16.    The Project also provided technical information to support the ESA consultation

with the National Marine Fisheries Service ("NMFS").  This included meetings and responding to

multiple requests for information from NMFS, as well as modeling to support take estimates.

---

[16] COP Approval Letters and Conditions of COP Approval for both New England I and 2 are available at  https://www.boem.gov/renewable-energy/state-activities/new-england-wind-1-and-2.

[17] FEIS at Appendix A, A-8-9.

[18] FWS, Biological Opinion for New England Wind (September 28, 2023) ("FWS BiOp"), at 40, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/20230928%20BOEM_New%20England%20Wind%20BO_Final%20alm%20signed.pdf.

BOEM submitted a draft Biological Assessment to NMFS on September 7, 2022 and continued to coordinate with NMFS throughout the consultation.  On February 16, 2024, NMFS issued a BiOp that assessed the potential effects of construction, operation, maintenance, and decommissioning of the Project on ESA-listed whales, sea turtles, fish, corals, and designated critical habitat in the Project area.[19]  The NMFS BiOp concluded that the Project is not likely to jeopardize the continued existence of any ESA-listed species under its jurisdiction.[20]

17.    More specifically, the NMFS BiOp concluded that the Project is likely to adversely affect but is not likely to jeopardize the continued existence of blue, fin, sei, sperm, or North Atlantic right whales or the Northwest Atlantic distinct population segment ("DPS") of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley, leatherback sea turtles, shortnose sturgeon, or any of the five distinct population segments of Atlantic sturgeon.[21] The BiOp also concluded that the Project is not likely to adversely affect giant manta rays, hawksbill sea turtles, oceanic whitetip sharks, or critical habitat designated for the New York Bight DPS of Atlantic sturgeon, and that the Project will have no effect on the Gulf of Maine population segment of Atlantic salmon or critical habitat designated for the North Atlantic right whale,[22] and "[t]here are no [Endangered Species Act] listed [distinct population segments] of humpback whales that occur in the action area."[23]  The BiOp included an Incidental Take Statement pursuant to ESA Section 7(b)(4), 16 U.S.C. § 1536(b)(4) that identified the permitted take incidental to the Project and extensive enforceable mitigation measures and requirements to avoid and minimize

---

[19] NMFS, Biological Opinion for New England Wind (Feb. 16, 2024) ("NMFS BiOp"), available at https://repository.library.noaa.gov/view/noaa/60610.
[20] *Id.*
[21] NMFS BiOp at 483.
[22] *Id.*
[23] *Id.* at 55.

impacts to listed species.[24]

18.     Pursuant to Sections 101(a)(5)(A) and (D) of the Marine Mammal Protection Act ("MMPA"), on December 1, 2021, Park City Wind LLC submitted a request for the promulgation of regulations, known as Incidental Take Regulations ("ITR"), and issuance of a letter of authorization ("LOA") for the taking of marine mammals, by harassment, incidental to construction activities associated with the Project.[25]  NMFS deemed the application complete in July 2022, and routine meetings were held with NMFS over a 14 month period to discuss the LOA, revised modeling, and revisions to the application.[26]  The application is hundreds of pages long and includes extensive data collection and analysis, including modeling, of the proposed activities, as well the numbers, status, and distribution of the species and stocks of marine mammals that could be affected, as well as proposed mitigation, monitoring and reporting requirements.

19.     On August 22, 2022, NMFS published in the Federal Register a notice of receipt of Park City Wind LLC's application and held a 30-day public comment period.[27]  NMFS published a proposed rule on June 8, 2023, and held another public comment period.[28]  Additional revisions and refinements were made to the application, all resulting in a reduction in expected

---

[24] *Id.* at Section 11: Incidental Take Statement.

[25] ROD at 26.

[26] Application for MMPA Rulemaking and Letter of Authorization (July 2022), available at https://media.fisheries.noaa.gov/2022-08/NewEnglandWind_2023LOA_App_OPR1_508.pdf.

[27] Taking and Importing Marine Mammals; Taking Marine Mammals Incidental to Construction of the New England Wind Offshore Wind Farm, Offshore Massachusetts, 87 Fed. Reg. 51345 (August, 22, 2022), available at https://www.federalregister.gov/documents/2022/08/22/2022-18057/taking-and-importing-marine-mammals-taking-marine-mammals-incidental-to-construction-of-the-new

[28] Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the New England Wind Project Offshore Massachusetts, Proposed Rule, 88 Fed. Reg. 37606 (June 8, 2023), available at https://www.federalregister.gov/documents/2023/06/08/2023-11814/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the.

and requested take.[29]  On June 21, 2024, NMFS published its final ITR authorizing incidental take

of small numbers of marine mammals by Level A and B harassment for the Project.  No take from

mortality or serious injury to any marine mammals is anticipated or authorized.[30]  To protect North

Atlantic right whales and other marine mammals, the final rule includes months-long seasonal

moratoriums on impact pile driving, drilling, vibratory pile driving and, if required, removal of

unexploded ordinance, with limited exceptions requiring NMFS approval.[31]

20.    In accordance with the final rule, NMFS issued a LOA authorizing the incidental

take, by unintentional harassment, of marine mammals incidental to construction-related activities

within the Project area for a period of five years from March 27, 2025, through March 26, 2030.[32]

The LOA is issued to Avangrid, which will oversee the construction of both phases of the Project

by its two subsidiaries.[33]  In issuing the LOA, NMFS determined that the authorized take will have

a negligible impact on marine mammal stocks, will not have an unmitigable adverse impact on the

availability of the affected marine mammal stock for subsistence uses, and the mitigation measures

required will provide a means of affecting the least practicable adverse impact on the affected

stocks and their habitat.[34]  NMFS's LOA includes over 40 pages of mitigation requirements and

---

[29] Updates to the Application for MMPA Rulemaking and Letter of Authorization (January 2024), available at: https://www.fisheries.noaa.gov/s3/2024-06/MAAvangridNEWind-2024FR-January-2024-Application-Update-OPR1.pdf.

[30] Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the New England Wind Project, Offshore Massachusetts, ("Final Rule"), 89 Fed. Reg. 52222 (June 21, 2024), available at https://www.federalregister.gov/documents/2024/06/21/2024-12085/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the.

[31] *Id.*

[32] NMFS, New England Wind LOA (July 22, 2022), available at https://www.fisheries.noaa.gov/s3/2024-07/MAAvangrid-2024LOA-LOA-OPR1.pdf.

