**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ACK FOR WHALES, Inc., *et al.*,<br>Plaintiffs,<br>v.<br>UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,<br>Defendants,<br>and<br>AVANGRID POWER, LLC, *et al.*<br>Defendant-Intervenors | Case No. 2:25-cv-1678-AHA<br><br>Honorable Amir H. Ali |

**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS DEFENDANT-INTERVENOR'S CROSSCLAIMS FOR LACK OF JURISDICTION**

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

PETER KRYN DYKEMA
Senior Trial Attorney
Natural Resources Section
(202) 532 3086
Peter.dykema@usdoj.gov
BONNIE M. BALLARD
Trial Attorney
Wildlife & Marine Resources Section
(202) 532 5567
Bonnie.ballard@usdoj.gov

*Counsel for the United States*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ........................................................................................................ 1

I. FEDERAL DEFENDANTS HAVE NOT MISSED DEADLINES OR WAIVED ARGUMENTS ........................................................................ 2

II. COUNT I OF THE CROSSCLAIM MUST BE DISMISSED BECAUSE IT DOES NOT SATISFY *BENNETT*'S REQUIREMENT THAT AGENCY ACTION IS NOT FINAL UNLESS IT DETERMINES LEGAL RIGHTS OR OBLIGATIONS........................................................................ 4

III. INTERVENORS' DECLARATORY JUDGMENT CLAIMS (COUNTS II-IV) SHOULD BE DISMISSED BECAUSE NO ADVERSE LEGAL INTEREST EXISTS BETWEEN INTERVENORS AND FEDERAL DEFENDANTS ........................................................................ 12

CONCLUSION........................................................................................................ 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aetna Life Ins. v. Haworth*,
300 U.S. 227 (1937) .......... 19

*Alabama v. United States Army Corps of Eng'rs*,
774 F. Supp. 3d 142 (D.D.C. 2025) .......... 18

*Am. Wild Horse Campaign v. Bernhardt*,
442 F. Supp. 3d 127 (D.D.C. 2020) .......... 6, 11

*Animals, Inc. v. U.S. Bureau of Land Management*,
460 F.3d 13 (D.C. Cir. 2006) .......... 11, 12

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... *passim*

*Ciba–Geigy Corp. v. EPA,*
801 F.2d 430 (D.C.Cir.1986) .......... 15, 16

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017) .......... 8, 10

*Collin Cnty. v. Homeowners Ass'n for Values Essential to Neighborhoods*,
915 F.2d 167 (5th Cir. 1990) .......... 20

*CSI Aviation Services., Inc. v. U.S. Dep't of Transportation*,
637 F.3d 408 (D.C. Cir. 2011) .......... 13, 14, 15

*Diamond v. Charles*,
476 U.S. 54 (1986) .......... 20

*Doctors for Am. v. Off. of Personnel Mgmt.*,
793 F. Supp. 3d 112 (D.D.C. 2025) .......... 7, 8

*Firestone v. Fed. Ret. Thrift Inv. Bd.*,
375 F. Supp. 3d 102 (D.D.C. 2019) .......... 4

*Giron v. Zeytuna, Inc.*,
597 F. Supp. 3d 29 (D.D.C. 2022) .......... 4, 13

*Maniscalco v. Brother Int'l Corp. (USA),*
627 F. Supp. 2d 494 (D.N.J. 2009) .......... 22

*Manning v. Esper*,
Civil Action No. 12-1802, 2019 WL 281278 (D.D.C. Jan. 22, 2019) .......... 4

*Mayor & City Council of Ocean City, Md. v. U. S. Dep't of the Interior*,
No. CV SAG-24-03111, 2026 WL 411759 (D. Md. Feb. 13, 2026) .......... 21

*Natural Resources Defense Council, Inc. v. U.S. Dep't of the Interior*,
397 F. Supp. 3d 430 (S.D.N.Y. 2019) ........ 8, 9, 10, 16

