**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ACK FOR WHALES, Inc., *et al.*,
Plaintiffs,

v.

UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,
Defendants,

and

AVANGRID POWER, LLC, *et al.*
Defendant-Intervenors.

Case No. 1:25-cv-01678-AHA

Honorable Amir H. Ali

**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


**Page**

INTRODUCTION ....1

BACKGROUND ....2

I. Legal Background ....2

A. Renewable Energy Leasing Under the Outer Continental Shelf Lands Act ....2

B. National Historic Preservation Act ....3

C. Endangered Species Act ....4

D. Marine Mammal Protection Act ....5

II. FACTUAL BACKGROUND ....6

A. BOEM Proceedings and Decisions ....7

B. NMFS's Issuance of the Biological Opinion ....10

C. NMFS's Issuance of the Letter of Authorization ....12

D. Prior Proceedings ....12

STANDARD OF REVIEW ....13

ARGUMENT ....14

I. Interior Agrees Its OCSLA Finding Warrants Re-Evaluation. ....14

II. Because BOEM's COP Approval Should Be Remanded, The Court Need Not Reach Plaintiffs' NHPA Challenge to That Same Agency Action. ....17

III. NMFS Complied with the MMPA. ....17

A. NMFS/OPR's "small numbers" determinations under the MMPA are reasonable. ....17

1. NMFS's "small numbers" determinations are plainly reasonable. ....18

2. NMFS/OPR's upper limit for "small numbers" is reasonable. ....21

B. NMFS's negligible impact finding under the MMPA is reasonable. ....24

C. Plaintiffs' critiques regarding Project mitigation measures lack merit. ....26

1. Seasonal Pile-Driving Moratorium ....27

2. Passive Acoustic Monitoring ....28

3. Shutdown Procedures ....29

4. Protected Species Observers (PSOs) ....30

5. Bubble Curtains ....30

6. Soft-Start Procedures ....................................................................31
D. NMFS/OPR's "small numbers" and "negligible impact" determinations are based on the best available science. ....................................................................31
E. Plaintiffs' remaining challenges under the First Cause of Action fail. ................32
IV. NMFS's Approvals Comply with the ESA....................................................................33
A. NMFS/GARFO reasonably concluded that the Project is not likely to...............34
jeopardize the continued existence of the NARW. ..................................................34
B. NMFS used the best available science.......................................................................36
CONCLUSION.......................................................................................................................39

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alaska Wilderness League v. Jewell*,
116 F. Supp. 3d 958 (D. Alaska, 2015) ....................20

*Alaska Wildlife All. v. U.S. Fish & Wildlife Serv.*,
No. 3:21-cv-00209, 2023 WL 2986365 (D. Alaska Feb. 6, 2023)....................22

*Balt. Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983)....................26

*Bays' Legal Fund v. Browner*,
828 F. Supp. 102 (D. Mass. 1993)....................32

*Bldg. Indus. Ass'n of Superior Cal. v. Norton*,
247 F.3d 1241 (D.C. Cir. 2001) ....................38

*Cap. Area Immigrants' Rts. Coal. v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) ....................17

*City of Las Vegas v. Lujan*,
891 F.2d 927 (D.C. Cir. 1989) ....................37

*Code v. McHugh*,
139 F. Supp. 3d 465 (D.D.C. 2015) ....................15

*CTIA-Wireless Ass'n v. FCC*,
466 F.3d 105 (D.C. Cir. 2006) ....................3

*Ctr. for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012).................... 19, 20, 23

*Davis v. Latschar*,
202 F.3d 359 (D.C. Cir. 2000) ....................3

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....................15

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985)....................15

*IMS, P.C. v. Alvarez*,
129 F.3d 618 (D.C. Cir. 1997) ....................14

*Keating v. FERC*,
569 F.3d 427 (D.C. Cir. 2009) ....................13

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................18

*Melone v. Coit*,
100 F.4th 21 (1st Cir. 2024)....................18, 23

*Melone v. Coit*,
No. 1:21-cv-11171-IT, 2023 WL 5002764 (D. Mass. Aug. 4, 2023).................... 25, 28, 29, 30

*Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) .......... 13, 14, 32

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*,
100 F.4th 1 (1st Cir. 2024) .......... 28

*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*,
947 F. Supp. 2d 1031 (D. Alaska 2013) .......... 22

*Nat'l Fam. Plan. & Reprod. Health Ass'n v. Sullivan*,
979 F.2d 227 (D.C. Cir. 1992) .......... 17

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
463 F.3d 50 (1st Cir. 2006) .......... 4

*NRDC v. Evans,*
279 F. Supp. 2d 1129 (N.D. Cal. 2003) .......... 18, 19

*NRDC v. Evans,*
232 F. Supp. 2d 1003 (N.D. Cal. 2002) .......... 18, 21

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
45 F.4th 291 (D.C. Cir. 2022) .......... 3

*Presidio Hist. Ass'n v. Presidio Tr.*,
811 F.3d 1154 (9th Cir. 2016) .......... 4

*RENEW Northeast et. al. v. United States Department of Interior, et al.*,
No. 25-CV-13961-DJC, 2026 WL 1078282 (D. Mass. Apr. 21, 2026) .......... 13, 16

*Save Long Beach Island, Inc. v. U.S. Dep't of Com.*,
No. 25-cv-2211 (JMC), 2026 WL 2294613 (D.D.C. Aug. 10, 2026) .......... 16

*Save Long Beach Island v. U.S. Dep't of Com.*,
794 F. Supp. 3d 273 (D.N.J. 2025) .......... 18, 20, 23

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
123 F.4th 1 (1st Cir. 2024) .......... 16

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
Nos. 1:22-cv-11091-IT, 1:22-cv-11172-IT, 2023 WL 6691015 (D. Mass. Oct. 12, 2023) .......... 16

*Sw. Ctr. for Biological Diversity v. Babbitt*,
215 F.3d 58 (D.C. Cir. 2000) .......... 36

*Tindal v. McHugh*,
945 F. Supp. 2d 111 (D.D.C. 2013) .......... 14

*Town & Cnty. of Nantucket v. Burgum*,
No. 25-cv-906, 2025 WL 3120419 (D.D.C. Nov. 4, 2025) .......... 16

*Trongone v. Comm'r of Internal Revenue*,
179 F.4th 1 (D.C. Cir. 2026) .......... 15

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
933 F.3d 728 (D.C. Cir. 2019) .......... 3, 4

*Wallish v. U.S. Dep't of Def.*,
No. 24-cv-00616, 2025 WL 1580702 (D.D.C. June 4, 2025) ....15

**Statutes**

5 U.S.C. § 706(2)(A) ....13, 34
16 U.S.C. § 1362(13) ....5
16 U.S.C. § 1362(18)(A) ....5
16 U.S.C. § 1362(18)(A)(i) ....5, 6
16 U.S.C. § 1362(18)(A)(ii) ....6
16 U.S.C. § 1362(18)(D) ....6
16 U.S.C. § 1371(a) ....5
16 U.S.C. § 1371(a)(5)(A)(i) ....6, 17, 25
16 U.S.C. § 1371(a)(5)(A)(i)-(i)(I) ....6
16 U.S.C. § 1371(a)(5)(A)(i)(I) ....24
16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa)-(bb) ....6
16 U.S.C. § 1372(a)(2)(A) ....5
16 U.S.C. § 1373(a) ....31
16 U.S.C. § 1532(15) ....4
16 U.S.C. § 1532(19) ....5
16 U.S.C. § 1536(a)(2) ....4, 35
16 U.S.C. § 1536(b) ....35
16 U.S.C. § 1536(b)(4)(c)(ii) ....5
16 U.S.C. § 1536(o) ....5
43 U.S.C. § 1337(p)(1)(C) ....2
43 U.S.C. § 1337(p)(4) ....passim
43 U.S.C. § 1337(p)(4)(A)-(L) ....3
43 U.S.C. § 1337(p)(8) ....2
54 U.S.C. § 300308 ....3
54 U.S.C. § 300320 ....3
54 U.S.C. § 306107 ....4
54 U.S.C. § 306108 ....3

**Regulations**


16 C.F.R. § 904.300(a)(3) ........ 27
30 C.F.R. Part 585 ........ 2
30 C.F.R. § 585.102(a) ........ 3
30 C.F.R. § 585.200(a)(1) ........ 2
30 C.F.R. §§ 585.210-585.211 ........ 2
30 C.F.R. §§ 585.215-585.216 ........ 2
30 C.F.R. § 585.600 ........ 2
30 C.F.R. §§ 585.605-585.613 ........ 2
30 C.F.R. §§ 585.620-585.628 ........ 2, 7
36 C.F.R. Part 800 ........ 3
36 C.F.R. §§ 800.2-800.6 ........ 4
36 C.F.R. § 800.2(d)(3) ........ 7
36 C.F.R. § 800.3 ........ 3
36 C.F.R. § 800.4 ........ 3
36 C.F.R. § 800.5(a)(1) ........ 3
36 C.F.R. § 800.6 ........ 3, 4
36 C.F.R. § 800.6(c) ........ 9
50 C.F.R. § 216.3 ........ 5
50 C.F.R. § 216.102(a) ........ 36
50 C.F.R. § 216.103 ........ 24
50 C.F.R. § 216.104(c) ........ 36
50 C.F.R. § 216.105 ........ 6
50 C.F.R. § 216.105(b) ........ 6
50 C.F.R. § 216.106 ........ 6
50 C.F.R. § 216.106(a) ........ 6
50 C.F.R. § 216.106(b) ........ 6
50 C.F.R. § 402.01(b) ........ 5
50 C.F.R. § 402.02 ........ 25, 34
50 C.F.R. § 402.14 ........ 5
50 C.F.R. § 402.14(c)-(d) ........ 11

50 C.F.R. § 402.14(g)-(h) ....................5
50 C.F.R. § 402.14(g)(2)-(4) ....................5
50 C.F.R. § 402.14(g)(8) ....................36
50 C.F.R. § 402.14(i) ....................34
50 C.F.R. § 402.14(i)(1)(ii) ....................5
50 C.F.R. § 402.14(i)(1)(iv) ....................5
50 C.F.R. § 402.16 ....................39

