**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ACK FOR WHALES, INC., *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,

Defendants,

and

AVANGRID POWER, LLC,
PARK CITY WIND LLC, and
COMMONWEALTH WIND, LLC,

Defendant-Intervenors.

Case No.: 1:25-cv-01678-AHA

Hon. Amir H. Ali

Oral Argument Requested

**DEFENDANT-INTERVENORS AVANGRID POWER, LLC, PARK CITY WIND LLC, AND COMMONWEALTH WIND, LLC'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rules 7(h) and 7(n), Defendant-Intervenors Avangrid Power, LLC, Park City Wind LLC, and Commonwealth Wind, LLC (referred to collectively herein as "Intervenors") hereby move for an order from this Court granting Intervenors' cross-motion for summary judgment on all of Plaintiffs' Causes of Action challenging federal approvals for the New England Wind Project (the "Project"). The Court should also reject Federal Defendants' renewed, pretextual request to remand the Construction and Operations Plan ("COP") approval for a variety of reasons, including because Federal Defendants' latest request fails on the merits, violates the preliminary injunction in *RENEW Northeast v. U.S. Department of the Interior*, No. 25-cv-13961, 2026 WL 1078282 (D. Mass. Apr. 21, 2026), is untimely, does not consider Intervenors' reliance interests, and is highly prejudicial to Intervenors.

Federal Defendants' and Plaintiffs' legal interpretation of 43 U.S.C. § 1337(p)(4) fails. The Court should uphold the COP as reasonably issued and compliant with federal law.

Intervenors also respectfully request that the Court grant Intervenors' motion and deny Plaintiffs' motion for summary judgment, Dkt. 53, on all claims because: (1) Plaintiffs have not met their burden of establishing standing on their Outer Continental Shelf Lands Act ("OCSLA") and National Historic Preservation Act ("NHPA") Section 110(f) claims; (2) Plaintiffs have not satisfied OCSLA's citizen suit requirements and Plaintiffs' OCSLA claim is not reviewable under the Administrative Procedure Act ("APA"); (3) the administrative record shows that the Bureau of Ocean Energy Management ("BOEM") complied with OCSLA in approving the Project's COP and Plaintiffs' legal interpretation of § 1337(p)(4), which Federal Defendants now rely upon, is wrong; (4) the administrative record demonstrates that BOEM complied with the requirements of NHPA Sections 106 and 110(f); (5) the administrative record shows that the National Marine Fisheries Service ("NMFS") complied with the Marine Mammal Protection Act ("MMPA") in issuing the Project's Incidental Take Regulation ("ITR") and associated Letter of Authorization ("LOA"); and (6) the administrative record also demonstrates that NMFS complied with the Endangered Species Act ("ESA") in issuing the Project's Biological Opinion ("BiOp").

Additionally, with respect to Federal Defendants' cross-motion for summary judgment, Dkt. 60, Intervenors respectfully request that the Court deny Federal Defendants' request to remand BOEM's approval of the Project's COP and reject Federal Defendants' arguments on Plaintiffs' OCSLA and NHPA claims (Plaintiffs' Third and Fourth Causes of Action, respectively)[1] because Federal Defendants' legal interpretation of § 1337(p)(4) also fails and

[1] Intervenors agree with Federal Defendants' cross-motion for summary judgment on Plaintiffs' First and Second Causes of Action (Plaintiffs' MMPA and ESA claims, respectively) that this Court should grant summary judgment to Defendants on the MMPA and ESA claims.

Plaintiffs' NHPA claims are ready for disposition.

In support of this cross-motion, Intervenors provide the accompanying statement of points and authorities and proposed order.

Dated: November 3, 2026

Respectfully submitted,

*/s/ Janice M. Schneider*

Janice M. Schneider (D.C. Bar No. 472037)
Devin M. O'Connor (D.C. Bar No. 1015632)
De Vann S. Sago (D.C. Bar No. 1742848)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: janice.schneider@lw.com
Email: devin.o'connor@lw.com
Email: devann.sago@lw.com

*Attorneys for Defendant-Intervenors Avangrid Power, LLC, Park City Wind LLC, and Commonwealth Wind, LLC*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ACK FOR WHALES, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,<br><br>Defendants,<br><br>and<br><br>AVANGRID POWER, LLC,<br>PARK CITY WIND LLC, and<br>COMMONWEALTH WIND, LLC,<br><br>Defendant-Intervenors. | Case No.: 1:25-cv-01678-AHA<br><br>Hon. Amir H. Ali<br><br>Oral Argument Requested |

**DEFENDANT-INTERVENORS AVANGRID POWER, LLC, PARK CITY WIND LLC, AND COMMONWEALTH WIND, LLC'S CROSS-MOTION FOR SUMMARY JUDGMENT, OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND PARTIAL OPPOSITION TO FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

I. BACKGROUND AND STATEMENT OF FACTS ..... 2

A. The Project ..... 2

B. Multi-Year Federal Review Process ..... 3

1. Wind Energy Area Leasing ..... 3
2. Environmental Review and COP Approval ..... 4
3. NHPA Sections 106 and 110(f) Processes ..... 6
4. MMPA Approval Process ..... 6
5. Endangered Species Act Process ..... 7

C. Procedural History ..... 8

II. LEGAL STANDARD AND SCOPE OF REVIEW ..... 8

III. ARGUMENT ..... 9

A. Plaintiffs Lack Standing for Their OCSLA and NHPA Section 110(f) Claims ..... 9

1. Mr. Vanderhoop Lacks Standing to Pursue the OCSLA Claim ..... 10
2. Plaintiffs Lack Standing to Pursue Their NHPA Section 110(f) Claim ... 10

B. Plaintiffs' OCSLA Claim Fails for Procedural Reasons ..... 11

1. Plaintiffs Failed to Provide Adequate Notice Under OCSLA ..... 11
2. Plaintiffs' OCSLA Claim Is Not Reviewable Under the APA ..... 12

C. Plaintiffs' OCSLA Claim Fails on the Merits ..... 15

1. Plaintiffs' and Federal Defendants' Legal Interpretation Is Meritless ..... 15
2. BOEM Appropriately Concluded that the Project "Shall Ensure" Each § 1337(p)(4) Factor Is Met ..... 18
3. BOEM Adequately Explained and Appropriately Relied on Mitigation Measures ..... 22

D. The Court Should Deny Remand Because Federal Defendants Lack Authority and Remand Is Unwarranted, Prejudicial, and Untimely ..... 25

1. Federal Defendants Lack Authority for an Untimely Re-Evaluation ..... 26
2. There Is No Valid Basis for Remand, and any Remand Would Be Highly

Prejudicial to Intervenors ............ 28

E. The Record Demonstrates that BOEM Complied with the NHPA ............ 29

1. BOEM Complied with the Requirements of NHPA Section 110(f) ............ 29

2. BOEM Complied with the Requirements of NHPA Section 106 ............ 33

F. The Record Demonstrates that NMFS Complied with the MMPA ............ 35

1. NMFS's "Small Numbers" Determination Was Reasonable ............ 35

2. NMFS's "Negligible Impact" Determination was Reasonable ............ 37

G. The Record Demonstrates NMFS and BOEM Complied with the ESA ............ 41

1. NMFS's No Jeopardy Determination for the NARW Was Reasonable and Well-Supported ............ 41

2. NMFS Relied on the Best Available Data and Science ............ 43

CONCLUSION ............ 45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aaacon Auto Transp., Inc. v. ICC*,
792 F.2d 1156 (D.C. Cir. 1986) ....................16

*Am. Waterways Operators v. Wheeler*,
427 F. Supp. 3d 95 (D.D.C. 2019) ....................28

*Balt. Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983) ....................45

*Basel Action Network v. Mar. Admin.*,
370 F. Supp. 2d 57 (D.D.C. 2005) ....................14

*Bldg. Indus. Ass'n of Super. Cal. v. Norton*,
247 F.3d 1241 (D.C. Cir. 2001) ....................44

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ....................14

*Brown v. Offshore Specialty Fabricators, Inc.*,
663 F.3d 759 (5th Cir. 2011) ....................12

*Center for Biological Diversity v. Rumsfeld*,
198 F. Supp. 2d 1139 (D. Ariz. 2002) ....................23, 39

*City of Tacoma v. FERC*,
460 F.3d 53 (D.C. Cir. 2006) ....................43

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................10

*Cloud Found., Inc. v. Salazar*,
999 F. Supp. 2d 117 (D.D.C. 2013) ....................20

*Club v. Jewell*,
764 F.3d 1 (D.C. Cir. 2014) ....................11

*Ctr. for Biological Diversity v. Burgum*,
No. 2:25-cv-02840, 2026 WL 2574833 (C.D. Cal. Aug. 31, 2026) ....................14

*Ctr. for Biological Diversity v. Burgum*,
No. 2-25-cv-02840, 2025 WL 2986120 (C.D. Cal. Sept. 10, 2025) ....................14

*Ctr. for Biological Diversity v. Kempthorne*,
588 F.3d 701 (9th Cir. 2009) ....................35, 38

*Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell*,
815 F.3d 1 (D.C. Cir. 2016) ....................9

*Duke Energy Field Servs. Assets, LLC v. FERC*,
150 F. Supp. 2d 150 (D.D.C. 2001) ....................11, 12, 14

*Friends of Animals v. Ashe*,
808 F.3d 900 (D.C. Cir. 2015) ....................12

*Garland v. Ming Dai*,
593 U.S. 357 (2021) ....................9

**Green Oceans v. U.S. Dep't of the Interior*,
No. 1:24-cv-00141, 2025 WL 973540 (D.D.C. Apr. 1, 2025)
....................10, 11, 12, 14

*Hallstrom v. Tillamook Cnty.*,
493 U.S. 20 (1989) ....................11

*Healthy Gulf v. U.S. Department of the Interior*,
152 F.4th 180 (D.C. Cir. 2025) ....................10

*Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA*,
71 F.4th 59 (D.C. Cir. 2023) ....................16

*Hornbeck Offshore Services, L.L.C. v. Salazar*,
696 F. Supp. 2d 627 (E.D. La. 2010) ....................14, 15

*Huls Am. Inc. v. Browner*,
83 F.3d 445 (D.C. Cir. 1996) ....................35

*In re AmTrust Fin. Corp.*,
694 F.3d 741 (6th Cir. 2012) ....................16

*Ivy Sports Med., LLC v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014) ....................26

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ....................16, 28

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................9

*Mashpee Wampanoag Tribe v. Bernhardt*,
466 F. Supp. 3d 199 (D.D.C. 2020) ....................16

*Mazaleski v. Treusdell*,
562 F.2d 701 (D.C. Cir. 1977) .....26

*Melone v. Coit*,
No. 1:21-cv-11171, 2023 WL 5002764 (D. Mass. Aug. 4, 2023) .....36, 40

*Melone v. Coit*,
100 F.4th 21 (1st Cir. 2024) .....36, 38, 40

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .....9

*Narragansett Indian Tribal Historic Preservation Office v. FERC*,
949 F.3d 8 (D.C. Cir. 2020) .....11

*Nat'l Tr. for Historic Pres. v. Blanck*,
938 F. Supp. 908 (D.D.C. 1996), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999) .....29, 33

*National Park Service v. National Trust for Historic Preservation in the United States*,
609 U.S. 1068 (2026) .....11

*National Parks Conservation Ass'n v. Semonite*,
916 F.3d 1075 (D.C. Cir. 2019) .....31, 32

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
463 F.3d 50 (1st Cir. 2006) .....31

*NRDC v. Evans*,
232 F. Supp. 2d 1003 (N.D. Cal. 2002) .....36

*NRDC v. Regan*,
67 F.4th 397 (D.C. Cir. 2023) .....26

*Oceana, Inc. v. Pritzker*,
24 F. Supp. 3d 49 (D.D.C. 2014) .....33

*Oceana, Inc. v. Ross*,
321 F. Supp. 3d 128 (D.D.C. 2018) .....44

*Oceana, Inc. v. Ross*,
No. 12-0041, 2020 WL 5834832 (D.D.C. Oct. 1, 2020) .....9

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
45 F.4th 291 (D.C. Cir. 2022) .....21

*OXY USA, Inc. v. Babbitt*,
122 F.3d 251 (5th Cir. 1997) .....14

*Pres. Soc'y of Newport Cnty. v. Burgum* (*PSNC*),
No. 23-cv-03510, 2026 WL 787910 (D.D.C. Mar. 20, 2026) ..............................31, 32, 33, 35

**RENEW Northeast v. U.S. Department of the Interior* (*RENEW*),
No. 25-cv-13961, 2026 WL 1078282 (D. Mass. Apr. 21, 2026)............................1, 17, 26, 27

**Save Long Beach Island v. U.S. Dep't of Com.* (*SLBI I*),
794 F. Supp. 3d 273 (D.N.J. 2025) ...............................................................36, 37, 38, 40, 41

**Save Long Beach Island, Inc. v. U.S. Dep't of Com.* (*SLBI II*),
No. 25-cv-02214, 2026 WL 2150375 (D.D.C. July 27, 2026) ...................................12, 13, 14

