# EXHIBIT B

LAW OFFICE OF THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

January 13, 2025 ***BY E-MAIL AND CERTIFIED MAIL***

Gina M. Raimondo, Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Ave NW
Washington, DC 20230
secyraimondo@doc.gov

Elizabeth Klein, Director
Bureau of Ocean Energy Management
1849 C Street, NW
Washington, D.C. 20240
elizabeth.klein@boem.gov

Benjamin Friedman, NOAA Administrator
National Oceanic and Atmospheric Administration
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230
benjamin.friedman@noaa.gov

Richard W. Spinrad, Under Secretary of Commerce for Oceans and Atmosphere & NOAA Administrator
National Oceanic and Atmospheric Administration
1401 Constitution Avenue NW, Room 5128
Washington, DC 20230
Richard.Spinrad@noaa.gov

The United States Army Corps of Engineers
Lieutenant General, Scott A. Spellmon
Commanding General of the United States Army Corps of Engineers
441 G Street, NW
Washington, DC 20314-1000
Scott.A.Spellmon@usace.army.mil

The United States Environmental Protection Agency
Michael S. Regan, Administrator
Office of the Administrator
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460
Mail Code 1101A
Regan.Michael@epa.gov

LAW OFFICE OF THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

The United States Coast Guard
Commandant of the Coast Guard
Admiral Linda L. Fagan
US Coast Guard Stop 7318
2703 Martin Luther King Jr. Ave, SE
Washington, DC 20593-7318
NationalCommandCenter@uscg.mil

Deb Haaland
Secretary of the Interior
1849 C Street, NW
Washington, DC 20240
secyhaaland@doi.gov
feedback@ios.doi.gov

Janet Coit
Assistant Administrator, NOAA Fisheries
1315 East-West Highway
Silver Spring, MD 20910
janet.coit@noaa.gov

*Re: 60-Day Notice of Intent to Sue: Violations of Endangered Species Act Section 7 – Legally Deficient Biological Opinion for New England Wind Offshore Energy Project (Lease OCS-A 0534) and Related Incidental Take Authorization and Incidental Harassment Authorization*

To whom it may concern:

This Law Office represents ACK For Whales ("ACK") whose members live and/or own property in Nantucket and nearby areas, and will be harmed by way of New England Wind Offshore Energy Project.

This letter concerns, specifically, the New England Wind Offshore Energy project (hereinafter, "Project"). As delineated in the recently issued Biological Opinion for the project, this project is a conglomerate, comprising Park City Wind and Commonwealth Wind. *"The applicant and lessee, Park City Wind, LLC, a wholly owned subsidiary of Avangrid Renewables, LLC, is proposing to construct, operate, and eventually decommission a commercial-scale offshore wind energy facility within Lease Area OCS-A 0534 and potentially a portion of Lease Area OCS-A 0501 across two phases. Phase 1, termed Park City Wind, would consist of between 41-62 wind turbine generators, one to two electrical service platforms, and associated inter-array cabling as well as export cabling to bring electricity to land. Phase 2, known as Commonwealth Wind, would consist of up to 88 wind turbine generators, up to three electrical service platforms,*

S LAW OFFICE OF THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

*and associated inter-array cabling as well as export cabling to bring electricity to land. Across the two phases, a total of up to 132 foundations will be installed."*[1]

The National Marine Fisheries Service/NOAA Fisheries ("NMFS") issued a Biological Opinion ("BiOp") for the Project on February 16, 2024, authorizing the "take" a variety of federally-listed species that reside in or use the Project Area, as that term is defined in the BiOp. Among the listed species for which take authority was granted is the North Atlantic right whale ("NARW"), one of the most endangered, imperiled animals in the world. Notwithstanding the NARW's declining population and celeritous peregrination toward extinction, the BiOp incredibly determined that the Project will not jeopardize the species. As explained infra, this determination is unsupported by the available evidence and thus is arbitrary and capricious, resulting in the contravention of the Endangered Species Act (ESA).

This Law Office has reviewed the 2024 BiOp scrupulously, on behalf of ACK For Whales, and determined that it fails to attain the legal requirements in the ESA, as interpreted and applied by available jurisprudence. Therefore, pursuant to ESA, 16 U.S.C. § 1540(g)(2)(A)(i), ACK For Whales hereby provides the following 60-Day Notice of Intent to Sue NMFS and BOEM 60-days over the BiOp. If NMFS and BOEM fail to rectify the deficiencies and defects adumbrated infra within the 60-day notice period, ACK For Whales will proceed to file an action in federal district court seeking an order declaring the BiOp invalid and contrary to law.