[33] Final Rule, 89 Fed. Reg. 52222.

[34] Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to the New England Wind Project, Offshore Massachusetts, Notice of LOA, 89 Fed. Reg. 60356 (July 25, 2024), available at

monitoring and reporting requirements.[35]    In addition, the LOA is based on conservative assumptions (i.e., assumptions that tend to overstate the Project's impacts to marine mammals), including conservative assumptions about; (a) the duration of construction activities, (b) the propagation of noise from pile driving, (c) the number of strikes to drive each pile, (d) that drilling (which is unlikely to occur) would occur 24 hours every day, (e) presence of species, including modeling the presence of species based on the month with the highest density among areas of interest for that species, and (f) noise exposure, including applying a noise exposure model that exaggerates noise impacts by modeling project construction activities without Project noise mitigation.

21.    In 2022, Park City Wind LLC submitted consistency certifications to the Rhode Island Coastal Resources Management Council ("Rhode Island CRMC") and the Massachusetts Office of Coastal Zone Management ("Massachusetts CZM") for review for consistency, to the maximum extent practicable, with each state's approved coastal management program pursuant to the Coastal Zone Management Act, 16 U.S.C. § 1451.1.[36]    On October 19, 2023, the Rhode Island CRMC issued a concurrence with the federal consistency certification for the Project, finding it is consistent and complies with the enforceable policies of Rhode Island's approved coastal management program, subject to certain mutually agreed conditions.[37]    Some of those conditions were compensatory mitigation for impacts to fishing, including "a total of $4,873,638 (net present value) consisting of $3,972,908 in direct financial compensation for commercial fishers, $400,731

---

https://www.federalregister.gov/documents/2024/07/25/2024-16411/takes-of-marine-mammals-incidental-to-specified-activities-taking-marine-mammals-incidental-to-the.

[35] NMFS LOA for the Project, https://www.fisheries.noaa.gov/s3/2024-07/MAAvangrid-2024LOA-LOA-OPR1.pdf.

[36] FEIS Appendix A, A-8.

[37] State of Rhode Island Coastal Resources Management Council. CRMC Federal Consistency Review (Oct. 19, 2023), available at
https://www.crmc.ri.gov/windenergy/newengland/NEWind_FedConDecision_101923.pdf.

for Rhode Island-based for-hire recreational fishers, and an additional $500,000 to support commercial and for-hire recreational fishing operations."[38] The Massachusetts CZM also issued a conditional concurrence with the federal consistency certification for the Project in November 2023.[39] The concurrence relied on the fact that the Project has committed to mitigation for impacts to fishing "totaling $7,359,471 for impacts over the life of the project."[40] Thus, over $12 million is available should there be impacts to fishing activities.

22.    Park City Wind LLC retained an environmental consulting firm with extensive experience in offshore wind environmental review and permitting to conduct required assessments and to perform additional surveys and analyses, including reports to assess archaeological, cultural and visual impacts associated with the Project, including: (a) Marine Archaeological Resource Assessment Report for the New England Wind Offshore Wind Farm for the OCS-A 0534 Construction and Operations Plan Terrestrial Archaeological Resources Assessment (2022); (b) Terrestrial Archaeology Report–Phase 1 Report: Intensive Archaeological Survey New England Wind Phase 1 (Park City Wind)/New England Wind 1 Connector Onshore Project Components "Intensive Archeological Surveys for New England Wind Phase 1 and 2 Facilities" (2022); (c) Technical Memorandum, New England Phase 2 Potential Onshore Substation Sites, Cultural Resources Archaeological Due Diligence Study (2022); (d) New England Wind Visual Impact Assessment (2022); and (e) New England Wind Historic Properties Visual Impact Assessment (2022).[41] In addition, at Park City Wind LLC's expense, BOEM retained another experienced consulting firm to prepare a "Cumulative Historic Resources Visual Effects Assessment for the

---

[38] *Id.* at 5.
[39] The Commonwealth of Massachusetts, CZM Federal Consistency Review of Park City Wind LLC (Nov. 9, 2023), available at https://www.mass.gov/doc/offshore-wind-park-city-wind-fcr-decision-11-9-23-revised-and-signed-with-attachments/download.
[40] *Id.* at 2.
[41] FEIS, Appendix J, J-20-23.

New England Wind Project under Section 106 of the National Historic Preservation Act," which was completed on December 23, 2022.[42]

23.     On June 14, 2021, BOEM initiated the NHPA Section 106 consultation on the proposed Project with eight federally recognized tribes to identify historic properties that may be adversely affected by the Project and measures to resolve those adverse effects.  On June 30, 2021, BOEM informed the federally recognized tribes of its intent to use the NEPA process to fulfill its review obligations for the proposed Project under NHPA Section 106 in lieu of the procedures set forth in 36 CFR §§ 800.3.  Additional consulting parties were invited through the consultation process as they were identified.[43]

24.     BOEM convened five consulting party meetings on March 3, 2022; February 8, 2023; June 15, 2023; September 14, 2023; and December 13, 2023.[44]  Park City Wind LLC participated in each of these consultation meetings, presenting information and answering questions about the Project as requested.   In addition to the formal consultation meetings, the Project met with individual tribes numerous times and consulting parties to provide Project overviews, Project updates, pre-survey consultations, and reviews of draft reports on marine archaeological assessments and historic property treatment plans.

25.     BOEM circulated documents and analyses to consulting parties and consulted on the Area of Potential Effects ("APE") for the Project and identification of historic properties in

---

[42] https://www.boem.gov/sites/default/files/documents/renewable-energy/New_England_Wind_Cumulative_HRVEA_compliant.pdf.

[43] FEIS, Appendix A, p. A-11.

[44] Memorandum of Agreement Regarding the New England Wind Offshore Wind Energy Project ("MOA"), at 6, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/New_England_Wind_App_J1_MOA_Compiled_With%20Sig%20Pages_Redacted%201.pdf.