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........ 11

*Portland Cement Association v. EPA*,
665 F.3d 177 (D.C. Cir. 2011) ........ 8

*Powder River Basin Res. Council v. U.S. Dep't of Interior*,
No. 22-cv-2696 (TSC), 2024 WL 195760 (D.D.C. Jan. 18, 2024) ........ 20

*Public Employees for Environmental Responsibility. v. National Park Service*,
No. CV 19-3629, 2021 WL 1198047 (D.D.C. Mar. 30, 2021) ........ 7

*Southwest Airlines Co. v. U.S. Dep't of Transportation*,
832 F.3d 270 (D.C. Cir. 2016) ........ 16, 17

*Southwest Airlines Co. v. Saxon*,
596 U.S. 450 (2022) ........ 18, 19

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ........ 12, 13

*Wilton v. Seven Falls*,
515 U.S. 277 (1995) ........ 21

**Statutes**

43 U.S.C. § 1337(p)(4) ........ 3, 11

49 U.S.C. § 41712 ........ 9

**Regulations**

43 C.F.R. § 1601.0-2 ........ 8

## INTRODUCTION

The crossclaims against Federal Defendants should be dismissed. Intervenors' original crossclaims attempted to defend the government's prior approvals for the New England Wind Project. Because those claims did not articulate a justiciable controversy (but instead championed the status quo) they could not satisfy Rule 12 muster. ECF No. 38 (Motion to Dismiss). As Intervenors explain, they responded by "amend[ing] their Crossclaim to directly challenge the Zerzan Opinion and Secretarial Order 3437." Opp'n at 24 (ECF No. 46) (referencing M-Opinion 37086 (the "Zerzan Opinion") and Interior Secretary's Order 3437 (Secretarial Order 3437)).

The main question before the Court is therefore simply stated: does a challenge to an M-Opinion and a Secretarial Order—neither of which take or direct any decision with respect to the prior New England Wind approvals—state an actionable APA claim within this Court's Article III jurisdiction? The answer is no.

## ARGUMENT

Our motion explained why Intervenor's crossclaims do not present an Article III case or controversy and otherwise fail to state an APA claim, including for failure to challenge a final agency action. We make three points in reply.

First, we address Intervenors' suggestions that Federal Defendants have somehow missed deadlines or waived issues. Those suggestions lack merit and need not detain the Court long.

Second, we address Intervenors' arguments in support of their new Count I — the Count that seeks to challenge the Zerzan Opinion and Secretarial Order 3437. Intervenors' own caselaw demonstrates that those documents are not final agency action(s) subject to judicial review under the APA.

Third, we further explain why Intervenors lack standing to champion the government's decisions in their favor.

## I. FEDERAL DEFENDANTS HAVE NOT MISSED DEADLINES OR WAIVED ARGUMENTS.

Intervenors' arguments regarding missed deadlines and waiver are wrong and irrelevant to the jurisprudential issues presented in Federal Defendants' motion. Intervenors start by arguing that Federal Defendants have delayed this case with the timing of their motions and the filing of administrative record materials. Opp'n at 13. But Federal Defendants' filings have all been made in accordance with the parties' stipulated schedules, and in accordance with the Court's orders based on those stipulated schedules, including extensions to which Intervenors consented. *See* Minute Orders (May 5, 2026 & August 3, 2026) (setting administrative record and summary judgment schedule, based on the parties' Joint Status Report and joint motion); ECF No. 41 (Order setting briefing schedule on Federal Defendants' motion to dismiss amended crossclaims based on the parties' joint motion); Minute Order (July 10, 2026).

Intervenors also insinuate that Federal Defendants failed to satisfy a filing obligation after the Court ruled (*see* Minute Order (April 24, 2026)) that it would hold Federal Defendants' remand motion in abeyance.[1] That is incorrect. What the Court said was that *"[t]o the extent Defendants decide to pursue remand on the basis of their [18] motion*, they shall file a supplemental brief addressing the impact of the case raised in their [33] notice of supplemental authority." *Id*. (emphasis added). The Court did not direct Federal Defendants to file anything.