**Other Authorities**

H.R. Rep. No. 97-228 (1981), *as reprinted in* 1981 U.S.C.C.A.N. 1458 ....................18, 23
74 Fed. Reg. 19638 (Apr. 29, 2009) ....................2
86 Fed. Reg. 34782 (June 30, 2021) ....................7

## TABLE OF ACRONYMS

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| BIWF | Block Island Wind Farm |
| BOEM | Bureau of Ocean Energy Management |
| BSEE | Bureau of Safety & Environmental Enforcement |
| COP | Construction & Operations Plan |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| GARFO | Greater Atlantic Regional Fisheries Office |
| ITA | Incidental Take Authorization |
| IPF | Impact-Producing Factors |
| ITR | Incidental Take Regulations |
| ITS | Incidental Take Statement |
| LOA | Letter of Authorization |
| MMA | Marine Minerals Administration |
| MMPA | Marine Mammal Protection Act |
| NARW | North Atlantic Right Whales |
| NHL | National Historic Landmarks |
| NHPA | National Historic Preservation Act |
| NMFS | National Marine Fisheries Service |
| OCS | Outer Continental Shelf |

| | |
|---|---|
| OCSLA | Outer Continental Shelf Lands Act |
| OPR | Office of Protect Resources |
| PAM | Moored Passive Acoustic Monitoring System |
| PSO | Protected Species Observers |
| PTS | Permanent Threshold Shift |
| ROD | Record of Decision |
| WTG | Wind Turbine Generator |

## INTRODUCTION

Plaintiffs challenge federal approvals associated with the New England Wind Project ("the Project"), an offshore wind energy project. The First Cause of Action alleges the final rule (also called "Incidental Take Regulations" or "ITR") and Letter of Authorization ("LOA") (collectively referred to as the "Incidental Take Authorization" or "ITA") issued by the National Marine Fisheries Service, Office of Protect Resources ("NMFS/OPR") violates the Marine Mammal Protection Act ("MMPA") and must be set aside under the Administrative Procedure Act ("APA"). The Second Cause of Action alleges the Biological Opinion ("BiOp") issued by the NMFS Greater Atlantic Regional Fisheries Office ("NMFS/GARFO") violates the Endangered Species Act ("ESA") and must be set aside under the APA. The Third and Fourth Causes of Action challenge the Department of Interior's ("Interior") approval of the Construction and Operations Plan ("COP") submitted by Avangrid Power, LLC ("Avangrid") for the Project pursuant to the APA, the National Historic Preservation Act ("NHPA"), and the Outer Continental Shelf Lands Act ("OCSLA").

The Court should remand, without vacatur, Interior's approval of the COP for the Project so that Interior can re-evaluate the COP under OCSLA. Upon remand, Interior would make a new decision regarding the COP. Given that remand, the Court need not reach Plaintiffs' claim under the NHPA related to Interior's prior COP approval.

As explained below, NMFS/OPR's decision to issue the ITA is fully supported by the record before the Court and consistent with all applicable requirements of the MMPA. The non-lethal incidental taking by harassment of North Atlantic Right Whales ("NARWs"), common dolphins, and other marine mammals is conditioned upon a comprehensive suite of effective mitigation measures (including mandatory avoidance and minimization measures). The BiOp

issued by NMFS/GARFO under the ESA is also supported by the record and consistent with all applicable requirements of the ESA.

## BACKGROUND

### I. Legal Background

#### A. Renewable Energy Leasing Under the Outer Continental Shelf Lands Act

Offshore wind development on the Outer Continental Shelf ("OCS") occurs under OCSLA. Congress amended OCSLA in 2005 to authorize the Secretary of the Interior to issue leases to "support production, transportation, storage, or transmission of energy from sources other than oil and gas," which includes wind energy. Energy Policy Act of 2005, 43 U.S.C. § 1337(p)(1)(C). Regulations promulgated by the Bureau of Ocean Energy Management ("BOEM"), located within Interior, govern offshore renewable energy development.[1] *Id.* § 1337(p)(8); 74 Fed. Reg. 19638 (Apr. 29, 2009); 30 C.F.R. Part 585. After identifying wind energy areas for leasing, 30 C.F.R. §§ 585.210-585.211, Interior may offer the identified areas or portions of those areas for lease or sale via auction. *Id.* §§ 585.215-585.216. Development of a lease, however, can only occur if Interior approves a site assessment plan and, later, a COP. *Id.* §§ 585.200(a)(1), 585.600, 585.605-585.613 (site assessment plan requirements), 585.620-585.628 (COP requirements).

When approving a project under OCSLA, Interior must ensure that "any activity" that it authorizes is "carried out in a manner that provides for" twelve enumerated requirements, including: "safety;" "protection of the environment;" "conservation of the natural resources of the [OCS];" "prevention of interference with reasonable uses (as determined by the Secretary)"

[1] Secretary's Order 3451 established the Marine Minerals Administration ("MMA"), which replaced BOEM. The transition from BOEM to the MMA is ongoing. This brief refers to BOEM in describing past agency actions to avoid confusion in reviewing the administrative record.

of the OCS; and consideration of other uses of the sea and seabed, including the use of the area for fishing and marine navigation. 43 U.S.C. § 1337(p)(4)(A)-(L); 30 C.F.R. § 585.102(a).

### B. National Historic Preservation Act

Two provisions of the National Historic Preservation Act ("NHPA") are relevant to this case. The first is Section 106, which "requires an agency, 'prior to the issuance of any license, [to] take into account the effect of the undertaking on any historic property.'" *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 296 (D.C. Cir. 2022) (alteration in original) (quoting 54 U.S.C. § 306108). Section 106 is procedural in nature and does not impose substantive preservation requirements. *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 106-07 (D.C. Cir. 2006). The Act does "not require a federal agency to engage in any particular preservation activities; rather, Section 106 only requires that the agency consult the State Historic Preservation Office and the Advisory Council on Historic Preservation [("ACHP")] and consider the impacts of its undertaking." *Id*. (quoting *Davis v. Latschar*, 202 F.3d 359, 370 (D.C. Cir. 2000) (citation modified)).

A "historic property" is one included on, or eligible for inclusion on, the National Register of Historic Places. 54 U.S.C. § 300308. As relevant here, an "undertaking" is defined broadly to include any "project, activity, or program" that requires a federal permit. *Id.* § 300320.

Regulations promulgated by the ACHP govern federal agencies' compliance with Section 106. *See* 36 C.F.R. Part 800. The regulations generally set forth a four-step process: (1) initiation (*Id.* § 800.3); (2) identification of historic properties potentially affected, which requires determining an undertaking's area of potential effects (*Id.* § 800.4); (3) assessment of effects, including adverse effects that may impact the "characteristics of a historic property that qualify the property for inclusion in the National Register" (*Id.* § 800.5(a)(1)); and (4) efforts to resolve any adverse effects (*Id.* § 800.6). *See United Keetoowah Band of Cherokee Indians in Okla. v.*

*FCC*, 933 F.3d 728, 745 (D.C. Cir. 2019). Agencies are to consult with the identified consulting parties in the second, third, and fourth steps. 36 C.F.R. §§ 800.2-800.6. Importantly, "resolution" in this context does not refer to the elimination or reduction of adverse effects. Rather, it refers to the agreement of the parties identified by regulation on how to move forward. *Id.* § 800.6.

The second relevant provision of the NHPA is Section 110(f), which concerns National Historic Landmarks ("NHLs"). NHLs are "historic and archaeological sites, buildings, and objects which 'possess exceptional value as commemorating or illustrating the history of the United States.'" NEW1801.0627.[2] For any project "directly and adversely affect[ing] any [NHL]," Section 110(f) requires that an agency, to "the maximum extent possible[,] undertake such planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C. § 306107. Like Section 106, Section 110(f) does not impose substantive preservation requirements. *See Presidio Hist. Ass'n v. Presidio Tr.*, 811 F.3d 1154, 1169 (9th Cir. 2016); *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 64 (1st Cir. 2006). Instead, it sets a "heightened procedural standard" for considering potential impacts to NHLs. *Presidio Hist. Ass'n*, 811 F.3d at 1169.

### C. Endangered Species Act

Section 7 of the ESA directs federal agencies to ensure that any action they authorize, fund, or carry out is "not likely to jeopardize the continued existence of" any ESA-listed species or destroy or adversely modify critical habitat that has been designated for such species. 16 U.S.C. § 1536(a)(2).[3] To achieve that objective, if an agency's proposed action may affect and

---

[2] The administrative record prepared by BOEM follows this numbering format: after the prefix "NEW" the document number precedes the period and the page number (within the document) follows the period.

[3] Depending on the species in question, either the Secretary of Commerce or the Secretary of the Interior is responsible for implementing the ESA as the consulting agency. 16 U.S.C. § 1532(15).

is likely to adversely affect an ESA-listed species or its critical habitat, the agency must engage in formal consultation with the consulting agency (here, NMFS). 50 C.F.R. § 402.14.

Formal consultation culminates in the issuance of a BiOp by the consulting agency. *Id.* § 402.14(g)(2)-(4). The BiOp evaluates the status of ESA-listed species and their designated critical habitat, the environmental baseline within the action area, the effects and cumulative effects of the agency's proposed action on those species, and includes the consulting agency's opinion as to whether the action is "likely to jeopardize the continued existence" of any listed species or result in the destruction or adverse modification of their critical habitat. *Id.* § 402.14(g)-(h). If incidental "take" is anticipated, the BiOp must include an incidental take statement ("ITS") that specifies the extent or amount of incidental take and specifies "reasonable and prudent measures . . . necessary or appropriate to minimize such impact," and terms and conditions to implement those measures. 16 U.S.C. §§ 1532(19), 1536(b)(4)(c)(ii); 50 C.F.R. § 402.14(i)(1)(ii), (iv). Any incidental take that occurs consistent with the specified measures in an ITS is exempt from ESA Section 9's prohibition on take of listed species. 16 U.S.C. § 1536(o).