*Save Long Beach Island, Inc. v. U.S. Department of Commerce* (*SLBI III*),
No. 25-cv-2211, 2026 WL 2294613 (D.D.C. Aug. 10, 2026)................................................27

**Seafreeze Shoreside, Inc. v. U.S. Department of the Interior*,
123 F.4th 1 (1st Cir. 2024)............................................................................................17, 20, 24

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025).........................................................................................................18, 19, 37

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
992 F.3d 1071 (D.C. Cir. 2021) ..........................................................................................41

*Shell Offshore, Inc. v. Department of the Interior*,
997 F. Supp. 23 (D.D.C. 1998) ...........................................................................................14

*Sierra Club v. NMFS*,
797 F. Supp. 3d 440 (D. Md. 2024) ..............................................................................23, 39

*South Fork Band Council of Western Shoshone of Nevada v. U.S. Department of the Interior*,
588 F.3d 718 (9th Cir. 2009) ...............................................................................................32

*Sw. Ctr. for Biological Diversity v. Babbitt*,
215 F.3d 58 (D.C. Cir. 2000) ...............................................................................................44

*Town & Cnty. of Nantucket v. Burgum*,
No. 25-cv-906, 2025 WL 3120419 (D.D.C. Nov. 4, 2025) ...................................................27

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)...............................................................................................................9

*V.I. Hous. Fin. Auth. v. FEMA*,
151 F.4th 409 (D.C. Cir. 2025)............................................................................................12

*Women's Equity Action League v. Cavazos*,
906 F.2d 742 (D.C. Cir. 1990) .............................................................................................13

## STATUTES


5 U.S.C.
§ 704 ............................................................ 13, 14
§ 706(1) ............................................................ 13
§ 706(2) ............................................................ 9
§ 706(2)(A) ............................................................ 13

16 U.S.C.
§ 1371(a)(5)(A) ............................................................ 40
§ 1371(a)(5)(A)(I) ............................................................ 36
§ 1533(b)(1)(A) ............................................................ 44
§ 1536(a)(2) ............................................................ 43
§ 1536(b)(4)(B)-(C) ............................................................ 43

43 U.S.C.
§ 1332(3) ............................................................ 15, 17, 19
§ 1337 ............................................................ 15
§ 1337(p) ............................................................ 13, 15, 24
§ 1337(p)(1)(C) ............................................................ 17
§ 1337(p)(4) ............................................................ 2, 5, 12, 14, 15, 16, 18, 20, 22, 23, 26, 28
§ 1337(p)(4)(I) ............................................................ 12, 20, 21
§ 1337(p)(4)(A) ............................................................ 20, 22
§ 1344(a)(1) ............................................................ 17
§ 1349(a)(1) ............................................................ 13
§ 1349(a)(2) ............................................................ 11
§ 1349(a)(2)(A) ............................................................ 12
§ 1349(a)(6) ............................................................ 13, 15
§ 1371(a)(5)(A)(II) ............................................................ 36

54 U.S.C. § 306107 ............................................................ 30

NHPA
§ 106 ............................................................ 2, 6, 29, 30, 33, 34, 35
§ 110(f) ............................................................ 2, 6, 9, 10, 11, 29, 30, 31, 32, 33

Pub. L. No. 109-58, 119 Stat. 594, 746 ............................................................ 15


## REGULATIONS


30 C.F.R.
§ 585.102(a) ............................................................ 16, 17
§ 585.214(a)(iv) ............................................................ 5, 23
§ 585.621(c) ............................................................ 20, 22
§ 585.621(d) ............................................................ 22
§ 585.626(a)(13) ............................................................ 23

36 C.F.R.
§ 800.6(c) ........................................................................................................33, 35
§ 800.8(c) ..................................................................................................................6
§ 800.10(b)..............................................................................................................30
§ 800.10(c) ..............................................................................................................30
§ 800.16(p)..............................................................................................................30

50 C.F.R.
§ 216.3....................................................................................................................39
§ 216.103.................................................................................................................38
§ 217.320-217.329 ....................................................................................................7
§ 402.14(i)...............................................................................................................43

**OTHER AUTHORITIES**

H.R. Rep. No. 95-590 (1977), *reprinted in* 1978 U.S.C.C.A.N. 1450 .........................................13

## INTRODUCTION

Plaintiffs challenge federal approvals for the New England Wind Project (the "Project"), a fully approved offshore wind energy project that will be constructed off the coast of Massachusetts and will affordably serve more than 900,000 homes and businesses. In their Motion for Summary Judgment, Dkt. 53, and memorandum, Dkt. 53-1 ("Pls. MSJ"), Plaintiffs seek an order vacating and setting aside the approvals issued by Federal Defendants for the Project, alleging violations of the Outer Continental Shelf Lands Act ("OCSLA"), Endangered Species Act ("ESA"), Marine Mammal Protection Act ("MMPA"), National Historic Preservation Act ("NHPA"), and Administrative Procedure Act ("APA"). Each of these approvals, including the Construction and Operation Plan ("COP"), were thoroughly evaluated by the agencies over the course of a multi-year process and are well-reasoned as documented in the robust administrative record before the Court. Each of these approvals was granted consistent with applicable law, and each should be upheld.

The Court is presented with an unusual posture for this case on summary judgment. Federal Defendants, as part of the Government's well-documented scheme to end offshore wind in the United States, have switched sides on a key approval at issue in this case without which the Project cannot be built. But Federal Defendants' renewed, pretextual request for remand to re-evaluate the COP in their Cross-Motion for Summary Judgment, Dkt. 60, and memorandum, Dkt. 60-1 ("Feds. MSJ")—made to effectively kill the Project—fails on the merits; violates the preliminary injunction in *RENEW Northeast v. U.S. Department of the Interior* (*RENEW*), No. 25-cv-13961, 2026 WL 1078282 (D. Mass. Apr. 21, 2026); is untimely; fails to consider reliance interests; and is highly prejudicial to Defendant-Intervenors Avangrid Power, LLC, Park City Wind LLC, and Commonwealth Wind, LLC (collectively, "Intervenors") who have, over a decade, incurred costs

and commitments of over $725 million in developing the Project. The Project's Record of Decision ("ROD") is based upon a well-reasoned assessment and the best reading of 43 U.S.C. § 1337(p)(4), and there is no "substantial and legitimate" issue with the approval, as this Court should find. The Court should uphold the COP as well-reasoned and compliant with federal law.

Plaintiffs have failed to meet their burden of establishing standing for their OCSLA and NHPA Section 110(f) claims. Plaintiffs' OCSLA claims are procedurally barred: They failed to satisfy OCSLA's citizen suit requirements, and their OCSLA claim is not independently reviewable under the APA. On the merits, each of Plaintiffs' claims fails, as the extensive administrative record demonstrates. The Bureau of Ocean Energy Management ("BOEM") complied with OCSLA in approving the COP after a lengthy and robust multi-year review, which concluded with detailed findings describing the manner in which § 1337(p)(4)'s requirements are met. Plaintiffs' legal interpretation of § 1337(p)(4), which Federal Defendants now rely upon, is incorrect as a matter of law. BOEM also complied with the purely procedural requirements of NHPA Sections 106 and 110(f). And the National Marine Fisheries Service ("NMFS") complied with the MMPA and ESA in issuing the Project's Incidental Take Regulations ("ITR"), associated Letter of Authorization ("LOA"), and Biological Opinion ("BiOp"). Plaintiffs' requests for relief and Federal Defendants' request for remand should be denied, and summary judgment should be granted to Intervenors.

## I. BACKGROUND AND STATEMENT OF FACTS

### A. The Project

The Project involves the construction and operation of a commercial-scale offshore wind energy facility in two phases: (1) New England Wind 1 (the Park City Wind Project); and (2) New England Wind 2 (the Commonwealth Wind Project). NEW1775.0017. The Project's wind turbines will be constructed in federal waters on the Outer Continental Shelf ("OCS") within

BOEM Renewable Energy Lease No. OCS-A 0534, held by Intervenor Park City Wind LLC and No. OCS-A 0561, held by Intervenor Commonwealth Wind, LLC, and located about 20 miles from the southwest corner of Martha's Vineyard and over 24 miles from Nantucket, Massachusetts. *See* NEW1187.0001, 1775.0035. Once constructed, the Project will consist of up to 130 wind turbines and five electrical service platforms linked by offshore cables, associated inter-array cables connecting the turbines, and a maximum of five submarine export cables that will bring up to 2,600 megawatts ("MW") to power states in the New England region. NEW1844.0011-12; *see also* Dkt. 22 (Massachusetts amicus brief). The Project will directly create at least 3,366 full-time equivalent jobs and generate at least $826 million in direct labor income and at least $1.2 billion in direct expenditures (other than payroll). NEW0995.0073.

## B. Multi-Year Federal Review Process

### 1. Wind Energy Area Leasing

BOEM's review of the Project's lease area began over 15 years ago when the agency conducted a review and environmental assessment of potential wind energy areas offshore Massachusetts in accordance with OCSLA. NEW0975.0056-57. After issuing a draft environmental assessment ("EA") and considering public comments, BOEM issued a final EA in 2014, concluding that leasing and related activities in the proposed lease sale area would not significantly impact the environment. NEW0975.0057. Following a competitive lease sale, in 2015 BOEM awarded Lease OCS-A 0501, which was subsequently divided into Leases OCS-A 0501 and OCS-A 0534 in June 2021. NEW1844.0170. In December 2021, BOEM approved the assignment of Lease OCS-A 0534 from Vineyard Wind LLC to Intervenor Park City Wind LLC; and in May 2024, Lease OCS-A 0534 was itself divided into two lease areas: (1) Lease OCS-A 0534, which was retained by Intervenor Park City Wind LLC and is the site of New England

Wind 1; and (2) Lease OCS-A 0561, which was assigned to Intervenor Commonwealth Wind, LLC and is the site of New England Wind 2. NEW1184.0001, 1187.0001 (Conditions of COP Approval), 1236.0001-7 (lease assignment approval), 1844.0006, 1844.0170; *see also* NEW1844.0172 (map). Since obtaining the Leases, Intervenors have worked to develop the Project for over ten years, including through the extensive review and permitting processes described below.

**2. Environmental Review and COP Approval**

After extensive environmental surveys and site assessment, Intervenor Park City Wind submitted a detailed COP to BOEM in July 2020 for both phases of the Project, which was revised during the review process. NEW0975.0003, 1844.0006, 1844.0011-12. On June 30, 2021, BOEM issued a Notice of Intent to Prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA"). NEW1347.0001-5. The proposed Project then went through a robust federal environmental and safety review process over more than two and a half years, involving numerous federal agencies (including BOEM, NMFS, the Bureau of Safety and Environmental Enforcement ("BSEE"), Department of War (then Department of Defense), Federal Aviation Administration, U.S. Environmental Protection Agency, U.S. Army Corps of Engineers ("USACE"), U.S. Coast Guard, National Park Service ("NPS"), and U.S. Fish and Wildlife Service); six cooperating state agencies; and consultation with many stakeholders, including federally recognized tribes, local community members, and historic preservation organizations. NEW1776.0002, 1776.0009-22, 1844.0004, 1844.0177-80, 1844.0186-87. BOEM held three public meetings and accepted written comments on its December 2022 draft EIS. NEW1775.0026. BOEM revised the EIS, taking these comments into account, and published a notice of availability of the final EIS ("FEIS") on March 1, 2024. NEW1775.0001-598 (FEIS Vol. I), 1776.0001-1342

(FEIS Vol. II: Appendices), 1844.0006.

On April 1, 2024, BOEM issued a ROD documenting the U.S. Department of the Interior's decision to approve the Project's COP, with some modifications, and to adopt the Preferred Alternative analyzed in the Project's FEIS. NEW1844.0001-207 (ROD). On July 1, 2024, BOEM issued COP approval letters and associated Conditions of COP Approval for each phase of the Project, with the Conditions of COP Approval each spanning over 80 pages. NEW1185.0001-2, 1188.0001-2 (COP Approval Letters); NEW1184.0001-88, 1187.0001-88 (Conditions of COP Approval). The Conditions of COP Approval require extensive measures to address and mitigate potential impacts to safety, national security, protected species and their habitats, commercial fisheries and for-hire and recreational fishing, cultural resources and historic properties, and interests raised by federally recognized tribes. *See id.*

The Project's ROD documents BOEM's determination that the COP complies with OCSLA and its implementing regulations, as well as BOEM's express determination that approval of the COP with modifications and the Conditions of COP Approval "would be in accordance with the regulations at 30 C.F.R. part 585 and *would ensure that all the Project activities on the OCS are carried out in a manner that provides for the factors in Subsection 8(p)(4) [43 U.S.C. § 1337(p)(4)] of OCSLA*." NEW1844.0202.[1] In Appendix B of the ROD (the "OCSLA Compliance Memo"), BOEM detailed its compliance review for the COP under each of the twelve § 1337(p)(4) factors, including safety, conservation of natural resources, environmental protection, other uses of the sea and seabed, and prevention of interference with reasonable use of the OCS. NEW1844.0166-202.

---

[1] All emphasis is added and all citations and quotation marks are omitted, unless otherwise noted.