The ESA stipulates, "each Federal agency shall, in consultation with and with the assistance of the Secretary, **ensure that any action** authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") **is not likely to jeopardize the continued existence of any endangered species or threatened species** or result in the destruction or adverse modification of habitat of such species . . .[emphasis added]." 16 USCS § 1536(a)(2). See, e.g., *Sierra Club v. United States Army Corps of Eng'rs*, 645 F.3d 978 (8th Cir. 2011). The acting agency, BOEM, is required to consult with the agency which possesses jurisdiction over the listed species (here, the NARW is an endangered marine mammal, this implicates the jurisdiction of the NMFS), and if evidence exists indicating that the proposed action may adversely affect the listed species, NMFS must prepare a BiOp. If the BiOp concludes that the proposed action is likely to jeopardize a listed species or adversely modify a critical habitat, then NMFS must proffer reasonable and prudent alternatives in attempt to mitigate the proposed action. If NMFS concludes no jeopardy, it must issue an incidental take statement specifying the terms and conditions under which the species may be taken. "If . . . the Biological Opinion concludes that no jeopardy or adverse habitat modification will result, or if it offers reasonable and prudent alternatives, the Service must issue a written statement (known as the "Incidental Take Statement") specifying the terms and conditions under which an agency may take the species. § 1536(b)(4)." *Bennett v. Spear*, 520 U.S. 154 (1997).

And note that pursuant to 16 USCS § 1536(a)(1), "Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes

[1] https://repository.library.noaa.gov/view/noaa/60610

LAW OFFICE OF
THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

of this Act by carrying out programs for the conservation of endangered species." Consultation with the NMFS is an integral part of this, and as such, abdication of the NMFS duty to prepare a legally adequate BiOp will likely have significant ramifications as to the listed species (here, NARW).

Finally, when preparing a biological opinion, NMFS must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 CFR Part 402.14(g)(8). Moreover, as violations of the ESA are adjudged through the vehicle of the Administrative Procedures Act ("APA"), agency actions are deemed arbitrary and capricious when they "rely on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency." *Conservation Cong. v. United States Forest Serv.,* 720 F.3d 1048 (9th Cir. 2013). Furthermore, the best data available stipulation obviates an agency from "disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006). The agency must "not ignore available biological information." Id. at 1080-81 (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988). ACK For Whales contends that the NMFS has in fact abdicated its duty in adequately considering numerous risks augmented by the project related to the NARW. As such, the BiOp was issued in violation of the ESA.

**Substantive Defects in the Biological Opinion**

1. The BiOp entirely ignores and fails to analyze the statistically anomalous increase in whale strandings in the NJ/NY Bight from late 2022-through 2023. The lack of acknowledgement that the pre-construction activities have likely caused problems is concerning, and substantially decreases confidence that objective analysis is being performed on the construction and operational phases. To the extent the agencies believe the spate of whale deaths is unrelated to the marine site characterization activities, the BiOp does not posit any alternative explanations of those strandings. This deficiency in analysis is significant, and arbitrary and capricious.

2. With respect to such events, the BiOp does not include a critical measure that it does require for offshore wind shallow hazard surveys for offshore oil and gas development. NOAA authorizations for Gulf of Mexico surveys require survey shutdowns in the event of a live stranding or near shore atypical milling of marine mammals within 50 kilometers of the survey operations, and potential investigations if "NMFS determines that the circumstances of any marine mammal stranding found in the vicinity of the activity suggest investigation of the association with survey activities is warranted" (https://www.fisheries.noaa.gov/s3/2023-08/ExxonMobil-GOMLOA-LOA-OPR1.pdf, p.

LAW OFFICE OF THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

12 of 14). This BiOp therefore applies an arbitrary double standard for offshore wind versus oil and gas development, even though the noise emanating from the devices used in the horizontal direction where most of the animals are, are similar.