2022.[45]  BOEM circulated a draft Finding of Adverse Effect ("FoAE") in December 2022 and a revised FoAE on May 26, 2023, with the final FoAE appearing in the FEIS.[46]  The FoAE described the process to identify historic properties that could be affected by the Project, including properties in the "viewshed" from which renewable energy structures might potentially be visible (the "visual APE").  BOEM determined that the Project would have a direct adverse visual effect on one National Historic Landmark ("NHL"): the Nantucket Historic District.[47]  BOEM determined that the Project would have direct adverse visual effects on five other historic properties: the Gay Head Lighthouse, Edwin Vanderhoop Homestead (Aquinnah Cultural Center), the Gay Head–Aquinnah Shops Area, the Chappaquiddick Island traditional cultural property ("TCP"), and the Nantucket Sound TCP.[48]  BOEM determined that due to the distance and open viewshed, the integrity of the properties would not be so diminished as to disqualify any of them for NRHP eligibility.[49]  The Massachusetts State Historic Preservation Officer ("SHPO") concurred with BOEM's FoAE on April 25, 2023.[50]

26.     In December 2022, BOEM circulated a draft Memorandum of Agreement ("MOA") to consulting parties and requested recommendations.  BOEM consulted with the consulting parties on drafts of the MOA and made the draft MOA available for public review and comment.[51]

27.     The Section 106 review concluded with the execution of the MOA, which resolved

---

[45] FEIS, Appendix J, J-25.
[46] *Id.*
[47] FEIS, Appendix J, J-31.
[48] FEIS, Appendix J, J-37.
[49] FEIS, Appendix J, J-37.
[50] MOA at 5.
[51] ROD, Appendix B, at 11-12, available at
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record%20of%20Decision_New%20England%20Wind_OCS-A%200534.pdf.

adverse effects and was signed by BOEM, Massachusetts SHPO, the Advisory Council on Historic Preservation, and Park City Wind LLC as required signatories, and became effective in March 2024.[52]   The U.S. Army Corps of Engineers, the Bureau of Safety and Environmental Enforcement, the Town of Aquinnah, and the Gay Head Lighthouse Advisory Board also signed the MOA as invited signatories.   After lease segregation, the MOA was amended to add Commonwealth Wind, LLC as an invited signatory.

28.   The final MOA memorialized agreements by the signatories to adopt specific avoidance, minimization, and mitigation measures, including measures relating to the affected NHL and historic properties, in order to take into account the effects of the undertaking on historic properties, to undertake such planning and actions as may be necessary to minimize harm to any NHL, and meet the requirements of both Section 106 and Section 110(f) of the NHPA.[53] Specifically, to minimize adverse impacts to historic properties, including the NHL, the MOA required mitigation measures as conditions of approval for the Project COP, including: (1) uniform WTG design, speed, height, and rotor diameter to reduce visual contrast and clutter; (2) uniform WTG spacing to decrease visual clutter; (3) requirements to use specific shades of paint operation to reduce daytime visibility on the horizon; and (4) the use of an aircraft detection lighting system to limit the time during which WTG lights are on and visible from affected properties, which the Project estimates will only be active for approximately 13 minutes over the course of a year.[54]

29.   Further, included as attachments to the MOA are Historic Property Treatment Plans ("HPTPs") that the Project is required to implement to mitigate visual adverse effects to each of the historic properties.[55]   The proposed mitigation measures in the HPTPs serve to support other

---

[52] *Id*; ROD at 22.
[53] MOA at 1-6 (Recital).
[54] MOA, Stipulations III.A.i-iv., at 8-9.
[55] MOA at 9-14, 39.

means of conveying the significance of the historic properties and to minimize the harm to NHLs, including documentation, interpretation, and dissemination of information and property preservation planning and activities (including repair and stabilization).[56]  Under the terms of the MOA, the Project is required to provide up to $2.9 million to support avoidance, minimization, and mitigation of all adverse effects to historic properties from the Project.[57]  In executing the MOA, the full suite of mitigation measures was agreed to by the parties, including BOEM, the Massachusetts SHPO, and the Advisory Council on Historic Preservation, as sufficient to resolve adverse effects.

*Defendant-Intervenors Successfully Bid for an Offshore Wind Energy Long Term Contract.*

30.     In 2023, the Commonwealth of Massachusetts, in conjunction with the three Massachusetts Electric Distribution Companies, launched a competitive solicitation for offshore wind energy pursuant to its authority under state law.  In March 2024, Park City Wind timely submitted a bid for the New England Wind 1 project into that solicitation, and Commonwealth Wind also submitted a timely bid for the New England Wind 2 project into that solicitation.  One of the unique features of the bid for New England Wind 1 was the maturity of the project; at the time of the bid submission, the project had secured the state, regional and local permits it needed, and was just a few months away from obtaining all the major federal permits it needed (all of which it obtained in the summer of 2024)  In addition, the project had secured most of its supply chain, which meant that the project bid price was grounded in actual costs, as opposed to speculation about what the costs could be, and Massachusetts and the Electric Distribution Companies could be confident in the Project's ability to commence construction expeditiously.

---

[56] *Id*. (identifying HPTPs attached to MOA).
[57] FEIS, Appendix J, at 377, available at
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/New_England_Wind_App_J_FOE.pdf.

The combination of permitting and supply chain confidence made the project a compelling bid.  In September 2024, Massachusetts selected New England Wind 1, while not selecting New England Wind 2, which was not as far advanced in the process as it lacked some state permits and supply chain commitments.

> *Defendant-Intervenors Continue to Work with the Administration to Advance Project Approvals so that Defendant-Intervenors Can Start Constructing the First Phase of the Project—New England Wind 1.*

31.    Defendant-Intervenors have continued to conduct commercially reasonable activities consistent with their fiduciary duties to shareholders to advance the Project and the Project's permitting.  For purposes of paragraphs 31-67 the term "the Project" means the first phase of the Project—New England Wind 1, unless otherwise indicated.

32.    Since the presidential inauguration day on January 20, 2025, the Project team has had recurring calls/meetings with BOEM, USACE, and USEPA to discuss Project specific topics, or provide general updates on status of permitting related items.  The meetings with BOEM generally continued on a once-a-month basis throughout the year.  The meetings with USACE and USEPA were on a once-a-month schedule but were typically canceled by the agencies.  Meetings typically covered active workstreams (development of certain monitoring plans, review status, compliance obligations and filings, etc.).  The Project also had individual/one-off meetings with other federal agencies, including NMFS and BSEE to discuss specific topics, such as the Federal Survey Mitigation Agreement, Oil Spill Response Plan, and Safety Management System.