[1] Opp'n at 14 ("On June 4, 2026, after the Federal Defendants failed to timely articulate their position on the applicability of the *RENEW Northeast* preliminary injunction to this matter, the Court issued a minute order denying Federal Defendants' motion for voluntary remand without prejudice.")

Finally, and more substantively, Intervenors assert that Federal Defendants have waived any argument that Secretarial Order 3437 is not final agency action under the APA. because we did not discuss Secretarial Order 3437 in our opening brief. Opp'n at 29 n. 30. But our focus on the Zerzan Opinion is not surprising because it is the focus of Count I in the Amended Crossclaims. Am. Crossclaim ¶¶ 47-62. The Amended Crossclaims allege that the *Zerzan Opinion* (not the Secretarial Order) is arbitrary and capricious. Am. Crossclaim ¶¶ 44, 52, 54. The Secretarial Order is only mentioned in the remedial sense. Am. Crossclaim ¶¶ 57, 58, 62. Thus, if Intervenors are now intending to challenge the Secretarial Order as a final agency action, that is not the claim they pled, and responding to such a new claim now would be wholly appropriate.

But we did address the issue in our opening brief, where we said:

> Intervenors also suggest that Interior Secretary's Order 3437 (Secretarial Order 3437) somehow injures them (Am. Crossclaim ¶¶ 37 n.14, 40, 41, 57, 58, 62), requesting that the Court issue a declaratory judgment regarding, and enjoin enforcement of, "the portion of Secretarial Order 3437 [that relies] on the Zerzan Opinion." Am. Crossclaim, ¶ 62 & Prayer for Relief ¶ 1. But Secretarial Order 3437 does no more than express a policy preference for domestic control of energy production and a preference for "dispatchable" energy sources. *And, like the Zerzan Opinion, Secretarial Order 3437 only states an abstract OCSLA interpretation, suggesting that unidentified COP approvals had resulted from "misapply[ing]" OCSLA Section 8(p)(4).[] Thus, like the Zerzan Opinion itself, Secretarial Order 3437 articulates legal opinions (and policy preferences), but has no concrete effect on Intervenors or on BOEM's Project approvals*.

Fed. Defs' Mem. at 8-9 (footnote omitted) (emphasis added).

Intervenors' waiver argument also champions form over substance. The relevant portion of Secretarial Order 3437 is part and parcel with the Zerzan opinion, because it merely restates the Zerzan Opinion's conclusion that the Jorjani Opinion, rather than the Anderson Opinion, accurately interpreted OCSLA Section 8(p)(4). *See* Secretarial Order 3437 §4 (b) (ECF No. 18-4). Indeed, the Amended Crossclaim only challenges "the portion of Secretary's Order . . . 3437

[that was] issued in reliance on the Zerzan Opinion." ECF No. 40 ¶¶ 6, 57, 58, 62. And the heading for Count I of the Amended Counterclaim challenges the Zerzan Opinion without mentioning Secretarial Order 3437. In other words, Intervenors themselves treat the Secretarial Order 3437 issue as derivative, and thus only pled final agency action with respect to the Zerzan opinion. In any event, every argument we made regarding the Zerzan Opinion applies equally to Secretarial Order 3437. The rationale for the waiver rule that Intervenors invoke—that "[t]he court will not do [a party's] research for him," *Giron v. Zeytuna, Inc.*, 597 F. Supp. 3d 29, 48 (D.D.C. 2022) (citation modified)—is therefore inapplicable. Even were it otherwise, "the Court hesitates to treat an issue as conceded." *Firestone v. Fed. Ret. Thrift Inv. Bd.*, 375 F. Supp. 3d 102, 116 (D.D.C. 2019) (citing *Manning v. Esper*, Civil Action No. 12-1802 (CKK), 2019 WL 281278, at *6 (D.D.C. Jan. 22, 2019)).

## II. COUNT I OF THE CROSSCLAIM MUST BE DISMISSED BECAUSE IT DOES NOT SATISFY *BENNETT*'S REQUIREMENT THAT AGENCY ACTION IS NOT FINAL UNLESS IT DETERMINES LEGAL RIGHTS OR OBLIGATIONS

Count I should be dismissed because it does not challenge a final agency action reviewable under the APA. In reply, we focus on the cases Intervenors cite, which themselves demonstrate that Intervenors' challenge to the Zerzan Opinion (and related request for relief as to Secretarial Order 3437) fails because neither document meets *Bennett*'s requirement that a final agency action be one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation omitted).