**D. Marine Mammal Protection Act**

Subject to certain exceptions, the Marine Mammal Protection Act ("MMPA") prohibits the "taking and importation of marine mammals." 16 U.S.C. §§ 1371(a), 1372(a)(2)(A). The term "take" is defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13); 50 C.F.R. § 216.3. The MMPA identifies two types of "harassment": "Level A" and "Level B." 16 U.S.C. § 1362(18)(A); 50 C.F.R. § 216.3. Level A harassment is defined as actions having the "potential to injure" a marine mammal. 16 U.S.C. §

---

The Secretary of Commerce administers the ESA through NMFS, and the Secretary of the Interior administers the ESA through the U.S. Fish and Wildlife Service. 50 C.F.R. § 402.01(b).

1362(18)(A)(i). By contrast, Level B harassment is defined as "any act of pursuit, torment, or annoyance" which has the "potential to disturb" a marine mammal by causing "disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." *Id.* § 1362(18)(A)(ii), 18(D).

The MMPA includes an exception under which, upon request "by [U.S. citizens] who engage in a specified activity . . . within a specified geographical region, [NMFS] shall allow . . . the incidental, but not intentional, taking . . . of small numbers of marine mammals of a species or population stock if [NMFS] . . . finds that the total of such taking . . . will have a negligible impact on such species or stock[.]" *Id.* § 1371(a)(5)(A)(i)-(i)(I).[4] If granted, an ITR, together with a LOA, may authorize such incidental take for a period of up to five years. *Id.* § 1371(a)(5)(A)(i); 50 C.F.R. §§ 216.105, 216.106.[5] When NMFS approves a request for an ITR, it must prescribe: (1) the "permissible methods of taking" pursuant to the applicant's specified activity; (2) "other means of effecting the least practicable adverse impact" on the affected species or stock and its habitat; and (3) "requirements pertaining to the monitoring and reporting" of the authorized take. 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa)-(bb); 50 C.F.R. § 216.105(b).

## II. FACTUAL BACKGROUND

[4] The Secretary of Commerce has delegated authority to NMFS/OPR to implement the MMPA. *See* Department of Commerce Organizational Orders (DOO) 25-5 § 6.04 (May 4, 2015).

[5] An ITR does not authorize take. Rather, an applicant must apply for and obtain an LOA to conduct identified activities pursuant to the ITR. 50 C.F.R. § 216.106(a). To issue an LOA, NMFS must determine that the level of taking expected from the activities identified in the LOA application will be consistent with the findings made for the total taking allowable under the ITR. *Id.* § 216.106(b).

Plaintiffs challenge BOEM's approval of the New England Wind COP under OCSLA, the NHPA, and the APA. Plaintiffs also challenge NMFS's associated authorization and consultation under the MMPA and the ESA, respectively. *See* Compl. ¶ 1, Dkt. No. 1.

**A. BOEM Proceedings and Decisions**

In 2015, Offshore MW LLC was awarded a commercial Renewable Energy Lease for the Project area offshore Massachusetts. NEW1844.0005-06; NEW1799.0015. On June 28, 2021, BOEM approved a partial assignment of the northernmost 65,296 acres of Lease OCS-A 0501 from Vineyard Wind LLC to Vineyard Wind I LLC. *Id*. Vineyard Wind LLC retained the remaining 101,509 acres, which were designated as Lease OCS-A 0534. *Id*. Then, on December 14, 2021, BOEM approved the assignment of Lease OCS-A 0534 from Vineyard Wind LLC to Park City Wind LLC. *Id*. These Leases did not authorize any activities, but rather required Park City Wind LLC to submit a COP to BOEM for approval before it could perform any construction or other activity on the Project area. 30 C.F.R. §§ 585.620-585.628; *see*, *e.g*., NEW3456.0026.

On July 2, 2020, a phased development COP was submitted to BOEM for construction, installation, operations, maintenance, and conceptual decommissioning activities for Lease Area OCS-A 0501. On August 9, 2023, Park City Wind submitted an updated COP. NEW1844.0006.

On June 30, 2021, BOEM issued a Notice of Intent to prepare an Environmental Impact Statement ("EIS"), initiating a 30-day public scoping period from March 30, 2021, to April 29, 2021. 86 Fed. Reg. 34782 (June 30, 2021); NEW1799.0024. The Notice of Intent solicited public input on the significant resources and issues, impact-producing factors ("IPF"), reasonable alternatives, and potential mitigation measures to analyze in the EIS. BOEM also used the NEPA scoping process to initiate the Section 106 consultation process under the NHPA, as permitted by 36 C.F.R. § 800.2(d)(3), and sought public comment and input through the Notice of Intent

regarding the identification of historic properties or potential impacts on historic properties from activities associated with approval of the COP. NEW1799.0024. BOEM held three virtual public scoping meetings on July 19, 23, and 26, 2021, to present information on the proposed Project and NEPA process, answer questions from meeting attendees, and solicit public comments. Scoping comments were received through Regulations.gov on docket number BOEM-2021-0047, via email to a BOEM representative, and through oral testimony at each of the three public scoping meetings. NEW1799.0024.

BOEM also began the NHPA Section 106 consultation process for the Project in June 2021. NEW1799.0024; NEW1801.0609. The same notice that began the NEPA scoping process "sought public comment and input … regarding the identification of historic properties [within the Project's area of potential effects] or potential impacts [the Project may have] on historic properties." NEW1799.0024. After receiving the COP submission from the applicant, BOEM contacted sixty-three governments and organizations, providing information on the proposed undertaking and inviting each of them to be a consulting party to the NHPA Section 106 review of the COP. NEW1776.0665; NEW1776.1015-16. Thirty-six participated. NEW1776.1017-18.

Numerous NHPA Section 106 consultation meetings were held virtually with consulting parties between August 13, 2021, and December 13, 2023. NEW1776.0665-66.

Following consultation with consulting parties, consideration of public input, and review of a series of technical reports, BOEM published its Section 106 Finding of Adverse Effect in January 2024. The Finding described the Project's area of potential effects, how BOEM identified historic properties, BOEM's assessment of adverse effects to historic properties, and potential avoidance, minimization, and mitigation measures. NEW1776.0637-1018. BOEM found that there were seven historic properties that would be adversely affected by the Project as

well as forty-nine ancient, submerged landforms that would be adversely affected by physical disturbance. NEW1776.0641.

To resolve adverse effects under the NHPA, BOEM and consulting parties developed a 328-page Memorandum of Agreement regarding the Project pursuant to 36 C.F.R. § 800.6(c). NEW1776.0685-1013.

The invited signatories included BOEM; the U.S. Army Corps of Engineers; the National Park Service; the State Historic Preservation Officer of Massachusetts; ACHP; Park City Wind; the Mashantucket (Western) Pequot Tribal Nation; the Mashpee Wampanoag Tribe of Massachusetts; the Chappaquiddick Wampanoag Tribe; the Town of Aquinnah; and the Bureau of Safety and Environmental Enforcement ("BSEE"). NEW1776.0713-24. The Memorandum of Agreement identified binding avoidance, minimization, and mitigation measures to resolve adverse effects to historic properties. NEW1774.001-327.

BOEM published the final EIS in January 2024. NEW1799.0001. On April 1, 2024, the Principal Deputy Assistant Secretary for Land and Minerals Management signed a Record of Decision ("ROD") for the New England Wind COP. NEW1844.0001. The ROD announced Interior's decision to approve the COP with modifications. The ROD stated:

> The Secretary's authorization must comply with OCSLA Subsection 8(p)(4) (43 U.S.C. § 1337(p)(4)), which "imposes a general duty on the Secretary to act in a manner providing for the subsection's [various policy] goals." According to M-Opinion 37067, "[t]he subsection does not require the Secretary to ensure that the goals are achieved to a particular degree, and she retains wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension."

NEW1844.0008-9.

Appendix B of the ROD is an Information Memorandum from the Chief of the Office of Renewable Energy Programs in BOEM to the Director of BOEM, with the subject, "Compliance

Review of the Construction and Operations Plan for the New England Wind Project for Commercial Lease OCS-A 0534" (the "OCSLA Memo"). NEW1844.0166-202. The OCSLA Memo states: "BOEM has determined that the Project will comply with the Bureau's regulations and that the proposed activities will be carried out in a manner that provides for safety, protection of the environment, prevention of waste, and the other factors listed in subsection 8(p)(4) of OCSLA." NEW1844.0167.

On July 1, 2024, BOEM approved the New England Wind COP, which authorized construction and operation of two wind energy projects, both of which were described in the COP. NEW1184.0001. On the same day, BOEM issued two COP Approval letters: one to the Chief Development Officer of Park City Wind LLC and one to the Chief Development Officer of Commonwealth Wind, LLC, which are the holders of leases OCS-A 0534 and OCS-A 0561, respectively, informing them that the COP for the New England Wind Projects 1 and 2 was approved and transmitting conditions of COP approval. NEW1185.0001; NEW1188.0001.

The activities in the COP would consist of two phases: Phase 1, which is also known as the Park City Wind Project, would be developed immediately southwest of Vineyard Wind 1 in Lease Area OCS-A 0534. Phase 1 would have a total generating capacity of up to 804 MW and consist of 41 to 62 Wind Turbine Generators ("WTGs"). Phase 2, which is also known as the Commonwealth Wind Project, would be developed immediately southwest of Phase 1 in the portion of Lease Area OCS-A 0534 that is not developed as part of Phase 1. Phase 2 would deliver at least 1,232 MW of power and consist of up to 88 WTGs. NEW1844.0011. Maps of the Project area can be found at NEW1799.0016 and NEW1844.0007.

**B. NMFS's Issuance of the Biological Opinion**

BOEM and NMFS/OPR engaged with NMFS GARFO in formal ESA Section 7 consultation to address the effects of the COP and its related permits and the separate issuance of the MMPA ITR/LOA on ESA-listed species. BOEM submitted a biological assessment ("BA") to NMFS/GARFO in September 2022 as the lead action agency for the COP, on behalf of itself, BSEE, the U.S. Army Corps of Engineers, the U.S. Environmental Protection Agency, and the U.S. Coast Guard. NMFS_00001-143.[6] NMFS/OPR, as the action agency proposing issuance of the MMPA ITA, separately requested Section 7 consultation, providing NMFS GARFO the *draft Notice of Proposed Incidental Take Regulation for the Taking of Marine Mammals Incidental to the New England Wind Project Offshore Massachusetts* on May 9, 2023. NMFS_0654-1008. After receipt of comments from NMFS/GARFO, BOEM transmitted revised BAs in May 2023 and December 2023, respectively. NMFS_01194-522; NMFS_02381-717.