### 3. NHPA Sections 106 and 110(f) Processes

BOEM conducted and completed historic properties consultation as required under NHPA Section 106 and, in accordance with NHPA implementing regulations, used the NEPA substitution process in fulfilling its NHPA obligations. 36 C.F.R. § 800.8(c); *see also* NEW1347.0002-5, 1775.0048. Overall, the Project's NHPA process spanned nearly three years and included extensive rounds of comments and meetings with Tribal Nations, the federal Advisory Council on Historic Preservation ("Advisory Council"), the Massachusetts State Historic Preservation Officer ("SHPO"), NPS, USACE, and other interested parties. NEW1774.0001-328 (Memorandum of Agreement), 1776.0018-21. BOEM identified one national historic landmark ("NHL"), the Nantucket Historic District NHL ("Nantucket NHL"), located more than 24 miles from the Project's closest proposed structure within the Project's visual area of potential effects, and determined that this NHL would be subject to adverse visual effects. NEW1032.0039, 1774.0003-4, 1774.0006. As required by NHPA Section 110(f) and implementing regulations, BOEM utilized a heightened standard of care as part of the consultation process to minimize the Project's potential harm to this NHL to the maximum extent possible. NEW1774.0003, 1774.0006, 1776.0020-21. BOEM concluded its consultation with the execution of a Memorandum of Agreement ("MOA") agreed to by BOEM, Park City Wind, the Advisory Council, the Massachusetts SHPO, USACE, BSEE, the Town of Aquinnah, Massachusetts, and the Gay Head Lighthouse Advisory Board. NEW1774.0001-328. The MOA includes extensive measures to resolve adverse effects to historic properties, including nearly $3 million in mitigation funding. NEW1774.0007-14, 1774.0327.

### 4. MMPA Approval Process

In December 2021, Intervenor Park City Wind applied to NMFS for an Incidental Take Authorization for the Project under the MMPA, including an ITR and associated LOA.

NMFS70526, 99137-295. After multiple rounds of NMFS technical review, and subsequent revisions of its application materials, Intervenor Park City Wind submitted an updated application in July 2022. NMFS70918. In August 2022, NMFS published a notice of receipt of the Project's application in the Federal Register and held a 30-day public comment period. NMFS70527-41. In June 2023, NMFS published a notice of its proposed rule and LOA. NMFS70551-647. Throughout the nearly three-year application process, NMFS provided multiple rounds of detailed comments on the Project's application materials, which the Project addressed, to NMFS's satisfaction. *E.g.*, NMFS101863-946. In June 2024, NMFS promulgated a five-year ITR and, in July 2024, the agency issued an associated LOA to Intervenor Avangrid Renewables, LLC[2] authorizing the incidental non-lethal "take" of small numbers of marine mammals during Project construction. NMFS70916-71015, 71018-19 (ITR); NMFS71025-82 (LOA); 50 C.F.R. §§ 217.320-217.329. No take from mortality or serious injury to any marine mammals was requested, anticipated, or authorized, and the LOA includes over 40 pages of mitigation, monitoring, and reporting requirements to reduce impacts to marine mammals. *E.g.*, NMFS70916, 71026-72.

#### 5. Endangered Species Act Process

Under ESA Section 7, BOEM consulted with NMFS, which issued a BiOp that concluded the Project is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of any ESA-listed species' critical habitat, including the North Atlantic right whale ("NARW"). NMFS1544-2291 (BiOp); NMFS75170, 75219 (ROD). NMFS's BiOp includes extensive mitigation measures and terms and conditions to reduce potential impacts to ESA-listed species. NMFS2032-61.

[2] Avangrid Renewables, LLC, now known as Avangrid Power, LLC, is the parent company of Park City Wind LLC, the original applicant for the Project's MMPA authorizations.

### C. **<u>Procedural History</u>**

On January 13, 2025, Plaintiffs sent a "60-Day Notice of Intent to Sue" letter, alleging that BOEM violated OCSLA when approving the Project ("OCSLA Notice").[3] On the same day, Plaintiffs also sent a "Sixty-Day Notice of Intent to Sue" letter, alleging ESA Section 7 deficiencies in the Project's NMFS BiOp ("ESA Notice").[4] On May 27, 2025, Plaintiffs filed their Complaint challenging the Project's approvals. Dkt. 1. On August 1, 2025, Intervenors moved to intervene, Dkt. 12, which the Court granted on October 9, 2025. On December 2, 2025, Federal Defendants filed a motion to voluntarily remand and stay the case, Dkt. 18, which the Court denied without prejudice on June 4, 2026.[5] After production of the administrative records, Plaintiffs moved for summary judgment on September 20, 2026, Dkt. 53, and Federal Defendants moved for summary judgment on October 20, 2026, Dkt. 60. Intervenors now timely file their cross-motion for summary judgment, opposition to Plaintiffs' Motion, and partial opposition to Federal Defendants' Motion.

## II. LEGAL STANDARD AND SCOPE OF REVIEW

In challenges to federal agency action, motions for summary judgment are reviewed using the APA's scope and standard of review based on the full administrative record before the agency when it made its decision. Under this standard, a court may only set aside an agency action,

---

[3] A copy of Plaintiffs' OCSLA Notice is attached as Exhibit A to the Declaration of Janice Schneider ("Schneider Decl.").

[4] A copy of Plaintiffs' ESA Notice is attached as Exhibit B to the Schneider Decl.

[5] Intervenors also filed an amended crossclaim in this case, challenging certain final agency actions taken by Federal Defendants, specifically the Zerzan M-Opinion M-37086 ("Zerzan Opinion") and the portion of Secretary's Order ("S.O.") 3437 that relies on the Zerzan Opinion both directing BOEM to re-evaluate decisions (such as the Project's COP) made in reliance on the Anderson M-Opinion M-37067 ("Anderson Opinion"). Dkts. 39, 40. Federal Defendants have filed a motion to dismiss this amended crossclaim, Dkt. 42, which Intervenors opposed, Dkt. 46, and that motion is currently pending before this Court.

finding, or conclusion if it is arbitrary and capricious, an abuse of discretion, in excess of statutory authority, or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2). The "review is highly deferential and presumes agency action to be valid." *Defs. of Wildlife & Ctr. for Biological Diversity v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016). Thus, "the scope of [the court's] review . . . is narrow and a court is not to substitute its judgment for that of the agency," but must instead review an agency's explanation for its decision and "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment[.]" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Where, as here, an agency is "evaluating scientific data within its technical expertise[,]" "a court will give an extreme degree of deference to the agency[.]" *Oceana, Inc. v. Ross*, No. 12-0041, 2020 WL 5834832, at *3 (D.D.C. Oct. 1, 2020). Finally, reviewing courts "must uphold even a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021).

## III. ARGUMENT

### A. Plaintiffs Lack Standing for Their OCSLA and NHPA Section 110(f) Claims

To establish Article III standing, a plaintiff must show for each claim and form of relief "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 431 (2021). At summary judgment, the plaintiffs' burden to establish standing is heightened; they must support their claims with affidavits or other evidence of specific facts. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

**1. Mr. Vanderhoop Lacks Standing to Pursue the OCSLA Claim**

Mr. Vanderhoop fails to show standing for Plaintiffs' OCSLA claim because his asserted future harms are merely conjectural and hypothetical.[6] *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("allegations of possible future injury are not sufficient"). Mr. Vanderhoop merely offers that "*[i]f* [the] activities [associated with the Project] cause fish to leave productive fishing grounds, make fish more difficult to locate, impair fish habitat, or interfere with my access to customary fishing areas, my charter business will be directly harmed." Declaration of William D. Vanderhoop, Jr. ¶ 27, Dkt. 53-5 ("Vanderhoop Decl."); *see also id.* ¶ 19 (similar for whales). Plaintiffs' brief just repeats these conditionals. Pls. MSJ 8-9. This "speculative chain of possibilities" does not establish "certainly impending" injury. *See Clapper*, 568 U.S. at 414. Mr. Vanderhoop also cannot show causation or redressability because he admits the injuries he alleges have already occurred, even though Project construction has not started. *See* Vanderhoop Decl. ¶¶ 12-17, 22. Plaintiffs' OCSLA claim should be dismissed for lack of standing. *See Green Oceans v. U.S. Dep't of the Interior*, No. 1:24-cv-00141, 2025 WL 973540, at *13 (D.D.C. Apr. 1, 2025) (dismissing plaintiffs', including Mr. Vanderhoop's, OCSLA claims for lack of standing).

**2. Plaintiffs Lack Standing to Pursue Their NHPA Section 110(f) Claim**

Mr. Kohler's asserted viewshed injuries related to the Nantucket NHL are insufficient to support standing. While his injuries are highly questionable given how far away the Project is from his home, Mr. Kohler's declaration is also internally inconsistent, which undermines his ability to demonstrate causation and redressability: on one hand he argues his injuries stem from the Project and that if the Project's approvals are set aside the alleged injuries to his "unobstructed

[6] Plaintiffs' reliance (at 7 n.13) on *Healthy Gulf v. U.S. Department of the Interior*, 152 F.4th 180, 189-90 (D.C. Cir. 2025), is inapposite. Unlike Mr. Vanderhoop, in *Healthy Gulf*, the declarant's "alleged harms [were] concrete and particularized, not conjectural or hypothetical."

ocean views" will be prevented or reduced, but on the other hand he concedes these views are not actually unobstructed as he "can already see the turbines associated with Vineyard Wind 1"—which is located between his home and the Project. Declaration of Steven Kohler ¶¶ 4, 11-14, Dkt. 53-4; *see* NEW1773.0036 (all Project turbines will be "behind" turbines from "other projects").[7] In addition, the Wampanoag Tribe ("Tribe") has not demonstrated standing for purposes of NHPA Section 110(f) because the Tribe has not asserted any interest in the Nantucket NHL specifically, *see* Declaration of Bettina Washington, Dkt. 53-6 ("Washington Decl."), which is the only NHL at issue relevant for purposes of Section 110(f). *See supra* at 6; *infra* at 29-30. Accordingly, Plaintiffs' NHPA Section 110(f) claim must be dismissed for lack of standing.

### B. Plaintiffs' OCSLA Claim Fails for Procedural Reasons

#### 1. Plaintiffs Failed to Provide Adequate Notice Under OCSLA

OCSLA's citizen suit provision bars all cases that do not comply with that provision, including its notice requirements. Plaintiffs failed to comply with two separate mandatory notice requirements of that provision. More than 60 days before filing an OCSLA citizen suit, a plaintiff must send a notice that (1) is made "under oath," and (2) describes the plaintiffs' claims in sufficient detail. *See* 43 U.S.C. § 1349(a)(2); *Duke Energy Field Servs. Assets, LLC v. FERC*, 150 F. Supp. 2d 150, 154-55 (D.D.C. 2001); *Green Oceans*, 2025 WL 973540, at *13. Plaintiffs' OCSLA Notice fails to meet these basic requirements, and their claim must be dismissed. *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 26 (1989) ("[C]ompliance with the 60-day notice

---

[7] Plaintiffs' reliance (at 10 n.33) on *Narragansett Indian Tribal Historic Preservation Office v. FERC*, 949 F.3d 8, 12 (D.C. Cir. 2020), is misplaced, as Mr. Kohler has not alleged any destruction of a ceremonial landscape and even there the D.C. Circuit dismissed the case for lack of standing. Similarly, Plaintiffs' reliance (at 10 n.33) on *Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014), is unavailing due to the interest alleged here and the Supreme Court's recent decision in *National Park Service v. National Trust for Historic Preservation in the United States*, 609 U.S. 1068, 1070-74 (2026).

provision is a mandatory, not optional, condition precedent for suit."); *Green Oceans*, 2025 WL 973540, at *13.

Plaintiffs' OCSLA Notice fails to comply with the "under oath" requirement, because it has "neither a notary's seal nor a statement that the paper is made under penalty of perjury." *See Duke Energy*, 150 F. Supp. 2d at 154-55 (rejecting OCSLA claim); *Green Oceans*, 2025 WL 973540, at *13 (same); Schneider Decl., Ex. A ("OCSLA Notice"). Plaintiffs' OCSLA Notice also failed to provide sufficiently specific details as required by the 60-day notice provision. *See Friends of Animals v. Ashe*, 808 F.3d 900, 904 (D.C. Cir. 2015) (interpreting similar ESA notice requirement); *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 769 (5th Cir. 2011) (noting this principle would apply to OCSLA's citizen suit provision). Plaintiffs did not (and cannot) show their OCSLA Notice includes any of the following key issues they now seek to raise, e.g., that: (1) BOEM purportedly misinterpreted § 1337(p)(4); (2) BOEM allegedly violated § 1337(p)(4)(I); (3) BOEM's mitigation efforts are inadequate; or (4) BOEM failed to adequately consider the Project's impacts on federal scientific surveys, search-and-rescue operations, radar interference, collision risks for aircraft, and blade failure. *See* OCSLA Notice at 3-5.