3. The BiOp fails to analyze an important, and perhaps the most important, aspect of the underwater noise problem. It does not include a cumulative wind project assessment from the NJ/NY Bight area to New England's offshore waters of the significantly increased operational turbine noise impacts from these large gearbox turbines, which will likely block the migration of the NARW, as well as fin and humpback whales that frequent the lease area. The BiOp also fails to analyze the cumulative impact/effect of HRG surveys and pile driving on NARW and other marine mammals as a result of all of the proposed/active offshore wind projects (in various stages of permitting) from Virginia to New England.

4. The BiOp does not include a numerical Level A assessment of the serious harm and fatality that can occur to the whale from Level B disturbances of its behavior, which are expected to significantly impair its navigation and communication capabilities.

5. ACK FOR WHALES contends all aspects of the BiOp's putative mitigation protocols exhibit deficiencies, including vessel speed itself, vessel speed restrictions, exemptions, soft-starts, protected species observers, passive acoustic monitoring, and seasonality restrictions.

6. With respect to vessel speeds in general, NOAA is proposing a 6-month speed restriction zone coastwide, for all vessels 35 feet and longer. See here: https://www.fisheries.noaa.gov/feature-story/rule-amend-north-atlantic-right-whale-vessel-speed-regulations-closed-comment

   https://media.fisheries.noaa.gov/2022-07/Proposed_Seasonal_Speed_Zones_and_Current_Seasonal_Management_Areas_Map_508.pdf.
   So, if that area is important enough to the whales to have it become essentially shut down to all fast vessel traffic for 6 months of the year, because NOAA doesn't think the existing measures are enough, how can multiple HRG surveys be allowed to operate in the area simultaneously, and the Project alone expecting up to 6,700[2] total round trips to ports during the entire construction period. If NOAA is looking to establish this coastwide 6 month of the year 10 kt speed restriction zone, covering the Project and all the other leases, then why isn't that measure at the very least required for the project itself, for all vessels?

[2] https://repository.library.noaa.gov/view/noaa/60610

LAW OFFICE OF
THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

Why isn't this measure incorporated into the BiOp? As such, ACK FOR WHALES contends that the BiOp's current vessel speed restrictions are inadequate.

7. The BiOp does not adequately explain the critical importance of the area off New Jersey in allowing the right whale to pass through in its migration.

8. In the BiOp, NMFS assumes an unsupported 10 dB pile driving noise loss attenuation from bubble curtains or similar system. The BiOp discusses in some length a double, big bubble curtain, combined with another noise abatement system, apparently in an attempt to overcome the failure of the Vineyard Wind system. It also discusses successes with these devices for lower power turbines. Unfortunately, this misses the key technical and scientific points. The larger turbines generate more of their energy at lower frequencies, and much of the lower frequency noise energy is transmitted down the foundation into the seabed where it then travels, bypassing the bubble curtains, and emerges back into the water column downstream. The larger diameter bubble curtains are also unstable due to the difficulty of sustaining the higher radius bubbles needed to constrain the lower frequency noise. Therefore, these systems are inherently limited for the large turbines proposed.

9. In the BiOp, too much reliance is placed on visual spotter observation and passive acoustic monitoring devices to detect whale presence, and take mitigating actions, that are not supported by study results of their effectiveness. Three visual spotters cannot effectuate a 1900-meter visibility distance for the clearance and shutdown zones. A 12,000-meter Passive Acoustic Monitoring (PAM) monitoring zone would require tens of monitors continuously redeployed as the pile driving location moves. No such robust system is proposed, nor is the real-time nature of the system or the expertise of the operators.

10. In 77 FR 50290, cited by *NRDC v. Pritzker*, 62 F. Supp. 3d 969 (N.D. Cal. 2014), the cited efficacies for passive acoustic monitoring ("PAM") and protected species observers ("PSO") are 25% and 9% respectively.

11. As to PAM, in *Native Village of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031 (D. Alaska 2013), the Court discussed defendant Apache Alaska Corporation's acknowledgement regarding the material limitations of acoustic monitoring: "Apache's application acoustic monitoring has limitations for detecting marine mammals because 'it requires that the animals produce sounds . . . [and] it requires those sounds to be of sufficient amplitude to be detected at the monitoring location.' The 'received levels of the biological sounds [also must] exceed background noise and other measurement noise. . .'" Id. at 1043-44.

LAW OFFICE OF
THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

12. PSOs are riddled with numerous limitations, including observer independence, bias, elevation of observation platform, weather conditions and visibility, opacity of the water, among other variables. These observers cannot effectively see beneath the surface of the water, and in terms of distance, the absolute "best" case scenario is observability out to 1-1.5km.