33.    In addition to the meetings to advance the Project, Defendant-Intervenors submitted multiple plans and documents to federal agencies to advance the Project.  In the last year, those submittals include: Vessel Strike Avoidance Plan (revision 4 submitted to NMFS and BOEM on February 3, 2025); MEC/UXO Identification Survey Plan (submitted to BOEM on

November 26, 2024); Lighting, Marking, and Signaling Plan (submitted to BOEM on May 2, 2025); Section 106 Memorandum of Agreement Summary Report (submitted to BOEM on July 31, 2025); Section 106 Terrestrial Archaeology Resource Assessment Addendum (submitted to BOEM on January 9, 2025); and Federal Survey Mitigation Plan (submitted to NMFS and BOEM on December 19, 2025).

> ***Defendant-Intervenors have Incurred Costs and Commitments of Over $725 Million in Developing the Project, including in Reliance on the COP.***

34.     A large wind project like the Project here requires specialized equipment, workers, and tools—some of them with long lead times.  To date, Defendant-Intervenors have incurred costs and commitments of over $725 million in developing both phases of the Project, including in reliance on the COP that BOEM approved and that Federal Defendants now allege violates OCLSA and requires a remand.

35.     Defendant-Intervenors have expended extensive additional time, effort, and financial resources since April 1, 2024 (the date the COP was approved) to progress Project engineering design for major supply contracts, maintain permit compliance, maintain site control, and to secure other required permits and approvals for the Project.  For example, since April 1, 2024, Defendant-Intervenors incurred approximately $257 million in costs and commitments to support the development of both phases of the Project, with nearly $63 million of that total incurred between January 20, 2025 and October 31, 2025.  My declaration focuses on the key approvals Plaintiffs are challenging in this lawsuit, but Defendant-Intervenors were required to obtain over thirty federal, regional, state, and local approvals—many of which involved significant public process in which Defendant-Intervenors engaged.[58]

---

[58] FEIS at Appendix A (describing "Required Environmental Permits and Consultations").

36.      So far, Defendant-Intervenors have incurred or otherwise committed substantial financial obligations developing, permitting, engineering, procuring, fabricating, preparing for Project construction, including entering into over fifteen major contracts to manufacture and transport Project components and to lease vessels, as well as other steps taken in reliance on the approvals challenged in this case.  Those contracts relating to New England Wind 1 include the following:

- Large Generator Interconnection Agreement for the management of all necessary aspects to interconnect the Project to the power grid, including but not limited to, the construction of necessary upgrades to power grid;

- Transmission Support Agreement to directly manage the construction project aspects of the power grid upgrades with the owner of the power grid;

- Contract for the supply of high voltage gas-insulated switchgear of the 275kV offshore substation;

- Preferred Supplier Commitment Agreement to secure engineering and scheduled factory production slots for manufacturing and installation for wind turbine generators;

- Capacity Reservation Agreement to secure engineering and scheduled factory production time slots for manufacturing monopiles and transition pieces for offshore foundations;

- Contract for supply and delivery of scour protection, including the vessel;

- Preferred Supplier Commitment Agreements to secure scheduled factory production slots for manufacturing electrical equipment for both onshore and offshore substations;

- Capacity Reservation Agreement to secure engineering and scheduled shipyard fabrication slots for manufacturing the offshore substation;

- Exclusivity Agreement for an installation vessel for the offshore substation and preliminary engineering;

- Contract for export cable supply including the vessel for export cable installation;

- Contract for horizontal drilling and duct bank;

- Contract for onshore cables;

- Contract for onshore substation;

- Contract for logistics for construction and operations & maintenance (O&M).

***Illegal Orders and Directives by the Federal Government have Caused Significant Project Delays.***

37.     In early 2025, President Trump issued a Presidential Memorandum which imposed a moratorium on the issuance of permits and other approvals for offshore wind projects.[59] Defendant-Intervenors are of the view that the moratorium on the issuance of permits did not apply to the Project because it had already received all of its major federal permits and approvals, and only needed various secondary sign offs from several federal agencies.  However, the Project was unable to obtain clarification from the Trump administration as to whether that view was correct, hampering its ability to move forward.[60]

38.     Creating the specter of even more delay, on July 15, 2025, Interior Secretary

---

[59] FEIS at Appendix A (describing "Required Environmental Permits and Consultations"). Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363 (Jan. 20, 2025).

[60] On December 8, 2025, the District Court of Massachusetts invalidated the permit moratorium in the Presidential Memorandum.  *Trump*, No. 25-CV-11221-PBS, 2025 WL 3514301, at *1 (D. Mass. Dec. 8, 2025).

Burgum issued a directive establishing a new permitting procedure for wind and solar projects. Under this directive, "all decisions, actions, consultations, and other undertakings—including but not limited to the following—related to wind and solar energy facilities shall require submission to the Office of the Executive Secretariat and Regulatory Affairs, subsequent review by the Office of the Deputy Secretary, and final review by the Office of the Secretary."[61]  This meant that the various ministerial sign-offs needed for New England Wind 1, which previously had been made efficiently by federal technical staff, would now require approval of three additional offices within the Interior, including the Secretary.[62]

39.     Given the permit moratorium and other administrative actions against offshore wind, the entire U.S. offshore wind market is in turmoil.[63]  The administration's actions have significantly and negatively affected Defendant-Intervenors' ability to sign contracts for installation vessels, wind turbines, inter-array cables, and foundations.  Costs for these services have surged due to reduced competition, as some suppliers have declined to bid, and risk premiums added by suppliers to account for heightened permit delays and political risk in the U.S. market. These factors have compounded the financial and scheduling risks for the Project, as well as its viability.

---

[61] Departmental Review Procedures for Decisions, Actions, Consultations, and Other Undertakings Related to Wind and Solar Energy Facilities, U.S. DEP'T INTERIOR (July 15, 2025), available at https://www.doi.gov/media/document/departmental-review-procedures-decisions-actions-consultations-and-other.

[62] This action is currently being challenged in the District of Massachusetts along with numerous others designed to slow or prevent development of renewable energy projects. *Renew Northeast et al. v. U.S. Department of the Interior et al.*, 1:25-cv-13961-DJC.

[63] On December 22, 2025, the Department of the Interior announced that it was ordering certain offshore wind project developers to pause all ongoing construction activities (with limited exceptions to protect health, safety and the environment) for all large-scale offshore wind projects under construction in the United States.  The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases, U.S. DEP'T INTERIOR (Dec. 22, 2025), available at https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.