Intervenors cite *Bennett* itself, comparing the Biological Opinion at issue in that case with the Zerzan Opinion (and Secretarial Opinion) at issue in this case. Intervenors note that, in *Bennett*, the Court found that the Biological Opinion at issue "alter[ed] the legal regime to which the action agency is subject." Opp'n at 32 (citing *Bennett*, 520 U.S. at 178). But the Biological

Opinion at issue in *Bennett* was much more than a legal interpretation. It was a directive imposing severe consequences on the action agency. The action agency was "technically free to disregard the Biological Opinion . . . , but it [would do] so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment." *Bennett*, 520 U.S. at 170 (citations omitted). It was for this reason, the *Bennett* Court held, that the Biological Opinion had "direct and appreciable legal consequences" that satisfied the second element of the final agency action calculus. *Id*. at 178.

The difference between the Biological Opinion in *Bennett* and the legal opinion at issue here is fundamental. The Biological Opinion in *Bennett* authoritatively applied to the specific facts of that case—*i.e*., to the specific reclamation project in whose operating parameters the petitioners were keenly interested. Neither the Zerzan Opinion nor Secretarial Order 3437 says anything about the specific COP (and other approvals) in which Intervenors are interested. Whether BOEM will conclude that those opinions require any changes in its Project approvals is not yet determined and cannot be known until and unless BOEM applies those opinions to its prior COP approval.

The issue is thus not whether the challenged action "affect[s] only the agency itself", Opp'n at 31 (quoting *Am. Wild Horse Campaign v. Bernhardt*, 442 F. Supp. 3d 127, 149 (D.D.C. 2020), *aff'd sub nom. W. Watersheds Project v. Haaland*, 850 F. App'x 14 (D.C. Cir. 2021)); the question is whether the challenged act is determinative of a regulatory outcome that impacts the complaining party. Neither the Zerzan Opinion nor Secretarial Order 3437 determines anything about BOEM's prior regulatory approvals for the Project.

Intervenor's reliance on *Public Employees for Environmental Responsibility. v. National Park Service*, No. CV 19-3629, 2021 WL 1198047 (D.D.C. Mar. 30, 2021), Opp'n at 30, is the

same. There the National Park Service issued a policy memorandum (the "Smith Directive") requiring that use of electric-assisted bicycles be permitted in National Parks wherever normal bicycles are allowed. 2021 WL 1198047 at *1-2. The Smith Directive satisfied the second prong of *Bennett* because it "create[ed] obligations on the part of the park superintendents, . . . requiring edits to their park compendium to allow e-bikes where traditional bicycles were allowed, and [requiring] that e-bikes and traditional bicycles be subject to the same regulations." *See id*. at *9 (citation modified). The directive had a regulatory outcome—e-bikes were allowed. Neither the Zerzan Opinion nor Secretarial Order 3437 creates a similar outcome. [2]

The most that the Zerzan Opinion or Secretarial Order 3437 requires is, perhaps, that BOEM undertake a reconsideration process. Intervenors make much of that fact, noting that BOEM has sought a remand and that Mr. Giacona opined that BOEM's original COP approval may not have applied the correct legal standard. Opp'n at 32. But the D.C. Circuit has been clear that "an agency's decision to . . . reconsider a regulation is not reviewable final agency action. . . . [because it] merely begins a process that could culminate in no change . . .". *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (citing *Portland Cement Association v. EPA*, 665 F.3d 177, 185 (D.C. Cir. 2011)). If a reconsideration process is itself not a final agency action, an order to initiate that process also cannot be a final agency action.