NMFS/GARFO deemed the information submitted by BOEM and NMFS OPR sufficient to assess the effects of the proposed action on ESA-listed species and designated critical habitat, and that the information constituted the best scientific and commercial data available (50 C.F.R. § 402.14(c)-(d)). NMFS_001553. NMFS/GARFO initiated formal ESA Section 7 consultation on June 15, 2023. *Id.* On February 16, 2024, NMFS/GARFO issued a BiOp in which it determined that federal authorization of the Project is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of critical habitat. NMFS_01544-2291.

---

[6] The administrative record prepared by NMFS follows this numbering format: the specific page number cited follows the prefix "NMFS."

**C. NMFS's Issuance of the Letter of Authorization**

New England Wind also sought an LOA from NMFS/OPR under the MMPA, authorizing the non-lethal take of small numbers of marine mammals incidental to its construction of the Project. NMFS_69275-841. With respect to the NARW, New England Wind sought authorization for non-lethal take by Level B harassment only. For Humpback whale, common dolphin, and Gray seal, New England Wind also sought authorization for non-lethal take by Level A and B harassment only. It did not seek authorization for take by mortality or serious injury of any marine mammal. Additionally, the record further shows specific mitigation measures will be implemented to ensure that no serious injury or mortality of any marine mammals occur. NMFS_69279. Upon publishing a notice of receipt of New England Wind's application, NMFS/OPR provided a thirty-day public comment period. NMFS_70527-28.

NMFS/OPR then published a proposed ITR that would govern the issuance of New England Wind's requested LOA and opened another public comment period. NMFS_70551-647. After consideration of public comments on the proposed rule, NMFS/OPR issued a final ITR in June 2024, NMFS_70916-1015, followed by a correction to the final ITR in October 2024. NMFS_71018-19. The LOA governs New England Wind's incidental taking of marine mammals during construction of the Project for a five-year period, from March 27, 2025, through March 26, 2030. NMFS_070916. "NMFS neither anticipates nor would allow take by serious injury or mortality incidental to the specified activities in this final rulemaking." NMFS_070916.

**D. Prior Proceedings**

Plaintiffs filed their Complaint in May 2025, alleging violations of the MMPA, ESA, OCSLA, NHPA, and the APA. Dkt. No. 1 ¶ 1. Plaintiffs' OCSLA claim alleges violations of 43 U.S.C. § 1337(p)(4). *Id.* ¶¶ 123-140. Plaintiffs seek a court order vacating and/or declaring

unlawful BOEM's decision to approve the New England Wind COP, NMFS's ITA, and the BiOp. *Id.* ¶¶ 174-179.

Federal Defendants previously asked the Court to stay the case and remand it while BOEM reconsiders its COP approval. Dkt. No. 18. Intervenor-Defendants (Intervenors) opposed the remand motion. Dkt. No. 20. Following issuance of a preliminary injunction in another case (*RENEW Northeast et. al. v. United States Department of Interior, et al.*, No. 25-CV-13961-DJC, 2026 WL 1078282, at *1 (D. Mass. Apr. 21, 2026)), this Court issued a Minute Order (April 24, 2026)) holding Federal Defendants' remand motion in abeyance. On June 4, 2026, the Court issued a Minute Order denying the remand/stay motion without prejudice.

Federal Defendants moved to dismiss Intervenors' cross-claim, in response to which Intervenors amended their cross-claim. Dkt. No. 39. Federal Defendants' motion to dismiss the amended cross-claim, Dkt. No. 42, has been fully briefed and remains pending.

BOEM and NMFS have prepared administrative records and filed with the Court notices of lodging, indexes, and certifications. *See* Dkt. Nos. 44, 47, 55, and 58.

## STANDARD OF REVIEW

Plaintiffs' claims are governed by the APA's standard of review, under which an agency decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is narrow, asking only whether the agency "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made." *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009). In making this determination, "a court is not to substitute its judgment for that of the agency[.]" *Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Review is limited to the administrative record, which consists of "materials that were before the agency at the time its decision was made" and were directly or

indirectly considered by agency decision makers. *Tindal v. McHugh*, 945 F. Supp. 2d 111, 123 (D.D.C. 2013) (quoting *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997)).

## ARGUMENT

Plaintiffs assert claims under OCSLA, NHPA, ESA, and MMPA. Interior agrees that its OCSLA finding warrants re-evaluation, and the Court should accordingly remand BOEM's COP approval, without vacatur, to that agency. Given that remand, the Court need not reach Plaintiffs' NHPA claims challenging the COP approval. Summary judgment should be granted in Federal Defendants' favor on Plaintiffs' remaining claims against NMFS under the MMPA, ESA, and APA.

### I. Interior Agrees Its OCSLA Finding Warrants Re-Evaluation.

Interior believes its prior OCSLA analysis for the New England Wind warrants reevaluation. Decl. of Lanny E. Erdos ¶¶ 5-6 (Oct. 19, 2026) (Exhibit 1). Interior agrees with Plaintiffs that BOEM's prior approach to assessing 43 U.S.C. § 1337(p)(4) did not properly consider or explain how the COP "provides for" the subsection's identified factors. Thus, remand (without vacatur) of the prior COP approval is appropriate so the factors in Section 1337(p)(4) can be properly considered.

In approving the COP, BOEM found that its "preferred alternative would have . . . the potential for major adverse impacts on (i) marine mammals, (ii) cultural resources, environmental justice, (iii) scenic and visual resources, (iv) commercial fisheries and for-hire recreational fisheries, (v) scientific research and (vi) some other uses, such as cumulative impacts on national security and military uses." NEW1844.0178-79. Cumulatively with other planned actions, BOEM added that navigation and vessel traffic "could be subject to major

impacts if future planned actions materialize and no further actions are taken to mitigate their impacts[.]" NEW1844.0179. In explaining BOEM's approval of the COP, the ROD stated:

> Today's decision balances the orderly development of OCS renewable energy with the prevention of interference with other uses of the OCS and the protection of the human, marine, and coastal environments. A decision that balances these goals where they conflict and does not hold one as controlling over all others is consistent with the duties required under subsection 8(p)(4) of OCSLA[.]

NEW1844.0028; *see also* NEW1844.0167 (describing the Secretary's "wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension" (quoting the Anderson Opinion, Dkt. No. 18-6)).

Interior believes the decision documents for BOEM's COP approval do not adequately explain how New England Wind's potential moderate to major adverse impacts to other uses of the OCS are consistent with the mandate in Section 1337(p)(4) to "ensure that any activity" carried out under that subsection "is carried out in a manner that provides for" the twelve enumerated criteria. 43 U.S.C. § 1337(p)(4); *see also* Erdos Decl. ¶ 5. Where the administrative record does not support the agency's determination, the ordinary course is remand to the agency for further evaluation or explanation. *Trongone v. Comm'r of Internal Revenue*, 179 F.4th 1, 6 (D.C. Cir. 2026) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

Further, absent a specific statutory limitation, agencies have inherent authority to reconsider past decisions and to revise or replace them. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ; *Wallish v. U.S. Dep't of Def.*, No. 24-cv-00616, 2025 WL 1580702, at *2 (D.D.C. June 4, 2025). Remand is appropriate where, as here, an agency has identified a "substantial and legitimate" concern about a prior decision. *Code v. McHugh*, 139 F. Supp. 3d 465, 468 (D.D.C. 2015). Indeed, two other judges in this District have granted motions for voluntary remand of offshore wind COP approvals to allow Interior to address similar concerns.

*Save Long Beach Island, Inc. v. U.S. Dep't of Com.*, No. 25-cv-2211 (JMC), 2026 WL 2294613, at *5 (D.D.C. Aug. 10, 2026); *Town & Cnty. of Nantucket v. Burgum*, No. 25-cv-906, 2025 WL 3120419, at *2 (D.D.C. Nov. 4, 2025).

The First Circuit's opinion in *Seafreeze Shoreside, Inc. v. U.S. Department of the Interior*, 123 F.4th 1 (1st Cir. 2024), does not call for a conclusion affirming BOEM's prior COP approval. In *Seafreeze*, the First Circuit affirmed a district court decision upholding a COP approval for a different project. The Circuit described the district court decision as "proceed[ing] from the premise that [] BOEM must ensure that 'each criterion is met' in a manner that is 'not to the detriment of the other criteria'" in Section 1337(p)(4). *Id.* at 25 (quoting *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, Nos. 1:22-cv-11091-IT, 1:22-cv-11172-IT, 2023 WL 6691015, at *22 (D. Mass. Oct. 12, 2023)). The holding affirmed by the First Circuit was "only that [] BOEM must have 'discretion' in considering whether each statutory criterion is satisfied, and that [] BOEM must 'balance' the statutory mandate to develop energy projects on the Outer Continental Shelf with the twelve statutory criteria for which it must provide." *Id.* at 25-26. Interior does not argue to the contrary here. Rather, Interior believes it previously exercised that discretion in a way that was inconsistent with OCSLA's direction to ensure that the twelve criteria identified by Section 1337(p)(4) are provided for. Erdos Decl. ¶ 5.

The Court previously denied without prejudice Interior's motion for voluntary remand of the COP given then-uncertainty regarding the preliminary injunction in *RENEW Northeast*, 2026 WL 1078282. For the reasons given by the court in *Save Long Beach Island*, 2026 WL 2294613, at *5, the *RENEW* injunction, as modified by the *RENEW* court, is not an impediment to Interior's reconsideration of the COP approval here on remand.

The Court should remand, without vacatur, Interior's COP approval for further consideration under OCSLA.

## II. Because BOEM's COP Approval Should Be Remanded, The Court Need Not Reach Plaintiffs' NHPA Challenge to That Same Agency Action.