### 2. Plaintiffs' OCSLA Claim Is Not Reviewable Under the APA

Plaintiffs' contention that they rely on *only* the APA is belied by their OCSLA Notice, which cites OCSLA's citizen suit provision as the sole basis for their suit. OCSLA Notice at 3 (citing 43 U.S.C. § 1349(a)(2)(A)). Regardless, OCSLA's citizen suit provision provides adequate review and thus "forecloses APA review." *Save Long Beach Island, Inc. v. U.S. Dep't of Com.* (*SLBI II*), No. 25-cv-02214, 2026 WL 2150375, at *3 (D.D.C. July 27, 2026); *V.I. Hous. Fin. Auth. v. FEMA*, 151 F.4th 409, 418 (D.C. Cir. 2025) ("APA review is not available if Congress has

provided a 'special and adequate review procedure' elsewhere."); *see also* 5 U.S.C. § 704 (APA review available only where "there is no other adequate remedy in a court").

OCSLA's citizen suit provision is an independent and exclusive cause of action. *SLBI II*, 2026 WL 2150375, at *4. It allows aggrieved parties to "commence a civil action . . . to compel compliance with [OCSLA] against" any "agency . . . for *any* alleged violation of any [OCSLA] provision . . . or any [OCSLA] regulation[,]" 43 U.S.C. § 1349(a)(1), and makes it the exclusive means for doing so, *id.* § 1349(a)(6) ("[A]ll suits challenging actions or decisions allegedly in violation of" OCSLA "shall be undertaken in accordance with the procedures described in this subsection[.]"). Plaintiffs argue (at 13) that § 1349(a)(6)'s savings clause provides for APA review. The savings clause was meant to allow suits under NEPA, "the Deepwater Ports Act, the Clean Air Act, or the Fish and Wildlife Act"—and Congress did not extend that to the APA. H.R. Rep. No. 95-590, at 161 (1977), *reprinted in* 1978 U.S.C.C.A.N. 1450, 1567.

Being able to "compel compliance . . . for any alleged [OCSLA] violation," 43 U.S.C. § 1349(a)(1), is also sufficiently similar to APA injunctive relief to preclude APA review, *see, e.g.*, 5 U.S.C. § 706(2)(A) ("hold unlawful and set aside agency action"); *id.* § 706(1).[8] *SLBI II*, 2026 WL 2150375, at *4. Plaintiffs assert (at 12) that they "do not invoke OCSLA's citizen-suit provision to enforce an ongoing statutory violation"—but that is exactly what they are doing. They seek to shoehorn their OCSLA claim challenging BOEM's past and ongoing compliance with § 1337(p) into the APA. *See* Compl. ¶¶ 124-25. Indeed, whether the ROD violated § 1337(p) is the very crux of their claim. *See id.* ¶¶ 1, 125, 175; Pls. MSJ 14-19 (arguing violations of

[8] Plaintiffs argue (at 13 n.34) that the "power to compel compliance" is not "equivalent to APA review." But they just ignore that "relief of the same genre" is appropriate, *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C. Cir. 1990), and make irrelevant arguments about the cases cited in *SLBI II*.

§ 1337(p)(4)); *Ctr. for Biological Diversity v. Burgum*, No. 2-25-cv-02840, 2025 WL 2986120, at *5 (C.D. Cal. Sept. 10, 2025) (rejecting similar argument); *see also Ctr. for Biological Diversity v. Burgum*, No. 2:25-cv-02840, 2026 WL 2574833, at *9 (C.D. Cal. Aug. 31, 2026) (same).

"OCSLA's 60-day notice requirement [also] makes" APA and OCSLA review "incompatible in major respects," which weighs "against the theory that Congress sanctioned concurrent use of both." *SLBI II*, 2026 WL 2150375, at *4. If plaintiffs could sue under the APA, they would "circumvent" OCSLA's notice requirement, *Basel Action Network v. Mar. Admin.*, 370 F. Supp. 2d 57, 77 (D.D.C. 2005), which "plainly bars all cases which do not comply with the provision," *Duke Energy*, 150 F. Supp. 2d at 156. Recognizing this, courts have held in offshore wind cases that "[p]laintiffs cannot . . . shoehorn [an] OCSLA citizen-suit claim into the APA." *Green Oceans*, 2025 WL 973540, at *13; *accord SLBI II*, 2026 WL 2150375, at *4. So too here.

Plaintiffs' reliance (at 12-13) on *OXY USA, Inc. v. Babbitt*, 122 F.3d 251 (5th Cir. 1997), *Shell Offshore, Inc. v. Department of the Interior*, 997 F. Supp. 23 (D.D.C. 1998), and *Hornbeck Offshore Services, L.L.C. v. Salazar*, 696 F. Supp. 2d 627 (E.D. La. 2010), is misplaced. *OXY* focused on the OCSLA claim and not the availability of APA review (as here). The *OXY* court did not reference § 704's adequate remedy bar or the controlling Supreme Court precedent on adequate remedies. *See Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). To the extent the Fifth Circuit was commenting on APA review, it got the analysis backwards. The APA question is whether OCSLA provides an adequate remedy, not whether OCSLA "implicitly repeal[ed] the APA," *OXY*, 122 F.3d at 258, which no one here is arguing. The Fifth Circuit also never intended its decision to reach more broadly; it "emphasize[d] that [its] decision today is limited to the unique facts of this case." *OXY*, 122 F.3d at 259 n.13. *Shell* took *OXY* out of context and barred an OCSLA challenge to a *non-final* agency action for fear of opening "the floodgates." 997 F. Supp.

at 35. That is not the issue here, and this Court should not read *Shell* as opining on the availability of APA review. And *Hornbeck* found APA review was appropriate because "the issue" was *not* "whether the Secretary [wa]s in violation of OCSLA or its regulations." 696 F. Supp. 2d at 636.

Because Plaintiffs "challeng[e] actions or decisions allegedly in violation of" OCSLA, their claim "shall be undertaken in accordance with the adequate procedures" and remedies available under OCSLA, not the APA. *See* 43 U.S.C. § 1349(a)(6). Their OCSLA claim must therefore be dismissed.

### C. Plaintiffs' OCSLA Claim Fails on the Merits

The Court should grant summary judgment to Intervenors on Plaintiffs' OCSLA claim on the merits because Plaintiffs' interpretation of § 1337(p)(4) is incorrect, and the extensive administrative record demonstrates that BOEM appropriately found the Project shall ensure each § 1337(p)(4) factor is met and that BOEM appropriately considered mitigation. For these same reasons, when deciding these cross-motions for summary judgment the Court should reject Federal Defendants' repackaged and pretextual request for remand of BOEM's COP approval for the Project because the request for remand is entirely baseless. *See infra* Section III.D.

#### 1. Plaintiffs' and Federal Defendants' Legal Interpretation Is Meritless

OCSLA governs energy development on the OCS and encourages "expeditious and orderly development [of the OCS], subject to environmental safeguards." 43 U.S.C. § 1332(3). In 2005, Congress amended OCSLA to add § 1337, which authorizes the Department of the Interior to grant OCS leases for alternate energy sources, including offshore wind. Pub. L. No. 109-58, 119 Stat. 594, 746, codified at 43 U.S.C. § 1337. Under § 1337(p)(4), the Secretary of the Interior is required to "ensure that any activity under [§ 1337(p)] is carried out in a manner that provides for" twelve enumerated factors, including safety and protection of the environment.

BOEM properly interpreted OCSLA and applied the best reading of the statute when it approved the Project. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). The ROD was issued on April 1, 2024, when BOEM's regulations repeated the statute's command that "BOEM will ensure that any activities authorized in this part are carried out in a manner that provides for" the twelve enumerated goals. 30 C.F.R. § 585.102(a) (2023); *Aaacon Auto Transp., Inc. v. ICC*, 792 F.2d 1156, 1161 (D.C. Cir. 1986) ("agencies must apply the law in effect at the time a decision is made"). BOEM made express findings that every one of the twelve § 1337(p)(4) factors were met, as discussed below in Section III.C.2. NEW1844.0181-200.

Plaintiffs take issue with the fact that the ROD relied on the then-effective Anderson Opinion, M-37067. *Contra Mashpee Wampanoag Tribe v. Bernhardt*, 466 F. Supp. 3d 199, 220 (D.D.C. 2020) (M-Opinions are binding). The Anderson Opinion evaluated the text of the statute and governing case law and concluded that § 1337(p)(4) "imposes a general duty on the Secretary to act in a manner providing for the subsection's enumerated goals." NEW4220.0005 (M-37067 at 5).[9] It found that the "subsection does not require the Secretary to ensure that the goals are achieved *to a particular degree*, and she retains wide discretion to determine the appropriate balance between *two or more goals that conflict or are otherwise in tension*." *Id.*; NEW1844.0009 (ROD). The Anderson Opinion rejected the narrower Jorjani Opinion, M-37059, which incorrectly interpreted the subsection to prohibit anything more than a *de minimis* impact. NEW4220.0001,

[9] Indeed, the statutory text and context confirm that the Anderson Opinion's interpretation is correct. Subsection 1337(p)(4) tells the agency to (1) "ensure" projects (2) "provide[] for" (3) the twelve criteria. Although OCSLA's "ensure" command sets the result—i.e., providing for the criteria—it "does not tell the agency anything about *how* to [do so]." *Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023); *see also In re AmTrust Fin. Corp.*, 694 F.3d 741, 751-52 (6th Cir. 2012) ("shall ensure" "does not specify the means").

5. The Zerzan Opinion, M-37086, reinstated the Jorjani Opinion.[10] The Anderson Opinion was subsequently codified into regulation and remains current law. *See* 30 C.F.R. § 585.102(a) (2026).

Plaintiffs (at 14) raise two concerns with the Anderson Opinion's interpretation: (1) that BOEM can "treat certain criteria as optional or simply ignore them"; and (2) that BOEM can "arbitrarily prioritize certain criteria over others." As the record demonstrates, *see infra* Section III.C.2, neither of these things occurred. In any event, as a practical matter, the agency must have some ability to (1) assess how the mandatory statutory criteria are satisfied, and (2) weigh the criteria, a point that Plaintiffs ultimately concede. Pls. MSJ 15. Plaintiffs (at 18) press for a test that does not allow impacts (or only de minimis impacts), such that Plaintiffs' interpretation of the statute would not allow for building offshore wind projects at all. But that is clearly contrary to the text of the statute, which provides for domestic offshore wind development. *See* 43 U.S.C. §§ 1332(3), 1337(p)(1)(C), 1344(a)(1) (value of renewable resources on the OCS).

In *Seafreeze Shoreside, Inc. v. U.S. Department of the Interior*, 123 F.4th 1 (1st Cir. 2024), the First Circuit explicitly rejected the de minimis approach. *Id.* at 25-26. Subsection 1337(p)(4), the court held, "cannot be read to prohibit project approval simply because one could imagine the project being involved in an accident." *Id.* at 26. And "BOEM must have 'discretion' in considering whether each statutory criterion is satisfied" and "must 'balance' the statutory mandate to develop energy projects on the Outer Continental Shelf with the twelve statutory criteria for which it must provide." *Id.* at 25-26; *see also RENEW*, 2026 WL 1078282, at *28 (following *Seafreeze* and preliminarily enjoining Zerzan Opinion). There is no daylight between *Seafreeze*'s

[10] Further background on the M-Opinions is in Intervenors' Amended Crossclaim, Dkts. 39, 40 ¶¶ 34-38; Opposition to Motion for Voluntary Remand and Stay, Dkt. 20 at 3-6; and Intervenors' Opposition to Motion to Dismiss, Dkt. 46 at 10-12.

interpretation and the approach BOEM adopted for the Project. This Court should similarly recognize this as the best reading of the statute.

**2. BOEM Appropriately Concluded that the Project "Shall Ensure" Each § 1337(p)(4) Factor Is Met**

The record demonstrates that when BOEM approved the Project, it appropriately concluded that the Project meets all twelve § 1337(p)(4) factors. Plaintiffs concede (at 15) that the key issue is "whether BOEM actually demonstrated satisfaction of the mandatory criteria." *See also* Feds. MSJ 14-16. After extensive analysis throughout a multi-year review and consultation processes, BOEM thoroughly considered each factor and determined that the Project "will comply with the Bureau's regulations and that the proposed activities will be carried out in a manner that provides for safety, protection of the environment, prevention of waste, and the other factors listed in subsection 8(p)(4) of OCSLA." NEW1844.0167. In the OCSLA Compliance Memo in the ROD, BOEM explained the Project's provision for each of the factors. *See* NEW1844.0181-200.

Plaintiffs (and now Federal Defendants) focus on the fact that BOEM's NEPA documents, prepared to address a different statutory standard,[11] identified "major adverse impacts" on certain resources. Pls. MSJ 15-19; Feds. MSJ 14-15. Federal Defendants do not even acknowledge BOEM's specific analysis of the § 1337(p)(4) factors in the OCSLA Compliance Memo (NEW1844.0181-200). *See* Feds. MSJ 14-17; Declaration of Lanny Erdos ¶ 5, Dkt. 60-2 ("Erdos Decl."). Rather, Federal Defendants (at 14-15) cherry-pick portions of the administrative record and fail to grapple with the nuances in both the ROD and the FEIS, including findings "that the

[11] BOEM's extensive NEPA review far exceeded the essentials required to "inform agency decisionmaking." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025); *see* NEW1775.0001-0598; NEW1776.0001-1342.