13. The BiOp attempts to discredit the work of Stober and Thompson in predicting noise levels for the larger turbines by stating that the authors did not do any in field measurements to validate their predictions (Yet, inconsistently, the BiOp readily accepts modelling data in various other contexts such as right whale distribution/density and acoustic modelling/pile driving noise), but fails to point out that such measurements are impossible to do because none of the larger turbines are installed yet. It points to the uncertainty in the predictions which of course exist, but those uncertainties are not sufficient to discredit the reliability of using their data to predict the source level of larger turbines.

14. Therefore, the BiOp incorrectly determined that Stober and Thomsen (2021)[3] is not considered the best available scientific information on underwater noise likely to result from operation of 10 MW or larger turbines. The turbines here, for the Project, will exhibit capacities up to 15 MW.[4]

15. Stober considers a variety of important factors that make its findings highly germane to the Project.

16. The BiOp incorrectly concludes that Elliot et al. 2019 represents the best available data on operational noise that can be expected from the operation of The Project's turbines. That cannot be the case because that study dealt with 6-megawatt turbines, whose noise source intensity levels are thousands of times less than the 15-megawatt turbines to be used here.

17. The BiOp asserts, without evidence, regarding operational noise, "this suggests that in areas with consistent vessel traffic, such as The Project lease area, operational noise may not be detectable above ambient noise and, therefore, would be unlikely to result in any behavioral response by any whale, sea turtle, or sturgeon." These assertions are inaccurate

[3] Stober U, Thomsen F. 2021. How could operational underwater sound from future offshore wind turbines impact marine life? J Acoust Soc Am. 2021 Mar;149(3):1791. doi: 10.1121/10.0003760. PMID: 33765823
[4] https://repository.library.noaa.gov/view/noaa/60610, page 197.

LAW OFFICE OF
THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

and grossly underestimate the impact of operational noise on marine mammals, including the NARW.

18. There is general scientific consensus that the whale will try to avoid or stand-off from continuous noise above 120 dB.

19. There are no practical, observational mitigation measures that can be applied in an operational turbine setting.

20. The BiOp does not provide the number of estimated vessel miles traveled. It only provides vessel trips, which does not disclose the length of those trips. The length of the trips more accurately serves to assess the risk posed to whales and other marine mammals. As such, a complete analysis on vessel strike risk to NARWs and other listed species cannot be conducted.

21. The BiOp fails to cite evidence for the assertion, "Up to two monopiles could be installed per day. When accounting for pre-piling preparatory work and post-piling activities, installation of a single monopile or jacket pile will take approximately 6–13 hours."

22. The BiOp does not clearly disclose the quantity of vessel miles or trips required for cable laying, cables connections, and otherwise, cable installation or maintenance related activities. Accordingly, the BiOp underestimates, under-analyzes, and/or underreports the impacts of vessel strikes on NARWs and other listed species.

23. The BiOp's glaring omission of vessel miles, particularly in view of the fact that most of the potential port locations will require hundreds of vessel trips (and even thousands, for construction), the more accurate assessment of risk vessel strikes on NARW or other marine mammals cannot be ascertained.

24. The BiOp's take estimates are inaccurate, and underestimated, for pile driving related activities, cable landfall, and high-resolution geophysical surveys.

25. The BiOp's proposed mitigation measures, including: "The proposed mitigation measures include restrictions on pile driving, establishment of clearance zones for all activities, shutdown measures, soft start of pile driving, ramp up of HRG sources, noise mitigation for impact pile driving, and vessel strike avoidance measures" all exhibit varying degrees of insufficiency and ineffectiveness. Taken together, they will not prevent the Project from jeopardizing the NARW.

LAW OFFICE OF THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

26. The BiOp fails to cite, analyze or otherwise use or consider (pursuant to ESA regulations) the salient data related to the NARWs' birth rates, death rates, and calving rates. It fails to cite or discuss the 7.6-year calving rate.[5] Further, detected NARW mortalities outnumber births 3:2. Id.

27. Likewise, the BiOp contains no analysis of the fact that the population dynamics of the NARW have altered significantly, and that the potential biological removal threshold for NARW has dropped to 0.7.[6] This implies that less than one NARW can be killed through anthropogenic activities and still maintain / recover to its optimal sustainable population size.