*Remand would Prejudice Defendant-Intervenors by Threatening the Lapse of Existing*
*Permits and Jeopardizing Construction in Accordance with the Necessary Timeline.*

40.    Offshore wind construction schedules are inherently sequential, driven by technical requirements such as installing foundations before turbine erection, laying subsea cables prior to energization, and completing commissioning steps only after electrical infrastructure is in place.  Each activity depends on the successful completion of the previous one, creating a tightly interdependent chain inherently tied to permitting.  There are also other interdependent approval processes occurring in parallel such as offtake agreements, grid interconnection and financing. Offshore wind projects take 4-5 years to construct.

41.    Permitting is a key ingredient required for financing.   Secured permits demonstrate that environmental, technical, and jurisdictional requirements have been satisfied, reducing the likelihood of delays, litigation, or compliance violations.  This assurance is essential for lenders to commit capital, as financing decisions hinge on predictable timelines and risk mitigation.  Financing, in turn is a critical milestone that unlocks the ability to issue Notices to Proceed ("NTPs") to contractors, which in turn makes available the capital for finalization of detailed design plans and pre-construction compliance activities and then construction.  Without financing, these steps cannot occur, leaving the Project in a holding pattern despite substantial prior investment and reliance on the original approval.   The delays associated with the Government's motion for remand are eroding the validity period of permits already obtained.

42.    There are a number of major scheduling constraints required by Project permits or other agreements.  These include:

Pile installation seasonal and daily restrictions (for marine mammals), per LOA conditions:

- All pile driving prohibited from January 1 – April 30

- Vibratory hammering is prohibited December 1 – January 1

- Pile driving from December 1 – December 31 is only allowed if approved by NMFS

- Pile driving or vibratory hammering are not allowed in times of limited visibility (e.g., darkness and fog/heavy rain – minimum visibility of 1.5 km)

Onshore construction seasonal and daily restrictions (for tourism), per Host Community Agreement conditions:

- No work at landfall site(s) between May 15 – September 15

- No work at onshore cable routes from Memorial Day – Labor Day

- No work on weekends

- No work from 6:00 PM – 7:00 AM

Export cable installation and related activities at landfall site seasonal restriction (for piping plover nesting), per COP conditions:

- Work prohibited on or near beaches from April 1 – August 31

Multi-year pre-construction environmental survey requirements, per COP conditions:

- Two years of pre-construction fisheries survey must be completed before installation of turbines, and must be completed in same annual cycle, limiting the time frame in which the surveys can begin

- One year of marine mammal and benthic habitat surveys must be completed before offshore works

- In addition to survey time, an additional six months (at the least) are required for procurement of surveys, survey gear (e.g., otter trawl), and vessel reservations

Weather windows (waves, wind):

- Technical and safety standards restrict installation and some survey work in metocean conditions nominally greater than 1.5 meters of wave height

43.     Given the myriad of annual and other restrictions, even small permitting delays

can result in delays of a year or more. The administration's January 2025 offshore wind memorandum[64] that imposed a moratorium on the issuance of permits and other approvals for offshore wind projects and subsequent administrative policy changes, including Federal Defendants' Motion, have created significant delays in the ability to complete that work. These surveys are now critical path for completing installation in the LOA 5-year window.[65] Specifically, the permit moratorium (which was in effect for almost a year before it was struck down by a federal court) and now the Motion have delayed the Project's ability to secure a foundation installation vessel because Defendant-Intervenors do not know when they will be able to conduct the work and so they do not know when to schedule the vessel. There are only a few vessels in the world capable of installing offshore wind foundations of the weight required for the Project's conditions, and there are multi-year backlogs for the vessels. Certainty regarding installation vessels is necessary to avoid schedule lapses. If the Court reached Defendant-Intervenors' Crossclaim and adjudged the COP to be valid and compliant with OCSLA, there is every reason to believe that Defendant-Intervenors could secure vessels to avoid such schedule lapses.

44.    The LOA, which is necessary for foundation installation, is valid only through March 27, 2030. Further, LOAs (which are issued pursuant to time-limited regulations) cannot be renewed beyond the overall 5 year expiration by statute; if the Project is unable to be constructed during the LOA term, a new application would need to be prepared and submitted, which in turn

---

[64] Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, 90 Fed. Reg. 8363 (Jan. 20, 2025).

[65] *See* NMFS LOA for the Project at 1, https://www.fisheries.noaa.gov/s3/2024-07/MAAvangrid-2024LOA-LOA-OPR1.pdf.

requires lengthy notice-and-comment rulemaking.[66]  Preparation of a new application would cost upwards of $600,000 and would take a minimum of two years to complete, including modeling and application time, and then there is the additional time required to complete a new rulemaking. Foundation installation is prohibited from January to April, meaning that in order to comply with the current deadline set forth in the LOA, all foundation installation needs to be completed by the end of 2029.  While this appears to be a significant window of time, completion of that work within the window is infeasible if this matter is remanded without immediate judicial attention to Defendant-Intervenors' Crossclaim upholding the validity of the permits due to the following factors:

- The Project must resolicit, renegotiate and execute contracts aligning the availability and capabilities of multiple suppliers, manufacturers, mills, contractors and vessel operators (in particular for the foundation installation vessels, which have multi-year backlogs as there are only a handful of vessels in the world that can lift the weights needed for the Project), and issue Notices to Proceed.

- The Project must conduct two years of pre-construction baseline fishery surveys (these surveys cost approximately $3 million per year).

- The Project must also conduct pre-construction geophysical surveys mitigating boulder risk, unexploded ordinance ("UXO") risk, and establishing preconstruction bathymetry also must be executed.  The UXO surveys and mitigation were targeted to occur over three phases in 2026 and 2027, consisting of 2-4 months per phase and concluding by the end of 2027.  I estimated 4 months in 2026 and estimated 4-5 months in 2027.  As such surveys rely on input from foundation and cable installation

---

[66] 50 C.F.R. §§ 217.320-217.329 (New England Wind Marine Mammal Protection Act incidental take regulations); *id.* § 217.321 ("Regulations in this subpart are effective from March 27, 2025, through March 26, 2030."); 16 U.S.C. § 1371(a)(5)(A) ("the Secretary shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking by citizens").

contractors, they cannot be initiated prior to those contracts being executed.  Due to seasonal restrictions (weather and noise production) and federal requirements, UXO mitigation may take more than two calendar years following the start of these surveys.