*Natural Resources Defense Council, Inc. v. U.S. Dep't of the Interior*, 397 F. Supp. 3d 430 (S.D.N.Y. 2019) (*NRDC v. Int'r*), upon which Intervenors place special reliance (Opp'n at 26, 28, 30), also supports dismissal. In *NRDC v. Int'r*, the then-Principal Deputy Solicitor issued an M-Opinion interpreting the Migratory Bird Treaty Act (MBTA) to permit the "incidental" (*i.e.*,

[2] *Doctors for Am. v. Off. of Personnel Mgmt.*, 793 F. Supp. 3d 112 (D.D.C. 2025) is similar. There an OPM directive "obligated federal agencies to take specific actions within a certain time frame and report back to OPM." 793 F. Supp. 3d at 139. Neither the Zerzan Opinion nor Secretarial Order 3437 obligates BOEM to take any specific action with respect to Intervenors' COP.

unintentional) killing of migratory birds. 397 F. Supp. 3d at 434, 436.[3] Both Interior and the Fish & Wildlife Service, which enforce the MBTA, were bound by the M-Opinion. Its "conclusion is binding on DOI and FWS;" as a result of the M-Opinion, "DOI and FWS cannot make prosecutorial decisions or take other actions that are inconsistent with the Opinion's interpretation of the MBTA." *Id*. at 448.

The M-Opinion in *NRDC v. Int'r* thus satisfied *Bennett*'s second prong because it determined regulatory outcomes. It did so by immediately and categorically changing the legality of a large class of activities and dictating how the regulatory authorities could act. "In its absence, industry actors would have been subject to criminal prosecution for incidental takes. The Opinion eliminates that threat and thus relieves regulated parties of liability they would otherwise face." *Id*. at 449 (citation modified) (quoting *Clean Air Council v. Pruitt*, 862 F.3d 1, 7 (D.C. Cir. 2017) (*per curiam*)). If the Zerzan Opinion and S.O. 3437 prohibited all offshore wind development, they would be analogous to the opinion in *NRDC v. Int'r*. They do no such thing.

*American Wild Horse* also supports dismissal of Count I. At issue there was a resource management plan (RMP) adopted by the Bureau of Land Management under which the wild horse population in a specific area (the Caliente Complex in Nevada) would be reduced to zero. The question (as relevant here) was whether adoption of the RMP was final agency action that, under *Bennett*'s second prong, had concrete legal consequences. The court answered in the affirmative because the RMP was binding on the agency and applied to the specific land (the Caliente Complex) of interest to plaintiffs.

> As a general matter, "[r]esource management plans are designed to guide and *control* future management actions." 43 C.F.R. § 1601.0-2 (emphasis added). In

---

[3] The M-Opinion stated that "the [MBTA's] prohibitions on pursuing, hunting, taking, capturing, killing, or attempting to do the same apply only to affirmative actions that have as their purpose the taking or killing of migratory birds, their nests, or their eggs." *Id*. at 477.

> accordance with this design, an RMP "constrains" BLM by "prevent[ing] BLM from taking actions inconsistent with the provisions of [the] land use plan." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 69, 71, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004). On this point, the Supreme Court has made clear that, "[u]nless and until the plan is amended, [inconsistent] actions can be set aside as contrary to law pursuant to 5 U.S.C. § 706(2)." *Id.* at 69, 124 S.Ct. 2373.

442 F. Supp. 3d at 149-150. And the legally binding nature of the RMP applied, the court emphasized, to the specific decision to reduce the Caliente Complex horse population to zero. *See id.* at 150.

Thus, the challenged agency action in *American Wild Horse*, like that in *Bennett* itself, dictated outcomes for the specific project in which the plaintiffs were interested. Not so here. *See also Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13, 19 (D.C. Cir. 2006) (noting that the Supreme Court has "held that [land use] plans themselves are generally unreviewable; it is only specific actions implementing the plans that are subject to judicial scrutiny.")[4]

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016), Opp'n at 30-31, further illustrates the point. *Hawkes* involved a landowner's challenge to a Clean Water Act jurisdictional determination by the Corps of Engineers. That determination applied specifically to the landowner's property and had immediate and significant legal consequences for that property. Under the Corps' regulations, jurisdictional determinations effectively prohibit unpermitted discharges on pain of civil enforcement proceedings. And they are binding for five years on both