Given the need to remand BOEM's COP approval to Interior to re-evaluate its OCSLA compliance, the Court need not reach Plaintiffs' NHPA challenge to BOEM's COP approval. *See, e.g.*, *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 37 (D.D.C. 2020) (citing *Nat'l Fam. Plan. & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 241 (D.C. Cir. 1992)).

BOEM concluded that the New England Wind Project will have adverse impacts on the environment, historic properties, and on the Nantucket Historic District National Historic Landmark. NEW1776.0641. But Federal Defendants' position that remand of the COP approval eliminates the need to address at this time Plaintiffs' NHPA claim is not an endorsement of arguments made by other parties about the requirements of the NHPA or the application of those requirements to the New England Wind Project.

## III. NMFS Complied with the MMPA.

Contrary to Plaintiffs' allegations, NMFS/OPR's "small numbers" and "negligible impact" determinations comply with the MMPA, are based on the best available science, and are neither arbitrary, nor capricious

### A. NMFS/OPR's "small numbers" determinations under the MMPA are reasonable.

As required by the MMPA, NMFS/OPR authorized "the incidental, but not intentional, taking… of small numbers of marine mammals of a species or population stock" while New England Wind is engaging in "a specified activity (other than commercial fishing) within a specified geographical region" 16 U.S.C. § 1371(a)(5)(A)(i).

The MMPA does not define "small numbers" and Congress has recognized that the small

numbers requirement "is not capable of being expressed in absolute numerical limits." *Melone v. Coit*, 100 F.4th 21, 30 (1st Cir. 2024) (quoting H.R. Rep. No. 97-228, at 19 (1981), *as reprinted in* 1981 U.S.C.C.A.N. 1458, 1469). Where, as in this case, the best reading of a statute is that the statute delegates discretionary authority to an agency, the role of the reviewing court under the APA is to independently interpret the statute and effectuate the will of Congress subject to constitutional limits by ensuring the agency has engaged in "'reasoned decisionmaking[.]'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). NMFS/OPR's interpretation of small numbers is reasonable.

**1. NMFS's "small numbers" determinations are plainly reasonable.**

Plaintiffs argue that NMFS's determination of "small numbers" is flawed because the authorized take of some marine mammal species (specifically Humpback whale and common dolphin) exceeds 12 percent of the population. *See* Dkt. No. 53-1 at 33-34 (citing *NRDC v. Evans ("NRDC I")*, 232 F. Supp. 2d 1003, 1027 (N.D. Cal. 2002)). The U.S. District Court of New Jersey rejected this same argument upon finding that the 12% discussed in *NRDC v. Evans,* 279 F. Supp. 2d 1129 (N.D. Cal. 2003) ("*NRDC II") is merely *dicta*. *Save Long Beach Island v. U.S. Department of Commerce*, 794 F. Supp. 3d 273, 325 (D.N.J. 2025).[7] Indeed, the New Jersey district court found that "the court's . . . decision [in *NRDC v. Evans*] rested on the holding that 'small numbers' and 'negligible impact' must be defined 'so that each term has a separate meaning[,]" and refused to adopt a bright-line rule for "small numbers." *Id.*

Here, NMFS appropriately separated its "small numbers" determination from the

[7] *NRDC I* is the October 31, 2002, decision granting a motion for preliminary injunction in that case. *NRDC II* is the August 26, 2003, decision granting a motion for summary judgment in the same case.

"negligible impact" standard.[8] Thus, in making its "small numbers" determination, NMFS applied a "proportional approach" whereby the agency "compares the number of individuals estimated to be taken to the most appropriate estimation of abundance of the relevant species or stock in our determination of whether an authorization is limited to small numbers of marine mammals." NMFS_70993.

Under this standard, NMFS/OPR authorized the incidental take of "small numbers" of NARWs, common dolphins, Humpback whales, and gray seals by analyzing the number of authorized takes relative to the size of each affected population as follows:

- NARW: the maximum annual allowable non-lethal take by Level B harassment only of 60 NARW (which equals approximately 17.65 percent of the NARW population) and no more than 126 non-lethal take of NARW by Level B harassment over the 5-year period. NMFS_70983; *see also* NMFS_70965 (Table 33); NMFS_70968 (Table 35).
- Common dolphin: the maximum amount of non-lethal take by Level A and Level B harassment of 26, 573 common dolphin (specifically amounting to 1 by Level A harassment and 26,572 by Level B harassment), which equals approximately 28.54 percent of the common dolphin population, and a total non-lethal take of no more than 46,761 common dolphins by Level A and B harassment over the 5 year period. NMFS_70990; *see also* NMFS_70965 (Table 33); NMFS_70968 (Table 35).

[8] *See, e.g., CBD v. Salazar*, 695 F.3d 893, 905-07 (9th Cir. 2012); *Evans*, 279 F. Supp. 2d at 1151-52. In these cases, the courts rejected a definition of "small numbers" in reference to the negligible impact determination because Congress intended the small numbers analysis to be distinct from the negligible impact determination. *Id.* at 1150; *Salazar*, 695 F.3d at 903.

- Humpback whale: the maximum annual allowable non-lethal take by Level A and Level B harassment of 152 humpback whale (specifically amounting to 18 by Level A harassment and 134 by Level B harassment), which equals approximately 10.89 percent of the humpback whale population, and no more than 301 humpback whales by Level A and Level B harassment over the 5-year period. NMFS_70988; *see also* NMFS_70965 (Table 33); NMFS_70968 (Table 35).
- Gray seal: the maximum annual allowable non-lethal take by Level A harassment and Level B harassment of 1546 gray seal (specifically amounting to 9 by Level A harassment and 1,537 by Level B harassment), which equals approximately 5.54 percent of the gray seal population, and no more than 3305 gray seal by Level A and B harassment over the 5-year period. NMFS_70992; *see also* NMFS_70965 (Table 33); NMFS_70968 (Table 35).

NMFS's proportional approach has been upheld as a reasonable interpretation of the MMPA by various Federal courts. *See Salazar*, 695 F.3d at 907 (upholding the adoption of a proportional approach to the interpretation of small numbers); *Alaska Wilderness League v. Jewell*, 116 F. Supp. 3d 958, 969 (D. Alaska, 2015) (finding that the U.S. Fish and Wildlife Service reasonably "interpreted the term 'small numbers' to focus on the proportion of [the species] that would be impacted by the industry activity"), *decision vacated as moot, appeal dismissed*, 637 F. App'x 976 (9th Cir. 2015); *Save Long Beach Island*, 794 F. Supp. 3d at 324 (finding that "NMFS's application of the proportional approach, and its determination that each of these take quantities met the MMPA's 'small numbers' requirement were reasonable").

Plaintiffs also disregard the fact that "the small numbers analysis conservatively assumes each take occurs to a different individual in the population." NMFS_70993. The small numbers

of non-lethal take that NMFS/OPR authorized "do not fully account for the likelihood that marine mammals would avoid a stimulus when possible before the individual accumulates enough acoustic energy to potentially cause auditory injury, nor do these numbers account for the effectiveness of the required mitigation measures." NMFS_70964. Further, the authorized non-lethal take assumes the worst-case scenario exposures for each species. NMFS_70953; NMFS_70982. Applying this proportional approach, comparing the number of individuals that may be taken to the most appropriate population estimate for the relevant species, NMFS/OPR reasonably determined that each of these quantities meet the MMPA's "small numbers" requirement. NMFS_70984.

**2. NMFS/OPR's upper limit for "small numbers" is reasonable.**

While it is unnecessary for purposes of this case to decide a specific upper limit for defining "small numbers," the percentage of the NARW and dolphin stocks subject to incidental harassment annually fall within the under-one-third range that NMFS/OPR has determined to constitute "small numbers." In the proposed and final rule, NMFS/OPR explains, "[w]hen the predicted number of individuals to be taken is less than one-third of the species or stock abundance, the take is considered to be of small numbers. Additionally, other qualitative factors may be considered in the analysis, such as the temporal or spatial scale of the activities." NMFS_70634; NMFS_70993.

Plaintiffs incorrectly suggest that the under-one-third range is too high to constitute "small numbers." Plaintiffs' cited authorities do not support their argument. As discussed above, the court in *NRDC v. Evans* concluded only that NMFS improperly conflated the applicable standards for "small numbers" and "negligible impact[,]" 232 F. Supp. 2d 1at 1026, which NMFS has not done here, *see supra*. Plaintiffs' other cited cases stand for the unremarkable

proposition that NMFS has sometimes authorized projects with estimated percentages of animals subject to incidental harassment at the lower end of the one-third range. *See* Dkt. No. 53-1 at 34 n.39 (citing *Alaska Wildlife All. v. U.S. Fish & Wildlife Serv.*, No. 3:21-cv-00209, 2023 WL 2986365, at *7 (D. Alaska Feb. 6, 2023) (finding that an LOA's authorization of take through Level B harassment of 10.4% of polar bears annually or 48.84% over five years was reasonable under the MMPA's small numbers requirement); *Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1053 (D. Alaska 2013) (upholding NMFS's determination that Level B Harassment of 30 beluga whales, amounting to 10% of the population, over the course of a year was a "relatively limited or small portion" of the population)).

Plaintiffs challenge NMFS's one-third upper limit for the "small numbers" determination, arguing that it is arbitrary. Plaintiffs' argument fails to undermine NMFS's "small numbers" determination. As NMFS/OPR explains in response to comment 13 in the final rule, "NMFS has provided a reasoned approach to small numbers, as described in the "Taking Marine Mammals Incidental to Geophysical Surveys Related to Oil and Gas Activities in the Gulf of Mexico" final rule [NMFS_99008-136]." NMFS_70928. In that matter, which NMFS/OPR incorporated by reference, NMFS/OPR explained that it "makes its small numbers findings based on an analysis of whether the number of individuals authorized to be taken annually from a specified activity is small relative to the stock or population size." NMFS_99124. "[NMFS/OPR] uses a simple approach that establishes equal bins corresponding to small, medium, and large proportions of the population abundance." NMFS_099125. "[NMFS/OPR] then compares the number of individuals estimated and authorized to be taken against the best available abundance estimate for that species or stock." *Id.*

This "relative" approach is consistent with the statement from MMPA legislative history

that "[small numbers] is not capable of being expressed in absolute numerical limits" (H.R. Rep. No. 97-228, at 19 (September 16, 1981)), and relevant case law (*Salazar*, 695 F.3d at 907 (holding that the U.S. Fish and Wildlife Service reasonably interpreted "small numbers" by analyzing take in relative or proportional terms)). NMFS_099050. This case is also distinguishable from *Melone*, where the record did not explicitly show that NMFS adopted one-third as the upper limit. 100 F.4th at 30-31. Here, by contrast, the record shows that NMFS expressly adopted the one-third upper limit and incorporated the rationale in the Gulf of Mexico rule by reference. *See* NMFS_70928 (response to Comment 13); NMFS_70993.