Project could have beneficial impacts" on some of the same resources, including marine mammals and commercial fisheries. NEW1844.0179, 1844.0193-94 (OCSLA Compliance Memo); *see, e.g.*, NEW1775.0094-97 (FEIS) (summarizing and comparing impacts by alternative). For example, in support of remand, the Erdos Declaration raises purported concerns with alleged "major adverse" impacts to endangered species, Erdos Decl. ¶ 5 (citing NEW1775.0293, regarding NARWs), but omits that the cited page includes impacts from other third-party actions and cumulative impacts unrelated to the Project, like non-offshore wind vessel strikes, and specifies that "[m]ore severe impacts on marine mammals, such as mortality or serious injury . . . are not anticipated" because of the suite of mitigation and monitoring measures required, NEW1775.0293. The FEIS states the Project *itself* is anticipated to have "minor" impacts on NARWs. NEW1775.0094; *see also* NEW1775.0518 (FEIS) ("moderate impacts on navigation and vessel traffic"). Federal Defendants' misrepresentation simply shows the remand request for the pretext that it is.

The FEIS's nuanced determinations, including acknowledgment that the Project may have "major adverse" effects on certain resources—particularly in the absence of the suite of mitigation measures required here in the Conditions of COP Approvals —does not, standing alone, establish that the Project violates OCSLA.[12] Subsection 1337(p)(4) does not incorporate NEPA's significance determinations as the measure of statutory compliance, and it does not override OCSLA's policy of making the OCS available for "expeditious and orderly development, subject to environmental safeguards." 43 U.S.C. § 1332(3). OCSLA cannot be read to mean that "if a project is likely to have any modicum of impact on one or more of the twelve OCSLA criteria, the

[12] To hold otherwise would transform NEPA's purely procedural informational framework into a substantive prohibition. *Contra Seven Cnty.*, 605 U.S. at 173 ("NEPA imposes no substantive environmental obligations or restrictions" and "does not require the agency to weigh environmental consequences in any particular way.").

BOEM cannot approve it." *Seafreeze*, 123 F.4th at 26. What matters is whether BOEM reasonably determined, based on the administrative record and the conditions governing the approved project—which are designed precisely to mitigate potential adverse impacts identified in the NEPA process—that each requirement of § 1337(p)(4) would be satisfied. Examining the record here shows that BOEM appropriately concluded that each factor was met. *See* NEW1844.0181-200.

Plaintiffs primarily argue (at 17-19) that BOEM could not have rationally concluded that the safety criterion, § 1337(p)(4)(A), was met because BOEM acknowledged: (1) that there could be navigational hazards and that mitigation measures would not remove them; (2) there could be increased difficulties for "search and rescue" operations; and (3) potential radar impacts. None of these alleged concerns are in the Complaint, and the Court should decline to consider them. *Cloud Found., Inc. v. Salazar*, 999 F. Supp. 2d 117, 126-27 (D.D.C. 2013) (party may not amend its complaint or broaden its claims through summary judgment briefing). Regardless, BOEM considered these issues under § 1337(p)(4)(I)—preventing "interference with reasonable uses of the OCS[,]" NEW1844.0190-97—and determined based on the administrative record (applying binding regulations) that the Project would "not unreasonably interfere with other uses of the OCS[,]" NEW1844.0190 (quoting 30 C.F.R. § 585.621(c) (2023)).

Contrary to Plaintiffs' claims (at 17-18), BOEM adequately considered concerns regarding navigation and vessel traffic, as well as aviation and air traffic. BOEM concluded that "[t]he navigation risk assessment prepared for the Project" "shows that it is technically feasible to navigate and maneuver fishing vessels and mobile gear through the Lease Area." NEW1844.0191-92. As BOEM explained, that is consistent with the U.S. Coast Guard's determination that the Project's turbine layout "along a standard and uniform grid pattern" of one nautical mile by one

nautical mile will allow safe navigation through and fishing within the area and will allow vessels to "maneuver in accordance with the International Regulations for Preventing Collisions at Sea." *Id.* The U.S. Coast Guard further advised BOEM that "no navigation-related measures within their jurisdiction conflict with the Proposed Project." NEW1844.0191. For air traffic, BOEM explained that the Project's use of an Aircraft Detection Lighting System ("ADLS") and compliance with the Federal Aviation Administration's standard procedures "would reduce risks associated with impacts from structures on aviation and air traffic." NEW1844.0193; *see also* NEW1775.0548 (Preferred Alternative would have "minor impacts" on aviation and air traffic).

As to search-and-rescue operations, BOEM specifically considered the required grid-like layout of the turbines in the Project design, which the U.S. Coast Guard determined "will meet the requirement for navigational safety and Search and Rescue (SAR) operations for the Project Area." NEW1844.0194; *see also* NEW1844.0192 (Project layout to "ensure two lines of orientation for [U.S. Coast Guard] helicopters to conduct search and rescue operations"), 1844.0064.

And as to radar, Plaintiffs excerpt (at 18) two sentences of the 923-page COP, which read in full: "The New England Wind [turbines] *may affect some shipborne radar systems*, *potentially* creating false targets and clutter on the radar display. Vessels navigating within the SWDA *may* become 'hidden' on the radar systems due to shadowing created by the [turbines]." NEW0995.0776; *see also* NEW0995.0105. This acknowledgement of potential radar impacts does not establish unreasonable interference. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 299 (D.C. Cir. 2022) (courts "do not supplant an agency's 'technical judgments and predictions' so long as the agency's decision is 'reasoned and rational'"). The COP provides that potential radar "impacts . . . will vary from vessel to vessel," and that various mitigation measures were being implemented to address these concerns. NEW0995.0776. Here, the Project's

Conditions of COP Approval include several binding measures to mitigate radar impacts, including requirements to analyze and mitigate potential unacceptable interference with Integrated Ocean Observing System high frequency radar systems and to mitigate impacts to North American Aerospace Defense Command's operation of the Falmouth, Massachusetts, Air Surveillance Radar-8. NEW1184.0022-24, 1184.0033, 1187.0022-24, 1187.0033 (COP Conditions 2.20 and 4.3.1). BOEM did not fail to ensure safety under § 1337(p)(4)(A) and its finding that the Project would not unreasonably interfere with other uses of the OCS, 30 C.F.R. § 585.621(c)(2023), is supported by the evidence and is sound.

Plaintiffs' argument (at 16-17) regarding potential adverse effects to "commercial fisheries and for-hire recreational fishing," NARWs, "cultural resources, national security and military, scientific research and surveys, [and] scenic and visual resources" also fails. After considering the applicable regulations, 30 C.F.R. § 585.621(c), (d) (2023), BOEM noted all the ways the Project would have some effects but concluded that none would rise to an unreasonable level. *See, e.g.*, NEW1844.0191-97 (OCSLA Compliance Memo summarizing how BOEM considered other OCS uses in lease area and actions taken to ensure Project will be implemented "in a manner that provides for the prevention of unreasonable interference with those uses," including commercial fisheries and for-hire recreational fishing, scenic and visual resources, scientific research and surveys, and national security and defense); NEW1844.0195. Based on these technical findings, BOEM reasonably concluded that the § 1337(p)(4) factors were satisfied.

### 3. BOEM Adequately Explained and Appropriately Relied on Mitigation Measures

Mitigation is an appropriate way for BOEM to carry out its statutory duties,[13] and BOEM reasonably relied on it here. All leases include site specific lease stipulations and environmental mitigation measures, 30 C.F.R. § 585.214(a)(iv), and all COPs must likewise include measures for avoiding, minimizing, reducing, eliminating, and otherwise mitigating environmental impacts, *id.* § 585.626(a)(13). After extensive evaluation under NEPA, the NHPA, and other processes, BOEM then incorporated these "proposed measures as COP conditions of approval," and required additional mitigation in its COP approvals, including those required by other federal agencies. Indeed, there are hundreds of conditions to the COP approvals, and these conditions meticulously and thoroughly address the potential impacts of the Project. *E.g.*, NEW1844.0185 (requiring Project "to comply with all measures and commitments resulting from consultations"); NEW1184.0001-88, 1187.0001-88 (Conditions of COP Approval providing that "[a]ll mitigation measures selected in the ROD for this Project are incorporated herein by reference and are considered terms and conditions of this COP").

Plaintiffs argue (at 19)—and notably, Federal Defendants do *not*—that BOEM's "mitigations are largely nominal, not functional, as they do not materially reduce the impact of the adverse effect" and that BOEM did not "adequately explain the rational connection between the cited mitigations and the actual satisfaction of the 43 USC § 1337(p)(4) criteria as OCSLA demands."[14] Not so. BOEM extensively explained how mitigation measures factored into its

---

[13] The Secretary has discretion to determine how to "ensure" the § 1337(p)(4) factors are met, *see supra* Section III.C.1, and there is no reason to think that mitigation would not be available under OCSLA, particularly when it is under NEPA, the MMPA, and the ESA.

[14] *Sierra Club v. NMFS*, 797 F. Supp. 3d 440 (D. Md. 2024), and *Center for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139 (D. Ariz. 2002), are inapposite. Pls. MSJ 19. Both are ESA cases addressing BiOps, not OCSLA decisions, and they are not factually on point. Here, BOEM explained how its measures would avoid, minimize, and mitigate adverse effects, *contra Sierra Club*, 797 F. Supp. 3d at 486-87, and made those mitigation measures enforceable conditions, *contra Ctr. for Biological Diversity*, 198 F. Supp. 2d at 1152, 1154.

conclusions about § 1337(p). *See, e.g.*, NEW1844.0184-86, 1844.0191-97. Like the plaintiffs in *Seafreeze*, Plaintiffs "fail to acknowledge . . . the mitigation requirements that the BOEM imposed in response to the safety and environmental concerns raised." 123 F.4th at 26-27; *id.* at 14 (upholding COP approval). Indeed, the First Circuit found relevant "the mitigation requirements that the BOEM imposed in response to [various] concerns raised[.]" *Id.* at 27.

Plaintiffs argue specifically (at 20-21) that BOEM acted improperly on three issues: (1) commercial fishing and for-hire recreational fishing, (2) NMFS scientific surveys, and (3) "blade failure." Plaintiffs' concerns are belied by the administrative record. *First*, for context, the effects on the fishing industry were relatively small to begin with: In 2021, NMFS reported that "small businesses that fished inside the RI/MA Lease Areas [which are larger than just the Project area] generated 0.20 percent of their total revenue from the lease areas" while "large businesses . . . generated 0.02 percent of their total revenue from the lease areas." NEW1844.0193; *see also* NEW1775.0364-65 (similar). BOEM also concluded that "[m]inor beneficial impacts from the presence of structures for commercial and for-hire recreational fishing operations could also occur." NEW1844.0193. Critically, Project approval does not "limit the right to navigate or fish within the Project Area" and "BOEM expects . . . many fishermen will adapt to the spacing and be able to fish successfully in the Project Area." NEW1844.0194. Further, while BOEM concluded that these impacts will be mitigated in part through requiring direct compensation through two fisheries mitigation programs, NEW1775.0374, 1844.0194-95, BOEM did not merely require monetary compensation as Plaintiffs allege (at 20). Instead, BOEM required a variety of mitigation measures to reduce the Project's potential interference with fisheries, including a uniform turbine layout to "accommodate the predominant trawling direction of commercial

fishing," NEW1844.0194, as well as various cable protection measures, NEW1184.0048-49, 1187.0048-49, 1187.0067, 1187.0073, 1775.0374.

*Second*, Plaintiffs (at 20) seem to misconstrue the scientific survey mitigation requirement. If the Project and NMFS fail to reach a survey mitigation agreement, the Project "must submit a Survey Mitigation Plan to BOEM and NMFS," which BOEM will review in consultation with NMFS, and the Project "must resolve comments to BOEM's satisfaction and must conduct activities in accordance with the plan." NEW1184.0073-75, 1187.0073-75 (COP Condition of Approval 6.3); *see also* NEW1844.0197.

*Finally*, Plaintiffs' sentence on blade failure is not enough to preserve this argument, which was also not raised in their Complaint's OCSLA claim (nor in the OCSLA Notice). Regardless, BOEM properly explained that "[turbine] structural failure (i.e., loss of a blade or tower collapse)" is "highly unlikely." NEW1775.0093. The Conditions of COP Approval nonetheless include detailed requirements for blade and nacelle controls, including mechanisms and procedures for shutdown of any turbine, as well as procedures for debris removal and reporting. NEW1184.0030, 1184.0037-40, 1187.0030, 1187.0037-40 (COP Conditions of Approval 3.1.2 and 5.1.2). The ROD and COP approvals met all requirements of law and should be upheld on the merits.