28. The BiOp contains no analysis of the fact that approximately 48 NARW have died in entanglements 2010-18, and that deaths recorded are only 36% of actual deaths, per a study commissioned by the NMFS.[7] The entanglement risk is higher than postulated by NMFS, and there is little evidence for the conclusion, "We have concluded that capture or entanglement of a right whale and any associated injury or mortality is not an expected outcome..." BiOp, p. 457. Note that vertical buoy lines, which are utilized in the region within which the project is proposed, can significantly enhance the risk of entanglements. These risks were insufficiently analyzed.

29. Pile driving disruption to foraging behavior caused by the noise can lead to increased time at surface. NARW are one of the species most frequently impacted by collisions, and ship strikes are a leading cause of mortality in NARW. This increased time at surface could increase their probability of being struck, especially since NARW do not appear to present evasive behaviors in the presence of approaching ships / ship noise.

30. The assumption of a bubble curtain attenuation of 10db is significantly overestimated, especially for the low frequency and noise emitted by these larger turbines.

31. The operational noise may increase stress or cause longer displacements from the area. Noise increases the stress levels of NARWs.

---

[5] Pettis, H. M., R. M. Pace, III, and P. K. Hamilton. 2021. North Atlantic Right Whale Consortium 2020 annual report card.

[6] https://www.federalregister.gov/documents/2023/02/03/2023-02185/taking-of-marine-mammals-incidental-to-commercial-fishing-operations-atlantic-large-whale-take#:~:text=The%20North%20Atlantic%20right%20whale%20is%20listed%20as%20an%20endangered,Atlantic%20fisheries%20on%20right%20whales.

[7] Richard M. Pace et al., Cryptic Mortality of North Atlantic Right Whales, 3 Conservation Sci. and Practice 1, 6 (2021), "We used an abundance estimation model to derive estimates of cryptic mortality for North Atlantic right whales and found that observed carcasses accounted for only 36% of all estimated death during 1990–2017 [emphasis added]." Study commissioned by NMFS.

LAW OFFICE OF
THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

32. Operational noise may have longer term impacts on the overall health of whales by increasing their stress with the increased noise. Baleen whales have many behavioral responses to impulsive noises well below the current 160 dB threshold. Wood et al., (2012) predict a 50% probability of disturbance of migrating baleen whales at 140 dB. Avoidance behaviors due to the noise may increase the risk of ship strike and/or increase energetic demand of NARW.

33. The Project's NARW take estimates for HRG surveys, pile driving, and every phase of the project, are grossly underestimated.

34. The BiOp fails to utilize the best available scientific evidence on operational noise, pile driving, entanglements, population baseline, recovery, and survival, and otherwise, all aspects of this Project.

35. It is not a certainty that the PSOs will be of sufficient independence and objectivity to accurately report whale detections. The BiOp notes that the PSOs will be NMFS approved for trained crew members. This is not the paradigmatic example of independence. How can confidence be expressed in terms of sufficient objectivity?

36. The BiOp provides, "At least four PSOs must be actively observing marine mammals before, during, and after installation of foundation piles (*i.e.*, monopiles and pin piles). At least two PSOs must be stationed and observing on the pile driving vessel and at least two PSOs must be stationed on a secondary, PSO-dedicated vessel. Concurrently, at least one PAM operator must be actively monitoring for marine mammals with PAM before, during, and after impact pile driving." Both the number of PSOs and PAM operators are significantly insufficient.

37. The BiOp does not exclude overnight HRG surveying or pile driving. How can the already very low efficacy of PSOs be maintained overnight? At 9% efficacy during daylight hours, PSOs will be virtually useless overnight. These are pernicious and arbitrary determinations for the NARWs. While pile driving initiation must not occur during the night, it is permitted to continue during the night. The BiOp does not acknowledge the limitations of PSOs at night or in general.

38. The BiOp does not adequately address the project's construction and operational impacts on NARW navigation, communication, migration, and behavior.

LAW OFFICE OF
THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

39. The BiOp does not adequately address the project's impacts, at any phase, on the behavior of NARWs and other marine mammals, and the resultant potential strandings, vessel strikes, entanglements, or other injuries and deaths that can eventuate from the project's noise or activities.