- The Project must prepare, submit and get concurrence from NMFS on numerous construction plans, such as the Marine Mammal and Sea Turtle Monitoring Plan and Passive Acoustic Monitoring Plan.  As required by the LOA and NMFS' Biological Opinion, these plans must include specific information on the pile driving plan, foundation installation vessel, equipment, and contractor, and be submitted at least six months in advance of foundation installation.

- The Project must complete final designs and complete the Facilities Design Report and Fabrication and Installation Report (which requires contractors to help prepare).

- The foundations must be engineered which has not yet been completed and cannot be until a PPA is signed and a notice to proceed is issued, then several years to manufacture and then install, which will require 8-12 months to complete, possibly over a one year period but more likely over a two year period.  As described above, there are numerous constraints on when work can be done.

45.     Lapse of the LOA will have other extremely serious ripple effects and would jeopardize the Project's existence.   Among other things, New England Wind 1 must reach Commercial Operation Date ("COD") by the end of 2033 in order to retain the investment tax credit which it has secured under safe harbor rules that are unchanged by the 2025 legislation that phased out certain renewable energy tax credits.  If Park City Wind LLC is required to apply for and secure a new LOA for New England Wind 1 after 2029, given the long construction sequencing and timelines, reaching COD by 2033 becomes extremely difficult, if not impossible. The tax credit is worth billions of dollars, and it would be impossible for Park City Wind to go

forward under the current fixed price bid award terms to be included in the PPA if it were to lose this tax credit.

### *Remand Would Prejudice Defendant-Intervenors as it Will Exacerbate the Already Extensive Delays and Increased Costs from Government Policy and Politicization of Permitting Decisions and Prevent the Project from Completing Critical Path Items*

46.    Securing the supply chain is fundamental to ensuring robustness, predictability, and cost certainty for offshore wind projects.  Offshore wind projects involve highly complex, globally distributed supply chains, where most components are custom-designed and manufactured for specific Project requirements. Given the high demand for offshore wind infrastructure, early design maturity and timely execution of preferred supplier agreements or final contracts are essential to guarantee availability and avoid delays.  In order to keep with originally intended timelines, Defendant-Intervenors proactively secured critical components and services, including:  (1) wind turbines; (2) offshore foundations; (3) scour protection; (4) main electrical equipment; (5) an offshore substation; (6) an installation vessel for offshore substation; (7) export cable supply; (8) a vessel for export cable installation; (9) horizontal drilling and duct bank; (10) onshore cables; (11) an onshore substation; and (12) logistics for construction, and operations and maintenance.  As a result of delays caused by the Federal Government, these major components and services had to be renegotiated to postpone deadlines, or in many cases terminated.  These renegotiations and terminations have forced the Defendant-Intervenors to incur tens of millions of dollars in costs, and challenges to secure slots to support the originally intended schedule. Defendant-Intervenors continue to make efforts to negotiate and reschedule the manufacturing of components, and procure services to the present day.  Remand would exacerbate these costs and Project viability even further.  While Defendant-Intervenors are making efforts to negotiate and

renegotiate several agreements, the Project faces the risk of losing an estimated $50 million in supply chain contract commitments, as not all suppliers are willing or able to mitigate financial impacts caused by the delay.

47.     The permit moratorium and federal efforts to impede the Project have specifically delayed Defendant-Intervenors' ability to conclude PPAs with the Commonwealth of Massachusetts' Electric Distribution Companies.  The bid awarded to Park City Wind essentially gave Park City Wind the right to negotiate PPAs with the Massachusetts Electric Distribution Companies (Eversource, National Grid, and Unitil), which Park City Wind is currently in the process of negotiating.  Once agreement is reached, the Massachusetts Department of Public Utilities must review and approve the PPAs, which could take up to nine months.

48.     The ability to conclude the PPAs has been hampered by questions of whether the Federal Government will continue to impede development of the Project.  Due to both the permitting moratorium (which was in place for almost a year before being ruled unlawful) and the specter of politicized decision-making over technical matters typically handled by federal staff who are subject matter experts, Park City Wind has, to date, been unable to negotiate and sign PPAs for New England Wind 1, especially as the draft PPA included significant financial penalties for non-performance of its terms.  If Defendant-Intervenors were to execute PPAs and fail to bring the Project online, then it would be subject to over $150 million in damages owed to the Electric Distribution Companies under the form PPA provided in the Request for Proposal.

49.     While the ruling invalidating the permit moratorium removed some of the confusion surrounding offshore wind permitting, unfortunately, the Federal Defendant's Motion in this case has caused further delay for the Project.  In effect, the remand request has eliminated any possibility of timely signing a PPA.  The deadline for signing the PPAs was December 31,

2025, but the deadline has been extended until June 30, 2026.  It would be entirely imprudent to execute a PPA and expose the Project to enormous financial risk, until the threat of a remand and rescission of federal approvals is resolved in the Project's favor.

50.    Even the Electric Distribution Companies have cited to "ongoing uncertainty caused by federal level activities" as the reason for the extended deadline to negotiate and execute the PPAs.  Attached hereto as Exhibit 1 is a true and correct copy of a publicly available letter from Jessica Buno Ralsto of Keegan Werlin LLP, counsel for Eversource, National Grid, and Unitil, to Peter Ray, Secretary of the Massachusetts Department of Public Utilities, dated December 30, 2025.

51.    In order to construct and operate an offshore wind farm in federal waters, a project developer must have in hand a myriad of federal approvals, including a ROD and a COP approval. The Federal Defendant's Motion calls into question the validity of these and other approvals that the Project secured in the summer of 2024, and upon which the Project has relied.  It would be inconsistent with Defendant-Intervenors' fiduciary duties and with prudent management to proceed with significant additional expenditures, such as signing a PPA, executing contracts with suppliers, commencing construction, and other activities while there is a risk that the requisite federal approvals could be withdrawn or substantially altered for political reasons during any remand.

52.    The permit moratorium and Federal Government efforts to impede the Project have also interfered with Defendant-Intervenors' ability to renegotiate contracts with key suppliers.  As discussed, many contractors are reluctant to engage with the Project to define updated schedules due to the political landscape.  Indeed, some contractors, like primary electrical equipment and export cable contractors, with agreements in place, refuse to provide updated time

slots for the Project. Other contractors, when asked to provide options for new production schedule slots, like the offshore substation or wind turbine foundations, have proposed revised slots and schedules not compatible with Project timelines and needs.