[4] The dissent in *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006) GRIFFITH, Circuit Judge, concurring in part and dissenting in part) (Opp'n at 32-33) is the same. At issue there was a memorandum issued by the BLM assistant director that directed the Bureau's local field offices to conduct wild horse and burro "gathers" in each of the Bureau's wild horse management areas. 460 F.3d at 17. The memo gave specific instructions as to the number and ages of the animals to be removed in each area, and left field employees no discretion as to either. *Id*. at 29. According to the dissent, because the regulatory outcome was determined, the second *Bennett* factor was satisfied. *Id*. (The majority found the issue moot because the memo had expired. *Id*. at 18.)

the Corps and the Environmental Protection Agency, which share authority to enforce the Clean Water Act. 578 U.S. at 597-98.

Like *Bennett* and *American Wild Horse*, *Hawkes* thus involved an agency determination specifically applicable to and binding upon the property or project of interest to the plaintiff. Not so here.

The same is true of *CSI Aviation Services., Inc. v. U.S. Dep't of Transportation*, 637 F.3d 408 (D.C. Cir. 2011). *See* Opp'n at 29 n.30, *see also id.* at 32. In *CSI* the plaintiff, an air charter broker for the government, challenged a DOT determination that the company was operating without proper authorization and therefore illegally. DOT's cease-and-desist letter informed CSI of DOT's determination that "CSI has been acting as an unauthorized indirect air carrier in violation of section 41101 [of the Federal Aviation Act]," that the same conduct also "constitute[s] unfair and deceptive practices and unfair methods of competition in violation of 49 U.S.C. § 41712," and that continued violations would subject CSI to daily fines of $27,500. 637 F.3d at 410.

CSI challenged DOT's reading of the relevant statutes. DOT countered that, because it had not commenced an enforcement proceeding, there was no reviewable final agency action. The court rejected DOT's argument. Because DOT had made a determination specifically applicable to CSI's operations, and because that determination had substantial and immediate legal consequences, *Bennett*'s second test was satisfied.

> DOT has imposed an immediate and significant burden on CSI. The agency effectively declared the company's operations unlawful and warned the company "to cease and desist from any further activity that would result in it engaging in indirect air transportation." Oct. 2009 Letter to CSI. At the very least, this cast a cloud of uncertainty over the viability of CSI's ongoing business. It also put the company to the painful choice between costly compliance and the risk of prosecution at an uncertain point in the future[.]

*Id*. at 412. Unlike the situation in *CSI*, BOEM has yet to make any determination as to whether, and if so how, the Zerzan Opinion affects Intervenor's Project.

Another aspect of the *CSI* decision, and of the decision in *Ciba–Geigy Corp. v. EPA,* 801 F.2d 430 (D.C.Cir.1986), upon which the *CSI* court relied, is instructive. In the "pre-enforcement" context in which those cases arose, one of the factors on which the D.C. Circuit relies in applying *Bennett* is whether "the case present[s] 'a purely legal' question of 'statutory interpretation.'" *CSI*, 637 F.3d at 412 (quoting *Ciba–Geigy Corp*, 801 F.2d at 435). If not, there would be "benefit in waiting for the agency to develop a record before granting judicial review," *see id.*, because the court's "review of the agency's legal position would . . . 'benefit from a more concrete setting.'" *Id*. (quoting *Ciba–Geigy,* 801 F.2d at 435.)

While the soundness of the Zerzan Opinion (and Secretarial Order 3437's reference to it) is by itself a purely legal question of statutory interpretation, application of that opinion to Intervenors' COP is fact-intensive. The question of whether the Zerzan/Jorjani interpretation, when and if applied to the New England Wind's COP approval, would lead the agency to conclusions differing from those initially reached has not yet been answered. And that question cannot be answered in the abstract. It requires a fact-based assessment of competing uses, a fact-based assessment of how if at all the Project would interfere with those uses, and then—only then—an application of the standard adopted in the Zerzan Opinion. Compare *NRDC v. Int'r*, 397 F. Supp. 3d at 451(*Bennett* is satisfied where there is no occasion for further factual development through agency decisionmaking processes.) Intervenors' Crossclaims are not a pre-enforcement case because administrative penalties are nowhere at issue. But *CSI* and *Ciba–Geigy* confirm that our facts do not satisfy *Bennett*.