Plaintiffs fail to meet their "heavy burden" to show these take authorizations are "arbitrary and capricious under the 'small numbers' requirement." *Save Long Beach Island*, 794 F. Supp. 3d at 328 (rejecting challenge to NMFS's small number analyses for similar offshore wind MMPA take authorizations).

Even if, assuming arguendo, the court disagrees with the NMFS/OPR's rationale concerning the "upper limit", summary judgment should still be granted for Federal Defendants because the record shows the maximum number of instances of non-lethal takes by combined Level A harassment and Level B harassment possible within any one year relative to the best available population abundance is less than one-third for all species and stocks potentially impacted. For most stocks, less than 12 percent of the marine mammal population (including gray seal and Humpback whale) may be authorized for non-lethal take by harassment under the final rule; for NARW less than 18 percent of the population is authorized for non-lethal take; and for common dolphins less than 29 percent of the population is authorized for non-lethal take. In each instance, the authorized take is a conservative over-estimate with the assumption that each take occurs to a different individual in the population.

**B. NMFS's negligible impact finding under the MMPA is reasonable.**

In addition to the "small numbers" determination, the MMPA requires that NMFS/OPR authorize incidental, but not intentional take, upon finding "that the total . . . taking during each five-year (or less) period concerned will have a negligible impact on such species or stock." 16 U.S.C. § 1371(a)(5)(A)(i)(I). The MMPA's implementing regulations define "negligible impact" as "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103. NMFS/OPR's negligible impact examination here considered whether there are any likely adverse effects on annual rates of recruitment or survival. NMFS_70979. In addition to considering estimates of the number of marine mammals that might be "taken" by mortality, serious injury, or by Level A harassment and Level B harassment, NMFS/OPR considered other factors such as the likely nature of any behavioral responses (*e.g.*, intensity, duration), the context of any such responses (*e.g.*, critical reproductive time or location, migration), as well as effects on habitat, and the likely effectiveness of mitigation. *Id.* NMFS also assessed the number, intensity, and context of estimated takes by evaluating this information relative to population status. *Id.*

For instance, while foundation installation impact pile driving is anticipated to be most impactful compared to other activities, *see* NMFS_70981, impacts are minimized through implementation of mitigation measures, including soft-starts, use of a sound attenuation system, the implementation of clearance zones that would facilitate a delay of pile driving commencement, and the use of shutdown zones. NMFS_07081.

Contrary to Plaintiffs' argument, Dkt. No. 53-1 at 36, the MMPA does not require NMFS/OPR to consider other offshore wind projects when defining "specified activity" or

making a negligible impact determination. *See* 16 U.S.C. § 1371(a)(5)(A)(i); *see also Melone v. Coit*, No. 1:21-cv-11171-IT, 2023 WL 5002764, at *24 (D. Mass. Aug. 4, 2023) ("Plaintiff is incorrect that the MMPA requires NMFS to consider more than what is reflected in the [incidental harassment authorization]."). While the MMPA negligible impact determination appropriately focuses on the taking from the "specified activity" identified by the applicant, as described above, NMFS/OPR considered other offshore wind projects through its environmental analysis pursuant to NEPA. The FEIS assesses the reasonably foreseeable cumulative effects of other planned non-offshore wind activities and planned offshore wind activities. NEW1799.0271. NMFS also properly considered effects on ESA-listed species of other offshore wind projects under construction or completed (*i.e.*, the South Fork Wind and Vineyard Wind 1 projects) as part of the "environmental baseline" in accordance with the ESA regulations, 50 C.F.R. § 402.02. NMFS_01714. Thus, as explained in response to comment 12 on the Final Rule, to the extent NMFS had an obligation to evaluate the cumulative effects of other wind projects, the record confirms that NMFS/OPR undertook such analysis as appropriate pursuant to NEPA and the ESA. NMFS_70927.

Plaintiffs also incorrectly suggest, *see* Dkt. No. 53-1 at 37, that NMFS erroneously failed to authorize Level A harassment takes, even though NMFS concluded that mitigation measures would avoid such takes. As discussed further below, the ITA includes 10 overarching mitigation measures related to pile driving. NMFS_70983. These required measures are intended to reduce both the number and intensity of marine mammal takes. *Id*. Whether individual NARWs leave the project area in response to the ramp-up protocols or are incidentally exposed to sound during the pile-driving operations, NMFS/OPR reasonably concluded that "no serious injury or mortality, or Level A harassment, of [NARWs] is anticipated or may be authorized."

NMFS_70987. The Court should defer to NMFS/OPR's reasoned conclusion based on its scientific expertise. *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).

NMFS/OPR also considered and responded to comments that incidental takings of NARWs due to sound exposure are underestimated. NMFS/OPR's response to Comment 1 noted that the Marine Mammal Commission did not provide specific comments on the proposed rule for the Project. NMFS_70921. Nevertheless, in consideration of public comments with concerns for underestimating takes by Level A harassment and Level B harassment, NMFS/OPR added a requirement for Avangrid to report to NMFS if it becomes aware of issues that call into question the validity of any measured Level A harassment or Level B harassment isopleths to a significant degree. NMFS_70935. Based on data collected during high-resolution geophysical surveys for the nearby Vineyard Wind Project, NMFS/OPR also adjusted group sizes for individuals of some dolphin species subject to Level B harassment "to ensure conservatism in the take numbers NMFS may authorize." NMFS_70962. Again, Plaintiffs' arguments fail to undermine NMFS's reasoned analyses supporting its negligible impact determination.

**C. Plaintiffs' critiques regarding Project mitigation measures lack merit.**

NMFS analyzed a comprehensive suite of mitigation measures imposed as conditions of Project approval to avoid and minimize exposure of ESA-listed whales and other marine mammals to pile-driving noise during construction. As NMFS/OPR explained, "[f]or installation of foundation piles, 10 overarching mitigation measures are required, which are intended to reduce both the number and intensity of marine mammal takes[.]" NMFS_70983. Taken together, this suite of avoidance measures makes it unlikely that ESA-listed whales will be in proximity to pile-driving operations when soft start procedures commence. NMFS_01771. NMFS/OPR reasonably concluded that it is unlikely that ESA-listed whales would stay in the

close proximity to the sound source long enough to be exposed to noise that could result in Level A harassment. *Id.*

NMFS/OPR adequately accounted for the limitations of individual mitigation measures, and Plaintiffs have provided no evidence that such acknowledged limitations undermine NMFS's decision to issue the LOA. Plaintiffs' arguments regarding specific mitigation measures are addressed in turn.

**1. Seasonal Pile-Driving Moratorium**

With respect to NARWs, "[t]he most significant measure" in minimizing impacts to [NARWs] is the seasonal pile driving moratorium that is in place from January through April, when right whale abundance in the project area is expected to be greatest. NMFS_70985. Mitigation and monitoring measures outside of those months will further minimize any takes that may otherwise occur. *See id.* Based on these considerations, NMFS/OPR's Negligible Impact Analysis and Determination reasonably concluded with respect to NARWs that "the specified activities are not expected to result in impacts on the reproduction or survival of any individuals, much less affect annual rates of recruitment or survival." NMFS_70987.

Through adaptive management over the course of Project implementation, NMFS/OPR may modify an existing mitigation, monitoring, or reporting measures in accordance with the provisions in the applicable regulations, 16 C.F.R. § 904.300(a)(3). NMFS_70917. Plaintiffs incorrectly suggest that the seasonal moratorium will be ineffective because mitigation may require modification if actual project conditions differ from those assumed during authorization. Dkt. No. 53-1 at 39-40. As explained in the Final Rule, "[t]he use of adaptive management allows NMFS to consider new information and modify mitigation, monitoring, or reporting requirements, as appropriate, with input from Avangrid regarding practicability, if such

modifications will have a reasonable likelihood of more effectively accomplishing the goal of the measures." NMFS_70979. Thus, if NMFS elects to modify the dates of the seasonal moratorium (or any other mitigation measure), such action must result in more effective mitigation, not less effective mitigation. *See id.*

### 2. Passive Acoustic Monitoring

The Project includes the use of Moored Passive Acoustic Monitoring ("PAM") systems or autonomous PAM platforms to record ambient noise and marine mammal vocalizations in the lease area to supplement visual observations by protected species observers ("PSOs") by detecting vocalizing whales. NEW1775.0480. *See also* FEIS Appendix H, NEW1776.0485; NEW1184.0051 (Conditions of COP Approval). Plaintiffs incorrectly suggest the use of PAM cannot be assured because Avangrid is required to submit final plans to NMFS regarding its use of PAM and other mitigation after COP approval. Dkt. No. 53-1 at 40. However, as stipulated in the BiOp, "[a]ll required plans must be submitted to NMFS GARFO in advance of the applicable activity with sufficient time for review, comment, and any required concurrence." NMFS_02034. In the meantime, the Project documents including the FEIS contain sufficient details about the planned use of PAM to support NMFS's decision to issue the LOA subject to review of the final mitigation plans. *See* NEW1775.0480; *see also* FEIS Appendix H, NEW1776.0485.