**D. <u>The Court Should Deny Remand Because Federal Defendants Lack Authority and Remand Is Unwarranted, Prejudicial, and Untimely</u>**

Federal Defendants have relentlessly sought to halt the offshore wind industry in the United States for political reasons, issuing unlawful permitting pauses, stop work, and suspension orders, which have been enjoined. Dkt. 46 at 7-8 (recounting court actions). Here, Federal Defendants again seek to disrupt a fully approved offshore wind project.[15] Federal Defendants' request (at 15)

---

[15] *See also Green Oceans v. U.S. Dep't of the Interior*, No. 24-cv-00141-RCL, Dkt. 115 (untimely seeking remand of COP approval for already fully constructed offshore wind project).

for the Court to "remand, without vacatur, Interior's approval of the COP for the Project so that Interior can re-evaluate the COP under OCSLA,"—a mere repackaging of their prior motion for voluntary remand—is highly prejudicial, untimely, and improper at this phase of the case.[16] And even under Federal Defendants' construct (at 14-17), voluntary remand is not appropriate here because the agency has not expressed any "substantial and legitimate" concern about its earlier decision.

### 1. Federal Defendants Lack Authority for an Untimely Re-Evaluation

Federal Defendants lack the "inherent authority" they claim to possess (at 15) to re-evaluate the Project's COP approval. The D.C. Circuit has recognized that the concept of "inherent authority" "rests on a faulty premise." *NRDC v. Regan*, 67 F.4th 397, 401 (D.C. Cir. 2023). Federal Defendants, "ha[ve] no inherent authority. [They] ha[ve] only the authority given to them by" Congress in OCSLA. *See id.* In any event, any reconsideration here would be untimely and improper given the *years* that have passed since the permits were granted and the hundreds of millions of dollars spent in reliance on those permits by Intervenors. *See supra* at 2, 5. To the extent Federal Defendants have any inherent authority to reconsider prior decisions, they may only exercise that authority "in a timely fashion." *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014). The D.C. Circuit has described a "reasonable" period for reconsideration as something "measured in weeks, not years." *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977). They have not done so here, and their request should be rejected. *See infra* at 29.

Federal Defendants' "reevaluation" of the Project's COP approval is also prohibited by an

[16] It is notable that the Erdos Declaration's reading of § 1337(p)(4) mimics the reasoning in the Jorjani and Zerzan Opinions. And, not only have Federal Defendants not repudiated the Zerzan Opinion, they continue to pursue its effectiveness through an appeal of the *RENEW* preliminary injunction. *RENEW*, 2026 WL 1078282, *appeal docketed*, No. 26-1731 (1st Cir.).

injunction. In *RENEW*, the District of Massachusetts preliminarily enjoined Federal Defendants here from "re-evaluat[ing] agency action taken in reliance upon M-Opinion 37067." *See* Dkt. 34 at 3; *RENEW*, 2026 WL 1078282, at *4, *6 & n.2. That injunction applies to the Project because Intervenor Avangrid Power, LLC is a member of *RENEW* plaintiff organizations and the Project's COP approval was issued in reliance on M-Opinion 37067, which was then binding. Dkt. 34 at 1-2; Dkt. 34-3; NEW1844.0008-9, 1844.0167 (ROD and OCSLA Compliance Memo citing M-Opinion 37067).

Federal Defendants' only response (at 16) is that "[f]or the reasons given by the court in *Save Long Beach Island*, 2026 WL 2294613, at *5, the *RENEW* injunction, as modified by the *RENEW* court, is not an impediment to Interior's reconsideration of the COP approval here on remand." But the reasoning in *Save Long Beach Island, Inc. v. U.S. Department of Commerce* (*SLBI III*), No. 25-cv-2211, 2026 WL 2294613 (D.D.C. Aug. 10, 2026), which was not a summary judgment decision, does not hold here. *First*, unlike in *SLBI III*, where no party challenged BOEM's reconsideration as untimely, *see* 2026 WL 2294613 at n.3,[17] Intervenors vigorously contest Federal Defendants' reconsideration as untimely. And no party in *SLBI III* vigorously argued that Federal Defendants were enjoined from re-evaluating the approval because the approval "was taken in reliance" on the Anderson Opinion. *Second*, while Federal Defendants suggest otherwise, the *RENEW* court did not change the meaning of its original preliminary injunction memorandum when it clarified its injunction to incorporate a proviso that was already included in its memorandum opinion, No. 25-cv-13961, Dkt. 89 at 73—a fact that the parties did

---

[17] Remand in *Town & Cnty. of Nantucket v. Burgum*, No. 25-cv-906, 2025 WL 3120419 (D.D.C. Nov. 4, 2025), was granted months before the *RENEW* preliminary injunction and without any review of the administrative record. It is not relevant here given the stage of the case.

not raise and one that *SLBI III* failed to recognize.[18] Regardless of the factual circumstances of *SLBI III*, Federal Defendants' re-evaluation of the Project's COP approval, which relied on the Anderson Opinion, is preliminarily enjoined.

**2. There Is No Valid Basis for Remand, and any Remand Would Be Highly Prejudicial to Intervenors**

As discussed above, there is no legitimate basis to revisit the well-reasoned decision to approve the COP. BOEM's alleged reasons for seeking remand are pretextual and the Court should deny remand because Federal Defendants have not shown any "substantial and legitimate" concern with the agency's prior decision. In their motion (at 14-16) and in the Erdos Declaration, Federal Defendants point only to the existing environmental analysis, which BOEM considered at the time it issued the Project's COP approval and documented the reasons for compliance with § 1337(p)(4). *E.g.*, NEW1844.0028, 1844.0167, 1844.0178-79, 1844.0181-197. As discussed, *supra* Section III.C.2, Federal Defendants misconstrue or mischaracterize this detailed analysis and Federal Defendants (at 14-17) offer no explanation as to why remand is needed to consider something they have already considered. Courts have denied remand in similar circumstances. *See, e.g.*, *Am. Waterways Operators v. Wheeler*, 427 F. Supp. 3d 95, 96 (D.D.C. 2019) (rejecting voluntary remand for agency approval because it was "not a case where the agency merely overlooked an issue" but instead had held a public process where "commenters . . . articulated concerns" on the same issues remand would address). So too here. *Supra* Section III.C.2. The proper interpretation of § 1337(p)(4) is also a purely legal issue that must be decided by this Court—remand would only delay resolution of the case. *Loper Bright*, 603 U.S. at 389, 400.

---

[18] Indeed, left unchanged is the command that "Defendants are enjoined from . . . *re-evaluat[ing] agency action taken in reliance upon M-Opinion 37067* [Anderson Opinion]." *Compare* Order at 3, No. 25-cv-13961 (D. Mass. June 16, 2026), Dkt. 104, *with* Order at 3, No. 25-cv-13961 (D. Mass. Apr. 21, 2026), Dkt. 90 (same).

Further, ordering remand of BOEM's COP approval would significantly harm Intervenors' reliance interests and threaten Project viability. Dkt. 20 at 27-39. Remand is highly prejudicial after Intervenors have spent or otherwise committed nearly $725 million in developing the Project. Federal Defendants' adverse actions have and continue to cause delay in adjudicating the validity of the Project's permits, forcing Intervenors to incur tens of millions of dollars in added costs to resolicit, renegotiate, terminate or extend required contracts and revise the construction schedule, and threatening the Project's viability. *See* Second Declaration of Ken Kimmell, Dkt. 20-1 ¶¶ 34-39, 40-60 (explaining significant harms); Schneider Decl., Ex. C (Massachusetts agency June 30, 2026 letter).

This Court should uphold the validity of the Project's OCSLA approval based upon the administrative record and governing law. *See supra* Section III.C.

## E. The Record Demonstrates that BOEM Complied with the NHPA

### 1. BOEM Complied with the Requirements of NHPA Section 110(f)

The record demonstrates BOEM complied with the heightened procedural requirements of NHPA Section 110(f) and implementing regulations in planning and minimizing harm to the Nantucket NHL.[19] *Contra* Pls. MSJ 21-24; *see Nat'l Tr. for Historic Pres. v. Blanck*, 938 F. Supp. 908, 925 (D.D.C. 1996) (Section 110(f) is "procedural" and "does not affirmatively mandate the preservation of historic buildings or other resources"), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999). As an initial matter, in failing to make any arguments regarding BOEM's obligations under Section 106 of the NHPA, Plaintiffs (at 21-24) appear to misunderstand that NHPA Section 110(f)

[19] Intervenors disagree with Federal Defendants' position (Feds. MSJ 1, 14, 17) that this Court need not reach Plaintiffs' NHPA claims because Federal Defendants request remand of the COP approval. Plaintiffs' NHPA claims are ready for disposition, and the Court should grant summary judgment to Intervenors on Plaintiffs' NHPA claims for the reasons provided herein.

requirements are "specific to National Historic Landmarks"[20] and not applicable to cultural and historic resources and properties more broadly.[21] 54 U.S.C. § 306107 ("Planning and actions to minimize harm to National Historic Landmarks"). Under Section 110(f), where a proposed project "may directly and adversely affect" an NHL, the agency must "to the *maximum extent possible* undertake such planning and actions as may be necessary to *minimize harm to*" the NHL, and invite the Advisory Council and the Secretary of the Interior to participate in the NHPA consultation. *Id.*; 36 C.F.R. § 800.10(b)-(c). BOEM complied with these requirements.

As Plaintiffs acknowledge (at 21-22), based on the Project's planned location, BOEM conservatively determined that there would be adverse visual effects to the Nantucket NHL, which is located onshore more than 24 miles from the Project's closest proposed structure. NEW1032.0039 (Visual Impact Assessment), 1774.0001, 1774.0003-4, 1776.0020-21. Consistent with NHPA Section 110(f)'s requirements, BOEM invited the Advisory Council to participate in the consultation regarding the Nantucket NHL. NEW1774.0003, 2079.0001-2, 2082.0001-7 (Advisory Council). BOEM also invited NPS (the Secretary of the Interior's delegate) to participate in this consultation, sending materials to NPS throughout the consultation. NEW1773.0029, 1773.0045, 1774.0003-6, 2120.0001-3 (NPS), 2141.0001-3 (NPS), 2167.0001 (NPS).

The Project is located more than 24 miles from the Nantucket NHL. NEW1032.0039. As a result, the Project's turbines "would not be visible from approximately 80 percent of the [NHL]" "and meteorological conditions would often obscure the view of the proposed Project[.]"

[20] An NHL is defined as "a historic property that the Secretary of the Interior has designated a National Historic Landmark." 36 C.F.R. § 800.16(p).
[21] Plaintiffs have waived arguments relating to NHPA Section 106, but to the extent this Court may find Plaintiffs raised them, they are addressed below in Section III.E.2.

NEW1773.0034-35 (findings of effect), NEW1032.0098-100, 103, 106, 109 (showing visual simulations). Nonetheless, to the "maximum extent possible" BOEM undertook "planning and actions" to "minimize harm" to this NHL, considered alternatives, and included in the MOA extensive, binding measures to mitigate and minimize adverse effects to aboveground historic properties within the Project's visual area of potential effects, including the Nantucket NHL, NEW1774.0004, 1774.0006, 1774.0008-9 (MOA); NEW1184.0002-3, 1184.0005, W1184.0075-80, 1187.0002-3, 1187.0005, 1187.0075-80 (Conditions of COP Approval); NEW1775.0377-403 (alternatives analysis), 1776.0020-21.[22] To reduce visual impacts, the mitigation measures require: (1) "non-reflective white and light gray paint on offshore structures"; (2) "navigational lighting that minimizes the visibility of the Project from the NHL"; (3) "uniform turbine design, speed, height, and rotor diameter to reduce visual contrast and decrease visual clutter"; (4) "uniform [turbine] spacing of 1 nautical mile (1.15 mile) by 1 nautical mile (1.15 mile) in the north-to-south and east-to-west direction to decrease visual clutter"; and (5) lighting and marking the turbines and electric service platforms "in accordance with Federal Aviation Administration and U.S. Coast Guard lighting standards . . . to reduce light intrusion." NEW1774.0006, NEW1774.0008-9. Nothing more was required under Section 110(f). *Pres. Soc'y of Newport Cnty. v. Burgum* (*PSNC*), No. 23-cv-03510, 2026 WL 787910, at *16-18 (D.D.C. Mar. 20, 2026); *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 64 (1st Cir. 2006).

Plaintiffs' attempts (at 22-24) to downplay the minimization and mitigation measures required in the MOA are contradicted by the record.[23] For instance, painting turbines off-

[22] Plaintiffs erroneously rely on a draft version of the MOA included in an appendix to the Project's FEIS. Pls. MSJ 21-22 (citing NEW1776.0690). The fully executed MOA, including its attachments, is in the administrative record at NEW1774.0001-328.