40. The BiOp concludes, arbitrarily and capriciously, on page 459-460 of the BiOp, "While we do not anticipate these effects to have long-term consequences, these behavioral consequences, combined with TTS, are expected to create a short-term likelihood of injury by substantially disturbing normal behavioral patterns as the disturbance is experienced: these adverse effects thus meet NMFS's interim guidance definition of take by harassment under the ESA. These adverse effects will be experienced by up to 101 individual right whales as a result of exposure to noise from pile driving. As explained in section 7 of this Opinion, these effects do not meet the ESA definition of harm. No harm, injury (auditory or other), serious injury, or mortality is expected due to exposure to any aspect of the proposed action during the construction, operations, or decommissioning phases of the project."

41. The BiOp states, "North Atlantic right whales' resilience to future perturbations affecting health, reproduction, and survival is expected to be very low," (page 69), but yet does not analyze this fact in its jeopardy assessment.

42. The BiOp admits: "Large whales also do not have to be at the water's surface to be struck." Page 306. Yet, the PSOs have little to no efficacy in detecting sub-surface whales.

43. The BiOp arbitrarily utilizes the proxy of Block Island Wind Farm (5 wind turbines) for the Project's operational noise impacts.

44. The BiOp arbitrarily assumes that soft-starts will cause NARWs to leave the area temporarily.

45. The BiOp does not account for the potential of subsurface vessel strikes on marine mammals or NARWs in the take or jeopardy analysis.

46. The BiOp's reasonable and prudent measures feature very little analysis on prevention of vessel strikes.

LAW OFFICE OF
THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

47. The BiOp does not discuss or cite the 7.6-year calving interval for the NARW.

48. The BiOp does not discuss or cite the fact that NARW mortalities outnumber births 3:2.

49. The BiOp fails to examine whether any phase of the project will increase water turbidity, and such concomitant effect on the NARW. This is important particularly in view of the NARW's strong reliance on eyesight.

50. The BiOp ephemerally references auditory masking in the context of vessel noise and cable installation:

    "Marine mammals may experience masking due to vessel noises. For example, right whales were observed to shift the frequency content of their calls upward while reducing the rate of calling in areas of increased anthropogenic noise (Parks et al. 2007a) as well as increasing the amplitude (intensity) of their calls (Parks et al. 2011a; Parks et al. 2009). Right whales also had their communication space reduced by up to 84 percent in the presence of vessels (Clark et al. 2009a). Although humpback whales did not change the frequency or duration of their vocalizations in the presence of ship noise, their source levels were lower than expected, potentially indicating some signal masking (Dunlop 2016)." P 247, BiOp.

    However, no analysis is provided on the implications of this 84% reduction in NARW communication space in the presence of vessels. This is a significant datapoint that warrants more much considered analysis. The auditory masking effect on the NARW could lead to a variety of negative consequences, potentially even leading to loss of navigational capacity, orientation, or injury and death via other, secondary causes.

51. The BiOp notes that the NARW population continues to decline and prey availability is low, yet, these factors are downplayed and received insufficient analysis in the BiOp.

52. The BiOp contains no discussion about whether the Project will destructively interfere with the NARW's recovery goals. See, p. 75-76.

53. The BiOp states, at p. 171, "As noted above, in the Environmental Baseline section of an Opinion, we consider the past and present impacts of all federal, state, or private activities and the anticipated impacts of all proposed federal actions that have already undergone Section 7 consultation." However, all proposed projects are excluded from the cumulative

LAW OFFICE OF
THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

analysis. This is a major deficiency in the BiOp's cumulative analysis of baseline conditions.

54. The BiOp does not actually "use" or "consider" much of the data it presents, pursuant to the ESA regulations (use best available data). The dictionary definition of "use" and "consider" is to avail oneself of, and think about carefully. The BiOp, on numerous occasions, fails to sedulously examine the datapoints and discuss them in a synergistic manner.

55. The BiOp does not analyze the cumulative, synergistic effects of vessel noise and pile driving noise, especially in view of the fact that vessels will often be traversing the area contemporaneous with pile driving activities.

56. The BiOp does not assess whether Naval operations are included in the environmental baseline analysis. If naval operations were to be included in the analysis, such analysis should assess the synergistic impact of noise emanating from pile driving, vessels propagating, and any adjacent naval activities.