53.     For example, and as discussed, Defendant-Intervenors have faced challenges with scheduling the necessary vessels for installation of the offshore foundations and substation. Defendant-Intervenors require at least one installation window (a year minus periods where work cannot be conducted due to restrictions) to install foundations. The global surge in demand for offshore wind projects has created a significant shortage of specialized heavy-lift vessels required for installing foundations—only ten worldwide—and for installing offshore substations—only three. This scarcity means that securing and coordinating the availability of these vessels often requires multi-year advance scheduling with associated commitments. Due to the Federal Government's actions against offshore wind projects, including the Federal Defendants' Motion, Defendant-Intervenors have been unable to secure a vessel for foundation installations.

54.     Defendant-Intervenors have also been attempting to reschedule the Vessel Reservation Agreement secured for the installation of the offshore substation. Defendant-Intervenors had scheduled installation vessels for a 2029 COD, but that date is no longer feasible. The Project is now facing challenges to reschedule the window. Unless the Project can complete work before its LOA expires, it will need to restart a lengthy and extremely expensive permit process, which will jeopardize the billions of dollars in the investment tax credit which Defendant-Intervenors have secured and retain despite recent prospective changes to the tax credit statute. But the current situation created by federal action has made the vessel operators hesitant to provide a new schedule for installation vessels that will meet the Project's goals. The current situation— with the Federal Defendants alleging that the COP violates OCSLA and seeking a remand for an

indeterminate length—makes it virtually impossible to reschedule vessels in the needed timeframe threatening Project viability.  If the Court reached Defendant-Intervenors' cross-claim and adjudged the COP to be valid and compliant with OCSLA, there is every reason to believe that Defendant-Intervenors could reschedule the vessels as needed.

55.     As another example, in 2024, Defendant-Intervenors renegotiated the Transmission Support Agreement with Eversource to support a revised construction schedule and 2029 COD, which increased the cost of the Transmission Support Agreement from $198.9M to $244.2M (a $45.3M increase).  The Amended and Restated Transmission Support Agreement required a Construction Notice to be issued on April 15, 2025.  Defendant-Intervenors had to continue renegotiation with Eversource to postpone the Construction Notice until January 31, 2026.  The reschedule was made at continued increased costs of over ten million dollars.  If relief from the Court is not provided soon, Defendant-Intervenors will have to try to renegotiate other existing contracts, which (assuming renegotiation is successful) could cost Defendant-Intervenors hundreds of millions of dollars.

56.     Additionally, several necessary Project components have already been purchased and manufactured or are well in the process of being manufactured.  For example, switchgear components for the offshore substation were manufactured in 2023.  Following their manufacture, detailed design of the whole switchgear system occurred until May 2025, and manufacturing of the system is underway and expected to be completed by July 2026.  Further, offshore export cable test sections were made in 2022 for conducting type testing, and a cable test section for the onshore export cable was manufactured in 2025.  Defendant- Intervenors paid $13.7 million to Eversource to make improvements to Massachusetts grid infrastructure, increasing the capacity of an Eversource-owned power line from 115 kilovolts to 345 kilovolts, to strengthen the power grid in

the Cape Cod area and to prepare it for the addition of the New England Wind 1's generated power.

57.    As yet another example, storage costs for equipment related to the Project are anticipated to begin in 2026.  Defendant-Intervenors will have to spend an estimated $12 million per year for equipment purchased by Eversource for the planned upgrade of the grid to connect New England Wind 1.  In addition, due to delays the Project will have to expend $1 million a year to store and maintain in operating condition the gas insulated switchgear that is currently being manufactured.  Export cable test sections will also need to be stored.

58.    As the Project developer, OCS lessee, holder of the state and federal permits for the Project, and owner of real estate rights from governmental and private entities, Defendant-Intervenors seek to protect their significant financial investments in the Project, as well as the significant investment of time in the administrative processes supporting the challenged approvals and the maintenance of their existing contracts entered into in reliance on the Project's permits and approvals.

59.    Beyond protecting what has already been spent, the very future of the project is at grave risk from the delays that would inevitably occur as a result of a remand.  If the remand drags on, it will jeopardize Defendant-Intervenors signing a PPA for New England Wind 1, completion of offshore construction by 2029 within the window specified by the existing LOA, and the already secured investment tax credit.  The loss of the tax credits alone could effectively kill the New England Wind 1 project, and Defendant-Intervenors could therefore lose tens of billions of dollars in future Project revenues as well as funds already committed if the Court remands the COP approval rather than adjudicating its validity now.  A remand of the COP approval would cause irreparable harm.  Defendant-Intervenors need prompt judicial resolution of the validity of its COP. In the Motion, the Government has asserted that the COP does not comply with OCSLA.  Their

proposed remedy of remanding the COP to BOEM for administrative proceedings of indeterminate length is a worst case scenario for Defendant-Intervenors.

### Remand Would Harm Ratepayers and the Environment

60.     As part of the bidding process for the Project, Defendant-Intervenors have committed to spend up to $74.5 million in directly funded initiatives, including investment in the workforce and supply chain, environmental conservation and monitoring initiatives, a tribal nation support fund, fisheries sustainability programs, and improvements to the local community microgrid.  Defendant-Intervenors will pay substantial operating fees under the leases over the life of the Project.  Total operating fees paid by the Project to the federal treasury are anticipated to be approximately $10 million per year, depending on the final operational capacity and annual average wholesale electric power price.

61.     In September 2025, RENEW Northeast published an analysis they commissioned Daymark Energy Advisors that illustrated that if 3,500 MW of contracted offshore wind had been operational during the winter of 2024/2025, ISO New England markets could have saved $528 million during the three month period.[67]   Using that report as a basis, had the Project been operational at its bid-in combined energy capacity of 2,051 MW, it could have generated approximately $234 million in electric energy market savings and approximately $75 million in electric capacity market savings.

62.     Defendant-Intervenors commissioned a third-party consulting firm to quantify the multitude of economic and market benefits the Project will provide to Massachusetts and the New England Region, which Defendant-Intervenors filed confidentially as part of the competitive

---

[67] Daymark Energy Advisors, Value of Wind in Winter 2024/25 (Sept. 2025), available at https://renew-ne.org/wp-content/uploads/2025/09/RENEW_Daymark-Value-of-Wind-in-Winter_2025-09-24-1.pdf.

bidding process.  The consulting firm conducted rigorous modeling of the effect of New England Wind 1 on the electricity market, and determined that the many public benefits of the Project include greater grid reliability due to having a major new power plant up and running, lowering winter price hikes when natural gas supplies are in short supply and winds blow steadily and forcefully, and providing a nighttime power supply to complement daytime solar energy generation.