On the application of *Bennett*'s second prong, Intervenors also cite *Southwest Airlines Co. v. U.S. Dep't of Transportation*, 832 F.3d 270 (D.C. Cir. 2016). Opp'n at 32. But that

decision is unhelpful because the court there found that the challenged DOT opinion letter did not satisfy the first *Bennett* prong, and therefore did not consider the second. 832 F.3d at 277 ("Because DOT's December 17 letter did not mark the consummation of the agency's decisionmaking process . . . we have no occasion to reach Southwest's arguments under the second *Bennett* prong.")

Intervenors lack a case or controversy under Count I, which should also be dismissed for a failure to identify a final agency action reviewable under the APA.

We also note that the substance of the Zerzan Opinion needs clarifying. The issue is how to interpret OCSLA Section 8(p)(4), which requires that "The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for-- . . . [inter alia] (I) prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas." 43 U.S.C. § 1337(p)(4). The Jorjani Opinion, which the Zerzan Opinion reestablishes, interprets this language as follows:

> I advise the Secretary that the phrase requires the Secretary to act to prevent interference with reasonable uses in a way that errs on the side of less interference rather than more interference. This means preventing all interference, if the proposed activity would lead to unreasonable interference, but not the type of interference that would be described as *de minimis* or reasonable.

*Secretary's Duty to Prevent Interference with Reasonable Uses of the Exclusive Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer Continental Shelf Lands Act Subsection 8(p), Alternate Energy-related Uses on the Outer Continental Shelf*, M-37059 at 2 (Dec. 14, 2020), https://www.doi.gov/sites/default/files/m-37059.pdf. The Jorjani Opinion thus interprets the statutory language as prohibiting "unreasonable" interference, but as not prohibiting "reasonable" interference. Intervenors instead focus all their fire on the expression "*de minimis*", arguing that the Opinion disallows all but *de minimis* interference. Opp'n at 10, 18, 31. But that is not what the Opinion says; instead, it contrasts *reasonable* with *unreasonable*

interference. The Jorjani Opinion cannot be read as intending "*de minimis*" as an alternative standard. Reading the language as a whole, reasonableness is the benchmark. In the statutory construction context, this is stated as the importance of "reading the words together, 'not in isolation.'" *Alabama v. United States Army Corps of Eng'rs*, 774 F. Supp. 3d 142, 162 (D.D.C. 2025) (quoting *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022).

And if there is ambiguity here, the need for allowing BOEM to apply the standard to concrete facts is all the more important.

## III. INTERVENORS' DECLARATORY JUDGMENT CLAIMS (COUNTS II-IV) SHOULD BE DISMISSED BECAUSE NO ADVERSE LEGAL INTEREST EXISTS BETWEEN INTERVENORS AND FEDERAL DEFENDANTS.

Intervenors' Opposition Brief fails to address the jurisdictional deficiencies of their declaratory judgment claims (Counts II-IV). Intervenors argue that Federal Defendants' actions in this case have "signaled that they are aligned with Plaintiffs" and that Federal Defendants "no longer stand by . . . key approvals." Opp'n at 23-24. But agency approvals remain in place. And a mere "signal" is not enough to satisfy Article III's case and controversy requirement. *See Aetna Life Ins. v. Haworth*, 300 U.S. 227, 240–241 (1937) ("The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests."). Indeed, "[t]he presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Diamond v. Charles*, 476 U.S. 54, 62 (1986). While Counts II-IV are alleged *against* Federal Defendants, those claims do not allege any legal controversy or violation against Federal Defendants. Instead, Intervenors claim that they are entitled to a declaratory judgment that Federal Defendants' Project approvals are lawful. In other words, Intervenors "*agree* that [Federal] Defendants acted lawfully," meaning "no controversy" exists between Intervenors and Federal Defendants with respect to Counts II-IV. *See Powder River*