Plaintiffs also suggest that PAM will be ineffective in preventing sound exposures because PAM detects actively vocalizing whales. Dkt. No. 53-1 at 41. However, the efficacy of PAM in conjunction with another offshore wind project (Vineyard Wind) was reviewed and upheld in recent litigation. *See Melone,* 2023 WL 5002764 at *10 (discussing use of passive acoustic monitoring); *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.,* 100 F.4th 1, 20 (1st Cir. 2024) ("[T]he Residents have supplied no adequate ground on

which to challenge the efficacy of passive acoustic monitoring or protected species observers.”). Moreover, Plaintiffs’ critique of specific known limitations of PAM overlooks the fact that NMFS is requiring a suite of mitigation measures, of which PAM is only one aspect. *See Melone,* 2023 WL 5002764 at *26. Considering the established use of PAM as a mitigation measure in other recent offshore wind projects, NMFS/OPR reasonably decided to issue its LOA here, subject to the receipt and review of final mitigation plans prior to commencing Project construction.

**3. Shutdown Procedures**

Plaintiffs also criticize NMFS for allowing exceptions to the requirement to stop pile driving in circumstances where shutdown may not be practicable. Dkt. No. 53-1 at 40 (citing NMFS_02207). The Federal Register notice approving the LOA explains in detail the applicable procedure for determining when shutdown is not practicable due to human safety or operational concerns. NMFS_70972-73. In the case of foundation installation, the shutdown requirement may be waived only if it is not practicable to shut down the equipment due to imminent risk of injury or loss of life to an individual, risk of damage to a vessel that creates risk of injury or loss of life for individuals, or where the lead engineer determines there is pile refusal or pile instability. *Id.* In situations when shutdown is called for during impact pile driving, but Avangrid determines shutdown is not practicable due to emergency reasons, reduced hammer energy (so pile driving is less noisy) must be implemented when the lead engineer determines it is practicable. NMFS_70973. In turn, the BiOp describes the detailed conditions on pile-driving activity, including shutdown procedures, that BOEM prescribed as conditions of COP approval in accordance with the NMFS-approved LOA. *See* NMFS_02045 (reporting requirements in event of shutdown); NEW1184.0050 (setting forth BOEM’s conditions pursuant to the

reasonable and prudent measures and the implementing terms and conditions of the NMFS BiOp). Plaintiffs fail to demonstrate that this safety exemption undermines the agency's decision to issue the LOA.

#### 4. Protected Species Observers (PSOs)

Plaintiffs also fail to demonstrate that it was arbitrary and capricious for NMFS to rely on the use of PSOs among a suite of other mitigation measures to minimize and avoid potential exposure of NARWs to pile-driving noise. PSOs must monitor for marine mammals prior to, during, and following construction activities including pile driving. NMFS_71006. The Federal Register notice also includes a detailed explanation of the required training and experience required of PSOs to ensure compliance and proper implementation of regulations. NMFS_70935; NMFS_71005. Contrary to Plaintiffs' assertion, Dkt. No. 53-1 at 42, it is immaterial that potential areas of Level B sound exposure for some activities such as drilling and vibratory setting are not fully subject to visual monitoring by PSOs. As with Plaintiffs' critique of NMFS's decision to use PAM, Plaintiffs' unremarkable assertion that PSOs may sometimes miss some NARW sightings, *id.* at 41, overlooks the fact that NMFS is requiring a suite of mitigation measures in addition to the use of PSOs. *Melone,* 2023 WL 5002764, *26 ("More crucially, Plaintiff's argument concerning the use of PSOs disregards that, as stated in the Notice of Issuance of IHA, NMFS is requiring a suite of mitigation measures, of which PSOs are only one aspect."). For example, vibratory setting of piles may not occur during the seasonal pile driving moratorium. NMFS_70919. Plaintiffs fail to demonstrate that NMFS erred in requiring the use of PSOs.

#### 5. Bubble Curtains

NMFS/OPR's decision to issue the LOA was supported by the best available science,

which supports the assumption that at least 10dB of attenuation can be reliably achieved using noise attenuation systems such as a double bubble curtain. NMFS_70921. The response to Comment 2 in the Final Rule addresses Plaintiffs' critique regarding the variable performance of such systems. *Id.* Avangrid is required to undertake extensive monitoring to maximize marine mammal detection effectiveness. NMFS_70922. Thus, NMFS's determination that sound attenuation systems will reduce the anticipated level of "take" appropriately reflects and acknowledges the monitoring efforts, including the placement of three PSOs on the pile driving platform and dedicated PSOs vessel(s) and PAM. *Id.*

#### 6. Soft-Start Procedures

"Soft start" procedures allow pile-driving operations to begin at a lower energy level before full energy hammer strikes begin. NMFS_70616. Given that pile-driving has to start at some energy level, it is better for marine mammals to have the initial hammer strikes be at reduced capacity, providing a chance to leave the area prior to the hammer operating at full capacity. *See id.* The Final Rule allows Avangrid flexibility to adjust the soft-start procedure should the need arise; however, any alternative protocol would be as protective as the generic coastal construction soft-start specifications provided in the proposed rule. *Id.* Plaintiffs fail to demonstrate that NMFS erred by including soft-start procedures as part of the required suite of mitigation measures to reduce both the number and intensity of marine mammal takes.

### D. NMFS/OPR's "small numbers" and "negligible impact" determinations are based on the best available science.

Additionally, Plaintiffs incorrectly assert that NMFS/OPR's "small numbers" and "negligible impact" determinations are not based on the best available science. Dkt. No. 53-1 at 32 (citing 16 U.S.C. § 1373(a)). The record shows that NMFS/OPR relied on NMFS's U.S. Atlantic and Gulf of Mexico Stock Assessment Report in determining the marine mammal

population estimates that may be taken by harassment under the MMPA, which was the best available science at the time of issuance of the ITA in this matter. NMFS_70936. The record further shows NMFS/OPR synthesized the best available scientific information and literature relevant to the Project, made preliminary small numbers and negligible impact determinations, and outlined, in detail, proposed mitigation measures designed to effect the least practicable adverse impacts on marine mammal species and stocks, as well as proposed monitoring and reporting measures. NMFS_70918. Plaintiffs point to no superior evidence that NMFS failed to consider at the time of issuance of the ITA. *See, e.g., Bays' Legal Fund v. Browner*, 828 F. Supp. 102, 106 n.7 (D. Mass. 1993) ("plaintiffs never produce any evidence that the data on which [the agency] relied to prepare its biological studies was inferior in any way."). The court may reverse an agency's decision under the "arbitrary and capricious" standard only "if the agency has relied on factors which Congress has not intended it to consider, [has] entirely failed to consider an important aspect of the problem, [or has] offered an explanation for [that] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463 U.S. at 43. Plaintiffs have offered no basis for overturning NMFS's ITA.

**E. Plaintiffs' remaining challenges under the First Cause of Action fail.**

Plaintiffs' remaining challenges under the First Cause of Action must fail for three reasons. First, Plaintiffs' challenges to the BiOp and incidental take statement under the MMPA in the First Cause of Action are misplaced Dkt. No. 1 ¶¶ 34, 35 and 56. Summary judgement should be granted in favor of Federal Defendants on the allegations in Paragraph 34, 35, and 56 of the Complaint on procedural grounds because the BiOp and incidental take statement are not required to be issued under the MMPA; rather they are core components of the ESA consultation

process. Second, summary judgement should be granted in favor of Federal Defendants on substantive grounds because, as explained in greater detail *supra*, NMFS used the best scientific evidence in issuing the incidental take authorizations under the MMPA, and Plaintiffs have failed to establish any legal deficiencies. Third, summary judgment should be granted in favor of Federal Defendants with respect to the allegations in Paragraph 55 of the Complaint, in which Plaintiffs claim that the Aquinnah Wampanoag Tribe were not consulted pursuant to Executive Order 13175. The administrative record shows there is no genuine issue of material fact that BOEM, as the lead federal agency, held government-to-government consultation with the tribe on August 13, 2021, May 2, 2022, May 26, 2022, and June 1, 2022. NMFS_73220-NMFS_73221 (FEIS, A-9 – A-10). During these meetings, BOEM shared information regarding proposed alternatives and cultural resources in the proposed Project area, including mitigation and monitoring measures to avoid, minimize, or mitigate any adverse effects on cultural resources. *Id*.

The Court should therefore grant summary judgment in favor of Federal Defendants Department of Commerce; NMFS; Howard Lutnick, in his official capacity; and Eugenio Piñeiro Soler, in his official capacity; regarding Plaintiffs' First Cause of Action regarding the MMPA. *See* Dkt. No. 1 ¶¶ 33-56.

## IV. NMFS's Approvals Comply with the ESA.

NMFS/GARFO complied with the ESA in issuing the BiOp for the Project, and NMFS/OPR reasonably relied on the BiOp in issuing the LOA. Based on the best available scientific information and the agency's informed scientific expertise, NMFS/GARFO concluded that the Project is not likely to jeopardize NARWs or any of the other threatened or endangered species in the action area. NMFS_02026. NMFS/GARFO evaluated a suite of proposed

mandatory minimization and monitoring measures that would be imposed on the developer as an element of the proposed Project and the effects of those measures on ESA-listed species. *See* 50 C.F.R. 402.02 (defining effects). These measures included all of those set forth in NMFS/OPR's proposed MMPA ITR as well as additional measures proposed by BOEM. NMFS_01593-97. After concluding that the proposed action, including the effects of anticipated incidental take, was not likely to jeopardize ESA-listed species, NMFS/GARFO specified additional mandatory measures to minimize the effect of such take in the BiOp's Incidental Take Statement (*i.e.*, reasonable and prudent measures to avoid and minimize the take of NARWs from harassment that it determined was reasonably certain to occur as a result of pile-driving construction). NMFS_02032-61; *See* 50 C.F.R. §402.14(i) (duty to specify measures to minimize the effects of take when incidental take is reasonably certain to occur). The Court should defer to the agency's reasoned conclusions in the BiOp under the APA's "arbitrary and capricious" standard of review. 5 U.S.C. § 706(2)(A).