[23] Plaintiffs' reliance (at 23 n.35) on *National Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019), is misplaced as the portion of that decision Plaintiffs rely on actually

white/light grey is effective because the color reduces the contrast "between the [turbines] and the background[,]" which greatly reduces "the percentage of the time the structures might be visible[.]" *E.g.*, NEW1774.0131-2. Further, ADLS will "reduce the duration of nighttime lighting," activating aviation warning lights only when airplanes are nearby and reducing "nighttime visibility of the Project" for adversely affected historic properties "to less than 13 minutes annually (or less than 0.1 percent of annual nighttime hours)." NEW1774.0009; *see also* NEW1773.0042. BOEM concluded the Project will be visible from the Nantucket NHL only " approximately 14 percent of the time," including "nearly 0 percent at night due to use of ADLS." NEW1773.0035. Importantly, "NPS has verified that ADLS will be installed on the [Project's turbines]" and stated "[t]his is one of the best ways to reduce lighting impacts to the setting and feeling of historic properties." NEW2042.0001-2 (NPS Comment). Plaintiffs (at 23-24) offer no basis for mere disagreement with these reasonable conclusions by expert agencies or for their request that this Court second-guess these determinations which are entitled to deference, *see PSNC*, 2026 WL 787910, at *14-18 (rejecting similar "attempt[s] to downplay the significance of evidence like [the Section 110(f) consultation] or the mitigation measures adopted in the MOA" for another offshore wind project and finding it "logical that, as part of its Section 110(f) planning, BOEM would evaluate the visual impacts of the turbines at the proposed distance and adjust as necessary to minimize adverse effects"). Plaintiffs' remaining arguments (at 23-24) about the Tribe's requests and the Nantucket mitigation fund agreement are misplaced. The Tribe is located

---

analyzed whether a project had sufficient environmental impacts under NEPA to require an EIS. 916 F.3d at 1083-87. Here, by contrast, an EIS was completed for the Project. And unlike in *Semonite*, the mitigation measures at issue here require specific actions. *See id.* at 1087. *South Fork Band Council of Western Shoshone of Nevada v. U.S. Department of the Interior*, 588 F.3d 718, 727 (9th Cir. 2009), which Plaintiffs cite (at 24), is also a NEPA case. Unlike the language Plaintiffs cherry-pick from that case, here, the MOA (including attachments) and Finding of Adverse Effect evaluated the minimization and mitigation measures adopted in the MOA.

on Martha's Vineyard, not Nantucket. Washington Decl. ¶¶ 1, 12-15; *see* NEW1775.0018, 37 (Nantucket and Martha's Vineyard miles apart). Plaintiffs have not offered any Tribal comments related specifically to the Nantucket NHL. *See* Washington Decl. ¶ 15.

Plaintiffs (at 24) complain generally about monetary investments in support of protecting cultural resources, including the mitigation fund agreement for the Nantucket NHL. But they ignore that a key feature of the agreement prohibits building any turbines closer to the Nantucket NHL in addition to other non-monetary mitigation. NEW1840.0004. In any event, as the MOA demonstrates, all MOA signatories, including the Advisory Council and the Massachusetts SHPO, agreed that the minimization measures in the Project's COP and Historic Resources Visual Effects Assessment were sufficient to minimize the Project's visual impacts to the NHL for Section 110(f) purposes. NEW1774.0006, 1774.0026, 1840.0004, 4543.0001; *see also* 36 C.F.R. § 800.6(c) (MOA "executed and implemented pursuant to this section evidences the agency official's compliance with section 106 and this part[,]" including the section 110(f) regulations). This Court should grant Intervenors summary judgment on Plaintiffs' NHPA Section 110(f) claims.

### 2. BOEM Complied with the Requirements of NHPA Section 106

While the Complaint alleged violations of NHPA Section 106, Compl. ¶ 166, Plaintiffs (at 21-24) do not raise these arguments in their Motion, and any such arguments are waived. *E.g.*, *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 72 (D.D.C. 2014) ("[A] plaintiff's failure to raise arguments or theories in its motion for summary judgment results in waiver of those arguments."). Nonetheless, the record demonstrates that in approving the Project, "BOEM complied with the statute and governing regulations at each step" of the NHPA Section 106 process, which is purely procedural. *See PSNC*, 2026 WL 787910, at *1, *12; *Nat'l Tr. for Historic Pres.*, 938 F. Supp. at

918 ("Section 106 is universally interpreted as requiring agencies to consult and consider and not to engage in any particular preservation activities per se.").

In particular, BOEM: (1) initiated the Section 106 process including identifying and engaging the relevant consulting parties and developing plans to involve the public; (2) identified historic properties in the Project's area of potential effects; (3) assessed whether these properties would be adversely affected; and (4) resolved adverse effects to historic properties, coordinating with the consulting parties to develop and adopt measures to avoid, minimize, and mitigate adverse effects to historic properties. NEW1773.0001-48 (findings of effect), 1774.0001-1774.0014 (MOA documenting BOEM's compliance with Section 106 process). As part of this process, BOEM addressed the input received from federally recognized tribes and other consulting parties. Among other things, BOEM considered concerns raised by the Tribe in five consultation meetings, Government-to-Government consultations, and comments and letters from the Tribe. *See, e.g.*, NEW1774.0006, 1839.0001-4, 1964.0001-12, 1966.0001-14, 1968.0001-9, 1970.0001-16, 2237.0001-42, 2261.0001-7. Although BOEM did not agree to all comments the Tribe proffered, the record demonstrates that BOEM fully considered the Tribe's input during the Section 106 process, recognized the special expertise of Tribal Nations (including Indigenous Knowledge), and revised the MOA accordingly. *See, e.g.*, NEW1774.0002, 1774.0010, 1774.0022, 1839.0001-4, 1991.0001-2, 1994.0001-29, 2282.0001-10. "[I]n response to feedback from Tribal Nations during consulting party meetings[,]" the Project also "increased funding amounts[.]" NEW1994.0016. Nothing more is required.

The MOA requires avoidance, minimization, and mitigation measures to resolve adverse effects (including visual effects) to cultural and historic resources and properties, including nearly $3 million for historic property mitigation and a requirement that the Project "provide reasonable

compensation, if requested by a Tribal Nation, for participation in the implementation of the [Historic Property Treatment Plans]" attached to the MOA. NEW1774.0007-14, 1774.0327. As noted, the Section 106 consultation process culminated in BOEM "execut[ing] and implement[ing]" a MOA, documenting the signatories and invited signatories' agreement that "adverse effects will be resolved in the manner set forth in [the] MOA[.]" NEW1774.0006; 36 C.F.R. § 800.6(c). BOEM complied with the NHPA. *See PSNC*, 2026 WL 787910, at *12-16 (upholding BOEM's NHPA Section 106 consultation for offshore wind project).

### F. The Record Demonstrates that NMFS Complied with the MMPA

Plaintiffs allege (at 25-37) that NMFS violated the MMPA when approving the LOA[24] for non-lethal take by the Project because Plaintiffs disagree with NMFS's "small numbers" and "negligible impact" findings. NMFS complied with the MMPA by engaging in a thorough scientific assessment, evaluating the issues raised, and providing a reasoned basis for its decisions. Its highly technical determinations are "presume[d] . . . valid" and entitled to deference. *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) (upholding agency's negligible impact finding); *Huls Am. Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996) (Courts "will give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise."). The Court should not second-guess NMFS's reasoned scientific judgments.

#### 1. NMFS's "Small Numbers" Determination Was Reasonable

NMFS's "small numbers" determination was reasonable, consistent with the MMPA, and supported by an administrative record that includes conservative assumptions of potential impacts

[24] Neither Plaintiffs' Complaint nor their Motion requests specific relief with respect to the Project's ITR. The Court should grant none.

on marine mammals. Under the MMPA, NMFS may authorize an applicant engaged in specific activities to incidentally "take" "small numbers of marine mammals of a species or population stock" over a maximum period of five years if NMFS determines the overall take "during [the] period concerned will have a negligible impact on such species or stock[.]" 16 U.S.C. § 1371(a)(5)(A)(I). NMFS then issues regulations delineating "methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat" and "requirements pertaining to the monitoring and reporting of such taking." *Id.* § 1371(a)(5)(A)(II). The MMPA does not define "small numbers" quantitatively. *Melone v. Coit*, 100 F.4th 21, 31-32 (1st Cir. 2024). To implement this direction, NMFS adopted a "proportional approach" to assessing "small numbers," which courts have upheld, whereby the agency "compares the number of individuals taken to the most appropriate estimation of abundance of the relevant species to determine whether the authorized take is limited to small numbers of that species." *Id.* at 30; *see also Save Long Beach Island v. U.S. Dep't of Com.* (*SLBI I*), 794 F. Supp. 3d 273, 323 (D.N.J. 2025); NMFS70993.

Contrary to Plaintiffs' suggestion (at 26-27), there is no 12% threshold for determining "small numbers." Plaintiffs' claim that such a threshold exists rests on *dicta* in *NRDC v. Evans*, 232 F. Supp. 2d 1003 (N.D. Cal. 2002), which courts have found does not impose a bright-line rule. "[T]he focus of *Evans* was not on whether 12% of the total population was a reasonable definition of 'small numbers,' but rather, whether the agency has properly considered what constituted 'small numbers' separately from its 'negligible impact' analysis." *Melone v. Coit*, No. 1:21-cv-11171, 2023 WL 5002764, at *22 (D. Mass. Aug. 4, 2023), *aff'd*, 100 F.4th 21 (1st Cir. 2024). Unlike in *Evans*, NMFS properly considered these concepts separately, determining take "to be of small numbers" "[w]hen the predicted number of individuals to be taken *is less than one-*

*third* of the species or stock abundance." NMFS70993 (ITR). Plaintiffs (at 27) wrongly claim that NMFS's one-third upper limit is incongruous with "NMFS' own precedent," ignoring the consistency with NMFS's small numbers analysis in other contexts, including oil and gas development. NMFS70928 (ITR citing 86 Fed. Reg. 5322). Plaintiffs advance the same theory that was rejected in *SLBI I*, where the court recently upheld NMFS's similar "small numbers" analyses for other offshore wind MMPA authorizations that also relied on the one-third threshold. 794 F. Supp. 3d at 325. This Court should also "defer[] to and credit" NMFS's "highly technical expertise" and uphold NMFS's small numbers determination. *Id.* at 325, 327.

NMFS's authorization of an annual take of 17.65% and 28.54% for the NARW and common dolphin, respectively, is both reasonable under the MMPA's "small numbers" requirement and entitled to deference. *Contra* Pls. MSJ 29; *see SLBI I*, 794 F. Supp. 3d at 327.[25] Based on its extensive analysis, NMFS concluded "small numbers of marine mammals would be taken relative to the population size of the affected species or stocks." NMFS70994. In reaching this conclusion, NMFS relied on many conservative assumptions. NMFS70993; *see also* NMFS70929-30, 49, 52, 56, 60, 80 (describing other conservatisms incorporated into NMFS's take analyses). NMFS has not authorized any lethal take here, *supra* at 7, and its "small numbers" determination is well supported by the record and consistent with MMPA requirements. "Plaintiffs have failed to meet their heavy burden to show" NMFS's "small numbers" determination was "arbitrary and capricious[.]" *See SLBI I*, 794 F. Supp. 3d at 328.

### 2. NMFS's "Negligible Impact" Determination was Reasonable

Plaintiffs' (at 29-37) arguments about deficiencies in NMFS's negligible impact

[25] Plaintiffs rely on *Loper Bright* to suggest NMFS is not entitled to deference. Pls. MSJ 28-29. But even post-*Loper Bright*, agencies have "substantial discretion" when they are making the types of "predictive and scientific judgments" at issue here. *Seven Cnty.*, 605 U.S. at 181-82.

determination also fail. A "negligible impact" is "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103. A negligible impact finding "only" violates the APA "if the agency . . .entirely failed to consider an important aspect of the problem[.]" *Ctr. for Biological Diversity*, 588 F.3d at 710.

Given the anticipated impacts, proposed mitigation, and other information provided, NMFS concluded that "the specified activities are not expected to result in impacts on the reproduction or survival of any individuals, [or] affect annual rates of recruitment or survival" and thus "that the take (by harassment only) that may be authorized would have a negligible impact on all of the species and stocks addressed." NMFS70991-92. NMFS's negligible impact determination is entitled to deference. *Ctr. for Biological Diversity*, 588 F.3d at 707, 711.

Plaintiffs (at 30) are wrong that NMFS's negligible impact analysis failed to consider cumulative effects. To start, as other courts have recognized, neither the MMPA nor its implementing regulations require NMFS to conduct a cumulative effects assessment in its "small numbers" or "negligible impact" determinations. *SLBI I*, 794 F. Supp. 3d at 326, 329-30 (neither the MMPA nor NMFS's regulations "requir[e] NMFS to assess take numbers based on activities outside of the scope of each individual application"); NMFS70928. Nonetheless, NMFS's negligible impact determination considered "other past and ongoing anthropogenic activities via their impacts on the baseline[.]" NMFS70928. Other courts have upheld this rationale. *Melone*, 100 F.4th at 33 (plaintiff "misse[d] the mark" in arguing NMFS "failed to consider the cumulative effect on right whales" because NMFS considered effects in "its negligible impact analysis"); *SLBI I*, 794 F. Supp. 3d at 325-26 (holding that neither MMPA nor implementing regulations require cumulative effects analysis, but NMFS considered effects in its negligible impact analysis).