57. The BiOp fails to analyze or discuss the noise interference that can occur with PAM – background, measurement, anthropogenic, or otherwise. There are a variety of disparate sources of noise that can contaminate a whale's vocalization signal, and prevent same from being received at the monitoring location. These variables are undiscussed.

58. While the BiOp avers that no Level A NARW takes will occur, it predicts that other whales will suffer Level A harassment. This is an inconsistency that cannot be reconciled in the BiOp. Furthermore, the total Level B takes of 126 and maximum annual takes of 60 violate the ESA and MMPA.[8]

59. In order for soft-starts to work, the undergirding assumption is that the mammals' avoidance response will initiate, causing it to deter / evacuate the region. A study conducted by Compton, et al. (2008) demonstrated that some mammals may, paradoxically, be attracted – not repelled – by weaker sounds, thus exposed to potentially harmful sounds as the noise level increases.[9]

[8] https://www.fisheries.noaa.gov/s3/2024-07/MAAvangrid-2024LOA-LOA-OPR1.pdf

[9] Compton, et al., A critical examination of worldwide guidelines for minimizing the disturbance to marine mammals during seismic surveys (2008), https://www.sciencedirect.com/science/article/abs/pii/S0308597X07000607

LAW OFFICE OF THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

60. A study examining short-finned whales in the context of soft-starts found that the whales, initially moved away, but then remained within 900 meters of the vessel as it passed by.[10]

61. Another soft-start study on humpback whales found that the whales slowed their speed toward the vessels, but importantly, did not alter their course.[11]

62. Moreover, soft start procedures can actually increase the total amount of acoustic energy emanated into the ocean environment, thereby worsening impacts to marine mammals and whales.

63. The BiOp considers none of these possibilities or the above cited data.

64. A study explained that, "Single transits of a management zone by visual surveys were only able to reliably (>0.5 probability) detect right whales when more than 20 whales were present. Twenty or more transits were required to reliably detect a single right whale."[12] This exemplifies the absence of efficacy associated with PSOs. Visual detection of NARWs is extremely difficult when NARWs are not grouped together in larger numbers.

65. The BiOp does not analyze any of this information or consider it. Soft-starts, PSOs, and PAM have low-efficacy.

66. The BiOp's implicit assumption that whales will avoid the areas of noise during 3-hour pile driving intervals is unsubstantiated and entirely speculative. Especially in view of the soft-start data, it is unlikely that whales significantly change their course in the presence of soft-starts. The impact and damage from pile driving noise is and will be greater than the BiOp anticipates.

67. There is no evidence that the BiOp examines the cumulative impact of multiple consecutive days of minimum 3-hour pile driving events on NARWs or any whale for that matter. This

---

[10] Weir C.R. (2008) Short-finned pilot whales (Globicephala macrorhynchus) respond to an airgun ramp-up procedure off Gabon. Aquatic Mammals, 34, 349-354. https://www.researchgate.net/publication/228404124_Short-Finned_Pilot_Whales_Globicephala_macrorhynchus_Respond_to_an_Airgun_Ramp-up_Procedure_off_Gabon

[11] Dunlop R.A., Noad M.J., McCauley R.D., Kniest E., Slade R., Paton D. & Cato D.H. (2016) Response of humpback whales (Megaptera novaeangliae) to ramp-up of a small experimental air gun array. Marine Pollution Bulletin, 103, 72-83. https://pubmed.ncbi.nlm.nih.gov/26781958/

[12] https://conbio.onlinelibrary.wiley.com/doi/full/10.1111/csp2.12866#:~:text=Acoustic%20surveys%20by%20Slocum%20gliders,detection%20range%20of%20acoustic%20platforms.

LAW OFFICE OF
THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

cumulative receipt of energy over the course of days and weeks could yield behavioral disturbances and injuries unaccounted for in the take estimates.

68. The BiOp contains insufficient and inadequate analysis on the impact of the project's activities on the NARW's foraging, critical habitat, and migration.

69. The BiOp contains no significant analysis of the impact of the project's various stages on the NARW's stress response (or the stress response of other marine mammals).

70. The potential for pile driving noise to compel NARW into entanglements nearby is undiscussed.

71. The potential for operational noise to compel the NARW into vessels or entanglements nearby is undiscussed.

72. The following piece of information disclosed by the BiOp seriously undercuts the efficacy and reliance on PSOs, as whales can be struck by vessels sub-surface. Given PSOs efficacy is constrained to the surface, PSOs will entirely fail to detect sub-surface strikes/potential strikes.