63.    The firm further projected that the Project would be expected to create a combined approximately 35,600 high quality full-time equivalent job-years (direct, indirect, and induced) over the duration of the Project lifetime,[68] with direct and indirect local expenditures (including labor income) expected to add approximately $6.6 billion (in 2023) to the regional economy.  A delay of the Project would result in a delay in the realization of electricity, cost reductions, reliability and environmental benefits, and the mitigation of winter price spikes.

64.    The Project is expected to contribute significantly to Massachusetts' (and the region's) renewable energy and carbon reduction goals.[69]  In 2022, Massachusetts enacted An Act Driving Clean Energy and Offshore Wind.  St. 2022, c. 179.  The Act aims to move Massachusetts toward net-zero greenhouse gas emissions by 2050 through the promotion and development of offshore wind, including by requiring procurement of 5,600 megawatts of offshore wind by June 30, 2027.  *Id.* § 61(b).  Massachusetts also has a Renewable Portfolio Standard, which requires that retail energy suppliers annually increase the share of renewable energy generation that is

---

[68] Defendant-Intervenors have a Project Labor Agreement ("PLA") with the Massachusetts Building Trades Council for onshore construction work and are negotiating a PLA with the National Building Trades Union for offshore construction.

[69] Bureau of Ocean Energy Management ("BOEM"), Record of Decision for New England Wind Farm and New England Wind Project Construction and Operations Plan ("ROD") (Apri1 1, 2024) at 9, 58, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Record%20of%20Decision_New%20England%20Wind_OCS-A%200534.pdf.

supplied to electricity customers.  Mass. Gen. Laws ch. 25A, § 11F.  Specifically, the Project will "result in a net avoidance of 3.93 million tons of carbon dioxide emissions annually, which is equivalent to taking 775,000 cars off the road each year."[70]  "[D]isplacing [approximately] 804 MW of fossil fuel power generation with an equivalent amount of offshore wind power generation from Phase 1 [New England Wind 1] could potentially avoid $169 to $377 million in annual health costs and 17 to 35 annual deaths that would otherwise have resulted from air emissions."[71]  The consulting firm Defendant-Intervenors commissioned for the Project bidding process estimated the total economic value of carbon emissions reduction of $473.4 million (in 2023) for a 20 year project.  Scaled to 1,080 MW to include New England Wind 2, this would equate to an additional potential avoidance of $227 to $506 million in annual health costs and 23 to 47 annual deaths that would otherwise have resulted from other power generation air emissions.  The consulting firm for the bidding process estimated the economic value of carbon emissions reduction from New England Wind 2 of $578.7 million (in 2023) for a 20 year project.

65.    The Project will also provide upgrades to the grid that increase reliability for consumers.  New England Wind 1 grid upgrades comprise Phase I & II from the Cape Cod Reliability Project, which will benefit the entire grid, as follows: (1) Phase I: upgrade of 115kV to 345kV of the line connecting West Barnstable to Bourne; and (2) Phase II: Bourne BPS 345kV substation to BPS and 345kV GIS West Barnstable including an auto-transformer.  Those works, along with the interconnecting underground cables from New England Wind 1 onshore substation to the planned 345kV Barnstable substation cost at least $256.2M.  Additional delays are expected to result in at least $100 million in increased costs for the Phase II of the Cape Cod Reliability Project.  New England Wind 2 grid upgrades comprise Phase III from the Cape Cod Reliability

---

[70] ROD at 58.
[71] FEIS at 3.12-34.

Program.  Phase III consists of a new 345-kV lines of 27 miles between Bourne (now Sagamore) and West Barnstable, including the expansion of both 345kV gas insulated substation.  All of these grid upgrades will be paid for by Defendant-Intervenors to the benefit of the entire grid and electricity consumers in New England.  Defendant-Intervenors will receive no benefit if its permits are revoked due to project delays.

66.    Delays in the Project will also have repercussions for the community at large.  For example, local community colleges will have to delay programs reliant on the Project, ports will be delayed in their development, negatively impacting the communities in which the ports are located, businesses and communities will experience delays in the training and workforce development promised by the Project.  Any additional delay will put further strain on the relationships that Defendant-Intervenors have with the communities and also puts a strain on the relationships the communities have with each other, with the municipalities they exist in, and with the State.

67.    There are many additional non-quantifiable benefits that the Project would provide to the public that would be lost if the Project does not proceed, including:

- Loss of meteorological and oceanographic data:  The Project will install advanced sensors for a number of environmental conditions, including water temperature, salinity, currents, and waves, and for wind speed, direction and turbulence.  These data sources are expected to be shared with the public, are far more accurate than current sources, can be used to improve regional forecasting/models, and provide data to answer many research questions (e.g., changes to oceanographic conditions over time).

- Loss of biological data:  The Project will collect years of data on fisheries, benthic habitat, avian movement (via receivers installed on turbines and tags deployed), and

marine acoustics (long term passive acoustic monitoring will be conducted). These activities will provide significant insights into multiple taxa, as well as the environmental covariate data described above, that could provide key insights into species health for the lifetime of the Project.

- Reduction in maritime safety: The Project infrastructure, personnel, and data fill critical gaps in offshore safety coverage that would be lost, including:

  o Assets on station: The Project will require vessels for the lifetime of operations in areas far from shore. Under maritime law, these assets have a duty to assist and respond to distress calls.

  o Search and rescue support tools: Precise, real-time data on surface currents, wave heights, and wind speeds supports search and rescue planning with much higher modeling accuracy, potentially shortening search times. Similarly, the select turbines will be equipped with CCTV cameras at the nacelle height that can be used for search and rescue operations.

  o Maritime communications: The Project will install LTE/5G and VHF repeaters which can be used by the public and extend the range where commercial fishermen and other boaters can communicate, aiding in emergency communications to shore.

  o Safe havens: Turbines and substations are equipped with AEDs, advanced trauma kits, and other safety equipment, and the assets are equipped with ladders. In an emergency, these could support emergency access (shelter) and/or response.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(2) that the foregoing is true and correct.

Executed on January 16, 2026, Boston, MA.

Ken Kimmell