*Basin Res. Council v. U.S. Dep't of Interior*, No. 22-cv-2696 (TSC), 2024 WL 195760, at *3 (D.D.C. Jan. 18, 2024). While Intervenors may have an interest in the legal sufficiency of Federal Defendants' Project approvals, that interest is only an "adverse legal interest" under the Declaratory Judgment Act when it relates to "a case of actual controversy within the court's jurisdiction." *Collin Cnty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170 (5th Cir. 1990) (citation modified) (citing 28 U.S.C. § 2201).

Simply put, federal approvals for the challenged project remain in force and the agencies have not expressed an intent to reconsider their approvals relating to the NHPA, MMPA, or ESA claims, which are the sole focus of Intervenors' declaratory judgment claims. *See* Am. Crossclaim ¶¶ 63-75. While Intervenors may endure increased risk to further investment in the project, "nothing legally precludes [Intervenors] from continuing the development of its project." *See Mayor & City Council of Ocean City, Md. v. U. S. Dep't of the Interior*, No. CV SAG-24-03111, 2026 WL 411759, at *3 (D. Md. Feb. 13, 2026).

In any event, the Court should decline jurisdiction even if theoretically available. *Wilton v. Seven Falls*, 515 U.S. 277, 282 (1995) (noting that the Declaratory Judgment Act gives courts discretion to determine "whether and when to entertain an action"). The Court has now entered a scheduling order for cross-motions for summary judgment on Plaintiffs' OCSLA, ESA, MMPA, and NHPA claims. Intervenors can present any arguments they wish on the legality of prior approvals in its cross motion on those claims, and the Court can adjudicate the questions contemplated in Crossclaim Counts II-IV in adjudicating Plaintiffs' claims. *See Mayor & City Council,* 2026 WL 411759, at *4 (declining jurisdiction over duplicative declaratory judgment claims where defendant-intervenor project proponent in wind energy challenge "will have the full opportunity to argue that the COP and its approval process complied with these statutes in its briefing on summary judgment of Plaintiffs' claims") (citing *Maniscalco v. Brother Int'l Corp.*

*(USA)*, 627 F. Supp. 2d 494, 505 (D.N.J. 2009)). The Court should therefore dismiss Intervenors' declaratory judgment claims.

## CONCLUSION

The reasoning underlying our motion is simple.

Intervenors' effort to champion BOEM's approval of Intervenors' Project under the applicable statutes (Counts II-IV) can't support a lawsuit because an agreement cannot be a "controversy." That is why a party can neither appeal a court decision in its favor nor seek judicial review of a favorable agency decision. The lack of 'adversarialness' means there is no Article III standing and there is no aggrievement under the APA. And dismissal of Counts II-IV will prejudice no-one. It will in no way limit Intervenors' ability, as Intervenors (rather than as cross-plaintiffs), to support the agencies' decisions and to contest any party's challenge to the lawfulness of those decisions.

The issue with Count I is also straightforward. Both the ripeness doctrine, and the final agency action requirement of the APA, serve to: (a) avoid piecemeal appeals; and (b) avoid premature review when the facts aren't settled and agency processes should be allowed to run their course. Intervenors point to numerous policy pronouncements that they view as hostile to wind energy development generally—including the Opinions challenged in Count I, administration press statements, and even including our motion for remand and Mr. Giacona's declaration in support of that motion. But with respect to Intervenors' Project approvals, the government hasn't *done* anything. Until and unless that happens, judicial review of policy statements and legal opinions is premature.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Energy & Natural Resources Division

*/s/ Peter Kryn Dykema*
PETER KRYN DYKEMA
Senior Trial Attorney
Natural Resources Section
(202) 532 3086
Peter.dykema@usdoj.gov
BONNIE M. BALLARD
Trial Attorney
Wildlife & Marine Resources Section
(202) 532 5567
Bonnie.ballard@usdoj.gov

*Counsel for the United States*

*Electronically filed September 3, 2026.*