**A. NMFS/GARFO reasonably concluded that the Project is not likely to jeopardize the continued existence of the NARW.**

Contrary to Plaintiffs' suggestion, Dkt. No. 53-1 at 45-46, that an agency action may have adverse effects on a species is not tantamount to saying the action is likely to jeopardize the existence of the species. "Jeopardize the continued existence" means "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce *appreciably the likelihood of both the survival and recovery* of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (emphasis added). Indeed, formal consultation is only triggered when a proposed action is likely to have adverse effects. The ESA, Section 7(a)(2), does not require action agencies to avoid or even minimize any adverse effects to listed marine species, but rather only to ensure, in consultation with NMFS, that their actions

are not likely to jeopardize the existence of a listed species or to destroy or modify its designated critical habitat. 16 U.S.C. § 1536(a)(2). Similarly, the ESA, Section 7(a)(2) only directs NMFS to formulate its opinion as to whether the action, as described by the action agency, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. *Id.* § 1536(b).

In support of its determination that the Project is not likely to jeopardize the NARW, NMFS/GARFO acknowledged that Project construction is likely to result in the incidental harassment of individual NARWs and recommended numerous measures to minimize and avoid such harassment. However, *NMFS does not anticipate or authorize any lethal take of NARWs during the life of the Project. See* NMFS_02027-34. NMFS also does not anticipate or authorize incidental take of NARWs resulting in harm or auditory injury in the form of permanent threshold shift ("PTS"). NMFS_02031; NMFS_01998. Furthermore, NMFS does not anticipate instances of behavioral harassment to result in fitness consequences to individual NARWs. NMFS_02003. NMFS also does not expect any reduction in NARW reproduction. NMFS_02004. Any effects to distribution will be limited to short-term alterations to normal movements by individuals to avoid disturbing levels of noise. *Id.*

As Plaintiffs note, Dkt. No. 53-1 at 46-47, NMFS acknowledged that "information is not available to conduct a quantitative analysis to determine the likely fitness consequences of these exposures and associated responses because we do not have information from wild cetaceans that links short-term behavioral responses to vital rates and animal health." NMFS_02003. However, "[n]early all studies and experts agree that infrequent exposures of a single day or less are unlikely to impact an individual's overall energy budget." *Id.* NMFS expects this to be the case for NARWs exposed to acoustic stressors associated with Project construction. *Id.* Therefore,

NMFS concluded that harassment resulting from acoustic stressors is not expected to reduce the likelihood of successful migration, breeding, calving, or nursing. *Id.* The record before the Court confirms that survival of the NARW is not implicated. Plaintiffs have not identified or pointed to any credible scientific information in the record that reasonably disputes NMFS's thoughtful analysis and well-supported conclusion.

The BiOp also includes NMFS/GARFO's express finding that "[t]he proposed action is not likely to affect the recovery potential of [NARWs]." NMFS_02004. NMFS/GARFO further reasoned that "[t]he proposed action will not result in any condition that impacts the time it will take to reach these [recovery] goals or the likelihood that these goals will be met." *Id.* In sum, NMFS/GARFO's determination that the Project is not likely to jeopardize the continued existence of the NARW is supported by the requisite analysis of effects on both survival *and* recovery.

**B. NMFS used the best available science.**

Contrary to Plaintiffs' arguments, Dkt. No. 53-1 at 48-50, the NMFS administrative record overwhelmingly demonstrates that NMFS complied with the ESA, as it provided detailed, well-supported analyses using the best available scientific information for its issuance of the BiOp and the LOA. *See* 50 C.F.R. § 402.14(g)(8) (NMFS "will use the best scientific and commercial data available" to formulate a BiOp); *id.* §§ 216.102(a), 216.104(c) (NMFS evaluates each incidental take request to determine, based on the "best available scientific evidence," whether the taking will have a negligible impact); *see also Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000) (The ESA's best available science requirement "merely prohibits [NMFS] from disregarding available scientific evidence that is in

some way better than the evidence [it] relies on." (quoting *City of Las Vegas v. Lujan*, 891 F.2d 927, 933 (D.C. Cir. 1989)).

Plaintiffs incorrectly assert that the BiOp "rejects" a 2021 study by Stober and Thomsen for purposes of estimating operational noise from the Project. Dkt. No. 53-1 at 48. Contrary to Plaintiffs' assertion, the BiOp cited the Stober and Thomsen study. NMFS_01739. The authors of the study had acknowledged that there is "unresolved uncertainty" in their methods because the measurements were carried out at different water depths and using different methods that might have had an effect on the recorded sound levels. *Id.* Given this uncertainty, NMFS/GARFO observed that "it is questionable how reliably this model predicts actual underwater noise levels for any operating wind turbines." *Id.* NMFS/GARFO further observed that Stober and Thomsen estimated of sound levels that would be produced by a theoretical 10 MWS direct-drive wind turbine generator was based on a "desktop calculation" using sound levels reported from different wind farms under different conditions, rather than *in situ* evaluation of underwater noise of an actual 10MW direct-drive turbine. NMFS/GARFO thus reasonably concluded that "[w]ithout information on soundscape, water depth, sediment type, wind speed, and other factors, it is not possible to determine the reliability of any predictions from the Stober and Thomsen paper to the New England Project[.]" *Id.*

The BiOp also discusses findings from Elliot *et al.* (2019), NMFS_017724, regarding hydroacoustic monitoring of operational noise from the Block Island Wind Farm ("BIWF"). NMFS_01740. The BIWF utilizes direct-drive technology similar to the WTGs planned for New England Wind, albeit with smaller capacity (6-MW) than New England Wind (up to 15 MW). *Id.* Elliott *et al.* (2019) compared underwater noise from operations of the direct-drive turbines at the BIWF to underwater noise reported at wind farms in Europe using older WTGs with gearboxes.

*Id.* Based on the findings of Elliott *et al.* (2019), NMFS reasonably concluded that direct-drive models are quieter than older WTGs with gearboxes (absent the noise from the gears). *Id.* NMFS/GARFO reasonably observed that "[o]perational noise from the direct-drive WTGs at the BIWF were generally lower than those observed for older generation WTGs, particularly when weighted by the hearing sensitivity of different marine mammal species." *Id.*

In sum, compared to Stober and Thomsen 2021, the BIWF monitoring information in the Elliott study provided better, real-world information from a wind farm with similar direct drive technology. NMFS/GARFO's explanation of its decision to rely on the Elliott study is reasonable, and Plaintiffs fail to identify any relevant scientific information that was not considered, explain why other scientific information is better than what NMFS/GARFO relied on, or demonstrate how reliance on allegedly superior information would make any difference to the analysis. *See Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1244-47 (D.C. Cir. 2001) (rejecting claims under ESA "best available [] data" standard where challenger failed to point to any superior data that was ignored by expert agency). Even given the acknowledged shortcomings of Stober and Thomsen methodology and modeling, NMFS nevertheless considered the approach and explained that, given the ambient noise created by shipping around the New England Wind site, the higher predicted operational noise may not be detectable by any whale and "would be unlikely to result in any behavioral response by any whale, sea turtle, or sturgeon." NMFS_01740.

Finally, Plaintiffs vaguely, and misguidedly, question the sound field verification procedures built into the BiOp to ensure that sound generated by pile driving and UXO detonation[9] does not exceed the predicted propagation and attenuation distance to modeled Level

[9] UXO detonation refers to the intentional explosion of old military bombs, mines, or torpedoes

A and B harassment. *See* Dkt. No. 53-1 at 47. Plaintiffs incorrectly claim that these procedures indicate that NMFS/GARFO relied on "uncertain mitigation and deferred verification of modeled noise." *Id.* at 46. But as the BiOp explains in detail, the model used by NMFS/GARFO represents the best available scientific approach to modeling noise attenuation in a dynamic marine environment and rationally supports the distance to potential harassment. *See* NMFS_01757. Plaintiffs do not credibly challenge this. Sound field verification is not an acknowledgement of any flaw or weakness in the modeling, but rather a real-time responsible and effective monitoring measure designed to ensure that corrective action will be taken should noise propagate beyond the harassment zone as construction occurs in a complex and dynamic marine environment.[10] The sound field verification measures are therefore a rational and effective approach to ensure that the action agency continues to meet its duty to avoid jeopardy as the action is implemented.

The Court should grant summary judgment in favor of Federal Defendants regarding Plaintiffs' Second Cause of Action regarding the ESA. *See* Dkt. No. 1 ¶¶ 57-122.

## CONCLUSION

The Department of the Interior agrees that its COP approval should be remanded without vacatur so that it can re-evaluate its OCSLA compliance. In light of that remand, the Court need not reach the merits of Plaintiffs' NHPA claims concerning Interior's COP approval. The Court

---

found on the seabed, in order to destroy them, before building wind turbines or laying cables. *See generally* NMFS_01558.

[10] Moreover, reinitiation of ESA consultation applies to all formal consultations that requires action agencies to reevaluate the effects of their action if circumstances change (*e.g.*, the proposed action is implemented in a different manner, new information reveals effects to species not previously considered, the amount or extent of incidental take is exceeded). *See* 50 C.F.R. § 402.16. Indeed, the BiOp, in line with the governing regulations, includes a Reinitiation Notice specifying these circumstances. NMFS_02063.

should grant summary judgment in Federal Defendants' favor on Plaintiffs' MMPA and ESA claims against the Department of Commerce and NMFS.

Dated: October 20, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

/s/ *Mark Arthur Brown*
MARK ARTHUR BROWN
Senior Trial Attorney
D.C. Bar No. 470050
Wildlife & Marine Resources Section
Benjamin Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 532-3103
Mark.brown@usdoj.gov

/s/ *Peter Kryn Dykema*
PETER KRYN DYKEMA
Senior Trial Attorney
Natural Resources Section
(202) 532 3086
Peter.dykema@usdoj.gov

*Counsel for the United States*

*Of Counsel:*

Stephen R. Vorkoper
Benjamin D. Neumann
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

Scott M. Farley
Attorney-Advisor
National Oceanic and Atmospheric Administration
Office of General Counsel, Northeast Section
55 Great Republic Drive
Gloucester, MA 01930

Gladys P. Miles
Attorney-Advisor
National Oceanic and Atmospheric Administration
Office of General Counsel, Fisheries and Protected Resources Section
1315 East-West Highway
SSMC-3, Room 15115
Silver Spring, MD 20910