The record also contradicts Plaintiffs' claims (at 30-31) that Level A[26] takes of NARWs (of which none were requested or authorized) are underestimated. NMFS70961. Instead, NMFS conservatively overestimated takes levels across species, including for NARWs, relying on modeled estimated takes that "do not account for mitigation (except with respect to assuming attenuation and seasonal restrictions)"; thus, NMFS concluded "it is reasonable to assume the model overestimates Level A harassment" for those species for whom Level A harassment is permitted. NMFS70921. For the NARW, where only Level B take is permitted, NMFS provided that the suite of required mitigation measures are "designed to reduce impacts to [NARWs] to the maximum extent practicable" and that these measures will "ensure that the number of takes by Level B harassment that are estimated to occur are not expected to affect reproductive success or survivorship." NMFS70985-86. NMFS's analysis also likely overestimates takes because it did not consider "avoidance", despite scientific literature that suggests that "marine mammals are likely to avoid loud noises[.]" NMFS70921. Nonetheless, NMFS's approval requires that "if at any time during the Project Avangrid becomes aware of any issue or issues which may . . . call into question the validity of any measured Level A harassment or Level B harassment isopleths to a significant degree," the Project must inform NMFS "within one business day of becoming aware . . . or before the next pile is driven, whichever comes first." NMFS70935.

Plaintiffs allege (at 32-37) a hodgepodge of concerns with the mitigation measures that NMFS required in the Project's approval, ignoring that the record addresses each of these issues.[27] The MMPA requires NMFS to establish permissible take methods "and other means of effecting

[26] The difference between "Level A Harassment" (potential to injure) and Level B Harassment (potential to disturb) is defined in 50 C.F.R. § 216.3. Neither authorizes lethal take.

[27] Plaintiffs' reliance on *Sierra Club v. NMFS*, 797 F. Supp. 3d 440 (D. Md. 2024), and *Center for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139 (D. Ariz. 2002), is unpersuasive as both of these cases address a different statute (the ESA), not authorizations issued under the MMPA.

the least practicable adverse impact [.]" 16 U.S.C. § 1371(a)(5)(A). In evaluating whether the Project's mitigation measures met this standard, NMFS considered several factors, including whether successful implementation of the measures is expected to reduce impacts and the practicability of the measures being implemented. NMFS70969.

NMFS adequately explained why each of the mitigation measures Plaintiffs attack are appropriate, including seasonal restrictions on pile driving and drilling, which NMFS has identified as "[t]he most significant measure to minimize impacts to individual [NARWs][.]" NMFS70908, 70917, 70970, 70986; *see also* NMFS1766, 70932, 70933, 70940, 70961, 70969, 70971, 70975-77, 70972-73, 70981, 70986 (analyzing measures Plaintiffs attack). These measures "are consistent with those required and successfully implemented under previous ITAs issued in association with in-water construction activities[,]" NMFS70969, and courts have found them appropriate to rely on in determining there would be no Level A harassment to NARWs, *Melone*, 100 F.4th at 27 (upholding NMFS's determination that no Level A harassment of NARWs would occur where NMFS required similar measures); *see also SLBI I*, 794 F. Supp. 3d at 291-95 (upholding MMPA approvals where projects were required to implement similar measures).

Plaintiffs' other (at 32-33) concerns about NMFS's mitigation measures do not amount to an MMPA violation. They ignore that NMFS's regulations permit adaptive management and that NMFS found this component "valuable and necessary" to protect marine mammals. NMFS70917, 70979. Plaintiffs' critique of the limitations of Passive Acoustic Monitoring and Protected Species Observers "disregards that . . . NMFS is requiring a suite of mitigation measures, of which" these are only one "aspect." *Melone*, 2023 WL 5002764, at *26.[28] Plaintiffs have not come close to

[28] Plaintiffs also wrongly assert (at 35) that NMFS failed to acknowledge how limitations on visual monitoring affected its take estimates. NMFS acknowledged these limitations, given the larger size of these areas, and provided that as a result NMFS "cannot reduce or refine the take estimates

meeting their "high burden." *SLBI I*, 794 F. Supp. 3d at 329.

## G. The Record Demonstrates NMFS and BOEM Complied with the ESA

### 1. NMFS's No Jeopardy Determination for the NARW Was Reasonable and Well-Supported

Contrary to Plaintiffs' claims (at 38-41), NMFS properly found that the Project is not likely to jeopardize the continued existence of the NARW. NMFS used the best scientific information available and engaged in a thorough and vigorous scientific assessment in the 748-page BiOp supported by the record. *See* NMFS1954-2026; *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1090 (D.C. Cir. 2021) (finding deference especially high where, as here, a court is "reviewing a scientific analysis within its area of expertise").

In objecting to NMFS's conclusion that the Project will "harass" up to 101 individual NARWs, Plaintiffs (at 38-39) improperly conflate the ESA concepts of "harm" and "harassment." As NMFS explained, under the ESA, "harm" and "harassment" have different meanings, with "harm" defined as "actually kill[ing] or injur[ing] fish or wildlife." NMFS1748-49, 2003. The harassment here will not cause actual harm or long-term impairment to this species' survival and recovery. NMFS2000-05. NMFS determined that the only adverse effects to NARWs expected from the Project "are [] temporary behavioral disturbance and/or temporary threshold shift (minor and temporary hearing impairment)[,]" including "masking and stress" from "exposure to noise during foundation installation . . . and UXO detonation[.]" NMFS2002-03. NMFS also determined that the Project will not "affect the abundance of[,]" "cause there to be fewer[,]" or affect or reduce the reproduction of NARWs. NMFS2004-05. Instead, the only effects to the distribution of NARWs will be minor changes in the movements of individuals exposed to

based on the Level B harassment thresholds in consideration of the effectiveness of the clearance or shutdown zone." NMFS1767.

foundation installation noise, resulting in ESA take by harassment. *Id.* Thus, NMFS reasonably concluded that "these effects [to the NARW] do not meet the ESA definition of harm" as "[n]o harm, injury (auditory or other), serious injury, or mortality is expected due to exposure to any aspect of the proposed action during the [lifetime] of the project." NMFS2003.

Plaintiffs argue that NMFS's "no jeopardy" determination impermissibly relies on mitigation measures that are "uncertain, deferred, or unproven." Pls. MSJ 38. Not so.[29] The BiOp considers an extensive and binding suite of mitigation measures, which are incorporated as part of the Project's approvals in the Conditions of COP Approval and/or as requirements under the ITR and LOA, and fully and rationally explains why the Project will not jeopardize the NARW. *See* NMFS1757-68 (BiOp); NEW1184.0036-67, 1187.0036-67 (COP Conditions of Approval, Section 5 "Protected Species and Habitat Conditions"); NMFS70903-15 (ITR Decision Memo); NMFS71026-48 (LOA). Among many other measures to avoid, minimize, or monitor impacts to whales during the Project, the BiOp requires the following:

- **Seasonal construction.** Pile driving may not occur between November and April, when NARW densities in the Project area are highest. NMFS1757, 2206.
- **Noise reduction and verification.** The Project must use sound attenuation devices to reduce the decibel level of turbine installation, as well as verify their functioning. NMFS1757-58, 2170-71. It must also cap the strength levels used by its pile drivers and conduct "soft starts" to alert any nearby whales without harm. NMFS1767-68, 2206.

[29] Plaintiffs' assertion is simply wrong. For example, the BiOp notes that "sound field verification" ("SFV") will be required for the Project and that in developing the BiOp, NMFS reviewed SFV reports from the nearby South Fork Wind and Vineyard Wind projects, the results of which indicated that the required bubble curtains and sound attenuation systems are effective. NMFS1731, 1733.

- **Visual and acoustic monitoring and, if necessary, clearance and shutdown.** The Project must employ observers and acoustic monitoring to detect the potential presence of whales prior to construction activities and may not pile drive when conditions prevent adequate visibility. When whales are detected, construction must cease. NMFS1758-67.
- **Vessel strike avoidance.** All Project vessels must employ lookouts and observe speed limits to prevent collisions with whales. NMFS1842-43.
- **Incidental Take Statement ("ITS") measures.** The Project's ITS[30] also identifies additional reasonable and prudent measures as well as additional terms and conditions to minimize the authorized non-jeopardizing impacts to listed species, including NARWs. NMFS2027-61.

As the BiOp explains, with these measures in place, NMFS "do[es] not expect any actual harm, injury (auditory or otherwise), serious injury, or mortality of any right whale" from the Project. NMFS2003-04. These measures are binding and enforceable. *See, e.g.*, NMFS2027-8. The BiOp's no-jeopardy determination and its mandatory mitigation measures are not arbitrary and capricious. Further, though Plaintiffs claim (at 43) that BOEM violated the ESA, they do so only by reference to BOEM's reliance on NMFS's BiOp rather than alleging any independent ESA violation by BOEM. Because the BiOp was not arbitrary and capricious, BOEM's reliance on it was lawful. *See City of Tacoma v. FERC*, 460 F.3d 53, 75-76 (D.C. Cir. 2006).

### 2. NMFS Relied on the Best Available Data and Science

Contrary to Plaintiffs' claims (at 39-43), NMFS relied on the best available data and science in its ESA consultation. 16 U.S.C. § 1536(a)(2). Its findings are entitled to deference.

[30] The ITS is incorporated in the BiOp as Section 11. NMFS2027-61; *see also* 16 U.S.C. § 1536(b)(4)(B)-(C); 50 C.F.R. § 402.14(i) (Feb. 2024). Portions of the ESA implementing regulations have been revised since the BiOp's issuance. Intervenors cite the version of the ESA regulations that were in effect when the BiOp was issued.

*Oceana, Inc. v. Ross*, 321 F. Supp. 3d 128, 142 (D.D.C. 2018) (Courts "give great deference where an agency exercises its scientific expertise in interpreting and applying the best data available.").

Plaintiffs' argument (at 39-41) that gaps in the quantitative data NMFS considered regarding the Project's long-term impacts on NARWs renders the BiOp unlawful fails because it misconstrues the ESA's standard. The relevant inquiry is whether the agency relied on the "best data available[,]" under which NMFS "has no obligation to conduct independent studies and tests to acquire the best possible data" and, instead, the agency is merely prohibited from "disregarding available scientific evidence that is in some way better than the evidence [NMFS] relies on." *Oceana*, 321 F. Supp. 3d at 142 (emphasis in original). Indeed, the D.C. Circuit has recognized that "[e]ven if the available scientific and commercial data were quite inconclusive, [an agency] may—indeed must—rely on it[.]" *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000) (interpreting analogous language in 16 U.S.C. § 1533(b)(1)(A)). Plaintiffs "have pointed to no data that was omitted from consideration," and NMFS's recognition that certain data is not yet available or is inconclusive does not render its findings arbitrary or capricious. *Bldg. Indus. Ass'n of Super. Cal. v. Norton*, 247 F.3d 1241, 1245-46 (D.C. Cir. 2001).

Plaintiffs' claim (at 41-43) that NMFS improperly rejected Stöber and Thomsen as the best available data on operational noise, and instead relied on Elliot is belied by the record. As NMFS explained, there were various "shortcomings with modeled predictions in Stober and Thompsen *[sic]*," including that the study did not directly measure operational noise from wind turbines, as the Elliot study did. NMFS1740. Instead, Stöber and Thomsen attempted to predictively model noise using data from heterogenous sources at varying water depths from different turbine models—an approach its authors admitted created "unresolved uncertainty in their methods[.]" *Id.* In contrast, NMFS found that Elliot "is the *only* available data on in-situ measurements of

underwater noise from operational direct-drive turbines" like those the Project would use. *Id.* NMFS acknowledged that Elliot relied on smaller turbines, but noted that "numerous scientific papers, including . . . Stober and Thompsen *[sic]* 2021, that predict greater operational noise from larger turbines note that operational noise is less than shipping noise; this suggests that in areas with consistent vessel traffic, such as the [Project's] lease area, operational noise may not be detectable above ambient noise and, therefore, would be unlikely to result in any behavioral response by any whale[.]" NMFS1740.[31] This finding is based on NMFS's expert scientific assessment, and this Court should decline to disturb it. *See Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983). Plaintiffs' ESA claims fail.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully ask the Court to grant Intervenors' cross-motion for summary judgment and deny Plaintiffs' motion for summary judgment and Federal Defendants' cross-motion for summary judgment on OCSLA and NHPA claims, as well as Federal Defendants' request for remand of the Project's COP approval.

Dated: November 3, 2026

Respectfully submitted,

*/s/ Janice M. Schneider*

Janice M. Schneider (D.C. Bar No. 472037)
Devin M. O'Connor (D.C. Bar No.1015632)
De Vann S. Sago (D.C. Bar No. 1742848)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
Email: janice.schneider@lw.com
Email: devin.o'connor@lw.com

[31] Similarly, Plaintiffs' concern (at 42) that the FEIS "discard[ed] Stober and Thomsen in favor of Elliot" is misplaced. The FEIS analyzes the Stöber and Thomsen study and explains that the study's predictions are based on a "likely inappropriate" "linear extrapolation of maximum received [sound] levels from [turbines] with ratings up to 6.15 MW[.]" NEW1776.0107.

Email: devann.sago@lw.com

*Attorneys for Defendant-Intervenors Avangrid Power, LLC, Park City Wind LLC, and Commonwealth Wind, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 3, 2026, I filed the foregoing electronically through the Court's CM/ECF system, which caused notice to be sent to the parties of record.

*/s/ Janice M. Schneider*
Janice M. Schneider