"Large whales also do not have to be at the water's surface to be struck. In a study that used scale models of a container ship and a right whale in experimental flow tanks designed to characterize the hydrodynamic effects near a moving hull that may cause a whale to be drawn to or repelled from the hull, Silber et al. (2010) found when a whale is below the surface (about one to two times the vessel draft), there is likely to be a pronounced propeller suction effect. This modeling suggests that in certain circumstances, particularly with large, fast-moving ships and whales submerged near the ship, this suction effect may draw the whale closer to the propeller, increasing the probability of propeller strikes." P. 306.

73. The BiOp's reliance on adjunctive PSOs and PAM as the principal mitigation measure is improper, misguided, and unsubstantiated.

74. The BiOp does not analyze the project's potential to cause takes of other federally listed ESA species, including birds.

75. Similarly, no basis is provided for a 10,000-meter PAM monitoring zone. A PAM monitor is only reasonably effective at 500 meters. A 10,000-meter monitoring zone would require scores of PAM monitors, and that is clearly not being provided for here. It is also not clear

LAW OFFICE OF
THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

whether the PAM monitors are operating in real time or collecting data over what is referred to on page 51 of the BiOp as "an identified amount of time."

76. The BiOp fails to consider that there is no independent verification of the modelling, noise dissipation factors, auditory functions, or generally, the noise modelling, associated with The Project in any phase of its development.

77. The BiOp entirely ignores and fails to analyze the statistically anomalous increase in whale strandings in the NJ/NY Bight from late 2022-through 2023. There were whale strandings in MA and RI during the same time as well, further evincing this correlation.

78. A NAS study identifies various inimical ecological impacts due to offshore wind energy development, including the potential hydrodynamic impacts of offshore wind on the Nantucket Shoals regional ecology, namely, how the installation and operation of wind projects can modulate physical processes like tidal, waves, and currents. It further underscores concerns about how the changes might influence the stratification, circulation patterns, and by extension, the availability of critical whale prey (zooplankton), especially salient for the NARW.

**Conclusion**

In view of the aforesaid points, the NMFS' and BOEM' reliance on the Project's BiOp issued February 16, 2024 is arbitrary and capricious. The BiOp is replete with legal inadequacies and arbitrary determinations. It fails to consider salient facts. When it does cite integral information, it insufficiently analyzes that information, and neglects to conduct synergistic and cumulative analyses. The BiOp's authorization of incidental takings of federally listed species including NARWs is improper, given the predicate of its no jeopardy conclusion does not employ the best available scientific data (within the meaning of the ESA) on numerous issues. The BiOp's multifarious deficiencies render the conclusion of "no jeopardy" arbitrary and capricious.

Note further that "a federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species" merely by relying on a biological opinion . . . Reliance on a biological opinion that is legally flawed or that fails to consider information that would undercut the opinion's conclusions violates the substantive duties imposed by ESA §7." *Strahan v. Roughead*, 910 F.Supp. 358, 381 (D. Mass. 2012). See also, *Ctr. for Biological Diversity*, 698 F.3d at 1128; *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010).

If the deficiencies remained uncorrected, both NMFS and BOEM will be in violation of the ESA, through their failure to ensure through consultation that the project's impacts will not jeopardize the NARW. NMFS will be in violation of the ESA through its arbitrary and improper conclusion of "no jeopardy" to the NARW. Please be advised that if the NMFS does not rectify

LAW OFFICE OF
THOMAS STAVOLA JR, LLC

Law Office of Thomas Stavola, Jr., LLC
209 County Road 537, Colts Neck, NJ 07722
P: 732-790-0639 E: tstavolajr@stavolalaw.com

the hereinabove deficiencies within the 60-day notice period provided by statute, ACK For WHALES will commence suit in federal court and seek an order abrogating the BiOp.

Thank you for your careful consideration of these matters.

Respectfully submitted,

*/s/ Thomas Stavola, Jr. Esq.*

Thomas Stavola, Jr., Esq.
Law Office of Thomas Stavola, Jr., LLC
209 County Road 537
Colts Neck, NJ 07722
E: tstavolajr@stavolalaw.com
P: 732-790-0639

cc: ACK For Whales